IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE;
PRINCE GEORGE'S COUNTY MARYLAND;
PRINCE GEORGE'S COUNTY
MARYLAND NAACP BRANCH;
ROBERT E. ROSS; and H. ELIZABETH
JOHNSON,

     *Plaintiffs*,

     v.

BUREAU OF THE CENSUS; RON JARMIN,
Acting Director, Bureau of the Census;
WILBUR ROSS, Secretary of Commerce;
DONALD TRUMP, President of the United
States; and THE UNITED STATES,

     *Defendants.*

---

Civil Action No. _____

COMPLAINT

---

Article I, Section 2 of the United States Constitution imposes one of the few affirmative obligations on the federal government:  to conduct an "actual Enumeration" of all residents every ten years. Despite this duty, the United States has undercounted people of color since the nation's founding, starting with the decision to treat African American slaves as only three-fifths of a person. The Three-Fifths Clause appeared in the same constitutional provision that mandates a decennial census.

The failure fully to count African Americans has persisted to the present. In the 2010 Census, for example, there was a 2.1% net undercount of African Americans. Accordingly, in the past, federal officials have made considerable efforts to enumerate what the Census Bureau calls "hard-to-count" individuals, including African Americans, non-English speakers, and young people. These efforts reflect the recognition that an

1

inaccurate census hurts some communities more than others, depriving them of their constitutional right to representation and their fair share of resources.

The government's preparations for the 2020 Census, however, are so conspicuously deficient as to extend far beyond the failures of past censuses, such that they violate Defendants' constitutional duty to conduct an "actual Enumeration." U.S. Const., Art. I, § 2. Sufficient staffing, funding, and preparation in advance of the census are essential to such a monumental undertaking. Yet, only two years from the 2020 Census, the Census Bureau lacks both a permanent director and a deputy director. A presidential hiring freeze has limited the Bureau's capacity to fill routine staff vacancies. The Bureau also canceled essential field tests last year and two of three "dress rehearsal" sites this year.

Moreover, the Bureau's intention to adopt substantial new technologies for the 2020 Census makes these cancellations especially dangerous. Defendants are unprepared to conduct the first-ever digital census, which will exacerbate undercounts and leave the census vulnerable to cyber-attack. Despite these imminent threats to the accuracy and integrity of the 2020 Census, the Bureau has been operating on the cheap, without sufficient funding to address its many challenges.

These deficiencies will result in a massive undercount of communities of color. The effects of an inaccurate census will be felt across the country, and especially in places like Prince George's County, Maryland that are home to many "hard-to-count" people. Such a dramatic undercount will especially dilute the votes of racial and ethnic minorities, deprive their communities of critical federal funds, and undervalue their voices and interests in the political arena.

Plaintiffs the National Association for the Advancement of Colored People (NAACP), the Prince George's County Maryland Branch NAACP, Prince George's County, Robert Ross, and Elizabeth Johnson, ask this Court to address this grave and imminent threat to the accuracy of the census. Absent judicial intervention, Defendants will violate their constitutional obligation to conduct an actual enumeration of *all* people residing in the United States. Plaintiffs bring this action to compel Defendants to fulfill their constitutional duty.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Article III of the U.S. Constitution.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e) because Plaintiff Prince George's County Maryland NAACP Branch maintains its principal place of business in, Plaintiffs Robert Ross and Elizabeth Johnson reside in, and Plaintiff Prince George's County is located in, the District of Maryland, Southern Division; the events or omissions giving rise to the claim occurred in this district and division; and no real property is involved in the action.

3.      Venue is also proper pursuant to 28 U.S.C. § 1391(e) because Defendants Bureau of the Census and its Acting Director, Ron Jarmin, are located in Suitland, Maryland, also in the District of Maryland, Southern Division.

## PARTIES

4.      Plaintiff National Association for the Advancement of Colored People (NAACP), a § 501(c)(3) non-profit, is the nation's oldest and largest grassroots-based civil rights organization. Its mission is to ensure the political, educational, social, and

economic equality of rights of all persons and to eliminate race-based discrimination. The NAACP is headquartered in Baltimore, Maryland, and has over two thousand local units nationwide. These units have helped and will continue to help promote the accuracy of the census by conducting outreach to community members.

5.      Plaintiff Prince George's County Maryland NAACP Branch is the local affiliate of the NAACP in Prince George's County. It was founded in 1935. Hester V. King served as the first branch President and continued in that role for nearly thirty years, during which time she worked to desegregate the Upper Marlboro courthouse, schools, and other public accommodations in the county. Mrs. King also helped conduct a statewide drive for passage of an equal accommodations bill by the State Legislature. The branch is headquartered in Upper Marlboro, Maryland, and devotes resources to ensuring the voting rights of its members.

6.      Plaintiff Prince George's County is a majority African American county in southeastern Maryland. Prince George's County has been repeatedly undercounted in past censuses. In the 2000 Census, the undercount in the county was 1.91%, and in 2010, the net undercount was 2.3%. In 2010, the County suffered the largest net census undercount of any large county in Maryland, and one of the largest undercounts in the entire United States for any county of 100,000 or more residents. The County is allocated federal funds and political representation depending on its population as determined by the census.

7.      Plaintiff Robert Ross has resided in Prince George's County, Maryland since 2001 and has served as the President of the Prince George's County Maryland NAACP Branch since 2010. Mr. Ross drives on roads in Prince George's County that

depend on federal funding for upkeep and repair and in other ways is affected by the level of federal funding allocated to the County based on the census.

8.      Plaintiff Elizabeth Johnson has resided in Prince George's County, Maryland since 1974. Ms. Johnson serves on the Executive Committee of the Prince George's County Maryland NAACP Branch and chairs the Branch's Housing Committee. Ms. Johnson drives on roads in Prince George's County that depend on federal funding for upkeep and repair and in other ways is affected by the level of federal funding allocated to the County based on the census.

9.      Defendant the Bureau of the Census is the agency within the United States Department of Commerce that oversees and implements the decennial census. The Census Bureau is headquartered and maintains its principal offices in Suitland, Maryland.

10.     Defendant Ron Jarmin is currently performing the nonexclusive functions and duties of the Director of the Bureau of the Census, which is charged with completing the decennial census. He is sued in his official capacity.

11.     Defendant Secretary Wilbur Ross, as Secretary of the U.S. Department of Commerce, oversees all operations of the Department of Commerce, including the operations of the Census Bureau. He is sued in his official capacity.

12.      Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

13.     Defendant United States has a constitutional obligation to conduct an actual enumeration every ten years.

## FACTUAL ALLEGATIONS

14.     Article I, Section 2 of the Constitution requires the federal government to

conduct an "actual Enumeration," or count of every resident of the United States, every ten years.

15.     The federal government uses census data to allocate hundreds of billions of dollars in public funding. These funds considerably impact the public sector's ability to provide for high quality education, health care, housing, transportation, and other vital services.

16.     Census data is also used for seat apportionment in the U.S. House of Representatives; drawing boundaries for congressional districts and many state legislative districts; and voting rights enforcement.

17.     Maryland is among the states that use census data for purposes of state legislative districting.

### History and Background of the Census

18.     The Founders were deeply concerned with ensuring an accurate census. The founding generation knew that counts of residents have been conducted since ancient times, and as recently as the 1750s there had been significant public controversy over how to count the British population.

19.     The drafters of the Constitution also knew "that the calculation of populations could be and often were skewed for political or financial purposes," *Utah v. Evans,* 536 U.S. 452, 500 (2002) (Thomas, J., dissenting), and therefore sought to draft a constitutional provision that would avoid these problems.

20.     John Randolph, for example, in discussing the accuracy of the census, remarked that "if a fair representation of the people be not secured, the injustice of the government will shake it to its foundations."

21.     At the time of the first census, in 1790, the authorizing legislation required enumerators to visit each household, post completed census schedules in public places in every jurisdiction, and submit the final tally to the president.

## Recent Efforts to Promote an Accurate Census

22.     The census has historically undercounted racial and ethnic minorities.

23.     The Census Bureau has identified what it terms "hard-to-count" populations. These include racial and ethnic minorities, non-English speakers, lower income people, the homeless, undocumented immigrants, young and mobile people, children, LGBTQ individuals, and "persons who are angry at and/or distrust the government."

24.     In 2010, the census had a net undercount of 2.1% of African Americans and 1.5% of Hispanic Americans, according to an official government post-census study.

25.     The 2010 Census did not account for 1.5 million black and Hispanic residents, which would be enough people to fill two Congressional districts.

26.     The census has also undercounted other populations. In 2010, for example, home renters were undercounted by 1.1% and children under the age of five were undercounted by 4.6%.

27.     By contrast, the census has overcounted homeowners and non-Hispanic whites. In 2010, the net overcount was 0.6% for homeowners and 0.8% for non-Hispanic whites.

## Imminent Risk of a Constitutionally Deficient 2020 Census

28.     While past censuses have resulted in troubling undercounts of African Americans and other racial and ethnic minorities, Defendants' preparations for the 2020

Census are so deficient as to raise imminent concerns of a substantially greater undercount than in past years, particularly affecting such "hard-to-count" populations.

29.     The deficiencies risked by the 2020 Census preparations are not simply the result of a choice of methodology.  Rather, they are a result of conspicuous neglect of a constitutional duty, through underfunding, understaffing, and under-planning, inadequacies that are all the more dangerous because of the roll-out of untested new technology.

30.     Defendants are well behind the typical pace of funding, staffing and preparation at this stage of a census cycle, even before considering the ambitious technological approach that Defendants have decided to undertake.

31.     Given the size and scope of the decennial census, immediate relief is necessary to ensure that Defendants have ample opportunity to implement the changes necessary to ensure a constitutionally sufficient census.

### *Underfunding*

32.     The cost of the decennial census has roughly doubled each decade from 1970 to the present.

33.     However, Congress directed that the budget for the 2020 Census not exceed the cost of the 2010 enumeration.

34.     Typically, at this point in the preparations, funding for the Census Bureau escalates to prepare for the decennial census. Between 2007 and 2008, for example, the Bureau's budget increased 61 percent.

35.     However, Congress approved only $1.47 billion for the Census Bureau in the 2017 fiscal year, approximately 10 percent below what the Obama Administration had requested.

36.     The Trump Administration's 2018 budget request for the Census Bureau asked for an increase of only two percent from 2017 levels.

37.     The Department of Commerce has acknowledged the severity of underfunding. In October 2017, Defendant Ross told Congress that the lifecycle cost of the 2020 Census would be $3.3 billion above the original estimate and that the administration would request an additional $187 million for Fiscal Year 2018.

38.     Former Bureau officials, outside experts, members of Congress, and Government Accountability Office (GAO) staff have all expressed alarm about the Bureau's funding shortage.

39.     A senior GAO official recently testified that the cost estimate for the 2020 Census "was not reliable and did not adequately account for risk."

40.     Former Bureau Directors Kenneth Prewitt and Vincent Barabba described the 2020 Census as "under threat by uncertain funding."

41.     The two former directors explained, "This is a critical period in which to begin operations, including well-researched advertising messages, staffing and training an army of temporary workers, opening field offices and testing new technology. The Census Bureau cannot do any of this at the last minute, just as the Defense Department cannot prepare for military action when a threat is imminent."

42.     The Census Bureau has already had to scale back critical planning activities due to budgetary uncertainty and shortfalls.

43.     Then-Census Bureau Director John Thompson testified on May 3, 2017, at an oversight hearing of the House Committee on Appropriations that, "[i]n order to concentrate our resources on systems readiness in this fiscal year, we had to make difficult decisions to descope some aspects of the program and pause others."

44.     In recent months, Defendants have:

*canceled 2017 field tests in Puerto Rico, North Dakota, South Dakota, and Washington State;

*canceled two of three sites for the 2018 End-to-End Census Test, dress rehearsals that serve as the basis for many final decisions about decennial census methods and operations;

*delayed opening six Regional Census Centers.

45.     Moreover, in the nine West Virginia counties that Defendants eliminated from the 2018 test, 31 percent of the population lacks access to high-quality residential broadband. As a result, the Bureau will not be able to test its novel digitization strategy in rural areas that are most susceptible to undercounting, leaving virtually no opportunity to test census operations in rural communities before the 2020 Census.

46.     Due to inadequate funding, the Bureau has thus far hired only about 40 partnership specialists for this outreach effort in 2018.

47.     The damage caused by Hurricanes Harvey and Irma will also require considerable funding to ensure that affected communities are accurately counted. It is extremely unlikely that the Census Bureau will be able to devote additional resources to these areas, given the existing impact of underfunding on its planned operations.

48.     Lack of funding will also make it more difficult to assess inaccuracies in the final census count.

49.     The Census Bureau typically conducts a so-called Census Coverage Measurement, which evaluates the size of the undercount and overcount. Funding uncertainty has led the Bureau to pause planning for this program, and the Bureau will not test this operation in the 2018 End-to-End Test as planned.

50.     On March 23, 2018, the President signed an omnibus spending bill that allocated $2.814 billion to the Census Bureau, $2.544 billion of which is set aside for Periodic Censuses and Programs, including the 2020 Census.

51.     The report from the appropriations committee that accompanies the bill states that the omnibus "provides half of the amount needed for the 2020 Census for" fiscal years 2019 and 2020. Congress has not specified what portion of the fiscal year 2018 appropriation, if any, the Census Bureau should reserve to spend in fiscal years 2019 and 2020.

52.     This omnibus bill funds the government only through September 2018 and is inadequate to redress the long term and cumulative underfunding problems set forth above.

53.     There is no guarantee, and strong reason to doubt, that the Census Bureau will receive an increase in the current funding level for the 2020 Census after September 2018, as Congress consistently has failed to pass new spending bills for the subsequent fiscal year in a timely way. On March 23, 2018, upon signing the omnibus bill, President Trump stated: "There are a lot of things that we shouldn't have had in this bill, but we were, in a sense, forced — if we want to build our military — we were forced to have. There are some things that we should have in the bill . . . But I say to Congress: I will never sign another bill like this again.  I'm not going to do it again."

54.     The President's proposed Census Bureau budget of $3.8 billion for fiscal year 2019 is also far short of the funding necessary to conduct a fair and accurate census. By contrast, the Census Bureau received $4.2 billion in fiscal year 2009 to fund the 2010 Census.

### *Understaffing*

55.     On January 23, 2017, Defendant Trump issued a Presidential Memorandum instituting a hiring freeze throughout much of the executive branch. Hiring Freeze, 82 Fed. Reg. 8493 (Jan. 23, 2017).

56.     As of April 10, 2017, the hiring freeze had prevented filling at least 157 jobs at the Census Bureau.

57.     The Office of Management and Budget lifted the hiring freeze on April 12, 2017, but immediately imposed a new order directing agencies to submit plans for personnel cuts and other restructuring moves to fit the budget blueprint.

58.     The Department of Commerce has not publicly disclosed these plans, or how they will affect the Bureau's plans to hire up to half a million temporary workers to conduct the enumeration.

59.     The effect of the Presidential Memorandum and the subsequent personnel directive has been to prevent the Census Bureau from hiring staff necessary to ensure an "actual enumeration" in 2020.

### *Lack of Leadership*

60.     The Bureau lacks permanent or senior leadership.

61.     On May 9, 2017, just days after testifying to Congress about imminent threats to the accuracy and integrity of the 2020 count, then-Census Director John Thompson abruptly announced his resignation, effective June 30, 2017.

62.     Mr. Thompson was, at the time, statutorily eligible to serve until the end of 2017, and was eligible to be reappointed to a second five-year term.

63.     The President has not nominated a director of the Census Bureau.

64.     The position of deputy director also has been vacant since the previous deputy director stepped down in early 2017. The President has not posted the position to be filled through the competitive civil service process, as has been done historically.

65.     In November 2017, it was reported that the President selected Thomas Brunell as deputy director of the Census Bureau. Mr. Brunell's primary experience at the time was serving as an expert witness in defense of partisan and racial gerrymanders. After widespread criticism of his qualifications, Mr. Brunell withdrew from consideration.

66.     There are no pending nominees or candidates for director or deputy director for the 2020 Census.

### Design Flaws

67.     The Census Bureau's plans for the 2020 Census reflect serious design defects that, if unresolved, will exacerbate the undercount.

68.     These design problems include (a) the first-time large-scale use of on-line census forms instead of paper surveys delivered by mail; (b) the failure to safeguard on-line census systems from cyber threats; (c) a significant reduction in on-the-ground

presence and field workers; and (d) improper reliance on state administrative databases of varying quality.

69.     The Census Bureau will digitize the census for the first time in 2020.

70.     The 2020 Census will deploy electronic and internet-based tools to collect responses. Such digitization is a radical departure from the paper and in-person methods used in all previous censuses.

71.     The 2010 Census delivered approximately 360 million questionnaires to 133 million housing units.

72.     This cycle, Defendants instead intend to encourage self-response primarily by internet and to reduce the number of in-person visits to households that do not self-respond.

73.     In 2020, Defendants will mail census questionnaires initially to only 20 percent of U.S. households.

74.     Defendants will mail the remaining 80 percent of U.S. households a notification inviting them to complete the census questionnaire online. Should these households not complete the questionnaire online or by telephone, Defendants plan to mail a paper version.

75.     A largely online census will likely have a devastating impact on communities that have low or little access to reliable broadband internet, many of which are communities of color and low-income households.

76.     The "digital divide" in the U.S. is stark. Only half of households earning incomes less than $30,000 per year have access to broadband internet.

77.     In addition, many rural residents have significantly reduced access to the internet.

78.     Communities of color, including African Americans and Hispanics, are more likely to have reduced access to internet than their White counterparts.

79.     Defendants' design flaws, coupled with their insufficient funding, planning and staffing deficiencies, have left them unprepared for the challenges that digitization presents.

80.     At a recent congressional hearing, Defendant Ross admitted that, of the forty-three technology systems the Bureau is supposed to prepare for testing in 2018, Defendants have completed development of only *four*, and less than half of the forty-three systems have some functionality.

81.     Digitizing the census also raises significant cybersecurity concerns.

82.     The Census Bureau has not explained how it will protect the personal information of hundreds of millions of Americans.

83.     Moreover, the Bureau's cancellation of planned tests deprives it of comprehensive opportunities to test critical cybersecurity infrastructure.

84.     These technical issues are compounded by the fact that even *perceived* data insecurity could dissuade digital responses, in light of recent high-profile and large-scale data breaches for clients of Equifax, Yahoo!, and Uber, among others.

85.     The Census Bureau has also decided to cut its on-the-ground presence and field infrastructure significantly. It has reduced the number of area offices and workers, and will conduct in-person visits at a fraction of past rates.

86.     In conducting the census, the Census Bureau typically makes initial contact with households via mail, and follows up with in-person visits if there is no response. Households that do not respond to the initial mailing are characterized as "hard-to-count."

87.     In prior censuses, the Census Bureau has made in-person visits to households up to six times in order to ensure completion of census forms.

88.     For the 2020 Census, the Census Bureau proposes to conduct only one in-person visit to each household.

89.     If the in-person visit is unsuccessful, the Census Bureau plans to use federal and state administrative records to attempt to determine the residents for an undetermined number of the households that have not responded.

90.     State administrative data is often unreliable and of poor quality, and the quality of the information between states varies significantly. Moreover, these databases generally do not include data that the census collects with respect to race, ethnicity, and the relationship of household members to each other.

91.     The Census Bureau has not yet reached agreements with all states to use the states' administrative databases. If the Census Bureau fails to secure agreements with all states, this failure will result in inconsistent counting methodologies between states.

92.     The Census Bureau plans to use state administrative data as a substitute for in-person enumeration only for those households that are already "hard-to-count," including communities of color. Using unreliable state data as the basis for compiling final census data for households that are disproportionately minority and low-income will lead to an even higher undercount for these groups.

93.     State administrative databases often lack accurate data on young children and undocumented individuals.

94.     Because many states do not collect data on race and ethnicity, using state administrative data would create incomplete census records, and would harm communities of color during the post-2020 redistricting process.

**The Impact of Defendants' Failings on Plaintiffs**

95.     Plaintiff Prince George's County is the only majority African American county in the state of Maryland. It was the nation's first majority African American suburban county.

96.     Prince George's County is well-known for its status as an African-American middle-class community. For example, the Brookings Institution has described Prince George's County as "a pathway to the middle class for large numbers of lower-income, working minorities."

97.     Prince George's County has been hailed by residents and civil rights advocates alike as representing a model of racial and economic integration, interracial communal relations, and African American political, academic, and economic leadership.

98.     However, census undercounts have threatened this model, causing political and economic harm to Prince George's County.

99.     The Census Bureau has characterized parts of Prince George's County as "hard-to-count," and the County has faced consistent census undercounts.

100.    In the 1990, 2000, and 2010 Censuses, the County's net undercounts were 3.0%, 1.91%, and 2.3% respectively.

101.    In 2010, Prince George's County had the highest net undercount of any county in Maryland, and one of the highest net undercounts *in the nation* among counties with 100,000 residents or more.

102.    This undercount data is all the more significant given that the net undercount is the rate of omissions offset by the number of erroneous enumerations (people counted twice or included by mistake).

103.    Accordingly, in the 2010 Census, the total rate of omissions amounted to 8.3% of Prince George's County residents—or approximately 73,351 individuals.

104.    After the 1990 Census, the Chairman of the County Planning Board concluded that had the census count been accurate, the County would have received $20 million more in federal funds per year, or a total of $200 million in grants and loans over the course of the decade.

105.    Based on the 2000 Census undercount, the County lost almost $27 million in federal funding for eight prominent federal programs between 2002 and 2012.

106.    Defendants' current failings threaten to result in a significantly higher undercount for Prince George's County, leading to an even greater loss of funding.

107.    A census undercount carries with it significant political consequences as well. The state legislature uses census data for state and congressional redistricting purposes. An undercount in Prince George's County therefore deprives county residents of fair and equitable representation in the state legislature and in Congress.

108.    Moreover, Defendants' failure to conduct a constitutionally sufficient census and the resulting dramatic undercount of Prince George's County residents

increases the risk of Maryland losing seats in Congress. This loss would deprive Prince George's County residents of fair and equitable representation.

109.     NAACP members, including Prince George's County residents Robert Ross and Elizabeth Johnson, and the organization itself face actual and imminent injuries based on Defendants' constitutional violations.

110.     NAACP members face impending and imminent political underrepresentation and loss of federal funding. This has frustrated the core of the NAACP's mission to ensure the welfare of communities of color.

111.     The NAACP organization has also had to divert resources from other pressing concerns in order to address Defendants' shortcomings. For example, the NAACP organization is preparing to provide extensive training for NAACP members on how to compensate for Defendants' inadequate preparations for the 2020 Census.

112.     Similarly, Prince George's County Maryland Branch NAACP members also face actual and imminent injury.

113.     Branch members face impending political underrepresentation. Branch members also face imminent injury due to the loss of federal funding that would result from an undercount of the Prince George's County population.

114.     The Branch faces an impending need to expend substantial resources to educate community members about the importance of the census and to encourage them to respond to the census questionnaire.

115.     The harm faced by all Plaintiffs is impending as of the date of the filing of this lawsuit. Defendants' unconstitutional failures to fund, staff, and plan for the 2020 Census are compounding with each day that the 2020 Census draws nearer.

116.    Defendants' choices in procedures, such as their approach to digitization, and cut-back in field and mailing outreach, have already been made.  As Defendants have already decided on these approaches for the 2020 Census, Plaintiffs are at imminent risk of harm.

117.    If a court does not act promptly to remedy these constitutional failures, the deficiencies currently present in the 2020 Census will become irremediable, and there will be no amount of funding, hiring, or appropriate planning that can fix the serious existing deficiencies in time for the census.

## CAUSE OF ACTION

## COUNT 1: ACTUAL ENUMERATION

118.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 117 of the complaint.

119.    The Constitution obligates Defendants to conduct a fair and accurate count of all persons in the United States in 2020.

120.    Defendants have already cancelled numerous important field tests and dress rehearsals in 2017 and 2018. Defendants have thus squandered priceless opportunities to ensure that adequate systems and plans are in place for the 2020 Census.

121.    Defendants have adopted a program for the 2020 Census that is understaffed and underfunded, that lacks leadership, that inadequately addresses the challenge of reaching hard-to-count populations, and that fails to safeguard the census from cyber-attack.

122.    Defendants have violated and are at imminent risk of violating the "actual Enumeration" clause of the United States Constitution, Art. I § 2 cl. 3.

123.     Defendants' violation will lead to an undercount of racial and ethnic minorities and harm the Plaintiffs.  This violation will deprive Plaintiffs of their constitutional right to representation and their fair share of resources.

124.     Defendants' violation has caused and will continue to cause ongoing, irreparable harm to Plaintiffs.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Assume jurisdiction over this matter;

2.     Declare that the Defendants are obligated to ensure an accurate actual enumeration of the people;

3.     Enjoin Defendants from violating their constitutional duty to conduct an accurate actual enumeration of the people;

4.     Enter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that hard-to-count populations will be actually enumerated in the decennial census; and

5.     Grant any other and further relief the Court deems appropriate.

Respectfully submitted,

/s/ Michael J. Wishnie

Benjamin Alter[*]
Varun Char[*]
Sameer Jaywant[*]
Erinma Kalu[*]
Brandon Levin[*]
Abigail Olson[*]
Joseph Schottenfeld[*]
Charlotte Schwartz[*]

Jeffrey Zalesin[*]
Michael J. Wishnie (Bar No. 20350)
Rule of Law Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511
Tel: (203) 436-4780
Fax: (203) 432-1426
michael.wishnie@ylsclinics.org

_____
[*] Law student interns. Petition to practice forthcoming.

*Counsel for all Plaintiffs*

Jeremy M. Creelan[**]
Susan J. Kohlmann[**]
Jacob D. Alderdice[**]
Jonathan M. Diaz[**]
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3908
*Counsel for all Plaintiffs*

Bradford M. Berry[**]
Janette Louard[**]
Anson Asaka[**]
Khyla Craine[**]
National Association for the
Advancement
 of Colored People, Inc.
4805 Mt. Hope Drive

Baltimore, MD 21215
Tel: (410) 580-5797
Fax: (410) 358-9350
*Counsel for Plaintiff NAACP*

---

[**] Motion for admission *pro hac vice*
forthcoming