**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

<table>
<tr><td>

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE, *et al.*,

Plaintiffs,

v.

BUREAU OF THE CENSUS, *et al.*,

Defendants.

</td><td>

No. 8:18-cv-00891 PWG

</td></tr>
</table>

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

BACKGROUND...................................................................................................................2

I.      CONSTITUTIONAL AND STATUTORY AUTHORITY FOR THE CENSUS ...............2

II.      2020 CENSUS PROCEDURES AND PLANS TO MINIMIZE NON-RESPONSE .........3

LEGAL STANDARDS ........................................................................................................5

ARGUMENT .......................................................................................................................7

I.      THIS CASE IS NOT JUSTICIABLE..........................................................................7

     A.      Plaintiffs Lack Standing To Maintain this Action. ...........................................7

         1.      Plaintiffs' allegations of injury are too attenuated and speculative....................8

         2.      Plaintiffs' alleged injuries are not fairly traceable to the challenged action. ...13

         3.      This Court cannot redress Plaintiffs' alleged injuries. .......................................15

     B.      Plaintiffs' Claim is Not Ripe. ........................................................................16

     C.      Plaintiffs' Suit Is Barred by the Political Question Doctrine. ........................18

         1.      All of Plaintiffs' complaints are textually committed to the Political Branches..................................................................................................................20

         2.      The Court has no judicially manageable standards to make the necessarily policy-based determinations regarding the census.........................22

II.      PLAINTIFFS FAIL TO STATE AN ENUMERATION CLAUSE CLAIM......................25

III.      THE PRESIDENT AND THE UNITED STATES SHOULD BE DISMISSED .............29

CONCLUSION ...................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................... 6

*Baker v. Carr,*
   369 U.S. 186 (1962) ............................................................................................ 19

*Beck v. McDonald,*
   848 F.3d 262 (4th Cir. 2017), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017) .... 5, 6, 7, 8

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................... 6

*Bennett v. Spear,*
   520 U.S. 154 (1997) ......................................................................................... 13, 14

*Carey v. Klutznick,*
   653 F.2d 732 (2d Cir. 1981) ............................................................................... 26

*Cincinnati Soap Co. v. United States,*
   301 U.S. 308 (1937) ........................................................................................ 21, 22

*City of Detroit v. Franklin,*
   4 F.3d 1367 (6th Cir. 1993) ................................................................................ 15

*City of New York v. U.S. Dep't of Commerce,*
   34 F.3d 1114 (2d Cir. 1994), *rev'd sub nom. Wisconsin v. City of NY*, 517 U.S. 1 (1996) ..................... 26

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................................................ 8, 13

*Clatterbuck v. City of Charlottesville,*
   708 F.3d 549 (4th Cir. 2013) ................................................................................ 3

*Dep't of Commerce v. U.S. House of Representatives,*
   525 U.S. 316 (1999) .................................................................................. 21, 24, 29

*Du Daobin v. Cisco Sys., Inc.,*
   2 F. Supp. 3d 717 (D. Md. 2014) ....................................................................... 20

*Earth Island Inst. v. Christopher,*
   6 F.3d 648 (9th Cir. 1993) .................................................................................. 16

*Evenwel v. Abbott,*
   136 S. Ct. 1120 (2016) ...................................................................................... 15

*Fed'n for Am. Immigration Reform v. Klutznick,*
   486 F. Supp. 564 (D.D.C. 1980) ................................................................................ 11

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ..........................................................................24, 25, 29, 30

*Franks v. Ross,*
   313 F.3d 184 (4th Cir. 2002) ................................................................................ 17

*Gaffney v. Cummings,*
   412 U.S. 735 (1973) ............................................................................................. 26

*Gonzalez v. Gorsuch,*
   688 F.2d 1263 (9th Cir. 1982) ............................................................................. 15

*In re KBR, Inc., Burn Pit Litig.,*
   744 F.3d 326 (4th Cir. 2014) ................................................................................ 19

*Int'l Refugee Assistance Project v. Trump,*
   857 F.3d 554 (4th Cir. 2017), *vacated and remanded on other grounds,* 138 S. Ct. 353 (2017) .........29, 30

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
   478 U.S. 221 (1986) .........................................................................19, 22, 23, 25

*Lane v. Holder,*
   703 F.3d 668 (4th Cir. 2012) ................................................................................ 13

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................................................................. 16

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ....................................................................................*passim*

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) .........................................................................................13, 15

*Lynch v. United States,*
   292 U.S. 571 (1934) ............................................................................................. 30

*McConnell v. Fed. Election Comm'n,*
   540 U.S. 93 (2003), *overruled on other grounds by*
   *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310 (2010) ............................... 15

*Md. Dep't of Human Res. v. U.S. Dep't of Agric.,*
   976 F.2d 1462 (4th Cir. 1992) ...........................................................................16, 22

*Miller v. Brown,*
   462 F.3d 312 (4th Cir. 2006) ................................................................................ 17

*Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*,
   91 F.3d 178 (D.C. Cir. 1996) ............................................................ 12

*Office of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990) ............................................................ 22

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ............................................................ 16, 17, 18

*Reeside v. Walker*,
   52 U.S. 272 (1850) ............................................................ 16

*Renne v. Geary*,
   501 U.S. 312 (1991) ............................................................ 5

*Ridge v. Verity*,
   715 F. Supp. 1308 (W.D. Pa. 1989) ............................................................ 11

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ............................................................ 20

*Sec'y of State for Def. v. Trimble Navigation Ltd.*,
   484 F.3d 700 (4th Cir. 2007) ............................................................ 6

*Sharrow v. Brown*,
   447 F.2d 94 (2d Cir. 1971) ............................................................ 11

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ............................................................ 13

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ............................................................ 8

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................ 8

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ............................................................ 29

*Taubman Realty Grp. Ltd. P'ship v. Mineta*,
   320 F.3d 475 (4th Cir. 2003) ............................................................ 13

*Tucker v. U.S. Dep't of Commerce*,
   958 F.2d 1411 (7th Cir. 1992) ............................................................ 24

*U.S. Dep't of Commerce v. Montana*,
   503 U.S. 442 (1992) ............................................................ 11, 24

*United States v. Munoz-Flores*,
   495 U.S. 385 (1990) ............................................................ 19

*United States v. Sanchez-Gomez,*
   138 S. Ct. 1532 (2018) ..............................................................................................14

*Utah v. Evans,*
   536 U.S. 452 (2002) ...............................................................................24, 25, 28, 29

*Vance v. CHF Int'l,*
   914 F. Supp. 2d 669 (D. Md. 2012)......................................................................3, 6

*Vieth v. Jubelirer,*
   541 U.S. 267 (2004) ................................................................................................20

*Warth v. Seldin,*
   422 U.S. 490 (1975) ..................................................................................................7

*Wesberry v. Sanders,*
   376 U.S. 1 (1964) ....................................................................................................24

*Wikimedia Found. v. Nat'l Sec. Agency,*
   857 F.3d 193 (4th Cir. 2017) ....................................................................................6

*Wisconsin v. City of NY,*
   517 U.S. 1 (1996)............................................................................................*passim*

*Wu Tien Li-Shou v. United States,*
   777 F.3d 175 (4th Cir. 2015) ..................................................................................19

*Zak v. Chelsea Therapeutics Int'l, Ltd.,*
   780 F.3d 597 (4th Cir. 2015) ....................................................................................3

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
   566 U.S. 189 (2012) ................................................................................................19

## STATUTES

2 U.S.C. § 2a ...............................................................................................................11

13 U.S.C. § 2 .................................................................................................................3

13 U.S.C. § 4 .................................................................................................................3

13 U.S.C. § 9 .................................................................................................................5

13 U.S.C. § 141 .............................................................................................................3

13 U.S.C. § 195 ...........................................................................................................24

13 U.S.C. § 221 .....................................................................................................14, 18

49 U.S.C. § 5305..........................................................................................................11

Md. Code Ann., Local Gov't § 1-1307 ........................................................................15

Md. Code Ann., State Gov't § 2-2A-01 .....................................................................15

**REGULATIONS**

Proposed Information Collection, 2020 Census,
  83 Fed. Reg. 26,643-02 (proposed June 8, 2018) .........................................4, 28

**RULES**

Fed. R. Civ. P. 12 ......................................................................................................5, 6

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 2 ..................................................................................1, 2, 19, 20

U.S. Const. art. I, § 8 ..................................................................................................22

U.S. Const. art. I, § 9 ....................................................................................19, 20, 21

U.S. Const. art. II, § 2 .................................................................................19, 20, 22

U.S. Const. amend. XIV, § 2 ......................................................................................20

**OTHER AUTHORITIES**

13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.6
  (3d ed. Apr. 2018 update) ...................................................................................15

2018 Census Test,
  https://www.census.gov/2018censustest ................................................................5

2020 Census Detailed Operational Plan for: 18. Nonresponse Followup Operation
  (NRFU) (April 16, 2018, v.1.0),
  https://www2.census.gov/programs-surveys/decennial/2020/program-management/
  planning-docs/NRFU-detailed-operational-plan.pdf .........................................4, 5, 10, 27

2020 Census Life-Cycle Cost Estimate Executive Summary, Dec. 21, 2018,
  https://www2.census.gov/programs-surveys/decennial/2020/program-management/
  planning-docs/2020-cost-estimate1.pdf ................................................................5

2020 Census Operational Plan: A New Design for the 21st Century (Sept. 2017, v.30)
  https://www2.census.gov/programs-surveys/decennial/2020/program-management/
  planning-docs/2020-oper-plan3.pdf ..............................................................3, 4, 5

2020 Census Detailed Operational Plan for:  3. Security, Privacy, and Confidentiality
  *Operation (SPC)*, June 6, 2017,
  https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-
  management/planning-docs/SPC-detailed-op-plan.html .......................................5

2020 Census Life-Cycle Cost Estimate Executive Summary, Dec. 21, 2018,
   https://www2.census.gov/programs-surveys/decennial/2020/program-management/
   planning-docs/2020-cost-estimate1.pdf ..............................................................................................5

https://www.census.gov/population/apportionment/about/computing.html ................................ 15

https://www.census.gov/popclock/ .......................................................................................... 26

Ron S. Jarmin, "U.S. Census Bureau Responses to National Advisory Committee on Racial,
   Ethnic and Other Populations 2017 Fall Meeting Recommendations," May 1, 2018,
   https://www2.census.gov/cac/nac/meetings/2017-11/2018-05-01-census-response.pdf ..........5

U.S. Census Bureau, Questions Planned for the 2020 Census and American Community
   Survey (Mar. 2018),
   https://www2.census.gov/library/publications/decennial/2020/operations/
   planned-questions-2020-acs.pdf ..........................................................................................................3

## INTRODUCTION

The relief sought in this suit—"an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that the hard-to-count populations will be actually enumerated in the decennial census"—is as extraordinary as it is unprecedented. The Constitution vests in the Political Branches the discretion to decide the "[m]anner" in which the census is conducted. In an exercise of that discretion, the Secretary of Commerce and the Census Bureau have established more wide-ranging and more advanced operations than any previous decennial census in order to conduct the largest census in American history. Nonetheless, Plaintiffs allege that preparations for the 2020 Census are so deficient as to violate the Constitution's Enumeration Clause nearly two years before a single person is counted. U.S. Const. art. I, § 2, cl. 3. This case is groundless and should be dismissed.

First, Plaintiffs—organizations and residents associated with Prince George's County, Maryland, as well as the County itself—lack standing to challenge pre-census information-gathering procedures. Plaintiffs' claimed injuries of lost voting power and decreased federal funding are too speculative to confer Article III standing. And even if Plaintiffs could allege injuries that are non-speculative, those injuries would be not be fairly traceable to the Census Bureau's preparations but would be attributable instead to the independent decisions of third parties. Perhaps most problematic, this Court cannot redress Plaintiffs' alleged harm because it has no power to order Congress's appropriation of more funds, the President's appointment of a Census Director (and the Senate's confirmation of the same), or a reallocation of agency staff.

Second, Plaintiffs' claim is not ripe for review. Even if the purported "deficiencies" Plaintiffs identify were legitimate, they could be remedied far in advance of Census Day in April 2020. In addition, all individuals have a legal obligation to respond to the census regardless of the scope or extent of pre-census planning, so Plaintiffs cannot plausibly allege that they are likely to suffer hardship if this case is

dismissed.  Furthermore, any judicial interference at this point would only hamper the Census Bureau's preparations.

Third, Plaintiffs' challenge is unreviewable under the political question doctrine.  The Constitution textually commits the "[m]anner" of conducting the census and the power of appropriations to Congress, and the appointment and confirmation of a Census Director to the President and Senate, respectively.  And it contains no judicially discoverable or manageable standards for determining whether any information-gathering procedures violates the Constitution some two years in advance of the Census. That question involves policy determinations that are ill-suited for judicial resolution and that the Constitution expressly commits to the Political Branches.

Finally, Plaintiffs cannot state a claim for relief under the Constitution's Enumeration Clause. The Enumeration Clause requires only that the population must be determined through a person-by-person headcount, rather than through estimates or conjecture.  Neither Plaintiffs' general allegations of an undercount nor their specific allegations of deficient census operations plausibly state a claim under the Enumeration Clause because there is no allegation that the Secretary is estimating rather than actually counting the population.  Additionally, Plaintiffs' allegations are contradictory and implausible on their face.

For all of these reasons, this action should be dismissed.  In the event the Court concludes that Plaintiffs have standing, that their case is ripe for review, that it is not barred by the political question doctrine, and that Plaintiffs have plausibly stated a claim under the Enumeration Clause, the President and the United States should be dismissed as improper parties.

## BACKGROUND

## I.      CONSTITUTIONAL AND STATUTORY AUTHORITY FOR THE CENSUS

The Constitution's Enumeration Clause requires that an "actual Enumeration" of the population be conducted every 10 years and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct."  U.S. Const. art. I, § 2, cl. 3.  Through the Census Act, Congress has

delegated to the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine." 13 U.S.C. § 141(a). The Bureau of the Census assists the Secretary in the performance of this responsibility. *See id.* §§ 2, 4. As required by the Constitution, a census of the U.S. population has been conducted every 10 years since 1790. U.S. Census Bureau, Questions Planned for the 2020 Census and American Community Survey, at 1 (Mar. 2018), https://www2.census.gov /library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf.

## II.    2020 CENSUS PROCEDURES AND PLANS TO MINIMIZE NON-RESPONSE

The Department of Commerce and the Census Bureau have extensive plans in place to maximize self-response and thereby minimize the amount of non-response follow up. The 2020 Census will be the first to rely extensively on digital methods and automation. It will be the first census where individuals are encouraged to respond online. 2020 Census Operational Plan: A New Design for the 21st Century, at 15, 18-19, 26, 88 (Sept. 2017, v.3.0), https://www2.census.gov/programs-surveys/ decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf ("2020 Census Operational Plan").[1] Most housing units will receive several short mailings instructing them to complete the census either online or by telephone; both options will be available in multiple languages. *Id.* at 18-21, 98. If households do not respond by the fourth mailing, the full paper questionnaire will be sent.[2] *Id.* at 99. Housing units that are less likely to have Internet access will receive a full paper questionnaire in the first

---

[1] The Court may, when necessary, "look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 676 (D. Md. 2012) (citation omitted). While Federal Rule of Civil Procedure 12(d) ordinarily requires the court to exclude matters outside the pleadings when considering a Rule 12(b)(6) motion or else convert the motion to one for summary judgment under Rule 56, there is a well-established, if narrow, exception for facts subject to judicial notice under Federal Rule of Evidence 201, including facts or documents in the public record. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (citing *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013)).

[2] In particularly hard-to-reach areas, census questionnaires will be hand delivered. 2020 Census Operational Plan, at 102-05.

mailing, allowing them to respond immediately via mail. *Id.* at 91, 95.

For households that do not self-respond initially, the Census Bureau has thorough and coordinated procedures in place for following up with these households.[3] Each household will receive up to six mailings, if necessary. 2020 Census Operational Plan, at 99. If no response has been received after the fifth mailing, a census enumerator will be assigned to that address. *Id.* at 114. The enumerator will personally visit all units to which he or she is assigned to verify that the address is occupied and to attempt to contact a household member to complete the questionnaire. *Id.* If the enumerator is not able to complete the questionnaire, administrative records[4] will be used to identify vacant housing units and determine response data for occupied households where the Census Bureau has high-quality administrative records. *Id.* at 22, 114, 117. If such records are unreliable or do not exist, a final postcard encouraging self-response will be mailed, and all addresses still non-responsive will undergo up to six contact attempts, with eligibility to have the data obtained from a proxy (such as a neighbor or landlord) after the third unsuccessful attempt. *Id.*

The Census Bureau also plans to mount extensive publicity and outreach campaigns, in which it will work with units of state, local, and tribal government, the media, and community-based organizations to encourage people to respond to the census. *Id.* at 92-95. Through that outreach the Census Bureau also regularly reiterates its strong commitment to preserving the confidentiality of the data it collects as

---

[3] For a detailed description of non-response follow-up operations, *see* 2020 Census Detailed Operational Plan for: 18. Nonresponse Followup Operation (NRFU) (April 16, 2018, v.1.0), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/NRFU-detailed-operational-plan.pdf ("NRFU Detailed Operational Plan").

[4] Administrative records include data from the Internal Revenue Service, the Social Security Administration, the Centers for Medicare and Medicaid Services, the Department of Housing and Urban Development, the Indian Health Service, the Selective Service, and the U.S. Postal Service. *See* Proposed Information Collection, 2020 Census, 83 Fed. Reg. 26643-02 (proposed June 8, 2018). The Census Bureau will only use administrative records "when it can confirm empirically across multiple sources that the data are consistent, of high quality, and can be accurately applied to the addresses and households in question." *Id.*

required by statute.  *Id.* at 19; *see* 13 U.S.C. § 9.

Despite more wide-ranging and more advanced preparation and operations than any previous decennial census,[5] Plaintiffs' First Amended Complaint ("FAC") advances the novel constitutional theory that, nearly two years before a single person is counted, preparations for the 2020 Census are so deficient as to violate the Enumeration Clause.[6]

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must establish a court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (internal quotation marks and citations omitted).  When considering such a motion, the Court must "accept as true … allegations for which there is sufficient factual matter to render them plausible on their face." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (brackets and citation omitted), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017).  Courts do not, however, "apply the same presumption of truth to conclusory statements and legal

---

[5] All core operations and systems necessary for a successful 2020 Census have been successfully deployed in the Census Bureau's 2018 End-to-End Census Test.  *See generally* 2018 Census Test, https://www.census.gov/2018censustest.

[6] As publicly-available information demonstrates, a complete and accurate enumeration is fully contemplated.  *See, e.g.,* 2020 Census Life-Cycle Cost Estimate Executive Summary, Dec. 21, 2018, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-cost-estimate1.pdf (featuring estimates of a variety of aspects of planning and operation for the 2020 Census); Ron S. Jarmin, "U.S. Census Bureau Responses to National Advisory Committee on Racial, Ethnic and Other Populations 2017 Fall Meeting Recommendations," May 1, 2018, https://www2.census.gov/cac/nac/meetings/2017-11/2018-05-01-census-response.pdf (including, *inter alia*, discussions of planned focus groups in areas hit by recent natural disasters, the ongoing undercount of children, and reaching hard-to-count populations); 2020 Census Detailed Operational Plan for: 3. Security, Privacy, and Confidentiality Operation (SPC), June 6, 2017, https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/planning-docs/SPC-detailed-op-plan.html (detailing "production support processes for the 2020 Census SPC operation" and "a summary of the operational processes involved, their inputs, outputs and controls, and the basic mechanisms employed to conduct the operational work"); *see generally* NRFU Detailed Operational Plan.

conclusions contained in … [the] complaint." *Id.* (citation omitted).   In evaluating subject-matter jurisdiction, the court may, when necessary, "look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 676 (D. Md. 2012) (citation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as … factual allegation[s]" are "disentitle[d] … to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted).  Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), it may consider any "matters of public record" of which the court may take judicial notice, *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citations omitted), as well as documents referenced in the motion to dismiss "so long as they are integral to the complaint and authentic." *Id.*

In this Circuit, courts also apply the "plausibility" standard of *Twombly* to motions to dismiss for lack of standing under Rule 12(b)(1).   "[J]ust because [an] allegation satisfies the elements of Article III standing doesn't mean that [the court] must accept it as true for the purpose of resolving the government's facial challenge to the complaint." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 210 (4th Cir. 2017).  Rather, the court "proceed[s] to the second part of [the] analysis to decide whether the [allegation] is plausible." *Id.; see also Beck*, 848 F.3d at 270.

**ARGUMENT**

In seeking to invalidate the Census Bureau's information-gathering procedures before they have even been implemented, Plaintiffs ask the Court to second-guess the Secretary's judgment about how to exercise authority that has been delegated to him by the Constitution through Congress—a particularly troublesome request because the relief requested would intrude deeply into matters textually committed to the discretion of the Political Branches.  Plaintiffs' request is not justiciable for three reasons: (1) Plaintiffs lack standing to bring their claim, (2) Plaintiffs' claim is not ripe for review, and (3) Plaintiffs' claim is barred by the political-question doctrine.  Alternatively, Plaintiffs' claim should be dismissed because the Complaint fails to state a claim under the Enumeration Clause.  In addition, the President and the United States should be dismissed as improper parties.

## I.      THIS CASE IS NOT JUSTICIABLE

### A.      Plaintiffs Lack Standing To Maintain this Action.

Constitutional standing, an essential part of Article III's case-or-controversy requirement, ensures that a plaintiff has "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The "irreducible constitutional minimum" of standing has three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  If the plaintiff fails to establish any of these three elements of standing, the case must be dismissed for lack of jurisdiction. *Id.* at 561.

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing these standing elements "with the manner and degree of evidence required at the successive stages of the litigation." *Id.*  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, so long as they plausibly identify an injury, *Beck*, 848 F.3d at 270.  However,

the Court does not "apply the same presumption of truth to 'conclusory statements' and 'legal conclusions.'" *Id.*

Plaintiffs have not met their burden here. Plaintiffs' alleged future injuries are too attenuated to satisfy Article III's injury-in-fact requirement. Plaintiffs also fail the causation requirement because their alleged injuries are fairly traceable to the independent actions of third parties, not the Census Bureau's actions. Finally, Plaintiffs' claimed injuries are not redressable because remedying the alleged deficiencies in the 2020 Census preparations is beyond the power of the judiciary.

### 1. Plaintiffs' allegations of injury are too attenuated and speculative.

Article III's "injury in fact" element requires a plaintiff to "ha[ve] sustained or [be] immediately in danger of sustaining a direct injury" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016). The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560, and not "merely conjectural or hypothetical or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009). An alleged future injury must be "*certainly impending*" and cannot rely on a "highly attenuated chain of possibilities"; "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013).

Plaintiffs' theory of injury relies on a tenuous chain of speculative predictions. Plaintiffs allege that the Census Bureau's preparations for the 2020 Census are deficient in funding, staffing, leadership, and design. FAC ¶¶ 28–94. They assume that those preparations will remain deficient through the 2020 Census, FAC ¶¶ 52–54, 58, 66, 115–17, and they allege that those supposed deficiencies are so severe that they will result in lower self-response rates from minorities and other hard-to-count populations in the 2020 Census. FAC ¶¶ 28, 67, 106. Plaintiffs allege that the Census Bureau's follow-up efforts for individuals who do not initially respond to the census questionnaire will be ineffective, resulting in an undercount of minorities and other hard-to-count populations. FAC ¶¶ 72, 74, 85–91. They assume that the undercount in their geographic area (Prince George's County) will be greater than the undercount in other areas—a so-called "disproportionate" undercount, FAC ¶¶ 106, 108, 113, and they assume that this

disproportionate undercount will be so substantial that Prince George's County will lose federal funding and congressional and state legislative seats. FAC ¶¶ 15–16, 106–08, 113. They further assume that this loss of federal funding will cause their state and local governments to spend materially less on roads and other public programs that they use. Each of these links—and, *a fortiori*, the entire chain—is far too conjectural to satisfy Article III's injury-in-fact requirement.

Even crediting Plaintiffs' allegations that preparations for the 2020 Census are deficient, Plaintiffs fail to allege that any supposed deficiencies will remain unremedied by the 2020 Census. The complaint is long on "ifs" but short on well-pleaded allegations indicating that the feared contingencies are likely to occur. *See, e.g.*, FAC ¶ 67 ("serious design defects that, *if* unresolved …"); ¶ 74 ("*Should* these households not complete the questionnaire online or by telephone …"); ¶ 89 ("*If* the in-person visit is unsuccessful …"); ¶ 91 ("*If* the Census Bureau fails to secure agreements with all states …"). For example, Plaintiffs allege that a new spending bill will be needed to fund the government beyond September 2018 and that the President's proposed census budget is insufficient. FAC ¶¶ 52–54. But they fail to allege any facts indicating that Congress will not appropriate more funds before the 2020 Census. They allege that the Department of Commerce has not publicly disclosed its plans for personnel cuts and restructuring, FAC ¶¶ 57–58, but acknowledge that they do not know how those plans might affect the temporary workers that the Census Bureau hires to conduct the decennial census. FAC ¶ 58. They allege that there are no pending nominees for director or deputy director of the Census Bureau, FAC ¶ 66, but they fail to allege any facts suggesting that the President will not nominate candidates before the 2020 Census. They allege that not all states have agreed yet to allow the Census Bureau to use their administrative databases to help determine the residents in households that fail to respond to the census questionnaire, FAC ¶ 91, but they allege no facts suggesting that the remaining states will not agree before the 2020 Census. Absent any well-pleaded allegations that these supposed deficiencies will not be remedied before the 2020 Census, the ultimate injuries that Plaintiffs fear remain nothing more than conjecture.

9

Plaintiffs also offer no well-pleaded factual allegations indicating that these supposed deficiencies will lead to a lower self-response rate among minorities and other hard-to-count populations. The complaint acknowledges that households have historically failed to respond to the census for many reasons, including because they are "'angry at and/or distrust the government.'" FAC ¶ 23. Yet Plaintiffs fail to allege facts suggesting that households that would otherwise respond to the 2020 Census will now choose not to do so as a result of deficiencies in funding, staffing, or leadership. Indeed, Plaintiffs acknowledge that the Census Bureau is implementing features designed to *increase* self-response rates— specifically, the option to complete the census form online or by phone. FAC ¶¶ 68–70, 72. Plaintiffs allege that an online census will hurt minorities and the poor, who have less access to the internet, FAC ¶¶ 75–78, but they acknowledge that online responses are *optional* and that the Census Bureau plans to mail a paper version to households that do not respond online or by phone. FAC ¶ 74.

Even if Plaintiffs had adequately alleged a reduced self-response rate, they have not alleged that the Census Bureau's follow-up efforts will fail to remedy that reduction. Plaintiffs allege that some changes to existing Census Bureau procedures—like planning for fewer in-person visits—might make follow-up efforts less effective.[7] FAC ¶ 88. But Plaintiffs acknowledge that the Census Bureau is also planning new procedures for obtaining accurate data for households that do not respond, including sending paper questionnaires to households that do not respond online or by phone, following up with in-person visits, and using governmental records databases to supplement information about non-responsive households. *See* FAC ¶¶ 74, 86–92. It is entirely unknown (and unknowable) now whether any initial decrease in self-response rates will ultimately result in an undercount after the Census Bureau has finished all its enumeration procedures.

---

[7] As shown by judicially noticeable public records, Plaintiffs' contention that the Census Bureau will only perform one in-person visit, FAC ¶ 88, is incorrect. *See* Background Section II., *supra*; NRFU Detailed Operational Plan at 4-5, 14-15.

Even if Plaintiffs had adequately alleged an undercount, they have not alleged a *disproportionate* undercount (also called a "differential undercount"). The level of federal funding and number of congressional seats for each geographical area are affected not only by that area's *own* total population, but also the population of *every other* area in the country. *See* 2 U.S.C. § 2a(a); https://www.census.gov/population/apportionment/about/ computing.html; *see generally U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 461 (1992). Here, Plaintiffs do not allege that their geographical area (Prince George's County) will lose funding and seats *even if potential undercounts in other geographical areas are taken into account*. FAC ¶¶ 100–13. Their allegations thus fail to establish a sufficiently certain injury for Article III standing. *See Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (no standing because "none of the plaintiffs in this case can show which states would gain and which would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (no standing because "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" since plaintiffs "can do no more than speculate as to which states might gain and which might lose representation," which depends on "the interplay of all the other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (no standing to challenge apportionment method because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York but *for every other State as well*" (emphasis added)).

Even if Plaintiffs had adequately alleged a differential undercount, they have not alleged that the disproportionate undercount will be *material* to Prince George's County's federal funding and legislative seats. Generally, the allocation of federal funds is not directly proportional to population; instead, it is a function of multiple factors, often including the populations of *other* states. *See, e.g.*, 49 U.S.C. § 5305(d)(1). Plaintiffs' only allegations connecting the purported undercount to changes in federal funding are based on a differential undercount for Prince George's County existing in a vacuum, but they fail to consider any undercounts, differential or otherwise, that might occur in other geographical

11

areas.  *See* FAC ¶¶ 103–06.  In other words, undercounts elsewhere may render an undercount in Prince George's County (if any) immaterial.  And Plaintiffs' only allegations connecting the purported undercount to changes in legislative representation are entirely conclusory.  *See* FAC ¶¶ 107–08, 113. These allegations are far too conjectural to satisfy Article III.  *See Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996) (no standing because court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," since "if a more accurate count would have enlarged some communities' shares, it likely would have reduced the shares of other communities").

Finally, even if Plaintiffs had adequately alleged that their *state and local governments* will suffer a material loss of federal funding, they have not alleged sufficient facts indicating that *they* will suffer any concrete injury from that loss of funding.  Plaintiffs have failed to tie any hypothetical funding decreases to material changes in the particular public services they use.  The mere fact of a decrease in federal funding to their state and local governments says nothing about how those governments will respond to any decrease.  Plaintiffs have alleged no facts indicating that their state and local governments will reduce spending on the particular roads and other programs that Plaintiffs use—as opposed to replacing any lost federal funding with other sources, or reducing spending on *other* roads and programs besides those used by Plaintiffs.  *See Defs. of Wildlife*, 504 U.S. at 571 ("[A]gencies generally supply only a fraction of the funding for a foreign project. . . . Respondents have produced nothing to indicate that the projects they have named will either be suspended, or do less harm to listed species, if that fraction is eliminated. … [I]t is entirely conjectural whether the nonagency activity that affects respondents will be altered or affected by the agency activity they seek to achieve.").

In any event, even if Plaintiffs had alleged an injury sufficient to confer Article III standing, that injury alone would not be enough for prudential standing, which requires a plaintiff to "establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the [ ] provision whose violation forms the legal basis for his complaint."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883

(1990); *see also Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003). Here, Plaintiffs' claimed injuries—like worse roads caused by reduced federal funding—are not within the zone of interests protected by the Constitution's Enumeration Clause. That Clause was never intended to ensure that federal grant monies flow equally to all individuals. Plaintiffs would have to adequately plead an injury related to *apportionment* for prudential standing under the Enumeration Clause. They have not.

### 2. Plaintiffs' alleged injuries are not fairly traceable to the challenged action.

Besides injury, Article III standing also requires a plaintiff to show "a causal connection between the injury and the conduct complained of." *Defs. of Wildlife*, 504 U.S. at 560. Federal courts have jurisdiction only if the plaintiff's injury "fairly can be traced to the challenged [conduct] of the defendant, and [does] not … result[] from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). Courts are "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. Thus, when the plaintiff's asserted injury "depends on the unfettered choices made by independent actors not before the courts," standing ordinarily becomes "substantially more difficult to establish." *Defs. of Wildlife*, 504 U.S. at 562; *see also Lane v. Holder*, 703 F.3d 668, 673 (4th Cir. 2012) (no standing because "any injury to the plaintiffs is caused by decisions and actions of third parties not before this court rather than by the laws themselves"). In these circumstances, the plaintiff must show that the government's action will have a "determinative or coercive effect … upon the action of" those third parties. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

Here, Plaintiffs do not allege that their purported injuries—lost federal funding for roads and public programs they use and lost legislative seats—will result directly from the Census Bureau's supposedly deficient preparations for the 2020 Census. Instead, Plaintiffs' theory of harm relies on a multi-step causal chain, as explained above. *See* Argument Section I.A.1., *supra.* That causal chain depends on the independent choices of multiple third parties not before the Court, severing any fair traceability to the Census Bureau's actions.

13

First, Plaintiffs' undercount allegations assume that Prince George's County residents will not respond to the 2020 Census. *See* FAC ¶¶ 28, 72, 74, 88, 106. But Plaintiffs have failed to allege any facts indicating that any decisions not to respond to the census are a "determinative or coercive effect" of the Census Bureau's conduct, instead of their own "independent action[s]." *See Bennett*, 520 U.S. at 169. To the contrary, the government requires people *to answer* the census: responding to the census is a legal obligation, and failing to do so is a federal crime. 13 U.S.C. § 221(a). Plaintiffs' theory of standing thus depends on the assumption that people will not comply with that legal obligation. But courts "have consistently refused to conclude that the case-or-controversy requirement is satisfied by the possibility that" people will "violat[e] valid criminal laws." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1541 (2018). Instead, courts presume that people "will conduct their activities within the law." *Id.* In addition to this legal obligation, Plaintiffs acknowledge that the Census Bureau also plans to: (1) give households the option to complete the census form online, (2) mail a paper version to households that do not respond online or by phone, (3) follow up in-person with households that do not respond to the paper version, and (4) use governmental records databases to supplement information about non-responsive households. FAC ¶¶ 68–70, 72, 74, 88–89, 106. Any person's choice not to respond despite these efforts is not fairly traceable to the Census Bureau.

Second, Plaintiffs' lost funding allegations assume that their state and local governments will respond to a hypothetical decrease in federal funding by reducing spending on the particular roads and other programs that Plaintiffs use. *See* FAC ¶¶ 7–8, 104–06. But Plaintiffs' FAC is devoid of any facts indicating that Census Bureau action has a determinative or coercive effect on the decisions of states and localities. Indeed, those state and local governments could simply replace any lost federal funding with other sources, or reduce spending on other roads and programs besides those used by Plaintiffs. *See Defs. of Wildlife*, 504 U.S. at 571.

Third and finally, Plaintiffs' state-level vote-dilution allegations assume that the state of Maryland will use unadjusted census figures for its state-level redistricting. *See* FAC ¶¶ 17, 107. But the federal

government does not require states to use census figures when redistricting. *See City of Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993) ("Nothing in the constitution . . . compels the states . . . to use only the unadjusted census figures."). Indeed, Maryland has chosen not to do so in some instances. *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 n.3 (2016); Md. Code Ann., State Gov't § 2-2A-01; Md. Code Ann., Local Gov't § 1-1307. Maryland's decision to use census figures is another independent action by a third party that breaks the causal chain.

Plaintiffs have failed to adequately allege that their claimed injuries are fairly traceable to any deficiencies in the Census Bureau's preparations for the 2020 Census, as opposed to the independent decisions of third parties. The case should be dismissed for lack of Article III causation.

### 3. This Court cannot redress Plaintiffs' alleged injuries.

Besides injury and causation, a plaintiff also "must show that some personal benefit will result from a remedy *that the court is prepared to give*." 13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.6 (3d ed. Apr. 2018 update) (emphasis added). Redressability thus requires the plaintiff to show that "the court has the power to right or to prevent the claimed injury." *Gonzalez v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.). If the Court cannot order relief that would remedy the plaintiff's alleged injury, redressability—and thus Article III standing—are lacking. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 229 (2003) (no redressability because Court "has no power to adjudicate a challenge to the [allegedly unconstitutional] FECA limits in this litigation"), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

Here, Plaintiffs cannot show redressability because, even if Plaintiffs' alleged injuries were fairly traceable to Census Bureau underfunding, understaffing, lack of leadership, or design flaws, remedying those supposed problems is beyond the power of the judiciary. A plaintiff "cannot seek *wholesale* improvement of [a federal] program by court decree, rather than in the offices of the [agency] or the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). "[I]t is not the role of courts, but that of the political branches, to shape the

15

institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). Courts cannot order Congress to appropriate more funds, the President to nominate a Census Director, the Senate to confirm the President's nominee, or the Census Bureau to reallocate agency staff. *See, e.g., Reeside v. Walker*, 52 U.S. 272, 290–91 (1850) ("It is a well-known constitutional provision, that no money can be taken or drawn from the Treasury except under an appropriation by Congress."); *Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1481–82 (4th Cir. 1992) ("The straightforward and explicit Appropriations Clause means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress. … [A]ny exercise of a power granted by the Constitution to the judicial branch is limited by a valid reservation of congressional control over funds in the Treasury."); *Earth Island Inst. v. Christopher*, 6 F.3d 648, 653 (9th Cir. 1993) (no redressability because "[t]his court has not and cannot lawfully order the Executive to comply with the terms of a statute that impinges upon power exclusively granted to the Executive Branch under the Constitution").[8]

Plaintiffs have therefore failed to show redressability as required for Article III standing.

## B.   Plaintiffs' Claim is Not Ripe.

Even if Plaintiffs had standing, their claim is not ripe for review. The ripeness doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998). The doctrine thus

---

[8] Even if these remedies were not beyond the power of the judiciary, they would require orders directed against governmental bodies that are not (and could not be made) a party to this case, such as Congress and the Senate. *See Defs. of Wildlife*, 504 U.S. at 568–71 (no redressability because agencies funding the challenged project were not parties to case so court could not order any relief against them). And as discussed in Argument Section III., *infra*, the President and the United States should be dismissed as improper parties.

ensures that courts do not decide an issue "until a controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006).

To determine whether a claim is ripe for judicial review, courts balance "the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002). The first element, fitness for judicial decision, examines "whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n*, 523 U.S. at 733. A case is not fit for judicial decision if the issues are not "purely legal" or if the challenged action is not "final" and still "depend[s] on future uncertainties." *Miller*, 462 F.3d at 319. The second element, hardship to the parties, examines not only the harm to a *plaintiff* from *delayed* review, but also to the harm to the *defendant* from *premature* review—i.e., "whether judicial intervention would inappropriately interfere with further administrative action." *Ohio Forestry Ass'n*, 523 U.S. at 733. The burden is on Plaintiffs, as the parties bringing this suit, to prove that their claim is ripe. *See Miller*, 462 F.3d at 319.

Here, Plaintiffs' challenge to the Census Bureau's supposedly deficient preparations for the 2020 census is not fit for judicial review some two years before the census because each of the alleged deficiencies in the FAC depends on future uncertainties, as the FAC itself acknowledges. Whether funding for the 2020 Census is constitutionally adequate depends not only on congressional appropriations to date, but also on whether Congress appropriates more funds as the census approaches. *See* FAC ¶ 53. Whether staffing for the 2020 Census is constitutionally adequate depends on the Census Bureau's personnel decisions in the next two years. *See* FAC ¶ 58. Whether Census Bureau leadership is constitutionally adequate depends on the President's nomination decisions before 2020. *See* FAC ¶ 66. Whether any design flaws in the Census Bureau's plans for the 2020 census violate the Constitution depends on whether the Census Bureau modifies those plans. *See* FAC ¶¶ 67, 80, 82, 91. In effect, Plaintiffs ask the Court to decide a constitutional question by predicting the next two years of funding, staffing, leadership, and operational decisions at a federal agency. But "depending upon the agency's

future actions to revise" its plans or to "modify the expected methods of implementation" of those plans, "review now may turn out to . . . be[] unnecessary." *Ohio Forestry Ass'n*, 523 U.S. at 737.

Immediate judicial review also threatens to interfere with the Census Bureau's ability to continue refining its preparations for the 2020 Census.  For example, setting aside the veracity of Plaintiffs' allegations, a judicial decision that the Census Bureau's cybersecurity plans are somehow unconstitutional *right now* would forestall the Census Bureau's efforts to improve the cybersecurity of its online systems. *See* FAC ¶¶ 69–84.  In other words, deciding such issues now could short-circuit the ability of the Census Bureau and Congress to augment any purported funding, staffing, leadership, and operational deficiencies in the FAC.

Nor would postponing judicial review cause Plaintiffs any significant hardship.  Plaintiffs' claimed injuries—lost federal funding and lost legislative seats—are *future* harms that they acknowledge will not occur before the 2020 Census, if ever.  *See* FAC ¶¶ 106–10, 113–17.  The Census Bureau's preparations to date do not require Plaintiffs "to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." *Ohio Forestry Ass'n*, 523 U.S. at 733.  Indeed, as noted above, all individuals have a legal obligation to respond to the census, 13 U.S.C. § 221, regardless of the scope or extent of pre-census planning.

Given this minimal hardship to Plaintiffs from postponing judicial review, as well as the potential interference with Census Bureau operations from immediate judicial review and, most importantly, the many future uncertainties that could affect the issues presented, this case is not ripe and should be dismissed.

C.   **Plaintiffs' Suit Is Barred by the Political Question Doctrine.**

Even if Plaintiffs had standing, and even if this case were ripe for review, their claims still must be dismissed because they are barred by the political question doctrine.  This case implicates not one, but three constitutional powers that are committed to the Political Branches by the Constitution's text:

Congress's plenary power over the "[m]anner" of the Census, Congress's exclusive power to appropriate funds, and the President's power to "nominate, and by and with the Advice and Consent of the Senate, [ ] appoint . . . all [ ] Officers of the United States." U.S. Cons. art. I, § 2, cl. 3; art. I, § 9, cl. 7; art. II, § 2. Beyond the plain text, however, decisions regarding the information-gathering procedures for the census are fully committed to the discretion of Congress—and, by delegation, the Secretary—for a reason: each procedure requires a careful balancing of policy choices outside the province of the judiciary. This case is therefore barred by the political question doctrine.

The political question doctrine is "primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The functional nature of this doctrine requires a case-by-case inquiry into "the precise facts and posture of the particular case." *Baker*, 369 U.S. at 217; *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 180 (4th Cir. 2015).

Six factors inform whether a case presents a nonjusticiable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see also In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 334 (4th Cir. 2014). While the first two factors are most important, *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012)

(examining only the first two factors); *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (observing that the factors are "probably listed in descending order of both importance and certainty"), the presence of any one of these factors can render a case nonjusticiable. *See id.* at 277 (referencing the six factors as six "independent tests"); *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) ("To find a political question, we need only conclude that one factor is present, not all."); *Du Daobin v. Cisco Sys., Inc.*, 2 F. Supp. 3d 717, 723 (D. Md. 2014). This case presents not one, but at least three factors that render this controversy nonjusticiable.

### 1.  All of Plaintiffs' complaints are textually committed to the Political Branches.

The Constitution provides that Representatives "shall be apportioned among the several States according to their respective numbers," which requires "counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2. To calculate the "number of persons in each State," *id.*, the Enumeration Clause requires an "actual Enumeration" every 10 years "in such Manner as [Congress] shall by Law direct." *Id.* art. I, § 2, cl. 3. The Constitution also provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," *Id.* art. I, § 9, cl. 7, and that the President is empowered to "nominate, and by and with the Advice and Consent of the Senate, [ ] appoint . . . all [ ] Officers of the United States," *Id.* art. II, § 2. The plain text of these provisions commits this case to the Political Branches, thus satisfying the first and most important political question factor.

While the Enumeration Clause requires an "actual Enumeration" every 10 years, it also states that the census will be conducted "in such Manner as [Congress] shall by Law direct." U.S. Cons. art. I, § 2, cl. 3. This Clause says only two things about the census: (1) there must be a decennial "actual Enumeration" of the population (*i.e.*, a person-by-person headcount), and (2) the "[m]anner" of conducting the census is up to Congress. The former command presents a judicially cognizable question that courts have routinely answered; the latter presents a nonjusticiable political question reserved for Congress and, through Congress's delegation, for the Secretary. This case implicates only the latter question because it does not involve whom to count, how to count them, or where to count them. Thus,

only the Enumeration Clause's "[m]anner" prong is at issue here, as this case concerns simply the "[m]anner" by which the Secretary performs the census's information-gathering functions.

By using the phrase "in such Manner" to modify the phrase "[t]he actual Enumeration shall be made," the Constitution makes clear that Congress fully controls the manner in which the decennial census is conducted. Dictionaries roughly contemporaneous with the ratification of the Constitution demonstrate that the "[m]anner" of conducting the Census necessarily includes full control over the information-gathering operations challenged by Plaintiffs.[9]   For example, Plaintiffs quibble with the Census Bureau's use of new technology, its "cancellation of planned tests", and its anticipated "number of area census offices and workers". FAC ¶¶ 67-94. But these operations are quite literally the "method" by which an "actual Enumeration" is conducted. *See* Note 9. Plaintiffs' challenge to pre-census information-gathering procedures thus goes directly to the "way of performing or executing" the census itself, *see* Note 9, a determination that is constitutionally entrusted to Congress.

The Appropriations Clause provides further textual support. The primary allegation of Plaintiffs' FAC is that the Census Bureau is underfunded, thus causing staffing and preparation deficiencies. *See* FAC ¶¶ 32-54; *see generally* FAC ¶¶ 55-59, 67-94; *see, e.g.*, FAC ¶ 79 ("Defendants' design flaws, coupled with their insufficient funding, planning and staffing deficiencies, have left them unprepared for the challenges that digitization presents."). The Constitution, however, commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," *Id.* art. I, § 9, cl. 7, which "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). As explained in Argument Section I.A.3., *supra*, this Court has no power to order Congress's appropriation of more

---

[9] Noah Webster's 1828 American Dictionary of the English Language defines "manner" as "form; method; way of performing or executing," and Thomas Sheridan's 1796 Complete Dictionary of the English Language (6th ed.) defines "manner" as "form, method" or "habit, fashion." *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 346-47 (1999) (Scalia, J., concurring in part) (examining the text of the Enumeration Clause by referencing these dictionaries).

funds.[10]  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990) ("Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."); *Cincinnati Soap*, 301 U.S. at 321; *Maryland Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1482 (4th Cir. 1992).  The bulk of Plaintiffs allegations, then, are textually committed to Congress, thus precluding judicial review.

Plaintiffs' remaining allegations—that the Census Bureau "lacks permanent or senior leadership," FAC ¶¶ 60-66—are also textually committed to a coordinate political department: the Executive. Specifically, the Constitution empowers the President to "nominate, and by and with the Advice and Consent of the Senate, [ ] appoint . . . all [ ] Officers of the United States," U.S. Cons. art. II, § 2.  As explained in Argument Section I.A.3., *supra*, this Court cannot order the President to appoint a director for the Census Bureau, nor order the Senate to confirm any nominee; the Constitution commits such decisions to the Political Branches.  Thus, these allegations are also barred by the political question doctrine.

Accordingly, the appropriate forum for Plaintiffs' grievances lies not in the courts, but in the "halls of Congress [and] the confines of the Executive Branch."  *Japan Whaling*, 478 U.S. at 230.  It is Congress to whom the Constitution entrusts the "[m]anner" of conducting the census.  It is Congress to whom the Constitution entrusts the power to appropriate funds.  And it is the President, in conjunction with the Senate, to whom the Constitution entrusts the appointment and confirmation of senior officials. This case should therefore be dismissed as a nonjusticiable political question.

### 2. The Court has no judicially manageable standards to make the necessarily policy-based determinations regarding the census.

The second and third political question factors also preclude the Court's intervention because there are no judicially manageable standards for making policy decisions regarding census procedures.

---

[10] Congress also has the power "make all Laws which shall be necessary and proper" for executing the 2020 Census.  U.S. Cons. art I, § 8.

The text and history of the Enumeration Clause unequivocally demonstrate that decisions regarding the information-gathering procedures of the census are fully committed to Congress's discretion.  The reason for this constitutional delegation is axiomatic: each census procedure requires a careful balancing of considerations such as cost, testing, training, effectiveness, timing, informational need, and accuracy.[11]  These considerations are quintessentially policy choices outside the province of the judiciary because there are no judicially manageable standards for determining how to weigh these factors, which do not implicate the affirmative constitutional command to count, rather than estimate, the population.  Once a court ventures beyond that affirmative constitutional command, there is no law to apply; it is in the realm of cost/benefit analyses and value judgments constitutionally entrusted to representatives of the people and executive officials confirmed by the same.  *Japan Whaling*, 478 U.S. at 230.

How does a court determine whether any individual aspect of the census—a massive, 10-year undertaking—is unconstitutional?  For example, has the Secretary violated the Constitution if he employs 550,000 enumerators for in-person visits instead of 551,000 enumerators?  How about when the census questionnaire is distributed in 12 non-English languages instead of 13?  Or when the Secretary opens six regional census centers instead of seven?  Or when the Secretary spends $8,000,000 on the Partnership Program instead of $9,000,000?  Or when he decides to conduct one end-to-end census test instead of two?  Each of these determinations are pieces of a much larger puzzle, all of which involve a careful consideration of numerous policy factors.  Courts have no standards by which to judge the consideration of those factors.[12]

---

[11] These considerations are present to some degree when the Secretary decides who, where, and how to count inhabitants of the United States; hence the Supreme Court defers to the Secretary's judgment in calculation-methodology cases.  *See Wisconsin v. City of NY*, 517 U.S. 1, 19 (1996).

[12] Plaintiffs not only ask the Court to *judge* these information-gathering operations, but ask the Court to conduct *day-to-day programmatic oversight* of such operations and a thousand others.  FAC pp. 21-22 (seeking, *inter alia*, "an injunction that requires Defendants to propose and implement, subject to this

Other apportionment and census-related cases are easily distinguishable.  The Supreme Court has routinely decided cases involving congressional districting by States on the theory that the Constitution requires "equal representation for equal numbers of people."  *See Wesberry v. Sanders*, 376 U.S. 1, 18 (1964).  And, based on those precedents, the Court has similarly decided that challenges to the way in which Congress allocates congressional seats are justiciable.  *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 459 (1992) (noting that Congress is granted more deference than its State counterparts in apportionment).  But the nature of those controversies provided easily administrable standards for courts to apply: the number of people in each congressional district.  It was easy to see, in *Wesberry* for example, that a congressional district of 823,680 people was out of line with the average size for the other 10 districts in Georgia (394,312).  *Wesberry*, 376 U.S. at 2; *Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1418 (7th Cir. 1992) (noting that the Supreme Court's reapportionment cases "authorize the courts to intervene in the process of apportioning representatives," because "[e]quality of voting power is an administrable standard").

The census-related cases decided by the Court are no different.  All have concerned calculation methodologies, not pre-census information-gathering functions.  *See, e.g., Utah v. Evans*, 536 U.S. 452, 452 (2002) ("hot-deck imputation"—a non-sampling process which infers characteristics of individuals based upon the characteristics of neighbors, resulting in inclusion of individuals who otherwise would be excluded—did not violate the Enumeration Clause); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (holding that statistical sampling violates the Census Act, 13 U.S.C. § 195, and declining to reach the Enumeration Clause claim); *Wisconsin v. City of NY*, 517 U.S. 1 (1996) (holding that Secretary did not violate Enumeration Clause by failing to correct a census undercount with data from a post-enumeration survey); *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (confirming that the method used

---

Court's approval and monitoring, a plan to ensure that the hard-to-count populations will be actually enumerated in the decennial census").  This Court would have no principled way of fulfilling that role.

to count federal employees serving overseas did not violate Enumeration Clause).  The Constitution supplies a simple judicial standard for determining the constitutionality of such practices: is the Secretary performing a person-by-person headcount, or is he unlawfully estimating the population?  While answering that question may be difficult in any given case, there is nothing unmanageable about the standard itself.

In stark contrast, there is no judicially discernible standard for determining whether a myriad of pre-census information-gathering operations are unconstitutional.  These are "policy choices and value determinations constitutionally committed for resolution to the halls of Congress [and] the confines of the Executive Branch." *Japan Whaling*, 478 U.S. at 230.  Thus, this case is barred from judicial consideration by the political question doctrine.

## II.      PLAINTIFFS FAIL TO STATE AN ENUMERATION CLAUSE CLAIM

Even if this case were justiciable, Plaintiffs' Enumeration Clause claim should be dismissed. The Constitution's reference to "actual Enumeration" is simple: population is to be determined through a person-by-person headcount, rather than through estimates or conjecture.  Neither Plaintiffs' general allegations of an undercount nor their specific allegations of deficient census operations plausibly state a claim under the Enumeration Clause because there is no allegation that the Secretary is estimating rather than counting the population.  Moreover, Plaintiffs' allegations are contradictory and implausible on their face.  Thus, this case should be dismissed.

Plaintiffs' general theory is that "Defendants have violated and are at imminent risk of violating" the Enumeration Clause because their conduct "will lead to an undercount of racial and ethnic minorities and harm the Plaintiffs."  FAC ¶¶ 122-23.  The possibility of an undercount, however, exists in every census, and does not inherently violate the Enumeration Clause—the Constitution does not require perfection.  *See Utah*, 536 U.S. at 504 (Thomas, J., concurring in part and dissenting in part) (canvassing the history of census undercounts, including the first Census in 1790); *Wisconsin*, 517 U.S. at 6 ("Although each [of the 20 past censuses] was designed with the goal of accomplishing an 'actual Enumeration' of

the population, no census is recognized as having been wholly successful in achieving that goal."); *Gaffney v. Cummings,* 412 U.S. 735, 745 (1973) (census data "are inherently less than absolutely accurate"); *Carey v. Klutznick,* 653 F.2d 732, 735 (2d Cir. 1981) ("Although the mechanics of the counting process have been improved in each of the nineteen ensuing censuses, there has never been a perfect count."). Moreover, Plaintiffs admit that even differential undercounts are commonplace in the census.[13] FAC ¶¶ 24-27 (identifying undercounts for certain groups in the 2010 Census); *see City of New York v. U.S. Dep't of Commerce,* 34 F.3d 1114, 1117 (2d Cir. 1994) ("This phenomenon, known as the 'differential undercount,' has skewed every census since at least 1940. The Census Bureau started measuring the differential undercount in that year."), *rev'd sub nom. Wisconsin,* 517 U.S. at 1. As long as the Secretary has established pre-census procedures for individually counting every resident of the United States, any undercount is the constitutionally permissible result of attempting to enumerate upwards of 325 million people across 3.8 million square miles. *See* https://www.census.gov/popclock/.

Plaintiffs' specific allegations fare no better than their general theory. Plaintiffs allege "conspicuous neglect of a constitutional duty" through four categories of alleged failings: "underfunding", "understaffing", "lack of leadership", and "design flaws". FAC ¶¶ 29-117. Plaintiffs paint these alleged failings as so detrimental to the 2020 Census that they will somehow violate the Enumeration Clause. But Plaintiffs fail to challenge any aspect of the 2020 Census that might infringe the Enumeration Clause's only command: to conduct a person-by-person headcount of the population rather than an estimation. *See* FAC ¶¶ 32-117. Instead, Plaintiffs' focus entirely on information-gathering operations for *how to conduct* the person-by-person headcount, far in advance of the census.

---

[13] Plaintiffs suggest that, while differential undercounts are nothing new, the "Defendants' preparations for the 2020 Census are so deficient as to raise imminent concerns of a substantially greater undercount than in past years." FAC ¶ 28. This contention merely highlights the lack of judicially manageable standards in this area, as Plaintiffs do not and cannot draw any line between a constitutionally permissible differential undercount in prior censuses and a potentially constitutionally impermissible differential undercount in the 2020 Census.

Plaintiffs' allegations concerning a link between alleged "understaffing" and "lack of leadership" and a violation of the Enumeration Clause are veritable non sequiturs.  Plaintiffs claim uncertainty over the Census Bureau's hiring practices in light of government-wide personnel directives from the Office of Management and Budget, and imply that, because the Department has not announced how the directive might affect the Census Bureau's plans to hire temporary workers, the Census Bureau will not be able to hire staff necessary to ensure an accurate count in nearly two years' time.  FAC ¶¶ 55-59.  Nowhere do Plaintiffs link these statements to an allegation that the Secretary will not be performing a person-by-person enumeration.  Similarly, Plaintiffs claim that the Census Bureau "lacks permanent or senior leadership", but again, fail to elaborate how that could have any impact on the Secretary's ability to perform a person-by-person enumeration.  FAC ¶¶ 60-66.  The FAC does not allege, for example, that a permanent Census Director would perform the Constitution's mandated headcount, while Dr. Ron Jarmin—who has decades of experience in the Census Bureau and is currently performing the nonexclusive functions and duties of its Director—would not.

Plaintiffs also express concerns with four particular "design flaws", each of which are contradictory and implausible on their face.  *See* FAC ¶ 68.  Plaintiffs rail against the Census Bureau's decision to "cut its on-the-ground presence and field infrastructure significantly," FAC ¶ 85, but readily acknowledge that the "Census Bureau will digitize the census for the first time in 2020," FAC ¶ 69, thus substantially reducing the need for costly "on-the-ground presence and field infrastructure".[14]  Plaintiffs take issue with the Census Bureau's use of "unreliable" state administrative records, FAC ¶¶ 89-94, but the Census Bureau shares this concern, which is why it "plans to use administrative data only when it can

---

[14] *See, e.g.*, NRFU Detailed Operational Plan at 3 ("Additional cost savings are expected to result from the use of automation to streamline in-field census taking.  Fieldworkers will use mobile devices for collecting the data.  Operations and functions such as recruiting, training, and payroll will also be automated, reducing the time required for these activities.  New operational control centers will rely on automation to manage the work, enabling more efficient case assignment, automatic determination of optimal travel routes, and reduction of the number of physical offices.").

confirm empirically across multiple sources that the data are consistent, of high quality, and can be accurately applied to the addresses and households in question." Proposed Information Collection, 2020 Census, 83 Fed. Reg. 26643-02 (proposed June 8, 2018).

With respect to digital responses and cybersecurity, Plaintiffs emphasize that only 20% of the population will initially receive a paper questionnaire, but they also acknowledge that the other 80% of the population will receive a paper questionnaire if they fail to respond online or by telephone. FAC ¶¶ 73-74. Despite these measures, Plaintiffs incongruously contend that "[a] largely online census will likely have a devastating impact on communities that have low or little access to reliable broadband internet, many of which are communities of color and low-income households." FAC ¶ 75; *see also* FAC ¶¶ 72-78. It is unclear how such communities will suffer a "devastating impact" from a "largely online census" if, as Plaintiffs admit, they would all receive paper questionnaires and non-response follow up as necessary. Plaintiffs similarly complain of cybersecurity concerns and allege that "even *perceived* data insecurity could dissuade digital responses." FAC ¶ 84. Again, Plaintiffs fail to acknowledge their own statements that any household not completing the online census questionnaire will receive a paper questionnaire, nullifying any need for digital responses. FAC ¶¶ 73-74.

Ultimately, Plaintiffs repeatedly fail to link any of their allegations to a plausible claim that the Secretary will be estimating the population rather than performing a person-by-person enumeration— the only requirement of the Enumeration Clause. Indeed, even when the Supreme Court struggled to distinguish between unconstitutional estimates and acceptable enumeration in calculation-methodology cases,[15] it recognized that the Enumeration Clause "vests Congress with virtually unlimited discretion in conducting the decennial" census. *Wisconsin*, 517 U.S. at 19; *see Utah*, 536 U.S. at 474 (explaining that the Clause's language indicates "the breadth of congressional methodological authority, rather than its

---

[15] *See, e.g., Utah*, 536 U.S. at 452 (four separate opinions regarding hot-deck imputation); *Dep't of Commerce*, 525 U.S. at 316 (five separate opinions regarding statistical sampling); *Franklin*, 505 U.S. at 788 (three separate opinions regarding how to count federal employees serving overseas).

limitation").   In light of this discretion, the Supreme Court has never invalidated the Secretary's population count on Enumeration Clause grounds.   *See Utah*, 536 U.S. at 474 (holding hot-deck imputation permissible under the Enumeration Clause); *Dep't of Commerce*, 525 U.S. at 344 (holding that statistical sampling violates the Census Act and declining to reach Enumeration Clause claim); *Wisconsin*, 517 U.S. at 1; *Franklin*, 505 U.S. at 788.   This case presents no reason to break from those precedents.

A complete and accurate person-by-person enumeration of the population is fully contemplated for the 2020 Census.   The FAC contains no allegation that the Secretary will be using "estimates" or "conjecture" rather than a headcount, and the allegations that *are* contained in the FAC are implausible on their face.   Due to these fatal flaws and the Secretary's "virtually unlimited discretion" in this area, this case should be dismissed.

## III.   THE PRESIDENT AND THE UNITED STATES SHOULD BE DISMISSED

If the Court concludes that Plaintiffs have standing, that their case is ripe for review, that it is not barred by the political question doctrine, and that Plaintiffs have plausibly stated a claim under the Enumeration Clause, then the President and the United States should be dismissed as improper parties.

"While injunctive relief against executive officials like the Secretary of Commerce is within the courts' power . . . injunctive relief against the President himself is extraordinary, and should . . . raise[ ] judicial eyebrows."   *Franklin*, 505 U.S. at 802.   Such relief should therefore "be ordered only in the rarest of circumstances" because, "in general, this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."   *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) (quoting *Franklin*, 505 U.S. at 802-03), *vacated and remanded on other grounds,* 138 S. Ct. 353 (2017); *see also Swan v. Clinton*, 100 F.3d 973, 977 n.2 (D.C. Cir. 1996) (recognizing that the same concerns that preclude injunctive relief against the President also preclude declaratory relief).   Given that the FAC lacks any allegations against the President and that Plaintiffs' purported harm would be redressed (if it all) by declaratory or other relief against the Secretary and the Census Bureau, the President should be dismissed from this case.   *See Franklin*, 505 U.S. at 803 ("[W]e need not decide whether injunctive relief against the

President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone."); *Int'l Refugee Assistance Project*, 857 F.3d at 605 ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." (quoting *Franklin*, 505 U.S. at 828)).

Plaintiffs' claim against the United States is equally flawed because it is barred by sovereign immunity. "The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced." *Lynch v. United States*, 292 U.S. 571, 582 (1934). Plaintiffs identify no waiver of sovereign immunity that would allow them to sue the federal government. The United States should therefore be dismissed from this case.

## CONCLUSION

In an unprecedented lawsuit, Plaintiffs not only assert entirely speculative injuries that may never occur, but they also seek to constitutionalize for judicial review every logistical decision in the 10-year lead up to the census and install this Court, rather than the Secretary of Commerce, as the decisionmaker of the census. But the Constitution envisions a nuanced process by institutions capable of weighing the numerous factors that must be considered in such policy choices—the Political Branches. The Court should therefore decline Plaintiffs' invitation to, in effect, serve as the monitor for the largest census in American history, and Defendants' motion to dismiss should be granted.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Director, Federal Programs Branch

/s/ Stephen Ehrlich
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 305-9803
Fax:  (202) 616-8470
Email:  stephen.ehrlich@usdoj.gov

*Counsel for Defendants*