**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; PRINCE GEORGE'S COUNTY MARYLAND; PRINCE GEORGE'S COUNTY MARYLAND NAACP BRANCH; ROBERT E. ROSS; H. ELIZABETH JOHNSON, | ) ) ) ) ) ) ) | Case No. 8:18-cv-00891-PWG |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| BUREAU OF THE CENSUS; RON JARMIN, Acting Director, Bureau of the Census; WILBUR ROSS, Secretary of Commerce; DONALD TRUMP, President of the United States; and THE UNITED STATES, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................2

I.     The Legal Background and History of the Census .................................................3

II.    The Resources and Preparations for the 2020 Census are Woefully Inadequate and Will Cause a Differential Undercount of Hard-to-Count Communities. .........................................................................................................4

A.    Defendants Have Underfunded the 2020 Census ........................................4

B.    Defendants Have Drastically Reduced the 2020 Census Staff and Field Presence ............................................................................................5

III.    Design Flaws in the 2020 Census Will Exacerbate the Differential Undercount............................................................................................................6

IV.    Defendants' Lack of Testing Will Further Exacerbate Their Shortages and Design Flaws.........................................................................................................7

V.    Plaintiffs Are at Risk of Imminent Harm As a Result of the Undercount ..............7

ARGUMENT .......................................................................................................................8

I.    Plaintiffs Have Article III Standing to Challenge Defendants' Deficient Preparations for the 2020 Census ..........................................................................8

A.    Plaintiffs Plausibly Allege That Defendants' Deficient Preparations Place Plaintiffs at Risk of Imminent Harm .................................................9

1.    Plaintiffs have plausibly alleged that Defendants' deficient preparations will cause a severe differential undercount. ...............9

2.    Plaintiffs have plausibly alleged various forms of harm caused by a differential undercount .............................................12

B.    Plaintiffs' Harms Are Fairly Traceable to Defendants' Conduct ..............14

C.    Plaintiffs Allege Redressable Harms .......................................................16

II.    Plaintiffs' Claims are Ripe for Review.................................................................18

III.    Defendants' Deficient Preparations are Not Immune from Judicial Review ........19

i

      A.    The Text of the Constitution Does Not Exempt Defendants from Judicial Review. ........................................................................................ 19

      B.    Judicially Discernible and Manageable Standards Exist That Permit Review of Defendants' Conduct of the Census. ........................... 22

IV.    Plaintiffs State a Claim for a Violation of the Enumeration Clause ..................... 24

V.    The United States Is Not Immune From Suit ........................................................ 30

CONCLUSION ................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott by Abbott v. Burke*,
   575 A. 2d 359 (N.J. 1990).................................................................................26

*Al Shimari v. CACI Premier Tech. Inc.*,
   840 F.3d 147 (4th Cir. 2016) ..........................................................................19

*Attias v. Carefirst, Inc.*,
   865 F.3d 620 (D.C. Cir. 2017) ....................................................................9, 15

*Baker v. Carr*,
   369 U.S. 186 (1962)......................................................................................2, 19

*Bennett v. Spear*,
   520 U.S. 154 (1997)....................................................................................14, 16

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ..........................................................................12

*Brown v. Plata*,
   563 U.S. 493 (2011)..........................................................................................17

*Campaign for Fiscal Equity, Inc. v. State*,
   801 N.E.2d 326 (2003).....................................................................................26

*Carey v. Klutznick*,
   637 F.2d 834 (2d Cir. 1980)..................................................................12, 20, 30

*Cent. Delta Water Agency v. United States*,
   306 F.3d 938 (9th Cir. 2002) ..........................................................................11

*Centro Presente v. U.S. Dept. of Homeland Security*,
   18-cv-10340, 2018 WL 3543535 (D. Mass. July 23, 2018) ...........................3

*City of Camden v. Plotnick*,
   466 F. Supp. 44 (D.N.J. 1978) ........................................................................12

*City of Detroit v. Franklin*,
   4 F.3d 1367 (6th Cir. 1993) ................................................................12, 24, 25

*City of New York v. U.S. Dep't of Commerce*,
   739 F. Supp. 761 (E.D.N.Y. 1990) .................................................................20

*City of Philadelphia v. Klutznick,*
 503 F. Supp. 663 (E.D. Pa. 1980) ..................................................................21, 24

*City of Willacoochee v. Baldridge,*
 556 F. Supp. 551 (S.D. Ga. 1983).........................................................................12

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013)..............................................................................14, 15, 24

*District of Columbia. v. Trump,*
 17-cv-1596, 2018 WL 3559027 (D. Md. July 25, 2018) ......................................26

*District of Columbia v. Trump,*
 291 F. Supp. 3d 725 (D. Md. 2018)............................................................15, 16, 17

*District of Columbia v. U.S. Dep't of Commerce,*
 789 F. Supp. 1179 (D.D.C. 1992) .........................................................................20

*Federation for American Immigration Reform (FAIR) v. Klutznick,*
 486 F. Supp. 564 (D.D.C.1980) ............................................................................13

*Franklin v. Massachusetts,*
 505 U.S. 788 (1992)........................................................................................17, 29

*Franks v. Ross,*
 313 F.3d 184 (4th Cir. 2002) ................................................................................18

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,*
 204 F.3d 149 (4th Cir. 2000) .........................................................................11, 16

*Gaffney v. Cummings,*
 412 U.S. 735 (1973).............................................................................................25

*Glavin v. Clinton,*
 19 F. Supp. 2d 543 (E.D. Va. 1998) .....................................................................13

*Harris v. Champion,*
 15 F.3d 1538 (10th Cir. 1994) .............................................................................26

*In re KBR, Inc., Burn Pit Litig.,*
 744 F.3d 326 (4th Cir. 2014) ...............................................................................19

*Jacinto-Castanon de Nolasco v. U.S. Immigration and Customs Enforcement,*
 18-cv-1536, 2018 WL 3472624 (D.D.C. July 19, 2018) ......................................30

*Karcher v. Daggett,*
 462 U.S. 725 (1983).............................................................................................13

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v.*
   *OpenBand at Lansdowne*, LLC, 713 F.3d 187 (4th Cir. 2013) ...............................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)...............................................................................................................15

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..................................................................................................................9

*Miller v. Brown*,
   462 F.3d 312 (4th Cir. 2006) ..................................................................................................18

*New York v. United States Dep't of Commerce*,
   18-cv-2921, 2018 WL 3581350 (S.D.N.Y. July 26, 2018)............................................ passim

*Nixon v. United States*,
   506 U.S. 224 (1993)................................................................................................................19

*Pub. Defender v. State*,
   115 So. 3d 261 (Fla. 2013)......................................................................................................26

*Ridge v. Verity*,
   715 F. Supp. 1308 (W.D. Pa. 1989)........................................................................................13

*Sharrow v. Brown*,
   447 F.2d 94 (2d Cir. 1971)......................................................................................................13

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)..............................................................................................................8

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008)................................................................................................................16

*State ex. rel. Missouri Pub. Defender Comm'n v. Waters*,
   370 S.W. 3d 592 (Mo. 2010) ..................................................................................................26

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014).............................................................................................................9

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996).................................................................................................16

*Townes v. Jarvis*,
   577 F.3d 543 (4th Cir. 2009) ..................................................................................................16

*Tucker v. Dep't of Commerce*,
   958 F.2d 1411 (7th Cir. 1992) ...........................................................................................12, 20

*U.S. Dep't of Commerce v. Montana*,
   503 U.S. 442 (1992)................................................................19

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
   11 F. Supp. 2d 76 (D.D.C. 1998)........................13, 16, 18, 20, 21, 29

*U.S. v. Rickenbacker*,
   309 F.2d 462 (2d Cir. 1962)........................................................25

*Utah v. Evans*,
   536 U.S. 452 (2002)........................................................ passim

*Weigel v. Maryland*,
   950 F. Supp. 2d 811 (D. Md. 2013)..............................................16

*Wesberry v. Sanders*,
   376 U.S. 1 (1964)...................................................................13

*Wikimedia Found. v. Nat'l Sec. Agency*,
   857 F.3d 193 (4th Cir. 2017) ....................................................10

*Wilbur v. City of Mount*,
   989 F. Supp. 2d 1122 (W.D. Wash. 2013)....................................26

*Wisconsin v. City of New York*,
   517 U.S. 1 (1996)........................................................ passim

*Woods v. City of Greensboro*,
   855 F.3d 639 (4th Cir. 2017) ....................................................29

*Young v. Klutznick*,
   497 F. Supp. 1318 (E.D. Mich. 1980)..........................................20

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
   780 F.3d 597 (4th Cir. 2015) ....................................................10

## STATUTES

5 U.S.C. § 702..........................................................................30

13 U.S.C. §§ 1 *et seq.*.................................................................4

Md. Code Ann., State Gov't §§ 2-201 ...........................................13

**INTRODUCTION**

Plaintiffs allege, based largely on public information, that Defendants' plans and preparations for the 2020 Census are so severely deficient as to present an imminent threat to a fair and accurate census, in violation of Defendants' constitutional obligations. Plaintiffs—an organization devoted to the equality of racial minorities; a historically undercounted, racially diverse county; and two residents of that county—are among those most at risk of harm due to Defendants' neglect, and brought this action at a critical juncture in order to remedy this imminent threat.

Contrary to Plaintiffs' well-pleaded allegations, Defendants simply assure this Court that they have conducted "more wide-ranging and more advanced preparation and operations than any previous decennial census." Defs.' Mem. at 5. But to avoid testing this claim, Defendants repeatedly stretch the law to try to insulate this case from judicial review.

First, Defendants contend that Plaintiffs lack standing to obtain relief from this Court because their injuries are too speculative, are not traceable to the Defendants' actions, and cannot be redressed. Yet Plaintiffs have alleged in detail how Defendants' deficient plans, procedures, and preparations will lead to a severe differential undercount, and thus will cause Plaintiffs multiple well-established harms—including the loss of federal funding and vote dilution at the state and federal level. These harms are concrete and specific, and result directly and predictably from a failed census.

Second, Defendants suggest Plaintiffs' claims are not ripe because the 2020 Census has not yet begun. But Plaintiffs are at imminent risk of these harms now, and need not wait to bring suit until after the Census begins, when the deficiencies identified can no longer be remedied.

Third, Defendants argue that the Constitution grants them unreviewable discretion in conducting the census, no matter the claim against them. But this argument ignores that in over

five decades of census-related litigation—from the Supreme Court's 1962 decision in *Baker v. Carr* to the decision last month by Judge Furman in the Southern District of New York—no court has ever refrained from reviewing this vital Constitutional obligation on that basis.

<u>Fourth</u>, Defendants argue that Plaintiffs cannot state a claim under the Enumeration Clause. Defendants, however, improperly invent an overly restrictive Enumeration Clause standard from whole cloth. Under the existing standards that courts have consistently applied, Plaintiffs' well-pleaded allegations as to Defendants' radical deficiencies and departures from sufficient levels of resources and planning, taken together, are sufficient for this case to advance to discovery. Finally, Plaintiffs may bring suit against the United States because it shares in the constitutional obligation to conduct a reasonably accurate census.

## BACKGROUND

On March 28, 2018, Plaintiffs brought this action asserting a single constitutional claim, a violation by Defendants of Article I, Section 2 of the Constitution's requirement to conduct an "actual Enumeration" of all residents every ten years. Plaintiffs NAACP, Prince George's County NAACP, Prince George's County, and two NAACP members who are residents of Prince George's County allege that Defendants' plans and preparations for the 2020 Census are so severely deficient as to create a substantial risk of, and in fact lead inevitably to, a significant undercount of at-risk populations termed "hard-to-count communities," including African-Americans, non-English speakers, and people in rural areas. Defendants have systematically reduced the resources necessary to complete an accurate count, introduced design flaws disproportionately affecting hard-to-count communities, such as an under-tested online counting procedure, and failed to vet and prepare for these deficiencies. These deficiencies amount to severe

and continuing neglect by Defendants of their constitutional duty.[1] If they are not remedied, Plaintiffs are at imminent risk of being undercounted, and thus suffering concrete harm in the loss of federal funding and diminished political representation.

## I.   The Legal Background and History of the Census

Article I, Section 2 of the U.S. Constitution mandates that the federal government conduct an "actual Enumeration" of all residents every ten years. The Constitution's framers recognized that "the calculation of populations could be and often were skewed for political or financial purposes," and thus intended for the phrase "actual Enumeration" to require an "actual counting[.]"[2] In securing the "fair representation of the people," the original census legislation required enumerators to visit each household. First Amended Complaint ("FAC") ¶¶ 20–21. After the passage of the Fourteenth Amendment and its abrogation of the Three-Fifths Clause, apportionment had to be based on "the whole number of persons in each State," U.S. Const. amend. XIV, § 2. An accurate census—one counting "the whole number of persons in each State" and rejecting a structural undercount of African-Americans—thus became the very foundation of congressional representation.

The federal government "uses census data to allocate hundreds of billions of dollars in public funding" for items such as education, health care, housing, and transportation. FAC ¶ 15. Census data also affects political representation, governing seat apportionment, the boundaries of

---

[1] One district court recently declined to dismiss constitutional claims against the President, notwithstanding the narrow circumstances in which such claims may proceed. *Centro Presente v. U.S. Dept. of Homeland Security,* 2018 WL 3543535, at *17 (D. Mass. July 23, 2018) (citing *Int'l Refugee Assistance Project v. Trump,* 857 F.3d 554, 605 (4th Cir. 2017)). Nevertheless, because Plaintiffs agree that they can obtain full relief against the remaining Defendants, they do not contest the dismissal of Defendant President Donald J. Trump in this action.

[2] *Utah v. Evans*, 536 U.S. 452, 500 (2002) (Thomas, J., concurring in part and dissenting in part).

congressional districts, and voting rights enforcement. *Id.* ¶ 16. Many states, including Maryland, use census data for purposes of state legislative districting. *Id.* ¶ 17.

In the modern era, the census is governed by the Census Act, enacted in 1976. 13 U.S.C. §§ 1 *et seq.* The Act delegates to the Secretary of Commerce the duty to "take a decennial census of population as of the first day of April of such year," and creates the Census Bureau within the Department of Commerce. *Id.* The Census Bureau has identified as "hard-to-count" populations, among others, racial and ethnic minorities, non-English speakers, lower income people, the homeless, and undocumented immigrants. FAC ¶ 23.

## II.     The Resources and Preparations for the 2020 Census are Woefully Inadequate and Will Cause a Differential Undercount of Hard-to-Count Communities.

Past censuses have resulted in undercounts of hard-to-count communities, but Defendants' preparations for the 2020 Census "are so deficient as to raise imminent concerns of a substantially greater undercount" of these populations. *Id.* ¶ 28. Defendants' deficiencies in resource allocation, preparation, and planning—as shown by persistent underfunding, understaffing, repeated test cancellations, and a reduced field presence, among other things—have placed Defendants "well behind the typical pace" of preparation at this stage of the cycle, and amount to the "conspicuous neglect of a constitutional duty." *Id.* ¶¶ 29–30.

### A.     Defendants Have Underfunded the 2020 Census

The cost of the census has effectively doubled every decade from 1970 to the present. *Id.* ¶ 32. As the census year approaches, funding for the Census Bureau normally increases at an exponential rate. For example, between 2007 and 2008, the Census Bureau's budget increased by 61 percent. *Id.* ¶ 34. However, the Trump Administration's 2018 budget inexplicably requested an increase of only *two percent* from the amount requested for 2017. *Id.* ¶ 36. Although, on March 23, 2018, President Trump signed an omnibus spending bill allocating $2.814 billion to the Census

Bureau, the bill funds the government only through September 2018. It is inadequate to redress the massive census underfunding issues that have already accumulated, and there is no guarantee that the Census Bureau will receive any increase in the current funding level for the 2020 Census after September 2018. *Id.* ¶¶ 50–53.

The Commerce Department has acknowledged the severity of underfunding; in October 2017, Defendant Secretary Ross told Congress that the lifecycle cost of the 2020 Census would be $3.3 billion above the Commerce Department's original estimate. *Id.* ¶ 37. Former Census Bureau directors have also expressed alarm about the Bureau's funding shortage; indeed, two former Census Bureau Directors described the 2020 Census as "under threat by uncertain funding" and explained that "[t]his is a critical period in which to begin operations[.]" *Id.* ¶¶ 38–41. A senior official in the Government Accountability Office (GAO) testified that the 2020 Census cost estimate "was not reliable and did not adequately account for risk." *Id.* ¶ 39.

This underfunding has been used by Defendants to justify the scaling back and cancellation of critical tests, trainings, advertising, community outreach, and other indispensable preparations—all of which having a disproportionate effect on hard-to-count communities.

### B.   Defendants Have Drastically Reduced the 2020 Census Staff and Field Presence

The 2020 Census is dangerously understaffed. The understaffing extends from top leadership positions down to routine staff vacancies, and the Census Bureau has lacked both a permanent director and a deputy director for over a year, during a time of critical preparations. *Id.* ¶¶ 62–66. At lower levels, first a hiring freeze instituted by President Trump, and then personnel cuts directed by the Office of Management and Budget, have left the Census Bureau with staff shortages and plans for hiring a drastically reduced number of enumerators. *Id.* ¶¶ 55–59. Further, Defendant Census Bureau has "cut its on-the-ground presence and field

infrastructure significantly," reducing not only its workers but number of field offices as well. *Id.* ¶ 85. Finally, Defendants have cut their partnerships with community specialists—a key component of reaching hard-to-count communities. *Id.* ¶ 46. These deficiencies in leadership, staff, and field presence have translated to Defendants' plans to "conduct in-person visits"—the visits used to follow up with less responsive populations—"at a fraction of past rates." *Id.* ¶ 85.[3]

### III.    Design Flaws in the 2020 Census Will Exacerbate the Differential Undercount

The existing preparations for the 2020 Census contain major design flaws that, if left unresolved, will substantially worsen the 2020 undercount, with minority and other hard-to-count communities experiencing the most dramatic consequences. First, in place of their customary on-the-ground visits, Defendants intend to rely on the first-ever on-line census. Second, in the event of non-responses, Defendants plan to rely on state administrative databases of varying quality. *Id.* ¶ 68–70. The effects of these two under-tested innovations coupled with a significant decrease in in-person follow-up visits will have devastating effects on the enumeration of populations with historic undercounts. *Id.* ¶¶ 72–79; ¶¶ 85–94.

The use of the first on-line census will disproportionately affect low-income and minority communities, creating a substantial risk of a differential undercount. There is a stark digital divide in the United States; households earning incomes less than $30,000, rural individuals, and African-American and Hispanic communities are all more likely to have reduced Internet access compared to their White counterparts. *Id.* ¶¶ 76–78. Moreover, even assuming an adequate level of access to the new on-line system, the Census Bureau has already failed to prepare a

---

[3] The limited discovery produced by Defendants thus far, though not appropriately considered on this motion to dismiss, confirms that Defendants' field presence and community partnership staffing as of June 1, 2018 lags far behind that as of June 1, 2008, notwithstanding the larger population that must be counted in the 2020 Census.

functioning digital platform. At the time of filing, Defendant Ross admitted at a Congressional hearing that only four of the 43 necessary technological systems had been completely developed and less than half of the systems had any level of functionality. *Id.*¶ 80.

The Census Bureau also plans to rely on federal and state administrative records to play the role previously satisfied by in-person follow-up visits. *Id.* ¶ 89. These records are often unreliable and of poor quality and will not suffice to fill in the gaps left by the on-line system. *Id.* ¶ 90. State records also often lack data about race, ethnicity, and the relationships among household members – data that are captured by the decennial census. *Id.*

## IV.    Defendants' Lack of Testing Will Further Exacerbate Their Shortages and Design Flaws

In the face of a growing population since 2010, with drastic shortages in on-the-ground resources, and entirely new methods of counting using on-line responses and administrative records, Defendants' need to conduct testing is at an all-time high. Nevertheless, Defendants canceled 2017 field tests in Puerto Rico, North Dakota and Washington State. *Id.* ¶ 44. Defendants canceled two of three sites for the 2018 End-to-End Census Test, which functions as a dress rehearsal that provides the basis for subsequent operational decisions. *Id.* The Census Bureau has also delayed the opening of six Regional Census Centers. *Id.* Such a significant reduction in testing would have dire consequences for a census in any year, let alone in a year with significant methodological change, including the first-ever on-line count. The threat of an undercount in 2020 is both imminent and predictable, as is the increased likelihood of a differential undercount.

## V.    Plaintiffs Are at Risk of Imminent Harm As a Result of the Undercount

As a majority African-American county classified as hard-to-count, Plaintiff Prince George's County has historically suffered differential undercounts, resulting in the loss of federal

funds and depriving the County and its residents, including Plaintiffs Ross and Johnson, of fair and equitable representation in the Maryland State Legislature and in Congress. *Id.* ¶¶ 97–108. Due to Defendants' drastic deficiencies for the 2020 Census, Plaintiffs are likely to face a far greater undercount, and suffer far larger injuries in the loss of federal funding and vote dilution. *Id.* ¶¶ 28–29, 106. Plaintiffs NAACP and its Prince George's County Branch face the same harms, because their members are subject to the same differential undercount. *Id.* ¶¶ 109–10.

The harm faced by Plaintiffs is certainly imminent.  As two former Census Bureau directors explained, "This is a critical period in which to begin operations, including well-researched advertising messages, staffing and training an army of temporary workers, opening field offices and testing new technology. The Census Bureau cannot do any of this at the last minute, just as the Defense Department cannot prepare for military action when a threat is imminent." *Id.* ¶ 41. If Defendants' failures are not promptly remedied, the deficiencies in the 2020 Census will become irremediable. *Id.* ¶¶ 115–17.

## ARGUMENT

I. **Plaintiffs Have Article III Standing to Challenge Defendants' Deficient Preparations for the 2020 Census**

Defendants argue that Plaintiffs have failed to demonstrate all three elements of standing. As detailed below, Plaintiffs' complaint sets forth well-recognized forms of concrete and particularized harms, including but not limited to vote dilution, malapportionment, and loss of federal funding, which are imminent and have a substantial risk of occurring, are directly traceable to Defendants' conduct, and are redressable by judicial action.

To establish standing, a Plaintiff must allege facts that show (1) that Plaintiffs have suffered an injury in fact (2) that is fairly traceable to the challenged action of the defendant and (3) is redressable by a favorable judicial decision. *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016)

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the pleading stage, the plaintiff must simply "clearly . . . allege facts demonstrating" each element. *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). To defeat a motion to dismiss for lack of standing, "plaintiffs are required only to state a *plausible* claim that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (emphasis in original). Further, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561.

### A.   Plaintiffs Plausibly Allege That Defendants' Deficient Preparations Place Plaintiffs at Risk of Imminent Harm

An "injury in fact" is any invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. Defendants argue that a threatened injury must be "certainly impending," Defs.' Mem. at 8, but it is also sufficient if "there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).

Defendants claim that Plaintiffs' asserted injuries rely on a "tenuous chain of speculative predictions." Defs.' Mem. at 8–9. But taking Plaintiffs' allegations as true, as the Court must at this stage, Plaintiffs have plausibly alleged a substantial risk of injury and an impending injury: (1) Defendants' severe deficiencies in their plans and preparations for the 2020 Census will lead to a severe, differential undercount of hard-to-count communities; and (2) Plaintiffs, as members or representatives of those communities, will be harmed by that differential undercount.

### 1.   *Plaintiffs have plausibly alleged that Defendants' deficient preparations will cause a severe differential undercount.*

As alleged in the complaint, Defendants' deficient preparations for the 2020 Census will result in a disproportionately severe undercount of minority and other hard-to-count communities, including Plaintiff Prince George's County. The Census has historically undercounted racial and

ethnic minorities; the 2010 Census had a net undercount of 2.1% of African-Americans and 1.5% of Hispanic Americans, totaling 1.5 million uncounted residents. FAC ¶¶ 22–25. As a majority African-American county, Prince George's County has experienced significant undercounts in past Censuses—even when Defendants' preparations were demonstrably less deficient than they are currently—including the highest net undercount of any county in Maryland for the 2010 Census. *Id.* ¶¶ 95–101.

Plaintiffs allege that Defendants' current failures will exacerbate this historic undercount. *Id.* ¶¶ 28–31, 58–59, 75–79. Contrary to Defendants' argument, Plaintiffs allege that deficiencies in Defendants' initial outreach *and* their follow-up process will inevitably worsen the undercount. *See, e.g.*, *id.* ¶¶ 85–91. It is not enough for Defendants to argue these claims are speculative. Even if Plaintiffs' claims were speculative, which they are not, what "may perhaps be speculative at summary judgment can be plausible on a motion to dismiss," and the Court should avoid "recasting plausibility into probability by demanding predictive certainty." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208, 212 (4th Cir. 2017).

As they have in the other pending census cases, Defendants repeatedly contest Plaintiffs' well-pleaded allegations, even suggesting that this Court may instead rely on Defendants' own aspirational planning documents. *See, e.g.*, Defs.' Mem. at 3–5, 8–9. However, courts must "focus their inquiry on the sufficiency of the facts relied upon by the plaintiffs in the complaint." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).[4] Judge Furman thus properly

---

[4] Defendants rely on *Zak* for the proposition that the Court may rely on their planning documents, but in that case, the Fourth Circuit reversed the lower court for relying on documents outside the complaint, noting that it was a "narrow exception," a court may only "judicially notice a fact that is not subject to reasonable dispute," and even when considering outside facts, "the court must construe such facts in the light most favorable to the plaintiffs." *Id.* at 607. Defendants are citing their own documents in order to contradict Plaintiffs' well-pleaded allegations, and therefore these documents cannot be relied upon. Moreover, even if the Court were to consider publicly available information, there has been a continued

rejected these attempts, finding the plaintiffs' similar causal chain—(1) the defendants' actions will cause an undercount and (2) the plaintiffs will be harmed as a result—plausibly established standing, and noting that "Defendants' reliance on contrary evidence merely raises disputes of facts that the Court may not resolve on a motion to dismiss." *New York v. United States Dep't of Commerce*, 2018 WL 3581350, at \*8 (S.D.N.Y. July 26, 2018).[5]

Defendants further argue that Plaintiffs cannot be certain that the deficiencies will remain unresolved by the time of the 2020 Census, and suggest that they may, in fact, fix all of the problems by then. Defs.' Mem. at 9. But Plaintiffs do "not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000). Moreover, "the possibility that defendants may change their course of conduct" does not defeat a claim related to a threatened harm. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002). "It would be inequitable in the extreme . . . to permit one party to create a significantly increased risk of harm to another, and then avoid the aggrieved party from trying to

---

stream of public reports regarding additional deficiencies that contradict the rosy picture Defendants try to paint regarding the 2020 Census. *See, e.g.*, Sam Adler-Bell, *How the Trump Administration is Botching Its Only Trial Run for the 2020 Census*, The Intercept (Mar. 31, 2018) https://theintercept.com/2018/03/31/census-2020-citizenship-question-providence-immigrants/ (describing failures with the only 2018 dress rehearsal); Hansi Lo Wang, *Census Bureau Stops Plans for 2020 Census Advisory* Committee, NPR (July 25, 2018), https://www.npr.org/2018/07/25/632308858/census-bureau-stops-plans-for-2020-census-advisory-committee (describing cancellation of the 2020 advisory committee, which one expert noted provides further evidence that "there's an intentionality to prevent a complete count."); Hansi Lo Wang, *'I will Call the AG'" Trump Officials Pushed for Census Citizenship Question*, NPR (Jul. 30, 2018) https://www.npr.org/2018/07/30/632847876/i-will-call-the-ag-trump-officials-pushed-for-census-citizenship-question (describing Defendants' deceptive public rationales for the late addition of the citizenship question). These recent deficiencies and more would be a part of this case in discovery.

[5] At oral argument on Defendants' motion to dismiss in another census case in the District of Maryland, Judge Hazel expressed similar skepticism regarding Defendants' factual disputes as to standing. *Kravitz v. Dep't of Commerce*, No. 18-cv-1041, ECF 45 (Jul. 18, 2018 Oral Argument Tr.) at 17–18 ("[T]hey at least do allege that there will be an undercount . . . and we are at a motion to dismiss stage.")

prevent the potential harm because the party that created the risk promises that it will ensure that the harm is avoided, yet offers no specific or concrete plan of action for doing so." *Id.* Plaintiffs have plausibly alleged that Defendants' failures will lead to a deeply injurious undercount.

        2.     *Plaintiffs have plausibly alleged various forms of harm caused by a differential undercount*

Plaintiffs allege four different types of imminently threatened harm, all recognized as establishing standing in census-related cases: (1) the loss of federal funding; (2) vote dilution from malapportionment of Congressional Representatives; (3) vote dilution from state-level redistricting; and (4) the diversion of organizational resources. Defendants implausibly argue that not a *single* Plaintiff can establish *any* of these harms. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."). Defendants' arguments may be easily rejected.

*First*, Plaintiffs have plausibly alleged that the undercount will deprive them of federal funding, even more so than it has for Prince George's County in the past. *See* FAC ¶¶ 104–06. "[T]here is no doubt that, as a matter of fact, the allocation of state and federal funds is heavily influenced by census figures." *Tucker v. Dep't of Commerce*, 958 F.2d 1411, 1415 (7th Cir. 1992). As courts across multiple circuits have held, local government entities can establish standing based on a "claim that the census undercount will result in a loss of federal funds." *City of Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993); *Carey v. Klutznick*, 637 F.2d 834, 836–38 (2d Cir. 1980) (finding that New York City and State had standing to challenge the census based on allegations that an undercount that would result in a loss of federal funds to the city and state).[6] Defendants argue that Plaintiffs have not alleged a *differential* undercount that would lead to a loss

---

[6] *See also City of Willacoochee v. Baldridge*, 556 F. Supp. 551, 554 (S.D. Ga. 1983); *City of Camden v. Plotnick*, 466 F. Supp. 44, 47–50 (D.N.J. 1978).

of funding, Defs.' Mem. at 11, but this ignores the bulk of the complaint. Plaintiffs' allegations that members of the NAACP, Prince George's County, and other hard-to-count communities and their residents (including NAACP members) will be disproportionately harmed by Defendants' deficiencies form the crux of Plaintiffs' case. *See, e.g.*, FAC ¶¶ 28–29, 45, 75–78, 92–117.

*Second*, because census data impacts Congressional apportionment, the undercount caused by Defendants will create a substantial risk that Plaintiffs will be deprived of fair representation in Congress. *Id.* ¶¶ 16, 108. Defendants' "failure to conduct a proper enumeration may injure the plaintiffs" when it results in "malapportioned districts" in Congress. *Glavin v. Clinton*, 19 F. Supp. 2d 543, 548–49 (E.D. Va. 1998), *aff'd sub nom Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329–31 (1999) (the "expected loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement" for Article III standing); *see also Utah v. Evans*, 536 U.S. 452, 464 (2002) (concluding that Utah had standing to challenge census methodology based on loss of House seat).[7]

*Third*, Plaintiffs have alleged a substantial threat of harm to Plaintiffs' representational and electoral interests at the state level. Like those in many states, Maryland's Legislature uses census data for both State and Congressional redistricting purposes. FAC ¶ 107; Md. Code Ann., State Gov't §§ 2-201; 2-202. A state's reliance on decennial census data as the population base for redrawing state and local districts to be "as nearly of equal population as is practicable" can form

---

[7] Defendants' few cited census cases are all inapposite because they involve far less precise theories of harm (such as the inclusion of undocumented immigrants in the Census), or more importantly, take place at the summary judgment stage. *See Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (granting summary judgment dismissing plaintiffs' claims that they were harmed by "the inclusion of illegal aliens in the census figures"); *Federation for American Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C.1980) (same); *Sharrow v. Brown*, 447 F.2d 94, 96 (2d Cir. 1971) (holding that the plaintiff's theory of harm based on the alleged failure to compile statistics on "male adults in each State whose right to vote is denied or abridged" did not establish standing in motion for injunctive relief).

the basis of an injury for purposes of standing. *Karcher v. Daggett*, 462 U.S. 725, 782 n. 14 (1983); *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964).

*Fourth*, and finally, Plaintiffs may also base standing on "reasonably incur[red] costs to avoid" a substantial risk of harm resulting from Defendants' conduct. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Plaintiffs NAACP and its Prince George's County Branch have diverted resources in order to address Defendants' shortcomings with respect to census preparations, including providing NAACP and community members with extensive training on how to mitigate the harm to their communities caused by a deficient Census. FAC ¶¶ 111, 114. Defendants provide no argument or evidence contesting Plaintiffs' claims that they will be required to expend valuable resources in order to mitigate the harms caused by an underfunded and unprepared Census Bureau.

### B.     Plaintiffs' Harms Are Fairly Traceable to Defendants' Conduct

Defendants argue that Plaintiffs' theory of injury is too speculative because it depends on individual people failing to comply with their legal obligation to answer the census, and is therefore not fairly traceable to Defendants' conduct. This cynical argument should be rejected.

At the pleading stage, the burden of alleging traceability is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997). To establish standing, Plaintiffs must allege injuries that are "fairly traceable to the actions of the defendant." *Id.* at 162. Defendants' conduct need not be "the very last step in the chain of causation." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne,* LLC, 713 F.3d 187, 197 (4th Cir. 2013). Rather, the causation element of standing is satisfied "where the plaintiff suffers an injury that is produced by the determinative or coercive effect" of the Defendants' conduct "upon the action of someone else." *Lansdowne*, 713 F.3d at 197 (quoting *Bennett*, 520 U.S. at 169). The main inquiry is simply whether the alleged

injury "can be fairly traced through the third party's intervening action" to the Defendants' actions. *District of Columbia v. Trump*, 291 F. Supp. 3d 725, 749 (D. Md. 2018) ("*D.C. v. Trump*").

Defendants exaggerate the causal chain required to find standing, and argue that the intervening acts of individuals from hard-to-count communities failing to respond severs the chain of causation, thus depriving Plaintiffs of standing. As noted above, Plaintiffs' alleged chain of causation contains two steps: Defendants have flagrantly failed to prepare for the 2020 Census and thus will undercount hard-to-count communities; those communities, including Plaintiffs, will be harmed. This case is thus far from the situation in *Clapper*, on which Defendants rely. In *Clapper*, which was decided at the summary judgment stage, "the plaintiffs' theory of injury depended on a chain of causation with five discrete [speculative] links," and required plaintiffs to prove that the defendants' generalized surveillance conduct "would cause injury to *particular* individuals." *New York*, 2018 WL 3581350, at *10–11 (citing *Clapper*, 568 U.S. at 410–14).

The mere fact that the intervening conduct of third parties may also contribute to Plaintiffs' injuries is not sufficient to defeat standing, so long as the Plaintiffs' alleged injuries remain fairly traceable to actions by Defendants. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing."). In *Attias*, the D.C. Circuit Court of Appeals found standing despite intervening illegal acts by third parties because, as here, the alleged harm flowed from the defendants' negligence. 865 F.3d at 629. The traceability requirement "does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant." *Id*. As in *Attias*, the harm alleged by Plaintiffs here is fairly traceable to Defendants' systemic neglect. For example, Plaintiffs have plausibly alleged that Defendants' sharp decreases in advertising, outreach, and physical presence in the field will lead

to decreased responsiveness, particularly in hard-to-count communities.  *See, e.g.*, FAC ¶¶ 46, 55-59, 85.

Defendants also argue that Maryland's decision to rely on census figures for redistricting breaks the causal chain. The Supreme Court has foreclosed this argument, finding standing in a challenge to the census where states "require use of federal decennial census population numbers for their state legislative redistricting." *Dep't of Commerce*, 525 U.S. at 333. Defendants' traceability arguments should be rejected.

### C.      Plaintiffs Allege Redressable Harms

The redressability inquiry focuses on whether the *injury* that a plaintiff alleges is likely to be redressed through a favorable decision arising from the litigation. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286–87 (2008); *Townes v. Jarvis*, 577 F.3d 543, 547 (4th Cir. 2009). The relief need not be total, and can exist even if it could be undercut by discretionary actions by the Executive Branch, so long as the injury can be "reduced to some extent." *D.C. v. Trump*, 291 F. Supp. 3d at 750–52 (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007)); *Swan v. Clinton*, 100 F.3d 973, 980–81 (D.C. Cir. 1996). "[N]o explicit guarantee of redress . . . is required to demonstrate a plaintiff's standing." *Weigel v. Maryland*, 950 F. Supp. 2d 811, 828 (D. Md. 2013) (quoting *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 100 (4th Cir. 2011)).

At this early stage of the litigation, Plaintiffs have met their "relatively modest" burden to show that their injuries can be remedied by judicial action. *See Bennett,* 520 U.S. at 170–71. In order to remedy the harms in loss of funding and malapportionment that would be caused by an undercount, Plaintiffs have requested injunctive and declaratory relief.

A plaintiff seeking injunctive relief can show "redressability by 'alleg[ing] a continuing violation or the imminence of a future violation' of the statute at issue." *Friends of the Earth*, 204

F.3d at 162–63 (citation omitted). The Court need not "say at this juncture what precise form injunctive relief, if any, could take" if it "seems entirely plausible . . . that an appropriate injunction of some sort could be fashioned, were Plaintiffs to succeed on the merits." *D.C. v. Trump*, 291 F. Supp. 3d at 752. Here, Plaintiffs allege a wide and deep range of severe deficiencies in Defendants' plans and preparations for the 2020 Census, which together will cause Plaintiffs injury. Plaintiffs must take discovery and work with experts in order to fashion a proposed remedy. In other cases of systemic neglect of a constitutional obligation, courts have allowed Government defendants to propose a remedy, but they cannot refuse to remedy unconstitutional conduct because it would be difficult to do so. *Cf. Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."). At this early stage, it is sufficiently likely that there are remedies through which the "injury can be reduced to some extent." *D.C. v. Trump*, 291 F. Supp. 3d at 750.

Moreover, Constitutional challenges to apportionment are justiciable and redressable by declaratory relief against the Secretary of Commerce. *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (holding that the plaintiffs' injury was redressable by declaratory relief against the Secretary alone because the Secretary "certainly has an interest in defending her policy determinations concerning the census"); *see also Utah*, 536 U.S. at 459–64. A declaration from this Court clarifying and establishing the Secretary of Commerce and the Census Bureau's obligations to meet their Constitutional duty under the Enumeration Clause will affect Defendants' conduct such that Plaintiffs' injuries could be remedied. The *Franklin* plurality also held that declaratory relief as to executive and congressional obligations may afford redress, noting that "it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the

District Court, even though they would not be directly bound by such a determination." 505 U.S. at 803.

Plaintiffs have met their minimal burden at this stage to show that their alleged harms are redressable through injunctive and declaratory relief.

## II.     Plaintiffs' Claims are Ripe for Review

Defendants argue that Plaintiffs must wait until the 2020 Census has been conducted before bringing suit over its preparations. But as the Supreme Court has noted, waiting is both unnecessary and harmful: "It is certainly not necessary for this Court to wait until the census has been conducted to consider [challenges to the census plan], because such a pause would result in extreme—possibly irremediable—hardship." *Dep't of Commerce*, 525 U.S. at 332; *see also Miller v. Brown*, 462 F.3d 312, 321 (4th Cir. 2006) (finding claims ripe despite uncertainty about election procedures because "[w]aiting until the last minute to seek a final ruling will severely diminish the effectiveness of" the plaintiffs' preparation for the election and the "plaintiffs' injuries become worse each day [a] decision is delayed").

In determining whether a case is ripe, the court "balance[s] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002) (citation omitted). A "case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller*, 462 F.3d at 319. When considering hardship, courts "consider the cost to the parties of delaying judicial review." *Id.*

Plaintiffs allege that Defendants' various deficiencies in funding, hiring, and planning for the 2020 Census have created an impending risk of an undercount in the 2020 Census and harm to Plaintiffs. FAC ¶¶ 110–15. Those deficiencies have begun to set in and are "compounding with

each day that the 2020 Census draws nearer," such that they "will become irremediable." *Id.* ¶¶ 115, 117. Plaintiffs' allegations, taken as true, present the legal question of whether those manifest deficiencies amount to a violation of Defendants' constitutional obligations under the Enumeration Clause, as amended by Section 2 of the Fourteenth Amendment.

Defendants' argument that Plaintiffs' claim is too speculative because it is based on future events is little more than a restatement of its arguments on standing, and should be rejected. Defs.' Mem. at 17–18. The argument that this case should be dismissed because Defendants' deficiencies may be remedied prior to the 2020 Census must fail for the same reasons as above. *See supra* Part I.A.1 at 11. Nor do Defendants identify any hardship of their own beyond their participation in this case. Defendants' ripeness argument should be rejected.

## III.     Defendants' Deficient Preparations are Not Immune from Judicial Review

Defendants make the argument, never before accepted by a court, that conduct related to the census is immune from judicial review. Defendants' argument is meritless. This case is "well within the competence of the judiciary," *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458–59 (1992), and this Court may review Plaintiffs' claims by "engag[ing] in the traditional judicial exercise of determining whether particular conduct complied with applicable law." *Al Shimari v. CACI Premier Tech. Inc.*, 840 F.3d 147, 158 (4th Cir. 2016).

### A.     The Text of the Constitution Does Not Exempt Defendants from Judicial Review.

Under the political question doctrine, courts lack authority to resolve questions where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217 (1962). However, to bar review under the political question doctrine, such a constitutional commitment of authority must clearly vest sole discretion in a political branch "and nowhere else." *See, e.g.*, *Nixon v. United States*, 506 U.S. 224, 229

(1993). Just because a case "touches" on a power delegated to another branch does not mean that it "lies beyond judicial cognizance." *Baker*, 369 U.S. at 211; *see also In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 334 (4th Cir. 2014) ("[W]e remain mindful of the fact that '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803))).

Here, Defendants argue that the Constitution's mandate that Congress conduct an "actual Enumeration" of "the whole number of persons" every ten years, "in such Manner as [Congress] shall by Law direct" constitutes a "textually demonstrable constitutional commitment" to Congress of unreviewable discretion over the decennial census. Defs.' Mem. at 18–25. This argument is unfounded: No part of the text indicates that the grant of authority to Congress is exclusive. The Enumeration Clause only "impose[s] on Congress the responsibility to provide for the taking of a decennial census. It does not say that Congress and Congress alone has the responsibility to decide the meaning of, and implement, Article 1, Section 2, Clause 3." *Young v. Klutznick*, 497 F. Supp. 1318, 1326 (E.D. Mich. 1980), *rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981).

To this end, courts have "consistently rejected application of the political question doctrine in [census] cases." *New York*, 2018 WL 3581350, at *13. In fact, in nearly 50 years of census-related litigation, a court has never held that the Government's actions are unreviewable under the political question doctrine. *See, e.g.*, *Tucker*, 958 F.2d at 1415 ("The accuracy of the decennial census is not" a political question); *Carey*, 637 F.2d at 838 (finding that a challenge to the adequacy of address registers and field enumerators for the 1980 Census was not a political question); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 95 (D.D.C. 1998) (three-judge court) (holding that the census is not textually committed to Congress and recognizing that

"[c]ourts routinely adjudicate these matters"), *aff'd* 525 U.S. 316 (1999).[8]

In order to avoid this lopsided case law, Defendants create a false distinction: All of the census cases heretofore brought are "actual Enumeration" cases, which are reviewable, but this case concerns the "manner" of conducting the census, and thus is unreviewable. Defs.' Mem. at 20–21. But the Supreme Court's precedent renders this distinction untenable, as the Court has reviewed cases in which it expressly found that the plaintiffs were challenging the "manner" in which the census was conducted. *See Utah*, 536 U.S. at 474 (adjudicating challenge to the Bureau's use of hot-deck imputation as a "Manner" of conducting the census); *Wisconsin v. City of New York*, 517 U.S. 1, 17 (1996) (adjudicating dispute over the Secretary of Commerce's decision not to statistically adjust the census to correct for the undercount of minorities).

Defendants dismiss the Court's precedent as about only "calculation methodologies," Defs.' Mem. at 24, but as Judge Furman held in rejecting this exact argument, "challenges to 'calculation methodologies' . . . are no less challenges to the 'manner' in which the 'enumeration' is conducted than are the challenges in the present cases." *New York*, 2018 WL 3581350, at *14. As in that case, Plaintiffs' claim under the Enumeration Clause here "is that Defendants plan to conduct the census in a manner that does not satisfy the constitutional command to conduct an 'actual Enumeration,'" by conducting the 2020 Census with severe flaws in its resources and preparations. *Id.* This claim fits within the well-established body of precedent refusing to find

---

[8] *See also District of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1185 (D.D.C. 1992) (concluding that a challenge to a Census Bureau decision about where to count certain parts of the population did "not constitute a political question that would bar . . . hearing" the claims); *City of New York v. U.S. Dep't of Commerce*, 739 F. Supp. 761, 764 (E.D.N.Y. 1990) (finding that a challenge "relat[ing] to the Secretary's yet unmade decision on a census adjustment, does not present a political question"); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 674 (E.D. Pa. 1980) (holding that the Enumeration Clause "does not constitute . . . textually demonstrable commitment").

Defendants' pre-census conduct immune from judicial review.[9]

**B.      Judicially Discernible and Manageable Standards Exist That Permit Review of Defendants' Conduct of the Census.**

Contrary to Defendants' argument, there is well-established case law from which this Court may discern standards for this case, and the Court need not make non-judicial policy determinations to do so. As argued in more detail in Section IV *infra*, this Court may rely on Supreme Court and other precedent setting forth standards for census cases, as well as other cases interpreting deficiencies in affirmative constitutional obligations.

The Supreme Court has already articulated an Enumeration Clause standard: courts may review census-related decisions to ensure that they bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," which is accuracy. *Wisconsin*, 517 U.S. at 19–20; *Utah*, 536 U.S. at 478 (concluding that the Enumeration Clause contains an "interest in accuracy" for purposes of judicial review). Second, the Court's review of census decisions should be guided by "the constitutional goal of equal representation." *Wisconsin*, 517 U.S. at 19–20 (quoting *Franklin*, 505 U.S. at 804). As argued in Section IV, *infra*, these standards are violated when Defendants make decisions that, as Plaintiffs allege here, affirmatively undermine the constitutional purpose of an actual Enumeration and result in a differential undercount. FAC ¶¶ 118–24.

Defendants insist, without citation, that all the Enumeration Clause requires is that

---

[9] Defendants also cite the Appropriations Clause and the Executive Branch's appointment powers as additional provisions that show a textual commitment of this case to another body, due to Plaintiffs' allegations of underfunding and the lack of permanent leadership for the 2020 Census. But Plaintiffs have not brought this case under either of those clauses, and have not requested that this Court appoint a Census Director or appropriate funds. Defendants' decisions to underfund the various necessary components of their census preparations and leave the Census Bureau leaderless are just two aspects of their overall deficient plans and preparations for the 2020 Census.

Defendants count, rather than estimate, the population. Defs.' Mem. at 23. Defendants then draw a number of trivial distinctions that supposedly exemplify "quintessential[] policy choices outside the province of the judiciary," such as if they were to employ 550,000 enumerators instead of 551,000. *Id.* But it is telling that Defendants invent their own, minor deficiencies, rather than address the actual deficiencies alleged by Plaintiffs. For example, Plaintiffs do not allege a deficiency of 1,000 enumerators, but rather that Defendants will employ a "fraction" of their regular number of enumerators, potentially *hundreds of thousands* fewer. FAC ¶¶ 55–59, 85. Defendants did not reduce their testing by just one; rather, they cancelled nearly all of their tests from 2017 through 2018. *Id.* ¶ 44. Additionally, Defendants intend to use an on-line response system, for the first time in history, for 80% of households. *Id.* ¶ 69, 74.

Moreover, these trivial distinctions are the precisely the opposite sort of questions a court should ask when deciding whether to exempt Defendants' conduct from judicial review. By Defendants' logic, as long as Defendants use a count rather than an estimate, no action of the Bureau regarding the information-gathering procedures of the census would be reviewable, regardless of its impact on the constitutional purpose of an accurate count. Defendants could cancel all preparations entirely, and begin planning for the Census in April 2020.[10] This position is plainly unreasonable. Indeed, such an interpretation would permit Defendants to reduce funding dramatically and arbitrarily, conduct testing haphazardly, and implement procedures designed to depress the count among certain demographic populations, "regardless of bias, manipulation, fraud or similarly grave abuse" — *i.e.*, "exactly the type of conduct and temptation the Framers wished

---

[10] The government had no meaningful response to similar questions posed by Judge Hazel at oral argument. *Kravitz*, ECF 45 at 10–12 ("[I]f they said, we are not going to send any enumerators to New York, Florida, Maryland, Nevada, wouldn't you agree that at that point, the Court might have a role to play?").

to avoid." *City of Philadelphia*, 503 F. Supp. at 675. Defendants' request to immunize their conduct

from judicial review should be rejected.

**IV.     Plaintiffs State a Claim for a Violation of the Enumeration Clause**

Because the federal government has a constitutional obligation to conduct an accurate

census, it must *prepare* for the census in a manner reasonably calculated to promote accuracy. In

this case, Plaintiffs allege that the government has made unprecedented decisions to cancel, cut,

and undermine critical census procedures. This course of conduct offends the "constitutional

interest in accuracy," *Utah*, 536 U.S. at 455–56 (2002). At a minimum, the radical deficiencies in

Defendants' preparations create a "substantial risk" of an imminent violation of the Enumeration

Clause. *Clapper*, 568 U.S. at 414 n.5.

Pre-census procedures must bear "a reasonable relationship to the accomplishment of an

actual enumeration of the population, keeping in mind the constitutional purpose of the census."

*Wisconsin*, 517 U.S. at 20. This standard applies particularly to cases challenging procedures that

"bear directly on the actual population count," such as the choices Plaintiffs attack in this case.

*New York*, 2018 WL 3581350, at \*23–24 (rejecting Defendants' "audacious[]" argument that

"there are no constitutional limits" on its authority to decide the manner in which it conducts the

census).[11]

---

[11] Judge Furman concluded that allegations regarding the addition of a single question concerning citizenship status failed to state a claim under the Enumeration Clause, especially in light of longstanding, undisputed historic practices. *New York*, 2018 WL 3581350, at \*22 ("[T]he foregoing history makes it difficult to maintain that asking about citizenship on the census would constitute a violation of the Enumeration Clause."). Here, Defendants offer no comparable history. Defendants nowhere argue, for instance, that there has been "two centuries . . . [of] nearly unbroken practice," *id.*, of radically inadequate preparations for the decennial census, understaffing, lack of leadership, cancellation of tests, reliance on administrative records, or use of on-line response systems. Moreover, unlike a challenge to the addition of a single question, Plaintiffs in this action present *structural* allegations that state a claim under the Constitution. Here, Plaintiffs challenge the very means by which the government plans to distribute, collect, and ensure that the population responds to the questionnaire—in other words, how the

The Supreme Court has recognized that the "constitutional purpose of the census" includes two interrelated interests. First, the Enumeration Clause enshrines "a strong constitutional interest in accuracy." *Utah*, 536 U.S. at 455–56; *see also City of Detroit*, 4 F.3d at 1376 (emphasizing constitutional mandate to conduct "a good-faith enumeration"); *U.S. v. Rickenbacker*, 309 F.2d 462, 463 (2d Cir. 1962) ("The authority to gather reliable statistical data reasonably related to governmental purposes and functions [through the census] is a necessity if modern government is to legislate intelligently and effectively"); Pub. L. 105–119, title II, § 209, Nov. 26, 1997, 111 Stat. 2480 (instructing Secretary to conduct a census that is "as accurate as possible, consistent with the Constitution and laws of the United States").[12] Second, the Secretary's decisions must be "consistent with . . . the constitutional goal of equal representation." *Wisconsin*, 517 U.S. at 19–20 (quoting *Franklin*, 505 U.S. at 804). The latter standard gives effect to the history of the Fourteenth Amendment, and its requirement that "the whole numbers of persons in each State" be counted.[13] By insisting that census procedures bear "a reasonable relationship to the accomplishment of an actual enumeration," *Wisconsin*, 517 U.S. at 20, modern Enumeration Clause doctrine instills the Fourteenth Amendment's guarantee of equality through accuracy.

Moreover, applying the "reasonable relationship" standard of *Wisconsin* so as to vindicate

government plans to actually count the population. This is precisely the type of challenge to which Judge Furman determined the *Wisconsin* standard applies. *Id.* at *23.

[12] Defendants quote *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973), for the unremarkable proposition that "census data 'are inherently less than absolutely accurate.'" Defs.' Mem. at 26. *Gaffney* did not deal with the adequacy of census procedures, nor did it suggest that the government is relieved of its constitutional obligation to make its best effort to conduct an accurate census.

[13] The authors of the Fourteenth Amendment staked the future of American democracy on a census that counted all African-Americans because the drafters recognized that "the only true, practical, and safe republican principle"—the only bulwark against political subjugation reminiscent of slavery—is representation based on "the *whole* population." Cong. Globe, 39th Cong., 1st Sess. 2767 (1866) (statement of Sen. Howard) (emphasis added), *available at* https://memory.loc.gov/ammem/amlaw/lwcglink.html#anchor39.

the Enumeration Clause's substantive interest in accuracy is consistent with how courts have interpreted and given effect to other affirmative constitutional obligations. For example, courts have granted injunctive relief against municipal indigent defense systems that, due to underfunding, understaffing, or other "systemic flaws," constructively deny indigent defendants their Sixth Amendment right to counsel. *Wilbur v. City of Mount* Vernon, 989 F. Supp. 2d 1122, 1131 (W.D. Wash. 2013); *see also, Harris v. Champion*, 15 F.3d 1538, 1547 (10th Cir. 1994) (holding that underfunding and "mismanagement of resources" of a public defender's office may violate criminal appellant's right to effective counsel).[14] Similarly, where state constitutions grant children a right to public education, courts have concluded that schools suffering systemic deficiencies, underfunding, and mismanagement may violate the right to education. *See, e.g.*, *Campaign for Fiscal Equity, Inc. v. State*, 801 N.E.2d 326, 344–48 (2003) (requiring the state to reform its methods of managing and funding public schools); *Abbott by Abbott v. Burke*, 575 A. 2d 359, 395–96, 408 (N.J. 1990) (ordering the legislature to ensure that poorer, urban school districts could improve their "tragically inadequate" course offerings).[15]

Seeking to avoid the issue of whether the procedures described in the Amended Complaint bear "a reasonable relationship" to fulfilling the Enumeration Clause's mandate, Defendants vastly exaggerate the deference owed to the Secretary. They argue that their sole obligation is to establish

---

[14] *See also Pub. Defender v. State*, 115 So. 3d 261, 278–79 (Fla. 2013) (underfunded and mismanaged public defenders' office resulted in "a denial of the actual assistance of counsel guaranteed by *Gideon* and the Sixth Amendment"); *State ex. rel. Missouri Pub. Defender Comm'n v. Waters*, 370 S.W. 3d 592, 596 (Mo. 2010) ("[T]he Sixth Amendment right to counsel is a right to effective and competent counsel, not just a pro forma appointment whereby the defendant has counsel in name only.").

[15] The meaning of the Enumeration Clause is litigated infrequently, but not as infrequently as that of the Foreign and Domestic Emoluments Clauses, which another judge in this district was recently called upon to interpret in denying a Rule 12(b)(6) motion. *D.C. v. Trump*, 2018 WL 3559027, *21–24 (D. Md. July 25, 2018). This Court should resist Defendants' invitation to default to the thinnest interpretation of the Enumeration Clause, just as Judge Messitte rejected a "narrow interpretation of the word 'emolument' [that] would reduce the [Emoluments] Clauses to little more than a prohibition of bribery." *Id*. at 18.

"pre-census procedures for individually counting every resident of the United States," as opposed to estimating the population. Defs.' Mem. at 25–26. Under this interpretation, the government could simply post a notice outside the Census Bureau asking that all residents of the United States come by and fill out a questionnaire. Or the government could require all residents to report to their local police station or travel to their state capital to be counted. That is not the law. The Secretary's discretion over the means of conducting the census is constrained by his duty to promote accuracy.

Even if Defendants' constitutional obligations were limited to "establish[ing] pre-census procedures for individually counting every resident of the United States," Plaintiffs still state a claim because Defendants' preparations do not even fit that description. Rather, Defendants have established procedures to count *some* residents while predictably leaving others—disproportionately those like Plaintiffs—uncounted. FAC ¶¶ 28; 78; 92. As Plaintiffs allege, Defendants' pre-census procedures do not include adequate provisions for individually counting members of communities of color, low-income communities, and other hard-to-count communities. *Id.* The government has drastically cut two of the most important elements of pre-census procedures for reaching these populations: outreach efforts with partnership specialists, and field infrastructure to conduct non-response follow up. FAC ¶¶ 46; 68; 85-88. *Cf. Wisconsin*, 517 U.S. at 7–8 (explaining the importance of implementing "improvements specifically targeted at eliminating the differential undercount," including "advertising campaigns developed by and directed at traditionally undercounted populations and expanded questionnaire assistance operations for non-English speaking residents").

Defendants have also undermined their ability to conduct an actual enumeration by cutting staffing and field presence while placing unjustified reliance on an ill-conceived on-line strategy

27

that is vulnerable to cyber-attack. FAC ¶ 68. There is nothing implausible, much less "contradictory," Defs.' Mem. at 27, about alleging that the 2020 Census will be both on-line and understaffed. FAC ¶¶ 29–30; 69–70; 76; 79. Moreover, Defendants' theory—that digitization will streamline the Bureau's field operations because "[f]ieldworkers will use mobile devices" and because various functions will be automated, Defs.' Mem. at 27 n.14—is empirically untested and facially too vague to establish that digitization will adequately offset the "*significant* reduction in on-the-ground presence and field workers" Plaintiffs have alleged. FAC ¶ 68.

Moreover, Defendants do not adequately address Plaintiffs' allegation that the actual or perceived risk of a data breach will suppress initial self-responses. *Id.* ¶ 84. Defendants ignore the aggregate effect of *many* households refusing to submit sensitive personal data through an on-line form. Such a trend, which is highly plausible in light of recent high-profile data breaches, *id.*, would increase the burden on other parts of the Census Bureau's operations, undermining Defendants' assumption that they can afford to reduce their field presence.

Defendants' claim that Plaintiffs' allegations regarding the digitization plan are "implausible," Defs.' Mem. at 27, rings especially hollow because the government has not adequately tested its technology and procedures for the census. FAC ¶¶ 44–49. The government has cancelled critical pre-enumeration test runs, including two of the three sites planned for the 2018 End-to-End Census Test and the 2017 field tests originally scheduled for Puerto Rico, North Dakota, South Dakota, and Washington State. *Id.* ¶ 44. By cancelling these tests, the government courts a serious risk that its procedures for conducting the census simply will not work. *Cf. New York*, 2018 WL 3581350 at *25 (noting that "lengthy consideration and testing . . . usually precede even minor changes" to the census.)

Defendants also fail to rebut Plaintiffs' allegation that the government's use of

administrative records to substitute for census responses will undermine accuracy. FAC ¶¶ 89–94. Defendants admit that the Bureau "shares [Plaintiffs'] concern" about inaccuracies in administrative records, but assures the court that the Bureau will use only data that *the Bureau determines* are reliable. Defs.' Mem. at 27–28. This circular logic does not render implausible Plaintiffs' well-pleaded allegations. FAC ¶¶ 89–94.

Finally, all of these constitutional deficiencies have been exacerbated by Congress's failure to provide adequate funding over the course of the 2020 Census cycle, FAC ¶¶ 32–54, and by the President's longtime failure to appoint permanent senior leadership for the Bureau.[16] *Id.* ¶¶ 60–66. Defendants argue that the FAC fails to allege "that a permanent Census Director would perform the Constitution's mandated headcount, while [acting director] Dr. Ron Jarmin . . . would not." Defs.' Mem. at 27. That is beside the point: even if interim leaders are just as capable *as individuals* as permanent leaders, it is not a stretch to infer that an agency without permanent leadership will suffer uncertainty and dislocation, undermining its ability to take swift action to fix constitutional deficiencies. FAC ¶¶ 60–66.

Even if Defendants can ultimately prove that their census preparations satisfy the Enumeration Clause, they cannot do so on a motion to dismiss. Defendants repeatedly go beyond the four corners of the Complaint to make disputable statements of fact purporting to disprove Plaintiffs' claims on the merits. *See, e.g.*, Defs.' Mem. at 29 ("A complete and accurate person-by-person enumeration of the population is fully contemplated."); 27–28 (the Census Bureau "plans to use administrative data only when it can confirm empirically across multiple sources that

---

[16] On July 18, 2018, President Trump nominated Steven Dillingham to serve as Director of the Census Bureau. A nomination is, of course, no guarantee of an actual appointment, and does not undo the effects of more than a year without permanent leadership.

the data are consistent"). Fact-based defenses like these have no place in a motion to dismiss. *See Woods v. City of Greensboro*, 855 F.3d 639, 652–53 (4th Cir. 2017). In fact, Defendants cite no census case in support of their Rule 12(b)(6) argument that was decided on a motion to dismiss. *See Utah*, 536 U.S. 452 (summary judgment); *Dep't of Commerce*, 525 U.S. 316 (summary judgment); *Wisconsin*, 517 U.S. 1 (decision after trial); *Franklin*, 505 U.S. 788 (summary judgment); *Carey*, 653 F.2d at 735 (decision after trial). Plaintiffs are entitled to prove after discovery that the constitutional violations they allege are real.

## V.       The United States Is Not Immune From Suit

In this case, Plaintiffs allege a constitutional violation by federal agencies and officers, and request declaratory and injunctive relief. In such cases, the United States has waived its sovereign immunity, and "may be named as a defendant in any such action, and a judgment or decree may be entered against the United States." 5 U.S.C. § 702. *See, e.g., Jacinto-Castanon de Nolasco v. U.S. Immigration and Customs Enforcement,* 2018 WL 3472624, at *3 (D.D.C. July 19, 2018) (rejecting argument that "plaintiffs have not pled a waiver of sovereign immunity" because Section 702 "explicitly waives sovereign immunity for claims . . . brought directly under the Constitution"). Because Plaintiffs seek declaratory or injunctive relief as against the United States, sovereign immunity does not bar Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss in its entirety.

Dated: August 13, 2018                                    Respectfully Submitted,

                                                         /s/Michael J. Wishnie

Varun Char, Law Student Intern
Erinma Kalu, Law Student Intern
Brandon Levin, Law Student Intern
Abigail Olson, Law Student Intern
Joseph Schottenfeld, Law Student Intern
Charlotte Schwartz, Law Student Intern
Jeffrey Zalesin, Law Student Intern
Michael J. Wishnie (Bar No. 20350)
Rule of Law Clinic
Yale Law School[17]
127 Wall Street
New Haven, CT 06511
Tel: (203) 436-4780
Fax: (203) 432-1426
michael.wishnie@ylsclinics.org
*Counsel for all Plaintiffs*

Jeremy M. Creelan, *pro hac vice*
Susan J. Kohlmann, *pro hac vice*
Jacob D. Alderdice, *pro hac vice*
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3908
*Counsel for all Plaintiffs*

Khyla Craine (Bar No. 14117)
Anson Asaka (Bar No. 20456)
National Association for the Advancement
 of Colored People, Inc.
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5797
Fax: (410) 358-9350
*Counsel for Plaintiffs NAACP and Prince
George's County NAACP Branch*

---

[17] This brief does not purport to state the views
of Yale Law School, if any.

## **CERTIFICATE OF SERVICE**

I, Jacob D. Alderdice, certify that copies of the foregoing *Memorandum of Law In Opposition to Defendants' Motion to Dismiss*, were served this 13th day of August, 2018 upon the all counsel of record by ECF.

/s/Jacob D. Alderdice
Jacob D. Alderdice