**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE, *et al.*,

               Plaintiffs,

      v.                                    No. 8:18-cv-00891 PWG

BUREAU OF THE CENSUS, *et al.*,

               Defendants.

**SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................................................1

ARGUMENT. ................................................................................................................................1

I.    This Case Should Be Dismissed as Non-Justiciable and Meritless...................................1

    A.    Plaintiffs lack standing. ........................................................................................1

    B.    This case presents a non-justiciable political question..........................................5

    C.    Plaintiffs' Enumeration Clause claim is meritless.................................................6

II.    This Case Is Not Ripe. .....................................................................................................8

    A.    Both Plaintiffs' own allegations and facts outside the pleadings demonstrate that Plaintiffs' claim is dependent on future uncertainties. ..........................................9

    B.    Census preparations will continue unimpeded despite the lapse in appropriations. .....................................................................................................12

    C.    If found unripe, Plaintiffs' claim can be heard in 2020. .......................................12

CONCLUSION .............................................................................................................................14

## TABLE OF AUTHORITIES

**CASES**

*Am. Chemistry Council v. Dep't of Transp.,*
    468 F.3d 810 (D.C. Cir. 2006) ............................................................................................. 3

*Carey v. Klutznick,*
    508 F. Supp. 416 (S.D.N.Y.), *aff'd*, 637 F.2d 834 (2d Cir. 1980) ............................... 13

*Carey v. Klutznick,*
    637 F.2d 834 (2d Cir. 1980) ........................................................................................... 13

*City of Phila. v. Klutznick,*
    503 F. Supp. 663 (E.D. Pa. 1980) .................................................................................. 4

*City of Willacoochee v. Baldrige,*
    556 F. Supp. 551 (S.D. Ga. 1983) .................................................................................. 4

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ..................................................................................................... 2, 3

*Clatterbuck v. City of Charlottesville,*
    708 F.3d 549 (4th Cir. 2013) ......................................................................................... 11

*Confederacion de la Raza Unida v. Brown,*
    345 F. Supp. 909 (N.D. Cal. 1972) ................................................................................ 7

*Gray v. First Winthrop Corp.,*
    989 F.2d 1564 (9th Cir. 1993) ................................................................................... 13, 4

*Kerns v. United States,*
    585 F.3d 187 (4th Cir. 2009) ......................................................................................... 11

*Lampkin v. Connor,*
    239 F. Supp. 757 (D.D.C 1965), *aff'd*, 360 F.2d 505 (D.C. Cir. 1966) ....................... 4

*Loconte v. Montgomery Cty., Maryland,*
    2018 WL 3642586 (D. Md. Aug. 1, 2018) ................................................................... 11

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................................ 1

*Mexican Am. Legislative Caucus, Texas House of Representatives v. Texas,*
    2013 WL 12315105 (W.D. Tex. Dec. 18, 2013) ........................................................... 4

*Miller v. Brown,*
    462 F.3d 312 (4th Cir. 2006) ............................................................................... 9, 10, 11

*Musari v. Loans,*
    2016 WL 4124227 (D. Md. Aug. 3, 2016) ............................................................. 11

*Nat'l All. for Accessibility, Inc. v. C1 Maryland Bus. Tr.,*
    2013 WL 4229262 (D. Md. Aug. 14, 2013) ........................................................... 11

*Nat'l Law Ctr. on Homelessness & Poverty v. Brown,*
    1994 WL 521334 (D.D.C. Sept. 15, 1994) ......................................................... 4, 7

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ........................................................................................ 9, 11

*Richmond, Fredericksburg & Potomac Ry. v. United States,*
    945 F.2d 765 (4th Cir. 1991) ............................................................................... 11

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ............................................................................................... 1

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) .............................................................................................. 3

*Tucker v. U.S. Dep't of Commerce,*
    135 F.R.D. 175 (N.D. Ill. 1991) ........................................................................ 5, 6

*Tucker v. U.S. Dep't of Commerce,*
    958 F.2d 1411 (7th Cir. 1992) ............................................................................... 6

*United States v. Garcia,*
    855 F.3d 615 (4th Cir. 2017) ............................................................................... 11

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) .............................................................................................. 3

*Virginia v. Reno,*
    117 F. Supp. 2d 46 (D.D.C. 2000), *aff'd*, 531 U.S. 1062 (2001) .......................... 9

*Williams v. United States,*
    50 F.3d 299 (4th Cir. 1995) ................................................................................. 11

*Wisconsin v. City of New York,*
    517 U.S. 1 (1996) .................................................................................................. 7

*Young v. Klutznick,*
    497 F. Supp. 1318 (E.D. Mich. 1980) ................................................................ 13

*Young v. Klutznick,*
    652 F.2d 617 (6th Cir. 1981) ............................................................................... 13

*Zak v. Chelsea Therapeutics Int'l, Ltd.,*
    780 F.3d 597 (4th Cir. 2015) ......................................................................... 10, 11

**STATUTES**

13 U.S.C. § 141(a) ......................................................................................................................... 13, 14

Census Act of 1790,
   1 Stat. 101 (1790) .................................................................................................................... 14

An Act to Extend the Time for Completing the Third Census,
   2 Stat. 658 (1811) .................................................................................................................... 14

An Act to Provide for Taking the Fourth Census,
   3 Stat. 548 (1820) .................................................................................................................... 14

An Act to Amend the Act Entitled "An Act to Provide for Taking the Fourth Census,"
   3 Stat. 643 (1821) .................................................................................................................... 14

An Act to Amend the Act for Taking the Fifth Census,
   4 Stat. 439 (1831) .................................................................................................................... 14

An Act to Amend the Act Entitled "An Act to Provide for Taking the Sixth Census,"
   5 Stat. 452 (1841) .................................................................................................................... 14

An Act Providing for the Taking of the Seventh and Subsequent Censuses,
   9 Stat. 445 (1850) .................................................................................................................... 14

An Act to Provide for Taking the Tenth and Subsequent Censuses,
   20 Stat. 473 (1879) .................................................................................................................. 14

**OTHER AUTHORITIES**

State of the Union, President John Quincy Adams, December 2, 1828,
   http://www.creatinghistory.com/john-quincy-adams-state-of-the-union-december-2-1828/ ........... 14

## INTRODUCTION

Pursuant to the Court's January 14, 2019 Order, ECF 58, Defendants submit this supplemental memorandum of law in further support of Defendants' motion to dismiss.  Specifically, Defendants assert that: (a) like other census cases, this case should be dismissed at the pleading stage for lack of jurisdiction and/or failure to state a claim; or, alternatively, (b) Plaintiffs' claim should be dismissed as unripe for judicial review in light of evolving 2020 Census preparations, which the Court may consider.

## ARGUMENT

I.   <u>This Case Should Be Dismissed as Non-Justiciable and Meritless.</u>

For the reasons set forth in Defendants' motion to dismiss and at the January 14, 2019 oral argument, the Court should dismiss Plaintiffs' First Amended Complaint ("FAC") for want of Article III standing or should find that this case presents a non-justiciable political question.  Mot. to Dismiss, at 7–16, 18–25, ECF No. 43 ("Defs.' Mem."); Reply Mem. of Law in Further Supp. of Defs.' Mot. to Dismiss, at 2–7, 9–14, ECF No. 49 ("Defs.' Reply Mem."); Transcript of January 14, 2019 Oral Argument [hereinafter, "Tr."] 1–48, 84–90.   Courts have commonly dismissed census cases at the pleading stage for these exact reasons.

### A.  Plaintiffs lack standing.

The "irreducible constitutional minimum" of standing has three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  Plaintiffs meet none of these criteria.

At the outset, Plaintiffs blatantly allege "possible future injur[ies]"—lost representation and funding—that are entirely dependent on a "highly attenuated chain of possibilities" insufficient for

standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013). Indeed, far from plausibly alleging a "certainly impending" injury, *id.*, Plaintiffs pile speculation atop speculation in four key ways.

First, Plaintiffs' hypothetical future injuries rely on the unsupported theory that any purported deficiencies in 2020 Census preparations will remain deficient for the next two years.[1] Plaintiffs themselves acknowledge the uncertainty of this proposition, *see* Defs.' Mem. at 9 (citing FAC ¶¶ 52–54, 57–58, 67, 91), and both real-world facts and common sense demonstrate its implausibility: the Census Bureau has since refined, and will continue to refine, its census operations to conduct the best possible 2020 Census. *See, infra*, Section II.A.

Second, the FAC lacks any allegations indicating that supposed preparation deficiencies will lead to a lower self-response rate among minorities and other hard-to-count populations. *See* Defs.' Mem. at 10. Plaintiffs advance no allegation that the Census Bureau will fail to reach every household with its initial mailing, and they concomitantly fail to allege that households who would have self-responded to the census will not do so now because, for example, the Census Bureau had an Acting Director for about 18 months. *See id.*; FAC ¶¶ 60–66 (allegations regarding a lack of permanent leadership).

Third, the FAC is utterly devoid of plausible allegations that the Census Bureau's extensive Nonresponse Followup operations—including up to six mailings, six in-person visits, high-quality administrative records, and proxy responses, *see* Defs.' Mem. at 3–5—plus imputation, will count less people than they otherwise would with different preparations. *See id.* at 10. As set forth more fully below, the FAC itself belies any such contention. *See, infra*, Section I.C.

Fourth, nothing but pure conjecture supports the theory that, even after the Census Bureau's exhaustive Nonresponse Followup operations and imputation, any theoretical undercount would disproportionately and materially impact Plaintiffs. *See* Defs.' Mem. at 11–13; Defs.' Reply Mem. at 2–4.

---

[1] Plaintiffs filed their FAC in June 2018 to correct a minor clerical error in their March 2018 Complaint. All allegations in the FAC therefore relate to purported deficiencies as of March 2018.

For example, Plaintiffs note the cancellation of a West Virginia test, which would have allowed further testing in rural areas, FAC ¶ 45, and complain that rural areas generally have less internet access, FAC ¶ 77. But, as Plaintiffs admit, Prince George's County is not rural; it's suburban. FAC ¶ 95. Plaintiffs also decry the readiness of online systems. FAC ¶¶ 75–78, 81–83. But Plaintiffs admit that households will receive a paper questionnaire if they do not respond online, FAC ¶ 74, and, if Prince George's County truly has *less* internet access, they would be *less* impacted by online deficiencies than other areas. *See* FAC ¶ 75.

At oral argument, Plaintiffs relied heavily on the theory that Plaintiff NAACP is an organization with members in every state, and thus their hypothetical injuries need not be limited to Prince George's County.[2] Tr. 53–54, 65. That would be a novel concept in this litigation because the FAC nowhere alleges that NAACP has members in every state, and, to the contrary, only identifies NAACP members that are residents of Prince George's County. FAC ¶¶ 109–110. But an organization does not have Article III standing to sue on behalf of its members unless the organization identifies a particular affected member, not merely a "statistical probability that some of [its] members are threatened with concrete injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). A general reference to unidentified members is insufficient to confer standing on an organization. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.23 (1982); *see also Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact. . . . At the very least, the identity of the party suffering an injury in fact must be firmly established."). Accordingly, Plaintiffs' last-ditch effort to salvage their ill-conceived theory of standing is meritless.

---

[2] To the extent Plaintiff NAACP is relying on its diversion of resources for standing, FAC ¶ 111, that argument fails for the reasons set forth above. *Clapper*, 568 U.S. at 416 ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").

Even if Plaintiffs could traverse the legal gauntlet of this "highly attenuated chain of possibilities," they do not plausibly allege that their hypothetical injuries are traceable to Defendants' census preparations.  *See* Defs.' Mem. at 13–15; Defs.' Reply Mem. at 4–5; Tr. 41–45, 85–86.[3]  Likewise, any theoretical harm to Plaintiffs is not redressable by the Court.  Defs.' Mem. at 15–16; Defs.' Reply Mem. at 5–7; Tr. 26, 36–37, 47; *see* Tr. 22 (the Court acknowledging that it "lacks authority to order the appropriation of funds," and "lacks the authority to command the President to nominate and the Senate to confirm senior executive branch officials," and noting that Plaintiffs' requested injunctive relief "seems to be somewhat problematic").

Indeed, courts have commonly dismissed census cases at the pleading stage (in whole or in part) for lack of standing, even in cases brought *post*-Census Day.  *Mexican Am. Legislative Caucus, Tex. House of Representatives v. Texas*, 2013 WL 12315105, at *1 (W.D. Tex. Dec. 18, 2013) (remanding a post-census case to state court because plaintiff's alleged harms were not fairly traceable to defendants); *Nat'l Law Ctr. on Homelessness & Poverty v. Brown*, 1994 WL 521334, at *9 (D.D.C. Sept. 15, 1994) ["*Nat'l Law Ctr.*"] (dismissing certain post-census claims for lack of standing and entering summary judgment for defendants where defendants had moved to dismiss, or in the alternative for summary judgment, on APA claims); *City of Phila. v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (dismissing, in a post-census case, certain parties for lack of standing) *City of Willacoochee v. Baldrige*, 556 F. Supp. 551, 554 (S.D. Ga. 1983) (same); *Lampkin v. Connor*, 239 F. Supp. 757, 766 (D.D.C 1965) (pre-census case dismissed for lack of standing due to the speculative nature of plaintiffs' alleged harm), *aff'd,* 360 F.2d 505 (D.C. Cir. 1966).  In this case—brought over two years before the Census Bureau begins to count a single person—the Court should do the same.

---

[3] For the reasons discussed at oral argument, the recent challenges to a citizenship question on the 2020 Census do not cast doubt on this conclusion.  Tr. 41–45, 85–86.

**B.  This case presents a non-justiciable political question.**

The FAC should also be dismissed because this case presents a non-justiciable political question. As Defendants previously explained, this case implicates not one, but three constitutional powers that are committed to the Political Branches by the Constitution's text, none of which provide judicially-manageable standards.  Defs.' Mem. at 18–25; Defs.' Reply Mem. at 9–14; *see* Tr. 22.

The court's decision in *Tucker v. U.S. Dep't of Commerce* is instructive.  135 F.R.D. 175 (N.D. Ill. 1991).   There, the plaintiffs contended that certain groups—like Hispanics, African Americans, immigrants, and the homeless—have been "chronically undercounted" in the census, and they alleged a loss of representation and funding as a result.  *Id.* at 176.  The district court in *Tucker* noted that:

> the only question before [the court] is whether the Census Bureau is doing what it should in order to obtain the most accurate count practicable.  No districts have been drawn, no benefits cut, no actual harm yet suffered by the plaintiffs.  This is not a case where the plaintiffs have *lost* political representation, but rather one in which they *fear* (perhaps with some justification) the loss.  The question is which of the coordinate branches of government is best equipped to deal with plaintiffs' concern.

*Id.* at 180.  The *Tucker* court then granted the defendants' motion to dismiss, concluding that the case was a non-justiciable political question for three reasons.  First, and most importantly, "the Constitution specifically delegates the census authority to the Congress.  Congress has delegated much of that Constitutional authority to the Census Bureau, which has . . . made a number of policy decisions about how to achieve the best count practicable."  *Id.* at 181.  Second, "[e]veryone concedes that an accurate headcount is a goal, but not a practical possibility," and "the plaintiffs have requested that this court 'second-guess' the Census Bureau's judgment about the proper manner in which to conduct the census." *Id.* at 182.  Finally, a statistical adjustment to correct an undercount in the census "is purely a policy determination;" "[e]ach of the available methods has its own advantages and disadvantages and the body best equipped to choose one over the other is that which is vested with authority to decide policy— Congress, through the Census Bureau."  *Id.*

5

On appeal, the Seventh Circuit affirmed.  *Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1417

(7th Cir. 1992) (Posner, J.).  Although the majority did not explicitly rely on the political question doctrine,

the court based its decision on the same concerns that undergird the doctrine:

> [t]he Constitution directs Congress to conduct a decennial census, and the implementing
> statutes delegate this authority to the Census Bureau. . . [Y]ou might as well turn [this
> case] over to a panel of statisticians and political scientists and let them make the decision,
> for all that a court could do to add to its rationality or fairness.

*Id.* at 1417–18 (7th Cir. 1992) (citations omitted); *id.* at 1419 (Ripple, J., concurring) (finding that the case

presented a nonjusticiable political question).

Both the reasoning and holding of *Tucker* apply here tenfold.  There, as here, the plaintiffs

contended that certain groups—including African Americans—have been "chronically undercounted" in

the census, and they alleged a loss of representation and funding as a result.  *Tucker*, 135 F.R.D. at 176.

There, as here, the plaintiffs alleged that the Census Bureau is not "doing what it should in order to obtain

the most accurate count."  *Id.* at 180.  There, as here, the plaintiffs simply "*fear*" a loss of representation.

*Id.*  There, as here, the Census Bureau "made a number of policy decisions about how to achieve the best

count practicable."  *Id.*  at 181.  There, as here, "the plaintiffs have requested that this court 'second-

guess' the Census Bureau's judgment about the proper manner in which to conduct the census."  *Id.* at

182.  And there, as here, "[e]ach of the available methods has its own advantages and disadvantages and

the body best equipped to choose one over the other is that which is vested with authority to decide

policy—Congress, through the Census Bureau."  *Id.*  In sum, "[t]he plaintiffs are not asking [the Court]

to decree equality."  *Tucker*, 958 F.2d at 1418.  They are asking the Court "to take sides in a dispute among

statisticians, demographers, and census officials concerning" preparations for the largest census in

American history.  *Id.*  This case is a non-justiciable political question.

**C.  Plaintiffs' Enumeration Clause claim is meritless.**

Even if this case were justiciable (and ripe for review, *see*, *infra*, Section II.), Plaintiffs' Enumeration

Clause claim should be dismissed.  *See* Defs.' Mem. at 25–30; Defs.' Reply Mem. at 14–15; Tr. 36–39; 88–

89. As the Court recognized, Tr. 16, Congress—and through Congress, the Secretary of Commerce—has "virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996).  It is no wonder, then, courts have held that "[t]he Constitution does not provide individuals with a right to be counted, or a right to a perfectly accurate census." *Nat'l Law Ctr.*, 1994 WL 521334, at *8 (citing *Confederacion de la Raza Unida v. Brown,* 345 F. Supp. 909, 910 (N.D. Cal. 1972)).  Although there is no judicially manageable standard for reviewing a challenge to pre-census preparations, if the Court finds this case justiciable, Plaintiffs have not remotely carried their burden of plausibly alleging that the Secretary, and the Census Bureau, have abused their "virtually unlimited discretion."

Even a cursory glance at the FAC leads ineludibly to that conclusion: Plaintiffs assert seven broad allegations, each more facially deficient than the last.[4]  First, Plaintiffs allege that a lack of funding has forced cancelled tests.  FAC ¶¶ 44–45.  But there is no allegation that the tests actually conducted are insufficient to test all operations, or that actual operations will fail in 2020.  Second, Plaintiffs express concern about staffing for the 2020 Census.  FAC ¶¶ 46, 55–59.  But Plaintiffs admit that future staffing is unknown, FAC ¶ 58, and therefore advance no plausible allegations that staffing will be impacted in 2020.  Third, Plaintiffs allege a lack of leadership at the Census Bureau.  FAC ¶¶ 60–66.  But there is no allegation that Acting Director Jarmin—with decades of experience in the Census Bureau—was in any way less competent than a permanent director, or that his tenure would impact actual census operations in 2020.  Fourth, Plaintiffs quibble with the use of online census questionnaires.  FAC ¶¶ 69–79.  But Plaintiffs themselves admit that paper forms will be used for 20% of the population *and any other household that does not respond online*, FAC ¶ 74, thus negating any purported impact of online questionnaires.  Fifth,

---

[4] The Court need not look outside the pleadings to find Plaintiffs' claim without merit.  However, the Court may do so by consulting the facts and documents cited on the Census Bureau website, *see* App. A.  *See* Section II.A., *infra.*  These sources only further demonstrate that Plaintiffs' Enumeration Clause claim is groundless.

Plaintiffs voice unease with the Census Bureau's still-developing cybersecurity measures.  FAC ¶¶ 81–84.  But Plaintiffs once again admit that future cybersecurity methods are unknown, FAC ¶ 82, and therefore advance no plausible allegations that cybersecurity would be impacted in 2020, or why cybersecurity (unrelated to enumeration) would result in a less-than-complete count.  Sixth, Plaintiffs take issue with the Census Bureau's reduced infrastructure for 2020.  FAC ¶¶ 85–88.  But Plaintiffs admit that "[t]he Census Bureau will digitize the census for the first time in 2020," FAC ¶ 69, thus requiring less field infrastructure than past censuses.  Plaintiffs further admit that all non-responding households will be visited at least once,[5] FAC ¶ 88, and that federal administrative records will be used for enumeration, FAC ¶ 89, but advance no allegation that these procedures will be inadequate to count the population.  Lastly, Plaintiffs spill much ink over the use of *state* administrative records.  FAC ¶¶ 89–94.  But the FAC explicitly notes that the Census Bureau will use *federal* administrative records, FAC ¶ 89, and they do not advance any allegation that such administrative records are unreliable or that they will be inadequate to enumerate the population.[6]

Justiciability issues aside, this case is baseless and should be dismissed.

II.     This Case Is Not Ripe.

Constitutional obligation and common sense dictate that preparations for the once-in-a-decade enumeration—attempting to count 330 million people across 3.8 million square miles—are not static; the Census Bureau continuously refines its plans and operations in the 10-year lead up to the decennial census.  Real-world facts bear this out: since Plaintiffs filed their Complaint in March 2018, the Census Bureau's preparations have continued to evolve, thus mooting all of Plaintiffs' substantive allegations and demonstrating that Plaintiffs' claim is dependent on future uncertainties.  Even if Plaintiffs' allegations

---

[5] In reality, a nonresponding household may receive six unique visits.  *See* App. A ¶ 74.

[6] The Census Bureau no longer plans to use state administrative records in the 2020 Census.  *See* App. A ¶ 89.

were not so speculative as to fall below the bare constitutional minimum for standing, the Court would clearly "benefit from further factual development of the issues presented." *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

### A. Both Plaintiffs' own allegations and facts outside the pleadings demonstrate that Plaintiffs' claim is dependent on future uncertainties.

In considering whether this case is "dependent on future uncertainties" such that the issues are not fit for judicial decision, *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006), the Court is certainly not precluded from consulting both the FAC and basic common sense. Plaintiffs' claim of a flawed 2020 Census necessarily requires an examination of not only census preparations through the filing of their Complaint in March 2018, but also census preparations between March 2018 and April 1, 2020. *See* Defs.' Mem. at 16–18; Defs.' Reply Mem. 7–9. How else could the Court determine whether the *2020* Census will be conducted in violation of the Constitution?

The court's decision in *Virginia v. Reno* provides strong support for Defendants' position. 117 F. Supp. 2d 46 (D.D.C. 2000) (three-judge court), *aff'd*, 531 U.S. 1062 (2001). There, Virginia sought a declaratory judgment regarding the use of unadjusted census data—as opposed to adjusted data from the post-enumeration survey—when redrawing congressional, state Senate, and state House of Delegates districts to comply with the Voting Rights Act. *Id.* at 47. At the time, however, the Census Bureau had not yet determined whether to release adjusted data for purposes of state redistricting. *Id.* at 49. The court therefore granted the defendants' motion to dismiss, concluding that Virginia's claims were not ripe because, "[n]otwithstanding Virginia's insistence that the release of adjusted figures is a virtual certainty," statements by the Census Bureau (outside the pleadings) demonstrated that "it will make its final decision on whether to release adjusted data after it evaluates the quality and accuracy of the [post-enumeration] process." *Id.* at 52.

Here, as in *Virginia v. Reno*, the Census Bureau's pre-census preparations are far from final. Indeed, Plaintiffs themselves acknowledge the uncertainty of their own allegations. *See, e.g.*, FAC ¶¶ 58

(admitting that future staffing is unknown); ¶ 67 ("serious design defects that, *if* unresolved . . ."); ¶ 82 (admitting that future cybersecurity methods are unknown); ¶ 91 ("*If* the Census Bureau fails to secure agreements with all states . . ."). Reviewing facts outside the pleadings, like the court in *Virginia v. Reno*, only further demonstrates that the FAC is "dependent on future uncertainties." *Miller*, 462 F.3d at 319.

As set forth more fully in Appendix A, the facts underlying all of Plaintiffs' allegations continue to change. With respect to funding, the Census Bureau continues to revise its cost estimates, taking into account its Fiscal Year ("FY") 2018 appropriations carried into 2019. *See* App. A ¶¶ 32–54; *see also* Section II.B., *infra*. And, of course, Congress has not yet appropriated funds for FY 2019 and FY 2020. *See* App. A ¶¶ 32–54. With respect to staffing, the Census Bureau has hired hundreds more staff (including Partnership Specialists) since the filing of this case, mooting Plaintiffs' allegations. *See* App. A ¶¶ 46, 55–59. The Census Bureau will continue to hire many more workers and is currently on track to hire all of the staff needed to conduct a successful 2020 Census. *See* App. A ¶¶ 46, 55–59. With respect to permanent leadership, Plaintiffs' allegations are now mooted by the confirmation of Dr. Steven Dillingham as Director of the Census Bureau, and with Dr. Ron Jarmin serving as Deputy Director of the Census Bureau. *See* App. A ¶¶ 60–66. Lastly, Plaintiffs' allegations regarding purported "design flaws" are mooted by updated workflow strategies, finalized design plans, and ongoing operational tests. *See* App. A ¶¶ 67–94.

The Court is fully empowered to consider these facts outside the pleadings. *See* App. A. Under Federal Rule of Evidence 201, "courts at any stage of a proceeding may 'judicially notice a fact that is not subject to reasonable dispute,' provided that the fact is 'generally known within the court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (quoting Fed. R. Evid. 201). This is true for motions to dismiss under both Rule 12(b)(1) and 12(b)(6).[7]   *See Loconte v.*

---

[7] Although Defendants primarily assert a 12(b)(1) facial challenge, the Court may construe Defendants' motion as a 12(b)(1) factual challenge, *see Kerns v. United States*, 585 F.3d 187, 192 (4th Cir.

*Montgomery Cty., Maryland*, 2018 WL 3642586, at *3 (D. Md. Aug. 1, 2018) (Grimm, J.) (explaining that a facial Rule 12(b)(1) challenge "is afforded the same procedural protection as [plaintiff] would receive under a 12(b)(6) consideration"). Thus, this Court is "permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment." *Zak*, 780 F.3d at 607 (citing *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013)).

To demonstrate the evolving nature of census preparations, Defendants cite to Census Bureau "facts and documents" available on the Census Bureau website. *See* App. A. Accordingly, the Court may take judicial notice of these sources and the facts cited therein. *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

Whether the Court examines the allegations of the FAC or consults facts outside the pleadings, *see* App. A., it is clear that this case is "dependent on future uncertainties" such that the issues are not fit for judicial decision. *Miller*, 462 F.3d at 319. The second prong of the ripeness inquiry—hardship to the parties—also points to unripeness because the Census Bureau would suffer extreme hardship with Court interference. *See* Defs.' Mem. at 17–18; Defs.' Reply Mem. at 8–9; Tr. 33–35. Plaintiffs have identified nothing to contrary and remain unable to identify any hardship *they* would suffer from delayed review. *See Ohio Forestry*, 523 U.S. at 733. Plaintiffs' claim is not ripe.[8]

---

2009), in which case "[t]he Court regards the pleadings' allegations as mere evidence on the issue and its consideration of additional evidence does not convert the proceeding to one for summary judgment." *Musari v. Countrywide Home Loans*, 2016 WL 4124227, at *3 (D. Md. Aug. 3, 2016) (Grimm, J.) (citing *Richmond, Fredericksburg & Potomac Ry. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). The Court may then resolve all factual disputes on the basis of outside evidence. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) ("the court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning jurisdiction").

[8] Alternatively, the Court may dismiss this case as moot. As this Court has recognized, "a plaintiff bringing a claim for injunctive or declaratory relief," as here, "must demonstrate a personal stake in the outcome and that personal stake must exist at the commencement of the litigation (standing) and must continue throughout its existence (mootness)." *Nat'l All. For Accessibility, Inc. v. C1 Maryland Bus. Tr.*, 2013 WL 4229262, at *2 (D. Md. Aug. 14, 2013) (Grimm, J.). The Court may raise mootness *sua sponte*. *Id.*

**B. Census preparations will continue unimpeded despite the lapse in appropriations.**

Despite the recent lapse in appropriations, the Census Bureau has funds available to continue its progress toward a successful 2020 Census. As set forth in the attached declaration of Burton Reist, the Consolidated Appropriations Act for FY 2018 included not only $987 million for planned FY 2018 activities, and not only $50 million in contingency funding controlled by the Secretary, but also $1.056 billion for FY 2019 activity. Reist Decl. ¶¶ 3–4. This funding has permitted the Census Bureau to maintain 2020 Census operations uninterrupted throughout the continuing resolution and into the current lapse in appropriations. *Id.* ¶ 4. According to the Census Bureau's most recent analysis, it can continue census preparations until at least the end of March 2019 or into April 2019, without requiring any change to the schedule, cost, or scale of 2020 Census operations. *Id.* ¶ 6. Beyond that point, the Census Bureau will identify other actions that could be taken to extend existing funds without notable programmatic slowdowns. *Id.* ¶ 7.

Put simply, the foreseeable future holds ever-changing staffing, testing, and operations as the Census Bureau prepares for a successful 2020 Census. Plaintiffs' claim is not ripe now, and will not become ripe until at least the 2020 Census.

**C. If found unripe, Plaintiffs' claim can be heard in 2020.**

There is nothing uncommon about a census case that does not ripen until the census is underway. Indeed, nearly all census cases are brought *post*-Census Day, not *before* the census, and certainly not *two years* before the census. *See generally*, cases cited, *supra*; Defs.' Reply Mem. at 12 n.7. Prior cases reveal a template for Plaintiffs to obtain appropriate relief in the unlikely event that their abstract fears are realized in 2020.

In *Carey v. Klutznick*, for example, the plaintiffs filed suit during the 1980 Census, alleging that, *inter alia*, the master address registers used to count residents of New York City were grossly inadequate

---

Given that the facts underlying nearly all of Plaintiffs' allegations are moot, any requested relief based on those allegations is now moot, and the Court may dismiss this case on that ground.

because they were compiled from private commercial mailing lists that were out of date, incomplete, and lacked information regarding residents of poor and minority neighborhoods. 637 F.2d 834, 836 (2d Cir. 1980). Plaintiffs sought a preliminary injunction requiring the Census Bureau to continue accepting "Were You Counted?" forms after the deadline and compare them with Medicaid records. *Id.* The district court granted the preliminary injunction, and the Second Circuit affirmed. *Carey v. Klutznick*, 508 F. Supp. 416, 417 (S.D.N.Y.), *aff'd,* 637 F.2d 834 (2d Cir. 1980).

Like the *Carey* plaintiffs, nothing prevents Plaintiffs here from moving for expedited relief during or after the 2020 Census—*i.e., after* census procedures are finalized, *after* Plaintiffs can identify actual census operations used in 2020 that impact Prince George's County, and *after* Plaintiffs have suffered (or will imminently suffer) a differential undercount specific to Prince George's County due to those operations.[9] If Plaintiffs later prove their claim, then, and only then, may the Court deploy its broad equitable powers by tailoring a remedy to the specific, faulty operations proved by Plaintiffs.

There remains a possibility that Plaintiffs may obtain such relief even if it extends beyond the current deadline for reporting the census results to the President.[10] 13 U.S.C. § 141(b). Indisputably, the statutory deadlines for reporting census results are just that: statutory. Congress has the power to change the deadlines at any time. *Cf. Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1570 (9th Cir. 1993) ("Congress clearly has the power to amend a statute and to make that change applicable to pending cases.").

---

[9] Defendants do not waive any claim or defense that may be raised in a subsequently-filed suit.

[10] In *Young v. Klutznick*, 497 F. Supp. 1318, 1321–22 (E.D. Mich. 1980), the district court expressly ordered an equitable remedy—there, a statistical adjustment of census data to correct a differential undercount—despite the defendants' protestation that the court's order could not be implemented before the statutory deadline. 13 U.S.C. § 141(b). Reasoning that "[g]reat discretion is given [to] courts in determining the application of statutes where a strict reading would result in a harsh result," and that "there is no absolute need to have accurate census figures for reapportionment until the latter part of 1981, or the early part of 1982, so as to meet early primary elections," the court held that the statutory deadlines were merely "directory," not "mandatory." *Young*, 497 F. Supp. at 1338. The Sixth Circuit later reversed, concluding that the plaintiffs lacked standing and the case was unripe. *Young v. Klutznick*, 652 F.2d 617, 626 (6th Cir. 1981).

Indeed, Congress has extended census deadlines from the earliest days of our Republic.  For example, in the 1790 Census, Congress directed that the census would commence on August 2, 1790 and end on May 2, 1791.  Census Act of 1790, 1 Stat. 101 (1790).  But Congress later amended the Census Act to extend the reporting deadline for Rhode Island and Vermont until late 1791, and for South Carolina until March 1, 1792.  *Id.*  Such amendments became a running theme, with census reporting deadlines codified, then subsequently extended in each census from 1810 to 1850.  *See* An Act to Extend the Time for Completing the Third Census, 2 Stat. 658 (1811); An Act to Amend the Act Entitled "An Act to Provide for Taking the Fourth Census," 3 Stat. 643 (1821), An Act to Amend the Act for Taking the Fifth Census, 4 Stat. 439 (1831), An Act to Amend the Act Entitled "An Act to Provide for Taking the Sixth Census," 5 Stat. 452 (1841), An Act Supplementary to the Act Entitled "An Act Providing for the Taking of the Seventh and Subsequent Censuses," 9 Stat. 445 (1850).[11]

In sum, Plaintiffs would have more than adequate opportunity for redress, both in Congress and the courts, in if their bare-bones allegations of harm come to fruition in 2020.

## CONCLUSION

For the reasons set forth in Defendants' prior briefing, at oral argument, and herein, the Court should refuse to entertain Plaintiffs' fanciful tales of "deficient" preparations and hypothetical injuries, and should dismiss this case.

---

[11] Extensions became less necessary in 1880 when professional enumerators were used in lieu of U.S. Marshals.  *See* An Act to Provide for Taking the Tenth and Subsequent Censuses, 20 Stat. 473 (1879).  Congress has also altered the start date of the decennial census.  From 1790 to 1820, censuses began on the first Monday in August.  *See* An Act to Provide for Taking the Fourth Census, 3 Stat. 548 (1820).  In 1828, President John Quincy Adams suggested the census be conducted earlier, so from 1830 to 1900, decennial censuses began on June 1.  State of the Union, President John Quincy Adams, December 2, 1828,  http://www.creatinghistory.com/john-quincy-adams-state-of-the-union-december-2-1828/.  After some fluctuation in the early Twentieth Century, Congress eventually codified April 1 as Census Day, 13 U.S.C. § 141(a), where it remains today.

DATED: January 21, 2019                    Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           JOHN R. GRIFFITHS
                                           Director, Federal Programs Branch

                                           JOSHUA E. GARDNER
                                           Special Counsel, Federal Programs Branch

                                           CARLOTTA P. WELLS
                                           Assistant Director, Federal Programs Branch

                                           /s/ Stephen Ehrlich
                                           GARRETT COYLE
                                           STEPHEN EHRLICH
                                           CAROL FEDERIGHI
                                           MARTIN M. TOMLINSON
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.
                                           Washington, DC  20530
                                           Tel.: (202) 305-9803
                                           Email:  stephen.ehrlich@usdoj.gov

                                           *Counsel for Defendants*

# APPENDIX A

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 32 | The cost of the decennial census has roughly doubled each decade from 1970 to the present. | *See* ¶ 33, *infra*. |
| 33 | However, Congress directed that the budget for the 2020 Census not exceed the cost of the 2010 enumeration. | Although such language appeared in Senate Reports early in the decade, it did not appear in the FY 2018 appropriations.  *Compare* 2011 S. Rept 111-229 (PDF pg. 17), https://www.congress.gov/congressional-report/111th-congress/senate-report/229/1 *with* 2018 S. Rept 115-139 (PDF pg. 17), https://www.congress.gov/congressional-report/115th-congress/senate-report/139/1.  There have not yet been appropriations for FY 2019 and FY 2020, so any future congressional direction is unknown. |
| 34 | Typically, at this point in the preparations, funding for the Census Bureau escalates to prepare for the decennial census. Between 2007 and 2008, for example, the Bureau's budget increased 61 percent. | The Census Bureau's budget increased 91% from FY 2017 to FY 2018.  *Compare* 2017 S. Rept. 114-239, https://www.congress.gov/114/crpt/srpt239/CRPT-114srpt239.pdf *with* 2018 S. Rept 115-139, https://www.congress.gov/congressional-report/115th-congress/senate-report/139/1.  The year-to-year increase from FY 2018 to FY 2019 is unknown, as there have not yet been appropriations for FY 2019. |
| 35 | However, Congress approved only $1.47 billion for the Census Bureau in the 2017 fiscal year, approximately 10 percent below what the Obama Administration had requested. | *See* ¶ 37, *infra*. |
| 36 | The Trump Administration's 2018 budget request for the Census Bureau asked for an increase of only two percent from 2017 levels. | *See* ¶ 37, *infra*. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 37 | The Department of Commerce has acknowledged the severity of underfunding. In October 2017, Defendant Ross told Congress that the lifecycle cost of the 2020 Census would be $3.3 billion above the original estimate and that the administration would request an additional $187 million for Fiscal Year 2018. | Congress approved the Department's request for an additional $187 million in 2018, and they added $1.056 billion forward funded from 2019 appropriations to allow continued work on the 2020 Census in the event of uncertain funding for 2019. Congress itself explained:<br><br>Approximately 70 percent of the costs of the 2020 Census will be incurred in fiscal year 2019 and fiscal year 2020. In order to ensure Census has the necessary resources to immediately address any issues discovered during the 2018 End-To-End Test, and to provide a smoother transition between fiscal year 2018 and fiscal year 2019, this agreement provides half of the amount needed for the 2020 Census for those fiscal years and includes the 2018 contingency amount of $50,000,000 requested by the Secretary. These resources will also allow the Bureau of the Census to move forward with the timely execution of its 2020 Decennial Census communications and partnerships program to improve response rates and enhance trust in the Census.<br><br>Commerce, Justice, Science and Related Agencies Appropriations Act, 2018 (P.L. 115-141).  There have not yet been appropriations for FY 2019 and FY 2020, so the amount of future appropriations is unknown. |
| 38 | Former Bureau officials, outside experts, members of Congress, and Government Accountability Office (GAO) staff have all expressed alarm about the Bureau's funding shortage. | *See* ¶¶ 39–45, *infra*. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 39 | A senior GAO official recently testified that the cost estimate for the 2020 Census "was not reliable and did not adequately account for risk." | The GAO has since analyzed the Census Bureau's revised cost estimate—which increased the anticipated budget by $3.3 billion—and issued an August 2018 report explaining "can be attributed, in part, to the Bureau gaining a clearer understanding of risk and uncertainty in the 2020 Census as it approaches."  Census Bureau Improved the Quality of Its Cost Estimation but Additional Steps Are Needed to Ensure Reliability, GAO-18-635, Aug 17, 2018, https://www.gao.gov/assets/700/693990.pdf.

The GAO recognized that "the Bureau has made considerable progress in all four" aspects of reliability, but that "it has only partially met the criteria for the characteristic of being well-documented."  Id.  Thus, "[u]ntil the Bureau meets or substantially meets the criteria for this characteristic, the cost estimate cannot be considered reliable."  Id.  The Census Bureau is continuing to refine its cost estimate and improve on the areas identified by the GAO. |
| 40 | Former Bureau Directors Kenneth Prewitt and Vincent Barabba described the 2020 Census as "under threat by uncertain funding." | The cost estimate for the 2020 Census has been revised since these comments by Kenneth Prewitt and Vincent Barabba in August 2017.  See "The Trump administration isn't ready for the 2020 Census," Washington Post, https://www.washingtonpost.com/opinions/the-trump-administration-isnt-ready-for-the-2020-census/2017/08/24/1808b450-8756-11e7-961d-2f373b3977ee_story.html?utm_term=.cbfe82b6e6c2.

The revised cost estimate anticipates an extra $3.3 billion for the 2020 Census, see Revised Life Cycle Cost Estimate, (PDF pg. 11), https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/planning-docs/cost-estimate.html, and Congress has since allocated funding to ensure census preparations in line with this estimate, see ¶ 37, supra.  There have not yet been appropriations for FY 2019 and FY 2020, so the amount of future appropriations is unknown. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 41 | The two former directors explained, "This is a critical period in which to begin operations, including well-researched advertising messages, staffing and training an army of temporary workers, opening field offices and testing new technology. The Census Bureau cannot do any of this at the last minute, just as the Defense Department cannot prepare for military action when a threat is imminent." | *See generally* ¶¶ 32–94.  Additionally, census preparations advanced considerably in 2018.  For example, the Census Bureau fielded the Census Barriers, Attitudes and Motivators Survey (CBAMS), which will provide inform the advertising campaign and the media plan.  The CBAMS fielded this decade was far more robust than the survey conducted prior to the 2010 Census; it included a sample size of 50,000, yielding a weighted response rate of 39.4%, and 42 focus groups.  *See* 2020 Census Barriers, Attitudes, and Motivators Study (CBAMS) Survey and Focus Groups: Key Findings for Creative Strategy, Oct. 31, 2018 (PDF Page 5–6), https://www2.census.gov/cac/nac/meetings/2018-11/mcgeeney-evans-cbams.pdf?#.  The Census Bureau will continue to learn from CBAMS and refine its advertising campaign and the media plan accordingly. |
| 42 | The Census Bureau has already had to scale back critical planning activities due to budgetary uncertainty and shortfalls. | *See* ¶ 44, *infra*. |
| 43 | Then-Census Bureau Director John Thompson testified on May 3, 2017, at an oversight hearing of the House Committee on Appropriations that, "[i]n order to concentrate our resources on systems readiness in this fiscal year, we had to make difficult decisions to de-scope some aspects of the program and pause others." | *See* ¶ 44, *infra*. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 44 | In recent months, Defendants have: *canceled 2017 field tests in Puerto Rico, North Dakota, South Dakota, and Washington State; *canceled two of three sites for the 2018 End-to-End Census Test, dress rehearsals that serve as the basis for many final decisions about decennial census methods and operations; *delayed opening six Regional Census Centers. | The Regional Census Centers are now all open, and the Area Census Offices are on track to open as scheduled.  *See* December 2018 Program Management Review, (PDF pg. 32), https://www2.census.gov/cac/sac/meetings/2018-12/fontenot-2020-census-update.pdf?# .  Although certain tests were cancelled in 2017 and two sites were cut from the field test for peak operations in the 2018 End-to-End Census Test, the full suite of public facing operations were successfully deployed in the 2017 Census Test using the IT systems that will be in place for the 2020 Census.  *See* 2020 Census Program Management Review, July 2017, (PDF pg. 20), https://www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/07-11-2017/pmr-update-testing-2017-07-11.pdf?# .

Additionally, the 2018 End-to-End Census Test, which is nearly complete, successfully conducted the early operations in all three planned test sites—including West Virginia—and successfully deployed 40 of the 52 systems necessary to conduct the 2020 Census in the Providence site.  *See* 2020 Census Program Management Review, April 20, 2018, (PDF pg. 75), https://www.census.gov/library/video/2018/2018-04-20-2020-pmr.html, 2:18:52–2:19:15.  The remaining four systems in the test support the final operations.  They have been successfully tested but not yet deployed.  *See* 2020 Census Program Management Review, April 20, 2018, (PDF pg. 84), 2:25:17–2:26:55.  The Census Bureau will continue to refine and test these operations in the coming year. |
| 45 | Moreover, in the nine West Virginia counties that Defendants eliminated from the 2018 test, 31 percent of the population lacks access to high-quality residential broadband. As a result, the Bureau will not be able to test its novel digitization strategy in rural areas that are most susceptible to undercounting, leaving virtually no opportunity to test census operations in rural communities before the 2020 Census. | The Census Bureau conducted field testing for the address canvassing phase in the nine West Virginia counties referenced in ¶ 45.  *See* National Advisory Committee Meeting: June 14–15, 2018, (PDF pg. 4–6) https://www2.census.gov/cac/nac/meetings/2018-06/fontenot-2020-update.pdf?#; National Advisory Committee Spring Meeting: June 14–15, 2018, https://www.census.gov/library/video/2018/2018-06-nac.html, 1:17:21–1:23:25  All operations were successfully deployed, but the Census Bureau will continue to refine and test these operations in the coming year. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 46 | Due to inadequate funding, the Bureau has thus far hired only about 40 partnership specialists for this outreach effort in 2018. | Congress specifically directed the Census Bureau to "ensure that its fiscal year 2018 partnership and communications activities in support of the 2020 Census are conducted at a level of effort and staffing no less than that conducted during fiscal year 2008 in preparation for the 2010 Decennial Census." Commerce, Justice, Science and Related Agencies Appropriations Act, 2018 (P.L. 115-141). The Census Bureau increased hiring of partnership specialists in the Summer of 2018 and is on track to meet its June 30, 2019 goal of hiring 1,501 partnership specialists (as opposed to 800 hired in 2010). *See* Presentation to the Census Scientific Advisory Committee, December 6, 2018, (PDF pg. 36), https://www2.census.gov/cac/sac/meetings/2018-12/fontenot-2020-census-update.pdf?#.  The Census Bureau will continue its hiring of partnership specialists and other staff throughout the year. |
| 47 | The damage caused by Hurricanes Harvey and Irma will also require considerable funding to ensure that affected communities are accurately counted. It is extremely unlikely that the Census Bureau will be able to devote additional resources to these areas, given the existing impact of underfunding on its planned operations. | The revised cost estimate for the 2020 Census allows sufficient funding to switch from the usual census operations to hand-delivered census questionnaires in areas impacted by these natural disasters.  *See* Revised Life Cycle Cost Estimate, (PDF pg. 25), https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/cost-estimate.html (noting that the Secretary controls $1.2 billion for unforeseen events "such as a natural disaster driving residents of an area away from their residences leading up to Census Day." ).  The Census Bureau has decided to use this hand-delivery method in Puerto Rico due to Hurricane Maria.  2020 Program Management Review, August 2018, https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/memo-series/2020-memo-2018_13.html .  The Census Bureau will continue to monitor these areas, and will refine its plans as necessary. |
| 48 | Lack of funding will also make it more difficult to assess inaccuracies in the final census count. | *See* ¶ 49, *infra*. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 49 | The Census Bureau typically conducts a so-called Census Coverage Measurement, which evaluates the size of the undercount and over-count. Funding uncertainty has led the Bureau to pause planning for this program, and the Bureau will not test this operation in the 2018 End-to-End Test as planned. | The Post Enumeration Survey—which will assess the quality of the census counts and identify the undercount/overcount for each major population group—is now fully budgeted and on schedule for implementation in the 2020 Census.  2020 Program Management Review, October 2018 https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/program-briefings/2018-10-19-pmr.html (Minute 2:41:00-2:42:33) ("One of the major decisions to date has been to use the existing field infrastructure of the current household surveys to conduct the Post-Enumeration Survey.  This decision has saved us from having to build new systems or modify old systems from the 2010 CCM.  In an effort to mitigate risks associated with design changes and to keep measurement properties of the coverage estimates invariant over time, the design of the 2020 PES is very similar to the 2010 CCM.  We are also relying on the solid design and methods from the 2010 CCM because of budget limitations during the decade.").  The Census Bureau will continue to test and refine its operations related to the Post Enumeration Survey. |
| 50 | On March 23, 2018, the President signed an omnibus spending bill that allocated $2.814 billion to the Census Bureau, $2.544 billion of which is set aside for Periodic Censuses and Programs, including the 2020 Census. | *See* ¶ 37, *supra*. |
| 51 | The report from the appropriations committee that accompanies the bill states that the omnibus "provides half of the amount needed for the 2020 Census for" fiscal years 2019 and 2020. Congress has not specified what portion of the fiscal year 2018 appropriation, if any, the Census Bureau should reserve to spend in fiscal years 2019 and 2020. | The Census Bureau used advanced funding to, *inter alia*, begin hiring for the Partnership Program, and the Census Bureau has since carried over $987 million from fiscal year 2018.  *See* Reist Decl. ¶¶ 3–4.  There have not yet been appropriations for FY 2019 and FY 2020, so the amount of future appropriations is unknown. |
| 52 | This omnibus bill funds the government only through September 2018 and is inadequate to redress the long term and cumulative underfunding problems set forth above. | *See* ¶ 37, *supra*. |

| FAC ¶ | Allegation | Changed Circumstances |
|-------|-----------|----------------------|
| 53 | There is no guarantee, and strong reason to doubt, that the Census Bureau will receive an increase in the current funding level for the 2020 Census after September 2018, as Congress consistently has failed to pass new spending bills for the subsequent fiscal year in a timely way. On March 23, 2018, upon signing the omnibus bill, President Trump stated: "There are a lot of things that we shouldn't have had in this bill, but we were, in a sense, forced — if we want to build our military — we were forced to have. There are some things that we should have in the bill . . . But I say to Congress: I will never sign another bill like this again. I'm not going to do it again." | *See* ¶ 37, *supra*. |
| 54 | The President's proposed Census Bureau budget of $3.8 billion for fiscal year 2019 is also far short of the funding necessary to conduct a fair and accurate census.  By contrast, the Census Bureau received $4.2 billion in fiscal year 2009 to fund the 2010 Census. | *See* ¶ 37, *supra*.  The proposed FY 2019 budget would support all 2020 Census activities and includes significant contingency funding.  *See* Revised Life Cycle Cost Estimate (PDF pg. 23–24), https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/planning-docs/cost-estimate.html (noting $1.42 billion to mitigate risks in the 2020). That said, there have not yet been appropriations for FY 2019 and FY 2020, so the amount of future appropriations is unknown. |
| 55 | On January 23, 2017, Defendant Trump issued a Presidential Memorandum instituting a hiring freeze throughout much of the executive branch. Hiring Freeze, 82 Fed. Reg. 8493 (Jan. 23, 2017). | *See* ¶ 58, *infra*. |
| 56 | As of April 10, 2017, the hiring freeze had prevented filling at least 157 jobs at the Census Bureau. | *See* ¶ 58, *infra*. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 57 | The Office of Management and Budget lifted the hiring freeze on April 12, 2017, but immediately imposed a new order directing agencies to submit plans for personnel cuts and other restructuring moves to fit the budget blueprint. | *See* ¶ 58, *infra*. |
| 58 | The Department of Commerce has not publicly disclosed these plans, or how they will affect the Bureau's plans to hire up to half a million temporary workers to conduct the enumeration. | The Census Bureau is currently on track to hire all of the staff needed to conduct a successful 2020 Census.  *See, e.g.*, Presentation to the Census Scientific Advisory Committee, December 6, 2018, (PDF pg. 33, 36), https://www2.census.gov/cac/sac/meetings/2018-12/fontenot-2020-census-update.pdf?#. |
| 59 | The effect of the Presidential Memorandum and the subsequent personnel directive has been to prevent the Census Bureau from hiring staff necessary to ensure an "actual enumeration" in 2020. | *See* ¶ 58, *supra*. |
| 60 | The Bureau lacks permanent or senior leadership. | Dr. Steven Dillingham was confirmed as Director of the Census Bureau on January 2, 2019.  *See* ECF 56.  Dr. Ron Jarmin serves a Deputy Director of the Census Bureau. |
| 61 | On May 9, 2017, just days after testifying to Congress about imminent threats to the accuracy and integrity of the 2020 count, then-Census Director John Thompson abruptly announced his resignation, effective June 30, 2017. | *See* ¶ 60, *supra*. |
| 62 | Mr. Thompson was, at the time, statutorily eligible to serve until the end of 2017, and was eligible to be reappointed to a second five-year term. | *See* ¶ 60, *supra*. |
| 63 | The President has not nominated a director of the Census Bureau. | *See* ¶ 60, *supra*. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 64 | The position of deputy director also has been vacant since the previous deputy director stepped down in early 2017. The President has not posted the position to be filled through the competitive civil service process, as has been done historically. | *See* ¶ 60, *supra.* |
| 65 | In November 2017, it was reported that the President selected Thomas Brunell as deputy director of the Census Bureau. Mr. Brunell's primary experience at the time was serving as an expert witness in defense of partisan and racial gerrymanders. After widespread criticism of his qualifications, Mr. Brunell withdrew from consideration. | *See* ¶ 60, *supra.* |
| 66 | There are no pending nominees or candidates for director or deputy director for the 2020 Census. | *See* ¶ 60, *supra.* |
| 67 | The Census Bureau's plans for the 2020 Census reflect serious design defects that, if unresolved, will exacerbate the undercount. | *See* ¶¶ 70–94, *infra.* |
| 68 | These design problems include (a) the first-time large-scale use of on-line census forms instead of paper surveys delivered by mail; (b) the failure to safeguard online census systems from cyber threats; (c) a significant reduction in on-the-ground presence and field workers; and (d) improper reliance on state administrative databases of varying quality. | *See* ¶¶ 70–94, *infra.* |
| 69 | The Census Bureau will digitize the census for the first time in 2020. | *See* ¶¶ 70–94, *infra.* |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 70 | The 2020 Census will deploy electronic and internet-based tools to collect responses. Such digitization is a radical departure from the paper and in-person methods used in all previous censuses. | The Census Bureau has since finalized plans which explain that "paper and in-person methods" will continue to be used extensively in the 2020 Census, consistent with prior censuses. *See* 2020 Census Detailed Operational Plan for: 18. Nonresponse Followup Operation (NRFU) [hereinafter "2020 Census DOP NRFU"], Section 2.3.1 Contact Strategy (PDF pg. 14), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/NRFU-detailed-operational-plan.pdf . The Census Bureau will continue to test these operations and refine plans as necessary. |
| 71 | The 2010 Census delivered approximately 360 million questionnaires to 133 million housing units. | *See* ¶¶ 72–74, *infra*. |
| 72 | This cycle, Defendants instead intend to encourage self-response primarily by internet and to reduce the number of in-person visits to households that do not self-respond. | *See* ¶ 74, *infra*. Additionally, the Census Bureau has since finalized Detailed Operational Plans which explain that nonresponding households may receive six in-person visits. *See* 2020 Census DOP NRFU (PDF pg. 14), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/NRFU-detailed-operational-plan.pdf ; *see* the 2010 Census Nonresponse Followup Operations Assessment Report, Section 5.1.1.4.2. Record of Contact (PDF pg. 59): https://www.census.gov/programs-surveys/decennial/2010/program-management/5-review/cpex/2010-memo-190.pdf?# . The Census Bureau will continue to test these operations and refine plans as necessary. |
| 73 | In 2020, Defendants will mail census questionnaires initially to only 20 percent of U.S. households. | *See* ¶ 74, *infra*. |
| 74 | Defendants will mail the remaining 80 percent of U.S. households a notification inviting them to complete the census questionnaire online. Should these households not complete the questionnaire online or by telephone, Defendants plan to mail a paper version. | All respondents will have the ability to respond via the Internet, over the telephone, or by returning a paper questionnaire. *See* 2020 Census DOP NRFU, (PDF pg. 4.) All nonresponding households will receive a paper questionnaire on the fourth mailing. And all nonresponding households will be included in the Nonresponse Followup operation. *See id.* The Census Bureau has since finalized plans which explain that nonresponding households may receive up to six in-person visits, *See id.*, (PDF pg. 14). The Census Bureau will continue to test these operations and refine plans as necessary. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 75 | A largely online census will likely have a devastating impact on communities that have low or little access to reliable broadband internet, many of which are communities of color and low-income households. | *See* ¶¶ 72–74, *supra.* |
| 76 | The "digital divide" in the U.S. is stark. Only half of households earning incomes less than $30,000 per year have access to broadband internet. | *See* ¶¶ 72–74, *supra.* |
| 77 | In addition, many rural residents have significantly reduced access to the internet. | *See* ¶¶ 72–74, *supra.* |
| 78 | Communities of color, including African Americans and Hispanics, are more likely to have reduced access to internet than their White counterpart. | *See* ¶¶ 72–74, *supra.* |
| 79 | Defendants' design flaws, coupled with their insufficient funding, planning and staffing deficiencies, have left them unprepared for the challenges that digitization presents. | *See* ¶¶ 33–59, 69–74, *supra.* |
| 80 | At a recent congressional hearing, Defendant Ross admitted that, of the forty-three technology systems the Bureau is supposed to prepare for testing in 2018, Defendants have completed development of only *four*, and less than half of the forty-three systems have some functionality. | The 2018 End-to-End Census Test, which is nearly complete, successfully conducted the early operations in all three planned test sites, and successfully deployed 40 of the 52 systems necessary to conduct the 2020 Census in the Providence site.  *See* 2020 Census Program Management Review, April 20, 2018, (PDF pg. 75), https://www.census.gov/library/video/2018/2018-04-20-2020-pmr.html, 2:18:52–2:19:15.  The remaining four systems in the test support the final operations.  They have been successfully tested but not yet deployed.  *See* 2020 Census Program Management Review, April 20, 2018, (PDF pg. 84), 2:25:17–2:26:55.  The Census Bureau will continue to refine and test these operations in the coming year. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 81 | Digitizing the census also raises significant cybersecurity concerns. | The Census Bureau is working closely with other Federal agencies, including the Department of Homeland Security, to apply the strongest possible cyber security protections to all systems.   *See* 2020 Census Program Management Review, April 20, 2018, https://www.census.gov/library/video/2018/2018-08-03-2020-pmr.html, (Minute 40:18–43:49) (noting that the Census Bureau is working closely with Federal Intelligence agencies).  Cybersecurity systems will undergo continuous development and rigorous testing throughout 2019 and 2020.  *See id.* |
| 82 | The Census Bureau has not explained how it will protect the personal information of hundreds of millions of Americans. | *See* ¶ 81, *supra.* |
| 83 | Moreover, the Bureau's cancellation of planned tests deprives it of comprehensive opportunities to test critical cybersecurity infrastructure. | *See* ¶ 81, *supra.* |
| 84 | These technical issues are compounded by the fact that even *perceived* data insecurity could dissuade digital responses, in light of recent high-profile and largescale data breaches for clients of Equifax, Yahoo!, and Uber, among others. | *See* ¶ 81, *supra.* |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 85 | The Census Bureau has also decided to cut its on-the-ground presence and field infrastructure significantly. It has reduced the number of area offices and workers, and will conduct in-person visits at a fraction of past rates. | The Census Bureau has since explained that "on-the-ground presence and field infrastructure" can be reduced due to significant technological advances for the 2020 Census.  *See* 2020 Census DOP NRFU, (PDF pg. 3) ("Additional cost savings are expected to result from the use of automation to streamline in-field census taking. Fieldworkers will use mobile devices for collecting the data. Operations and functions such as recruiting, training, and payroll will also be automated, reducing the time required for these activities. New operational control centers will rely on automation to manage the work, enabling more efficient case assignment, automatic determination of optimal travel routes, and reduction of the number of physical offices.").<br><br>Nonetheless, the Census Bureau has finalized plans which explain that nonresponding households may receive six in-person visits, the same number of visits used in prior censuses.  *See* ¶ 72, *supra*.  The Census Bureau will continue to test these operations and refine plans as necessary. |
| 86 | In conducting the census, the Census Bureau typically makes initial contact with households via mail, and follows up with in-person visits if there is no response. Households that do not respond to the initial mailing are characterized as "hard-to-count." | *See* ¶ 74, *supra*. |
| 87 | In prior censuses, the Census Bureau has made in-person visits to households up to six times in order to ensure completion of census forms. | *See* ¶ 74, *supra*. |
| 88 | For the 2020 Census, the Census Bureau proposes to conduct only one in-person visit to each household. | The Census Bureau has since finalized plans which explain that nonresponding households may receive six in-person visits, the same number of visits used in prior censuses.  *See* ¶ 72, *supra*.  The Census Bureau will continue to test these operations and refine plans as necessary. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 89 | If the in-person visit is unsuccessful, the Census Bureau plans to use federal and state administrative records to attempt to determine the residents for an undetermined number of the households that have not responded. | As part of Nonresponse Followup operations, the Census Bureau has since explained that federal administrative records—such as data from the Internal Revenue Service and the Social Security Administration—will be used to enumerate households only when they are of high quality.  *See* 2020 Census Program Management Review, August 2018, https://www.census.gov/library/video/2018/2018-08-03-2020-pmr.html, (Minute 1:35:00–1:38:00).  It is no longer the Census Bureau's plan to use state administrative records.  *See* 2020 Program Management Review, April 2017 (PDF pg. 13, 17–18) https://www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/04-21-2017/pmr-update-testing-2017-04-21.pdf?#  (listing only federal sources for administrative records).  The Census Bureau will continue to test these operations and refine plans as necessary. |
| 90 | State administrative data is often unreliable and of poor quality, and the quality of the information between states varies significantly. Moreover, these databases generally do not include data that the census collects with respect to race, ethnicity, and the relationship of household members to each other. | It is no longer the Census Bureau's plan to use state administrative records.  *See* ¶ 89, *supra*.  The Census Bureau will continue to test these operations and refine plans as necessary. |
| 91 | The Census Bureau has not yet reached agreements with all states to use the states' administrative databases. If the Census Bureau fails to secure agreements with all states, this failure will result in inconsistent counting methodologies between states. | It is no longer the Census Bureau's plan to use state administrative records.  *See* ¶ 89, *supra*.  The Census Bureau will continue to test these operations and refine plans as necessary. |

| FAC ¶ | Allegation | Changed Circumstances |
|---|---|---|
| 92 | The Census Bureau plans to use state administrative data as a substitute for in-person enumeration only for those households that are already "hard-to-count," including communities of color. Using unreliable state data as the basis for compiling final census data for households that are disproportionately minority and low-income will lead to an even higher undercount for these groups. | It is no longer the Census Bureau's plan to use state administrative records. *See* ¶ 89, *supra*. The Census Bureau will continue to test these operations and refine plans as necessary. |
| 93 | State administrative databases often lack accurate data on young children and undocumented individuals. | It is no longer the Census Bureau's plan to use state administrative records. *See* ¶ 89, *supra*. The Census Bureau will continue to test these operations and refine plans as necessary. |
| 94 | Because many states do not collect data on race and ethnicity, using state administrative data would create incomplete census records, and would harm communities of color during the post-2020 redistricting process. | It is no longer the Census Bureau's plan to use state administrative records. *See* ¶ 89, *supra*. The Census Bureau will continue to test these operations and refine plans as necessary. |