**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., | ) ) ) | |
| | ) | Case No. 8:18-cv-00891-PWG |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BUREAU OF THE CENSUS, et al., | ) | Jan. 22, 2019 |
| | ) | |
| Defendants. | ) | |

**SUPPLEMENTAL BRIEF OF PLAINTIFFS IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**<u>Page</u>**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................1

   I.   The 1998 Appropriations Act Does Not Preclude This Suit. ...........................................1

      A.   The 1998 Act cannot limit Article III injuries to malapportionment. ............................2

      B.   The 1998 Act did not limit Article III injuries to malapportionment...........................3

   II.   Plaintiffs Have Adequately Alleged Standing ..................................................................4

      A. Plaintiffs allege an increased risk of loss of a congressional seat.....................................4

      B.   Dilution of representation in intrastate redistricting is also a cognizable injury. ...........6

      C.   The Enumeration Clause's zone of interests includes additional interests....................8

      D.   Plaintiffs' injuries are redressable by injunctive and declaratory relief. ......................10

   III.   This Case Is Ripe for Adjudication .................................................................................12

   IV.   Defendants May Not Contravene Plaintiffs' Well-Pleaded Allegations.........................14

CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bennett v. Spear,*
  520 U.S. 154 (1997)......................................................................................................... 6, 7

*Carey v. Klutznick,*
  508 F.Supp. 416 (S.D.N.Y. 1980)................................................................................. 10, 11

*Carey v. Klutznick,*
  637 F.2d 834 (2d Cir. 1980) ........................................................................................ 5, 9, 11

*City of Detroit v. Franklin,*
  4 F.3d 1367 (6th Cir. 1992) ..................................................................................................9

*Dep't of Commerce v. U.S. House of Representatives,*
  525 U.S. 316 (1999)...........................................................................................6, 10, 12, 14

*District of Columbia v. Trump,*
  291 F. Supp. 3d 725 (D. Md. 2018) ...................................................................................11

*Evenwel v. Abbott,*
  136 S. Ct. 1120 (2016) .........................................................................................................8

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992)....................................................................................................... 7, 14

*Glavin v. Clinton,*
  19 F. Supp. 2d 543 (E.D. Va. 1998)......................................................................... 4, 10, 11

*Gonzales v. Gorsuch,*
  688 F.2d 1263 (9th Cir. 1982) ...........................................................................................10

*Karcher v. Daggett,*
  462 U.S. 725 (1983)........................................................................................................ 7, 8

*Kravitz v. United States Dep't of Commerce,*
  336 F. Supp. 3d 545 (D. Md. 2018) ............................................................................... 5, 11

*Kravitz v. United States Dep't of Commerce,*
  No. GJH-18-1041, 2018 WL 6830226 (D. Md. Dec. 28, 2018)...........................................11

*La Unión Del Pueblo Entero v. Ross,*
  No. GJH-18-1570, 2018 U.S. Dist. LEXIS 192174 (D. Md. Nov. 9, 2018) ...........................9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ............................................................................... 6

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ............................................................... 2

*Morales v. Daley*,
   116 F. Supp. 2d 801 (S.D. Tex. 2000) ................................................ 9

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*,
   522 U.S. 479 (1998) ............................................................................... 3

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009) ............................................................... 15

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ................................................................................... 13

*Quon v. Stans*,
   309 F. Supp. 604 (N.D. Cal. 1970) .................................................... 11

*Reynolds v. Simms*,
   377 U.S. 533 (1964) ............................................................................... 7

*Ridge v. Verity*,
   715 F. Supp. 1308 (W.D. Pa. 1989) .................................................. 11

*Robinson v. Lorillard Corp.*,
   444 F.2d 791 (4th Cir. 1971) ............................................................... 12

*Spokeo, Inc. v. Robins*,
   136 S.Ct. 1540 (2016) ...................................................................... 2, 3

*State of California v. Ross*,
   No. 18-cv-01865-RS (N.D. Cal. Aug. 17, 2018) ............................ 9

*State of New York v. Dep't of Commerce*,
   18-CV-2921, 2019 WL 190285 (Jan. 15, 2019) ...................... 5, 6, 12

*Tucker v. U.S. Dep't of Commerce*,
   958 F.2d 1411 (7th Cir. 1992) ............................................................. 5

*U.S. v. Rickenbacker*,
   309 F.2d 462 (2d Cir. 1962) ............................................................... 9

*United States v. Morrison*,
   529 U.S. 598 (2000) ............................................................................... 2

*Utah v. Evans*,
  536 U.S. 452 (2002) ........................................................................... 9

*Wesberry v. Sanders*,
  376 U.S. 1 (1964) .............................................................................. 7

*Wisconsin v. City of New York*,
  517 U.S. 1 (1996) .............................................................................. 7

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
  780 F.3d 597 (4th Cir. 2015) ........................................................... 14

**STATUTES**

2 U.S.C. § 2c ........................................................................................ 7

13 U.S.C. § 9 ........................................................................................ 8

13 U.S.C. § 141 .................................................................................. 13

Del. Code Ann. tit. 29, § 805 ............................................................ 13

Mass. Gen. Laws Ann. ch. 54, § 1 .................................................... 13

Mich. Comp. Laws Ann. § 4.261 ...................................................... 13

N.Y. Legis. Law § 93(1) .................................................................... 13

111 Stat. 2440, 2481 (1997) ...................................................... passim

Va. Code Ann. § 24.2-304.1 .............................................................. 13

**OTHER AUTHORITIES**

Md. Const. art. III, §§ 5, 14 .......................................................... 8, 13

*2020 Census Operational Plan Version 3.0*, U.S. Census Bureau, 141 (Sept.
  2017), https://www2.census.gov/programs-surveys/decennial/2020/program-
  management/planning-docs/2020-oper-plan3.pdf ............................. 8

Cal. Const. art. XXI, § 1 .................................................................... 13

Fed. R. Civ. P. 54(c) .......................................................................... 12

Fed. R. Evid. 201 ............................................................................... 14

Ill. Const. art. IV, § 3(b) ................................................................... 13

Kristin D. Burnett, *Congressional Apportionment: 2010 Census Briefs*, U.S.
  Census Bureau, 2 (2011),
  https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf...............................................4

Margo J. Anderson, <u>The American Census: A Social History</u> 14 (1988).....................................9

Michael Wines, *Census Officials Say Rhode Island Rehearsal is Going Well. Not
  Everyone Agrees.*, N.Y. Times (Apr. 28, 2018),
  https://www.nytimes.com/2018/04/28/us/2020-census-test-rhode-island.html ....................15

*Reapportionment and Redistricting*, General Assembly of Maryland,
  <u>http://mgaleg.maryland.gov/Other/Redistricting/Redistricting.htm</u> ........................................8

U.S. Const. amend. XIV.....................................................................................................................7

U.S. Const. art. I § 2..........................................................................................................................7

William P. O'Hare, *The Undercount of Young Children in the U.S. Decennial
  Census* 17 (2015)...............................................................................................................8

## INTRODUCTION

The 2020 Census is fewer than fifteen months away. The First Amended Complaint alleges in detail the failure of the Census Bureau to meet its constitutional obligations under the Enumeration Clause, likely causing a severe undercount of African-American and other hard-to-count populations. Yet Defendants' response amounts to nothing more than "trust us" based on conflicting allegations from outside the record. Like the plaintiffs in countless prior Enumeration Clause challenges, the NAACP and Prince George's County have alleged cognizable injuries in the loss of federal funding, intrastate vote dilution, and an increased risk of malapportionment of congressional seats. Defendants cite no cases in which a district court dismissed a census case at the pleadings stage, and for good reason: every census case even remotely analogous to this one has proceeded past the pleading stage. With the unconstitutional undercounting of African Americans hanging in the balance, this Court should deny Defendants' motion to dismiss, and afford Plaintiffs the opportunity to prove their claims.

## ARGUMENT

### I.        The 1998 Appropriations Act Does Not Preclude This Suit.

In 1998, Congress sought to establish a new private right of action to challenge statistical sampling. *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act ("1998 Appropriations Act" or "1998 Act"), Pub. L. No. 105-119, §209(b), 111 Stat. 2440, 2481 (1997) There is no evidence in the statute or its legislative history that Congress also intended to *limit* the injuries courts had previously recognized over decades of census litigation, such as loss of federal funding or intrastate redistricting harms. To the contrary, the plain language of the statute recognized the very sorts of harms alleged in this suit, such as undercounts of hard-to-count communities. *See, e.g.*, *id*. §209(a)(9) ("Congress expects . . .

1

aggressive and innovative promotion and outreach campaigns in hard-to-count communities").

Moreover, that Congress may *create* new causes of action in no way suggests that Congress may

also *invalidate* injuries otherwise cognizable under Article III. *See, e.g., Spokeo, Inc. v. Robins*,

136 S.Ct. 1540, 1549 (2016) ("Congress may elevat[e] to the status of legally cognizable injuries

concrete, *de facto* injuries that were previously inadequate in law") (internal quotation omitted).

### A. *The 1998 Act cannot limit Article III injuries to malapportionment.*

The Court must determine independently whether Plaintiffs' injuries are cognizable in an

Enumeration Clause case. *Spokeo*, 136 S. Ct. at 1549 (holding that Congress's views are

"instructive," but not final in standing analysis). The 1998 Appropriations Act states that the

census's "sole constitutional purpose . . . is the apportionment of Representatives in Congress

among the several States." Pub. L. No. 105-119 § 209(a)(2). There is no evidence that in this

single, uncodified finding regarding constitutional *purpose* that Congress also sought *sub silentio*

to invalidate *injuries* arising from constitutional violations previously recognized in decades of

census litigation before 1997. A congressional finding "is not sufficient, by itself" to determine

the meaning of a constitutional provision. *United States v. Morrison*, 529 U.S. 598, 614 (2000).

The judiciary must make that determination. *See id.* at 616 n.7 (citing *United States v. Nixon*, 418

U.S. 683, 703 (1974)).

The standards for pleading standing and stating a claim under the Enumeration Clause are

determinations appropriately made by the Court independent of Congress's views. Even in

statutory cases, Congress's judgment on standing is merely "instructive and important," not

dispositive. *Spokeo*, 136 S. Ct. at 1549. Congress is owed less deference in interpreting the

Constitution, which Congress did not create and does not control. *See Marbury v. Madison*, 5

U.S. (1 Cranch) 137, 177 (1803). Thus, in articulating the Enumeration Clause's purpose, the

2

1998 Appropriations Act could not limit the scope of injuries that may arise from violations of the Clause.

### B.  *The 1998 Act did not limit Article III injuries to malapportionment.*

In the 1998 Appropriations Act, Congress sought to establish a new cause of action to challenge statistical sampling. There was nothing improper in this effort, as "Congress may elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo*, 136 S.Ct. at 1549 (internal citation omitted). But nothing in the text, history, or purpose of the 1998 Act suggests that, apart from elevating this claim, Congress *also* sought to extinguish the injuries from constitutional violations leading to loss of funding and intrastate redistricting that courts had acknowledged in decades of pre-1998 census litigation. Congress presumably knows that the "purpose" of a provision is not the same as defining the range of injuries a court may consider redressable under that provision. *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 492 (1998). If Congress had meant to express its views about which injuries should be cognizable in Enumeration Clause litigation, it would have said so directly, rather than speaking of the census's "constitutional purpose."

Further, in the same statute, Congress specifically acknowledged that a deficient census—in particular, one that undercounts hard-to-count communities—can injure individual rights in ways that go beyond congressional apportionment. The statute seeks to prevent the full range of undercounting-based harms by stressing the importance of "accurately enumerating all individuals who have historically been undercounted." Pub. L. 105-119 § 209(a)(9).  Congress explicitly noted that it "expects" the Census Bureau to undertake "aggressive and innovative promotion and outreach campaigns in hard-to-count communities," including by hiring "enumerators from within those communities." *Id.* Congress's detailed elaboration of expected

"constitutional census activities" undermines any suggestion that Congress intended to foreclose relief for the kinds of apportionment and non-apportionment injuries that Plaintiffs have alleged in this case. *Id.*; First Amended Complaint ("FAC") ¶¶ 106-08.

## II.   Plaintiffs Have Adequately Alleged Standing

Plaintiffs have plausibly alleged that a severe undercount in the 2020 Census will increase the risk of Maryland losing a congressional seat, dilute the representation of Plaintiffs or their members in intrastate redistricting, and deprive them of federal funds distributed on the basis of census data. FAC ¶¶ 106-08. Each of these injuries is cognizable under the Enumeration Clause and can be redressed by the Court.

### A. *Plaintiffs allege an increased risk of loss of a congressional seat.*

Plaintiffs have adequately alleged that the differential undercount caused by the Defendants will create a substantial risk of injuring them by depriving their state of its fair share of representation in Congress. FAC ¶ 108. Maryland has maintained eight congressional seats in the last three census cycles, Kristin D. Burnett, *Congressional Apportionment: 2010 Census Briefs*, U.S. Census Bureau, 2 (2011), https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf, but that does not preclude Plaintiffs' standing.

Plaintiffs have plausibly alleged that the deficiencies in the 2020 Census will result in a more severe undercount than in previous decades, FAC ¶ 28, and that this undercount "increases the risk of Maryland losing seats in Congress." FAC ¶ 108. "[I]n the context of a motion to dismiss," Plaintiffs "do not need to prove with mathematical certainty the degree" of injury that would occur under one methodology for conducting the census compared to another. *Glavin v. Clinton*, 19 F. Supp. 2d 543, 548 (E.D. Va. 1998), *aff'd sub nom Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (discussing possibility of injury from use of

4

statistical sampling). It is sufficient that Plaintiffs "have plausibly pleaded" a likelihood of injury to their state's Congressional representation. *Kravitz v. United States Dep't of Commerce*, 336 F. Supp. 3d 545, 557–58 (D. Md. 2018); *see also Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) (permitting claim that census procedures "*may* deprive" a state of representation because of a "disproportionate undercount") (emphasis added). Plaintiffs sufficiently establish standing at the pleading stage, not least because proving whether Maryland is likely to lose a seat based on the 2020 Census' undercount requires that the Census Bureau "adequately test the precise effects of" new policies, something "that the Census Bureau, the sole entity in the country capable of conducting such a test, [has] failed to do." *State of New York v. Dep't of Commerce,* 18-CV-2921, 2019 WL 190285 at * 65 n.41 (Jan. 15, 2019) ("[I]t would be perverse indeed to hold that Plaintiffs lack standing" based on lack of testing about citizenship question).

In addition, but for the historical undercount, Maryland might have been entitled to more than eight seats in the past. It would require complex analysis to determine whether Maryland has missed out on apportionment gains that it would have received if the census had not undercounted areas like Prince George's County and Baltimore City. *See Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1415-16 (7th Cir. 1992) (explaining that an alternate method for adjusting census data might "increase [a] state's seats in the House of Representatives" and that courts should not "insist, as a condition of standing, on proof that a census recount really would help a plaintiff").

In any event, the injury Plaintiffs allege is not a deprivation of congressional representation from *past* censuses, but the probability that such a deprivation will result from the *next* census. Plaintiffs plausibly allege a more severe differential undercount in 2020 than in past decades. FAC ¶ 28. Therefore, Plaintiffs have pleaded an injury sufficient for standing.

**B.** *Dilution of representation in intrastate redistricting is also a cognizable injury.*

A state's loss of a congressional seat is not the only injury sufficient for standing under the Enumeration Clause. Plaintiffs also have standing because the differential undercount in the 2020 Census will cause dilution of their representation in intrastate redistricting. FAC ¶ 107. "Intrastate vote dilution plainly qualifies as an injury in fact for purposes of Article III." *State of New York*, 2019 WL 190285 at *76; *see also House of Representatives*, 525 U.S. at 332-33.

To hold that Plaintiffs have alleged an adequate injury for standing, the Court need not decide anything more than that Plaintiffs have pled an injury in fact under Article III. Standing doctrine at one time included the additional, "prudential" rule that, regardless of whether the cause of action arose under the Constitution or a statute, the "plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). But the Supreme Court has recently reformulated the zone-of-interests test in a way that makes it suitable exclusively in statutory, not constitutional, cases. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (courts must "determine, using traditional tools of statutory interpretation, whether a *legislatively conferred* cause of action encompasses a particular plaintiff's claim.") (emphasis added). Therefore, the Court need not decide the Enumeration Clause's constitutional purpose or define the Clause's zone of interests to decide that Plaintiffs have standing.

Even if the Court determines that it must inquire into the constitutional purpose of the Enumeration Clause, *see* Jan. 14, 2019 Oral Argument Transcript ("Tr.") at 18:18-20 (remarks by the Court concerning the constitutional purpose of the census), that inquiry favors Plaintiffs. Preventing intrastate malapportionment *is* a constitutional purpose of the Enumeration Clause,

and loss of representation in intrastate redistricting is an injury that falls squarely within the Enumeration Clause's zone of interests.

"[T]he constitutional goal of equal representation" underlies the Enumeration Clause, *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992), and one essential way the census serves that goal is by providing the data used to draw equally populous voting districts. The Constitution's mandate that members of the House or Representatives be elected "by the people of the several states," U.S. Const. art. I § 2 cl. 1, requires states' congressional districts to have approximately equal populations. *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964). The Equal Protection Clause, U.S. Const. amend. XIV § 1, imposes the same requirement on redistricting for state legislatures. *Reynolds v. Simms*, 377 U.S. 533, 577 (1964). "[B]ecause the census count represents the best population data available, it is the only basis for good-faith attempts to achieve population equality." *Karcher v. Daggett*, 462 U.S. 725, 738 (1983) (internal quotation marks and citation omitted). The constitutional right to "equal representation for equal numbers of people," *Wesberry*, 376 U.S. at 18, is thus one of the "interests protected or regulated by the . . . constitutional guarantee" of an actual enumeration. *Bennett*, 520 U.S. at 162.

Although the use of census data in redistricting is not explicitly "delineated in the Constitution," *Wisconsin v. City of New York*, 517 U.S. 1, 5 (1996), that does not remove redistricting from the Enumeration Clause's zone of interests. Today, unlike in 1789, federal law requires single-member congressional districts, 2 U.S.C. § 2c, and the Fourteenth Amendment requires population equality whenever states redistrict their own legislatures. *Reynolds*, 377 U.S. at 577. The modern constitutional and statutory system that requires states to redistrict on a population basis makes sense only in combination with the fundamental understanding that the Enumeration Clause requires Defendants to produce trustworthy census data.

Where, as here, the federal government undermines the distributive accuracy of the census, states are practically powerless to protect their residents from the resulting intrastate vote dilution. In theory, states are free to attempt their own censuses, and if the results were the "best available census data," *Karcher*, 462 U.S. at 744, the state could use those data for redistricting. But in practice, every state relies on federal census data. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016). States do not have permanent census-taking agencies, and it is not feasible for them to launch state-specific censuses when they learn that the federal government is ill-prepared.

Nor is it realistic for states to prevent intrastate malapportionment by adjusting federal census data to correct for differential undercounts between different parts of the state. The only data potentially suitable for measuring local census undercounts within a state—data that incorporate the results of so-called dual-system estimation—can be produced only by the Census Bureau after completion of the 2020 Census,[1] and will not be available until well after states such as Maryland must begin drawing new district maps.[2] The states are thus at the mercy of the Census Bureau. Plaintiffs' allegations of intrastate vote dilution are cognizable injuries.

### C.  *The Enumeration Clause's zone of interests includes additional interests.*

As established above, Plaintiffs' alleged injuries need not fall within the Enumeration

---

[1] Dual-system estimation has been used as the basis for estimating undercounts for sub-national and sub-state geographic areas in the past. *See* William P. O'Hare, *The Undercount of Young Children in the U.S. Decennial Census* 17 (2015). Only Defendants can use dual-system estimation, because the method involves matching Post-Enumeration Survey responses with individual households' responses to the census, *id.* at 19, and those census responses may not lawfully be accessed by anyone except the Census Bureau and its sworn agents. 13 U.S.C. § 9.

[2] Maryland's constitution requires the governor to propose a plan to redistrict the General Assembly by the second Wednesday of January, 2022. Md. Const. art. III, §§ 5, 14. The process of formulating the governor's plan takes roughly half a year. *See Reapportionment and Redistricting*, General Assembly of Maryland (last visited Jan. 17, 2019), http://mgaleg.maryland.gov/Other/Redistricting/Redistricting.htm. But the Census Bureau does not plan to release state and local estimates of net undercounts from the 2020 Census until October 2021. *2020 Census Operational Plan Version 3.0*, U.S. Census Bureau, 141 (Sept. 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf.

Clause's zone of interests. However, Plaintiff's injuries resulting from governmental use of census data for regulation and distribution of benefits meet this standard, FAC ¶ 106, because the census was always intended provide data to facilitate equitable and rational policymaking.

Since 1790, the census has gathered information for purposes other than apportionment. *See* Margo J. Anderson, <u>The American Census: A Social History</u> 14 (1988); *Morales v. Daley*, 116 F. Supp. 2d 801, 818 (S.D. Tex. 2000) ("[F]rom the first census, taken in 1790, the Congress has …. [a]lways included additional data points, such as race, sex, and age of the persons counted."). Over time, in keeping with the census's "strong constitutional interest in accuracy," *Utah v. Evans*, 536 U.S. 452, 478 (2002), the federal government has come to rely on census data for additional purposes, such as allocating federal funding and federal grants to states. *See U.S. v. Rickenbacker*, 309 F.2d 462, 463 (2d Cir. 1962) ("The authority to gather reliable statistical data reasonably related to governmental purposes and functions is a necessity if modern government is to legislate intelligently and effectively.").

As a result, courts have found that allegations involving the allocation of federal funding "easily survive the zone-of-interests-test" under the Enumeration Clause. *See State of California v. Ross*, No. 18-cv-01865-RS, at *13-14 (N.D. Cal. Aug. 17, 2018); *City of Detroit v. Franklin*, 4 F.3d 1367, 1374-75 (6th Cir. 1992) (allocation of federal funding gives rise to an injury under the Enumeration Clause); *La Unión Del Pueblo Entero v. Ross*, No. GJH-18-1570, 2018 U.S. Dist. LEXIS 192174, at *20 (D. Md. Nov. 9, 2018) ("Defendants' other prudential standing argument—that Plaintiffs' funding-related injuries are outside the zone of interests protected by the Enumeration clause—also fails."). In cases involving both Enumeration Clause claims and statutory claims over funding misallocation from census undercounts, courts have found standing without suggesting that standing is conferred only based on the statutory claims. *See, e.g.*, *Carey*,

637 F.2d at 838 (holding that New York, New York City, and individual citizens suffered an

injury in fact when they "challenge[d] a census undercount on the basis, *inter alia*, that improper

enumeration will result in loss of funds to their city"); *Clinton*, 19 F.Supp.2d at 549 (establishing

that the loss of federal funding creates an "[e]conomic injury" in a challenge brought under the

Enumeration Clause and census statutes). The injuries alleged to Plaintiffs' share of federal

funding are thus cognizable under the Enumeration Clause.

### D.  *Plaintiffs' injuries are redressable by injunctive and declaratory relief.*

Plaintiffs seek declaratory and injunctive relief to remedy the Defendants' severely

deficient procedures and preparations that will inevitably lead to a significant differential

undercount, in violation of Defendants' constitutional obligations. As alleged, these procedures

and preparations include the Defendants' reduction of community outreach, FAC ¶ 46; the

drastic decrease in census field offices and infrastructure, *id.* ¶¶ 55-59, 85; the novel and

underdeveloped online response program that will disadvantage hard-to-count communities, *id.*

¶¶ 72-79; and Defendants' cancellation of almost all of their 2017 and 2018 testing, *id.* ¶ 44.

Redressability requires only that the Court have "the power to right or to prevent the

claimed injury" and need not interfere with the Census Bureau's expertise or political judgment.

*Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982). Thus, a request that the Court enjoin

unconstitutional changes to the Census, or fashion an equitable remedy to prevent a constitutional

violation, satisfies the requirement of redressability. *See, e.g.*, *House of Representatives*, 525 U.S.

at 332 (enjoining "uses of sampling in the census . . . will redress the alleged injury").

At oral argument, the Court requested references for cases in which courts issued remedies

regarding census procedures. As early as 1980, the district court in *Carey v. Klutznick* noted, "there

have been several cases in which challenges to census procedures have in fact been entertained by

the federal courts." 508 F.Supp. 404, 411 (S.D.N.Y. 1980) (citing cases). Challenges have been brought prior to the census, and several courts have issued appropriate remedies.

In *Carey*, plaintiffs alleged a differential undercount of "'hard to enumerate' persons" before there was a final count in the 1980 census. *Id.* at 408. The court denied a motion to dismiss on standing, ripeness, and political question grounds, *id.* at 415, and granted the plaintiffs' preliminary injunction requesting changes to the defendants' field presence and counting procedures. *Carey v. Klutznick*, 508 F.Supp. 416, 420 (S.D.N.Y. 1980) (partially relying on estimates of a higher differential undercount for New York and noting "insufficient manpower" in census offices). The Second Circuit affirmed the preliminary injunction. *Carey,* 637 F.2d at 839.

Over the last few decades, a variety of other pre-census challenges to census procedures have been brought. *See, e.g.*, *Kravitz*, 336 F.Supp.3d 545 (requesting injunction against use of citizenship question; motion to dismiss denied); *Kravitz v. United States Dep't of Commerce*, No. GJH-18-1041, 2018 WL 6830226 (D. Md. Dec. 28, 2018) (discussing denial of motion for summary judgement); *Clinton*, 19 F.Supp.2d at 545 (granting plaintiffs' summary judgement motion and prohibiting use of statistical sampling).[3]

A targeted injunction in this case—such as enjoining Defendants against reducing their mailings in hard-to-count communities—would cause Plaintiffs' injuries to be "reduced to some extent." *District of Columbia v. Trump*, 291 F. Supp. 3d 725, 752 (D. Md. 2018).  If the Plaintiffs succeed on the merits of their claim, "an appropriate injunction . . . could be fashioned". *Id.*

Additionally, declaratory relief is available, as the Court noted. *See* Tr. at 24:5-20 (citing

---

[3] Even for the pre-census challenges that were ultimately unsuccessful, none were dismissed on the pleadings. *See, e.g.*, *Ridge v. Verity*, 715 F. Supp. 1308 (W.D. Pa. 1989) (granting summary judgment dismissing claims regarding counting of undocumented immigrants); *Quon v. Stans*, 309 F. Supp. 604, 607 (N.D. Cal. 1970) (denying request for preliminary injunction against "mail-out— mail-back method" but also denying defendants' motion to dismiss).

*Franklin* and *Evans* for the proposition that "it would be likely that the President of the United States and other executive and congressional officials would abide by an authoritative interpretation of the census, statute, and constitutional provisions"). Defendants responded that no such relief is available to Plaintiffs based on their Prayer for Relief. *See* Tr. at 36:14-19. But Plaintiffs requested declaratory relief and "any other and further relief the Court deems appropriate." FAC Requested Relief ¶ 5. If a declaration that Defendants' plans or procedures violate the Enumeration Clause is warranted, this Court is not limited by the precise wording of Plaintiffs' requested relief. *See* Fed. R. Civ. P. 54(c) ("Every . . . final judgment [other than a default] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); *Robinson v. Lorillard Corp.*, 444 F.2d 791, 803 (4th Cir. 1971) (stating there is "no question that it is the court's duty to grant whatever relief is appropriate in the case on the basis of the facts proved. The pleadings serve only as a rough guide to the nature of the case.") At this stage, Plaintiffs have shown that their alleged injuries are redressable.

### III.      This Case Is Ripe for Adjudication

The Court should reject Defendants' argument that this case is unripe because the 2020 Census has not yet been taken. The Supreme Court has rejected the argument that plaintiffs must wait until after the census' completion to bring suit. In finding that a challenge to a census procedure filed two years before Census Day was ripe, the Court observed that waiting would "result in extreme—possibly irremediable—hardship," and concluded that "it is certainly not necessary for this Court to wait until the census has been conducted to consider" challenges to the census plan. *House of Representatives*, 525 U.S. at 332 (1999); *see also State of New York*, 2019 WL 190285, at *89. Similarly, in the 1998 Appropriations Act, Congress recognized that if the census is conducted in an unconstitutional manner, "it would be impracticable for…the

courts of the United States to provide, meaningful relief after." Pub. L. 105-119 § 209(a)(8).

Disputes over the government's census plans ripen before the enumeration itself because the census is bound by legal and practical deadlines that make it difficult to obtain relief if litigation begins after the census. The results of the census must be completed and reported to the President "within 9 months after the census date" of April 1, 2020, 13 U.S.C. § 141(b), or no later than January 1, 2021. The Secretary must then transmit census data to the states "as expeditiously as possible," but no later than "one year after the decennial census date," 13 U.S.C. § 141(c), or April 1, 2021. The first elections based on 2020 Census data will occur in November 2021. *See* Va. Code. Ann. § 24.2-304.1 (West 2018). Many other states have redistricting deadlines soon after the census data is transmitted. *See* Cal. Const. art. XXI, § 1 (requiring redistricting "in the year following the year in which the national census is taken"); Ill. Const. art. IV, § 3(b) (requiring redistricting "in the year following each Federal decennial census year"); *see also* N.Y. Legis. Law § 93(1) (McKinney 2018) (requiring redistricting in 2021); Del. Code Ann. tit. 29, § 805 (West 2019) (requiring redistricting by June 30, 2021); Mass. Gen. Laws Ann. ch. 54, § 1 (West 2018) (requiring redistricting by June 15 of every tenth year after 2001); Mich. Comp. Laws Ann. § 4.261 (West 2018) (requiring redistricting by November 1 every tenth year after 2001). Maryland's governor must present a redistricting plan based on decennial census data no later than January 12, 2022. Md. Const. art. III, §§ 5, 14.

Serious practical concerns would also arise from providing election-related remedies too near an election date. The Supreme Court has cautioned against court orders affecting elections soon before they start for precisely this reason. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Candidates and voters need to know how many Congressional seats their state will have and where the district lines will be drawn to prepare for those elections, petition for ballot access, and

13

ensure in-district residency. If Plaintiffs must wait until post-census litigation to prove an unconstitutional undercount, they will not be able to obtain an injunction ordering the census figures be adjusted to cancel an undercount. *House of Representatives*, 525 U.S. at 342 (barring use of statistical sampling). Post-census declaratory relief would also be ineffectual, as there would be no actions left for the Secretary to conform to "an authoritative interpretation" of the Enumeration Clause. *Franklin*, 505 U.S. at 803. Only *pre*-census litigation allows a meaningful opportunity for the Court to remedy unconstitutional choices in planning and implementation.

### IV.      Defendants May Not Contravene Plaintiffs' Well-Pleaded Allegations

Defendants have repeatedly and improperly relied on facts outside the pleadings, including in their most recent 17-page appendix, and argued that the Court may consider those facts for both the 12(b)(1) and 12(b)(6) motions. Tr. at 32:18–33:15. The Court may not consider facts the Defendants now seek to introduce and as a result should strike Defendants' appendix. Even if the Court were to consider these facts, they are highly disputed. Accordingly, for both 12(b)(1) and 12(b)(6) purposes, this Court should reject Defendants' attempt to introduce new facts contrary to the allegations in the Amended Complaint and deny the motion to dismiss.

At the pleading stage, courts "are limited to considering the sufficiency of allegations set forth in the complaint and the documents attached or incorporated into the complaint." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (citation omitted). There are a few exceptions to this general rule, but the only one Defendants meaningfully raised is a request for judicial notice. *See* Defs.' Mot. at 3, 5-6, 10; Tr. at 33:7-8; Fed. R. Evid. 201. The facts alleged by Defendants fail to fall into this narrow exception.

Defendants argue for the Court to take judicial notice of their own aspirational planning documents for the 2020 Census. But these documents fail the FRE 201 requirements: they are

"subject to reasonable dispute," not "generally known within the court's territorial jurisdiction," and cannot be "accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201.  The Fourth Circuit has refused to take judicial notice where the meaning of documents is contested.  *See, e.g.*, *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009).

Defendants also raise several factual assertions that they allege "moot" Plaintiffs' claims. But these new facts are also highly disputed.[4] Defs.' Suppl. Mem. Supp. Mot. to Dismiss App. Defendants dismiss concerns regarding the uncertainty of their funding based on the *ipse dixit* that "Congress has always appropriated the money that we need."  Tr. at 32:3-4.  This statement flies in the face of the well-pleaded allegations of the Complaint.  *See, e.g.*, FAC ¶¶ 35-41.  Similarly, Defendants claim that the 2018 End-to-End Test moots Plaintiffs' allegations regarding the Defendants' failure to conduct testing.  Tr. at 87:19-24.  But Plaintiffs have alleged that Defendants cancelled nearly every test *except* the single 2018 test.  FAC ¶ 44.  Far from "mooting" Plaintiffs' claims regarding testing, the 2018 End-to-End test, and its failures due in part to the reduction of community outreach,[5] substantiate Plaintiffs' claims.

## CONCLUSION

For these reasons, and those stated in Plaintiffs' prior briefing and during argument, the motion to dismiss should be denied.

---

[4] Additionally, were the Court to consider Defendants' appendix, it would find examples of facts that actually support Plaintiffs' claims. For example, Defendants mention that the Bureau is responding to the CBAMS survey. Defs.' Suppl. Mem. Supp. Mot. to Dismiss App. A-5. But the survey, which showed that trust in the Census has plummeted and that African Americans are particularly unlikely to respond, only confirms Plaintiffs' allegations. 2020 CBAMS Survey and Focus Groups: Key Findings for Creative Strategy, 11, 56 (Oct. 31, 2018), https://www2.census.gov/cac/nac/meetings/2018-11/mcgeeney-evans-cbams.pdf?; FAC ¶ 41, 85, 114, and 116.

[5] *See, e.g.*, Michael Wines, *Census Officials Say Rhode Island Rehearsal is Going Well. Not Everyone Agrees.*, N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/us/2020-census-test-rhode-island.html.

Dated: January 22, 2019

Respectfully Submitted,

/s/Michael J. Wishnie

Rachel Brown, Law Student Intern*
Nikita Lalwani, Law Student Intern*
Abigail Olson, Law Student Intern
Joseph Schottenfeld, Law Student Intern
Charlotte Schwartz, Law Student Intern
Jeffrey Zalesin, Law Student Intern
Michael J. Wishnie (Bar No. 20350)
Rule of Law Clinic
Yale Law School[6]
127 Wall Street
New Haven, CT 06511
Tel: (203) 436-4780
Fax: (203) 432-1426
michael.wishnie@ylsclinics.org
*Counsel for all Plaintiffs*

Jeremy M. Creelan, *pro hac vice*
Susan J. Kohlmann, *pro hac vice*
Jacob D. Alderdice, *pro hac vice*
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3908
*Counsel for all Plaintiffs*

Khyla Craine (Bar No. 14117)
Anson Asaka (Bar No. 20456)
National Association for the
Advancement of Colored People, Inc.
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5797
Fax: (410) 358-9350
*Counsel for Plaintiffs NAACP and Prince George's County NAACP Branch*

---

[6] This brief does not purport to state the views of Yale Law School, if any.
*Law student interns. Petition to practice forthcoming.

16

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Wishnie, certify that copies of the foregoing *Supplemental Brief of Plaintiffs In Opposition to Defendants' Motion to Dismiss* were served this 22nd day of January, 2019 upon the all counsel of record by ECF.

<u>/s/ Michael J. Wishnie</u>
Michael J. Wishnie
