**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>NATIONAL ASSOCIATION FOR THE<br>  ADVANCEMENT OF COLORED<br>  PEOPLE, <em>et al.</em>,</td><td>*<br><br>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>      Plaintiffs,</td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Case No.: PWG-18-891</td></tr>
<tr><td>BUREAU OF THE CENSUS, <em>et al.</em>,</td><td>*<br><br>*</td><td></td></tr>
<tr><td>      Defendants.</td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION AND ORDER**

Every ten years, beginning in 1790, the United States has counted its population as of the first of April, as required by the Enumeration Clause of the United States Constitution. U.S. Const. art. I, § 2, cl. 3 ("Enumeration Clause" or "Census Clause"); *see Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992). Specifically, it is the Secretary of Commerce ("Secretary") to whom the Congress has delegated the duty of conducting the decennial census, and who has broad discretion in fulfilling his duty. 13 U.S.C. § 141; *Wisconsin v. City of New York*, 517 U.S. 1, 19–20 (1996); *La Unión del Pueblo Entero v. Ross* ("*LUPE*"), No. GJH-18-1570, --- F. Supp. 3d ----, 2018 WL 5885528, at \*2 (D. Md. Nov. 9, 2018). The results of this headcount are important in many regards, not the least of which are the apportionment of Congressional representatives and the allocation of federal resources based on population. *See id.*; U.S. Const. am. XIV, § 2 ("Apportionment Clause"). Congress has found that "[t]he decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs." Dep'ts of Commerce,

Justice, & State, the Judiciary, & Related Agencies Appropriations Act ("1998 Appropriations Act"), Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2480 (1997).

Congress also has found that "[i]t is essential that the decennial enumeration of the population be as accurate as possible consistent with the Constitution and Laws of the United States." *Id.* (Finding No. 6). Yet, decade after decade, "[t]he census has historically undercounted racial and ethnic minorities." Am. Compl. ¶ 22, ECF No. 38;[1] *see also Wisconsin*, 517 U.S. at 6, 7 ("Although each [of the first twenty censuses] was designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been wholly successful in achieving that goal. . . . Since at least 1940, the Census Bureau has thought that the undercount affects some racial and ethnic minority groups to a greater extent than it does whites."). Indeed, before the passage of the Fourteenth Amendment, the Enumeration Clause actually *required* a calculated undercount, counting only "three fifths of all other persons" who were not "free Persons," that is, three-fifths of the slave population. U.S. Const. art I, § 2, cl. 3.

The Fourteenth Amendment ostensibly removed the inequality by providing that "Representatives shall be apportioned among the several states according to their respective numbers, counting the *whole number of the persons* in each state . . . ."[2] *Id.* am. XIV, § 2 (emphasis added). Still, more than 150 years after the Fourteenth Amendment's passage, the Bureau of the Census ("Bureau") acknowledges that "racial and ethnic minorities," as well as a slew of others— "non-English speakers, lower income people, the homeless, undocumented immigrants, young and mobile people, children, LGBTQ individuals, and 'persons who are angry at and/or distrust the

---

[1] I accept Plaintiffs' well-pleaded allegations as true for purposes of Defendants' Motion to Dismiss. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

[2] "Indians not taxed" were excluded from the count before and after the amendment. *Compare* U.S. Const. art I, § 2, cl. 3, *with id.* am. XIV, § 2.

government'"—, are "'hard-to-count.'"   Am. Compl. ¶ 23; *see also Wisconsin*, 517 U.S. at 6

("Despite consistent efforts to improve the quality of the count, errors persist.").   And, the 2020

decennial census ("2020 Census") will depart in significant ways from the manner in which the

decennial census has been conducted for more than fifty years (by mailing the census questionnaire

and then following up with personal visits to non-responders), as it will feature electronic surveys

and online responses, heightening the need for field testing and "dress rehearsals" to ensure that

the results are as accurate as possible, and the process itself protected from cybersecurity threats.

*See* Am. Compl. ¶¶ 69–75.

In March 2018, with the 2020 Census only two years away, Plaintiffs[3] filed the lawsuit

now before me, focusing on the Bureau's preparedness to conduct the 2020 Census in a manner

that will result in an accurate count of the United States of America's population, as the

Enumeration Clause requires.   This single-count complaint asserts only an Enumeration Clause

violation.   Compl., ECF No. 1; *see* Am. Compl.   When Plaintiffs filed suit, the Bureau, a division

of the United States Department of Commerce, was without a permanent director or deputy

director.   Am. Compl. 23.[4]   Further, it had "canceled essential field tests . . . and two of three 'dress

rehearsal' sites," and (at least in Plaintiffs' view) it lacked "sufficient funding to address its many

---

[3] Plaintiffs are the National Association for the Advancement of Colored People ("NAACP");
Prince George's County (the "County"); Prince George's County Maryland NAACP Branch (the
"County NAACP"); Robert E. Ross, President of the County NAACP; and H. Elizabeth Johnson,
County NAACP Executive Committee member.   Am. Compl. 1, ¶¶ 7–8.

[4] On January 2, 2019, after the position had been vacant for eighteen months, the Senate
unanimously confirmed Steven Dillingham as Director of the Bureau.   Notice, ECF No. 56; *see*
Tara Bahrampour, *Senate confirms new Census Bureau director as 2020 survey approaches*,
Wash. Post (Jan. 3, 2019), https://www.washingtonpost.com/local/social-issues/senate-confirms-
new-census-bureau-director-as-2020-survey-approaches/2019/01/03/5599b2d2-0fa0-11e9-831f-
3aa2c2be4cbd_story.html?utm_term=.038a4677f030.

challenges." *Id.* Defendants[5] did not then dispute the status of their leadership, and while the Bureau now has a director, Defendants do not dispute the status of the testing they have (or, more pointedly, have not) conducted, or the amount of funding allocated to the Bureau. And, they unflinchingly acknowledge their obligation to count the United States population accurately. Defs.' Reply 7, ECF No. 49.

What Defendants dispute in the pending Motion to Dismiss is whether Plaintiffs' Enumeration Clause claim is properly before this Court and, if so, whether they have stated a claim. Defendants argue that Plaintiffs' claim is not ripe, they lack standing to bring this litigation, the political question doctrine bars this suit, and they have not stated a claim under the Enumeration Clause. Defs.' Mot., ECF No. 43.[6] Certainly, this suit is not the first challenge to the Bureau's plans for the 2020 Census, as other citizens and citizen groups repeatedly have sued the Department of Commerce and its Secretary, Wilbur Ross, regarding the planned 2020 reintroduction of a citizenship question to the census questionnaire. *See LUPE*, 2018 WL 5885528; *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545 (D. Md. 2018); *California v. Ross* & *City of San Jose v. Ross*, Nos. 18-1865-RS & 18-2279-RS (N.D. Cal. Aug. 17, 2018) (slip op.), ECF No. 47-1; *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766 (S.D.N.Y. 2018). And, similar challenges by the defendants to the plaintiffs' claims in these other lawsuits have not

---

[5] Plaintiffs named the following Defendants: the Bureau; Ron Jarmin, Acting Director of the Bureau; Wilbur Ross, Secretary of Commerce; President Donald J. Trump; and the United States of America. The Clerk shall substitute Steven Dillingham for Ron Jarmin as Defendant on the docket. Plaintiffs consent to the dismissal of their claims against President Trump. Pls.' Opp'n 3 n.1, ECF No. 46.

[6] The parties fully briefed the motion. ECF Nos. 43-1, 46, 49; *see also* ECF Nos. 47, 48, 50 (Plaintiffs' notices of supplemental authority). A hearing was held on January 14, 2019, after which the parties provided supplemental briefing, ECF Nos. 61, 63.

succeeded, with this Court and two other federal district courts concluding that the plaintiffs had standing, presented claims that were not barred as political questions, and asserted claims that were adequately pleaded.[7]   Further, at least one group has achieved a favorable judgment following a bench trial.  *See New York v. U.S. Dep't of Commerce*, Nos. 18-2921 (JMF) & 18-5025 (JMF), --- F. Supp. 3d ----, 2019 WL 190285, at *3–4, *88–90, *123 (S.D.N.Y. Jan. 15, 2019) (holding that "most, if not all, of Plaintiffs ha[d] standing to bring their claims" because they "proved by a preponderance of the evidence that they w[ould] be harmed in various ways as a result of the addition of a citizenship question on the census and that a favorable ruling will redress those harms"; claim was ripe;[8] and inclusion of citizenship question violated Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; enjoining defendants from adding citizenship question to 2020 Census without first completing preliminary steps).

Yet this case is distinctly different from the other litigation to date leading up to the 2020 Census, as it does not challenge a discrete agency decision and does not include a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  Indeed, unlike almost all, if not

---

[7] In *LUPE*, Judge Hazel of this Court denied the defendants' motion to dismiss, in which they argued that the plaintiffs lacked standing, the political question doctrine barred the claims, and plaintiffs failed to state a claim for, *inter alia*, violation of the Enumeration Clause.  2018 WL 5885528, at *5, *7.  Similarly, in *Kravitz*, Judge Hazel denied the defendants' motion to dismiss, which also was based on standing and failure to state a claim for violation of the Enumeration Clause.  336 F. Supp. 3d at 566; *see also Kravitz v. U.S. Dep't of Commerce*, --- F. Supp. 3d ----, 2018 WL 6830226, at *1 (D. Md. Dec. 28, 2018) (denying defendants' summary judgment motions in *Kravitz* and *LUPE*).  Likewise, in *California* and *City of San Jose*, the court denied the defendants' motions to dismiss, which were based on standing, political question doctrine, and failure to state a claim for, *inter alia*, violation of the Enumeration Clause.  Slip op. at 9, 15, 17–20, 28.  And, in *New York*, 315 F. Supp. 3d at 775, the court rejected the defendants' arguments for dismissal based on standing and political question doctrine and granted their motion to dismiss for failure to state a claim for violation of the Enumeration Clause; it permitted claims under the Administrative Procedure Act and Due Process Clause to proceed.

[8] In *New York*, the defendants "did not raise the issue of ripeness until their post-trial briefs—and then raised it only in response to a query from the Court."  2019 WL 190285, at *88.

the entirety, of the robust body of litigation surrounding past censuses, this case challenges agency action before the Bureau has finalized its preparations for the 2020 Census.  And, as relief, the Plaintiffs request nothing short of this Court injecting itself directly into the final planning of the Census to superintend the process.

The crux of this suit is Plaintiffs' belief that the Bureau should have done more to prepare for the 2020 Census than it has at this time.  But, ripeness bars Plaintiffs' claim for injunctive relief with respect to the method and means of conducting the 2020 Census, at least at this time.  The claim will be dismissed without prejudice to being reinstated at a later time.  But, Plaintiffs' claim that there are insufficient funds available for the Bureau to conduct the 2020 Census, which, they allege, also will result in an Enumeration Clause violation, may be ripe for declaratory relief (assuming an evidentiary basis exists to support their allegations).  And, it is plausible that this Court could fashion declaratory relief that would make it likely that sufficient funds will be appropriated to enable the final planning and execution of the 2020 Census to take place. Therefore, I find that Plaintiffs have standing, and I will deny Defendants' Motion to Dismiss as to their insufficient-funding claim for declaratory relief.  This claim will proceed, and targeted discovery will be permitted to determine whether there is an evidentiary basis for the declaratory relief they seek.

## **Background**

### *Why the Census Is Conducted*

When the United States Constitution was drafted in 1787, the Framers "believed the correct apportionment of political power would be the 'fundamental … instrument' of this republican government."  Robert R. McCoy, *A Battle on Two Fronts: A Critique of Recent Supreme Court Jurisprudence Establishing the Intent and Meaning of the Constitution's Actual Enumeration*

*Clause*, 13 Cornell J.L. & Pub. Pol'y 637, 655 (2004).  Thus, the "constitutional goal" was "equal

representation" (although, as noted, "equal representation" did not account for slaves).  *Franklin*

*v. Massachusetts*, 505 U.S. 788, 804 (1992).  The Framers vigorously debated the representation

the States should have in the federal legislature.  *See Sincock v. Duffy*, 215 F. Supp. 169, 186 (D.

Del. 1963) (noting that "[t]he Constitutional Convention was deadlocked"), *aff'd sub nom. Roman*

*v. Sincock*, 377 U.S. 695 (1964); *Clemons v. U.S. Dep't of Justice*, 710 F. Supp. 2d 570, 576 (N.D.

Miss. 2010) (noting that, in drafting the Constitution, "[t]he debate over representation in Congress

was among the most contentious"), *vacated on other grounds sub nom. Clemons v. Dep't of*

*Commerce*, 562 U.S. 1105 (2010).

> [T]he larger States supported the so-called Virginia plan to create a bicameral
> legislature in which the rights of suffrage ought to be proportioned to the quotas of
> contributions or to the number of free inhabitants of the respective States. The more
> populous States, since they thought that they would have to bear a greater burden
> taxwise and in other respects, sought a proportionally larger share of control of the
> central government, and the smaller States, such as Delaware, understandably did
> not desire to be controlled by their larger sisters. . . . The problem was one of
> balance of power in a federation of States differing greatly in size, wealth and
> population.

*Sincock*, 215 F. Supp. at 186.  The compromise they reached provided for "two Houses, one with

equal and the other with proportional representation," with "direct taxation [linked to]

representation in the House of Representatives," the House with proportional representation. *Id.*

The Framers introduced the Enumeration Clause "to determine how political power would

be apportioned among the 'disparate' population of the New Republic."  McCoy, 13 Cornell J.L.

& Pub. Pol'y at 655.  The Enumeration Clause of the U.S. Constitution requires that an "actual

Enumeration" of the people in the United States "shall be made . . . every . . . ten Years, in such

Manner as [the United States Congress] shall by Law direct."  U.S. Const. art. I, § 2, cl. 3.  The

Framers assigned the task of enumeration to the federal government "to make the apportionment

count as objective as possible" and "to avoid the possibility of corruption by state politics." McCoy, 13 Cornell J.L. & Pub. Pol'y at 656.  Congress has "delegate[d] the duty of conducting the decennial census to the Secretary of Commerce." *LUPE*, 2018 WL 5885528, at *2 (citing 13 U.S.C. § 141 *et seq.*).  Specifically, Congress enacted the Census Act, which directs the Secretary to "take a decennial census of population as of the first day of April" every ten years "in such form and content as he may determine, including the use of sampling procedures and special surveys," and it "authorized [the Secretary] to obtain such other census information as necessary."  13 U.S.C. § 141(a).

The "primary purpose" of the enumeration, as noted, is to determine the number of Congressional representatives; but also significant is its use in allocating federal funding among the states.  *See* U.S. Const. am. XIV, § 2 ("Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state."); *Wisconsin v. City of New York*, 517 U.S. 1, 24 (1996) ("The Constitution confers upon Congress the responsibility to conduct an 'actual Enumeration' of the American public every 10 years, with the primary purpose of providing a basis for apportioning political representation among the States."); *id.* at 5–6 ("Because the Constitution provides that the number of Representatives apportioned to each State determines in part the allocation to each State of votes for the election of the President, the decennial census also affects the allocation of members of the electoral college. Today, census data also have important consequences not delineated in the Constitution: The Federal Government considers census data in dispensing funds through federal programs to the States, and the States use the results in drawing intrastate political districts." (internal citation to U.S. Const. art. II, § 1, cl. 2 omitted)).

In *Wisconsin*, Chief Justice Rehnquist observed that the results of the census are used to apportion the members of the House of Representatives among the States. 517 U.S. at 6. Congress has found that "[t]he sole constitutional purpose of the decennial enumeration of the population is the apportionment of Representatives in Congress among the several States." 1998 Appropriations Act § 209(a)(2). But, the federal government also considers census data in dispensing funds through federal programs to states, and states use census data to draw interstate political districts. *Wisconsin*, 517 U.S. at 6; *see Baldrige v. Shapiro*, 455 U.S. 345, 353 (1982) (noting that while the Enumeration Clause's "initial constitutional purpose was to provide a basis for apportioning representatives among the states in the Congress[,] [t]he census today serves an important function in the allocation of federal grants to states based on population" and "also provides important data for Congress and ultimately for the private sector"). Indeed, "[t]he statute authorizing the Secretary of Commerce to conduct the census, 13 U.S.C. § 141, 'expresses the intent of Congress that census data be collected *not only for reapportionment purposes but also for accurate distribution of funds*.'" *Texas v. Mosbacher*, 783 F. Supp. 308, 314 (S.D. Tex. 1992) (quoting *City of Willacoochee, Ga. v. Baldrige*, 556 F. Supp. 551, 555 (S.D. Ga. 1983); noting that "[t]he zone of interest of § 141 includes anyone with an interest in fair reapportionment, which constitutionally concerns all citizens, *and those with an interest in the fair distribution of the funds*" (emphases added)).

### *How the Census Is Conducted*

Originally, census data was collected "by an actual inquiry at every dwelling-house . . . and not otherwise." McCoy, 13 Cornell J.L. & Pub. Pol'y at 640 (quoting Thomas R. Lee, *The Original Understanding of the Census Clause: Statistical Estimates and the Constitutional Requirement of an "Actual Enumeration"*, 77 Wash. L. Rev. 1, 6 (2002) (quoting *Dep't of Commerce v. U.S.*

*House of Reps.*, 525 U.S. 316, 335 (1999))).   In 1964, Congress amended the Census Act, 13

U.S.C. § 1 *et seq.*, to "permit[] the Bureau to replace the personal visit of the enumerator with a

form delivered and returned via the Postal Service," and in 1970, "census officials conducted

approximately 60 percent of the census through a new 'mailout-mailback' system for the first

time." *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 336 (1999) (citing M. Anderson,

*The American Census: A Social History* 210–11 (1988)).   Under the new approach, "[t]he Bureau

. . . conducted follow up visits to homes that failed to return census forms." *Id.*   And, as of 1976,

the Secretary may conduct the census "in such form and content as he may determine, including

the use of sampling procedures and special surveys," except that sampling still may not be used

"for the determination of population for purposes of apportionment of Representatives in Congress

among the several States." *Id.* at 337–38 (quoting 13 U.S.C. §§ 141(a), 195).

Relevant legislation sets various census-related deadlines, and in *Department of Commerce*

*v. U.S. House of Representatives*, Justice O'Connor described the sequence:

> The [Census] Act provides that the Secretary "shall, in the year 1980 and every 10
> years thereafter, take a decennial census of population as of the first day of April of
> such year." [13 U.S.C.] § 141(a). It further requires that "[t]he tabulation of total
> population by States ... as required for the apportionment of Representatives in
> Congress among the several States shall be completed within 9 months after the
> census date and reported by the Secretary to the President of the United States."
> § 141(b). Using this information, the President must then "transmit to the Congress
> a statement showing the whole number of persons in each State ... and the number
> of Representatives to which each State would be entitled." 2 U.S.C. § 2a(a). Within
> 15 days thereafter, the Clerk of the House of Representatives must "send to the
> executive of each State a certificate of the number of Representatives to which such
> State is entitled." 2 U.S.C. § 2a(b) (1994 ed., Supp. III).

*Id.* at 321–22.   The actual impact of a loss of a Representative in a state is not immediate.   Rather,

it is felt as of the next Congressional election following the census, when a lower number of

Representatives will be elected based on the reapportionment.

*Historical [In]Accuracy of the Census*

"[I]t is essential that the decennial enumeration of the population be as accurate as possible consistent with the Constitution and laws of the United States." 1998 Appropriations Act § 209(a)(6).  Thus, each census from 1790 to 1990 "was designed with the goal of accomplishing an 'actual Enumeration' of the population."   *Wisconsin*, 517 U.S. at 6.   Yet, "no census is recognized as having been wholly successful in achieving that goal."   *Id.*   The Supreme Court noted in 1996:

> There have been 20 decennial censuses in the history of the United States. . . . Despite consistent efforts to improve the quality of the count, errors persist.  Persons who should have been counted are not counted at all or are counted at the wrong location; persons who should not have been counted (whether because they died before or were born after the decennial census date, because they were not a resident of the country, or because they did not exist) are counted; and persons who should have been counted only once are counted twice. It is thought that *these errors have resulted in a net "undercount" of the actual American population in every decennial census*. In 1970, for instance, the Census Bureau concluded that the census results were 2.7% lower than the actual population.

*Id.* (emphasis added) (citations and footnotes omitted); *see also id.* at 6 n.2 ("Indeed, even the first census did not escape criticism.  Thomas Jefferson, who oversaw the conduct of that census in 1790 as Secretary of State, was confident that it had significantly undercounted the young Nation's population." (citing C. Wright, History and Growth of the United States Census 16–17 (1900))). And, ironically, improvement in census planning and procedures does not necessarily correlate with improved accuracy.  *See U.S. House of Reps.*, 525 U.S. at 323.  "Indeed, the 1990 census was 'better designed and executed than any previous census,'" but "it was less accurate than its predecessor for the first time since the Bureau began measuring the undercount rate in 1940."  *Id.* (quoting Census 2000 Report).  Thus, however desirable a well-designed and executed census is, having one is not a guarantee of a more accurate enumeration.  *See id.*

Critical in the case before me is the concept known as the "differential undercount." As noted, according to Plaintiffs' well-pleaded allegations, the Bureau "has identified what it terms 'hard-to-count' populations . . . includ[ing] racial and ethnic minorities, non-English speakers, lower income people, the homeless, undocumented immigrants, young and mobile people, children, LGBTQ individuals, and 'persons who are angry at and/or distrust the government." Am. Compl. ¶ 23. The Supreme Court has observed:

> The undercount is not thought to be spread consistently across the population: Some segments of the population are "undercounted" to a greater degree than are others, resulting in a phenomenon termed the "differential undercount." Since at least 1940, the Census Bureau has thought that the undercount affects some racial and ethnic minority groups to a greater extent than it does whites. In 1940, for example, when the undercount for the entire population was 5.4%, the undercount for blacks was estimated at 8.4% (and the undercount for whites at 5.0%). The problem of the differential undercount has persisted even as the census has come to provide a more numerically accurate count of the population. In the 1980 census, for example, the overall undercount was estimated at 1.2%, and the undercount of blacks was estimated at 4.9%.

> The Census Bureau has recognized the undercount and the differential undercount as significant problems, and in the past has devoted substantial effort toward achieving their reduction. Most recently, in its preparations for the 1990 census, the Bureau initiated an extensive inquiry into various means of overcoming the impact of the undercount and the differential undercount. As part of this effort, the Bureau created two task forces: the Undercount Steering Committee, responsible for planning undercount research and policy development; and the Undercount Research Staff (URS), which conducted research into various methods of improving the accuracy of the census. In addition, the Bureau consulted with state and local governments and various outside experts and organizations.

> Largely as a result of these efforts, the Bureau adopted a wide variety of measures designed to reduce the rate of error in the 1990 enumeration, including an extensive advertising campaign, a more easily completed census questionnaire, and increased use of automation, which among other things facilitated the development of accurate maps and geographic files for the 1990 census. The Bureau also implemented a number of improvements specifically targeted at eliminating the differential undercount; these included advertising campaigns developed by and directed at traditionally undercounted populations and expanded questionnaire assistance operations for non-English speaking residents.

*Wisconsin*, 517 U.S. at 7–8 (citations to record omitted).

### 2020 Census and Plaintiffs' Allegations

Despite these considerable concerns about conducting an accurate enumeration, Defendants' preparations and funding to undertake this Herculean task are, in Plaintiffs' view, abysmal.   Am. Compl. ¶¶ 28–30.   The Amended Complaint inventories these perceived deficiencies. First, while each census for the past half century has been considerably more costly than the one before, *id.* ¶ 32, and Secretary Ross "told Congress that the lifecycle cost of the 2020 Census would be $3.3 billion above the original estimate and that the administration would request an additional $187 million for Fiscal Year 2018," *id.* ¶ 37, Congress nonetheless "directed that the budget for the 2020 Census not exceed the cost of the 2010 enumeration," *id.* ¶ 33, and funding for the Bureau has not "escalate[d] to prepare for the decennial census" as it typically would. *Id.* ¶¶ 34–37, 54.  As a result, the Bureau "has already had to scale back critical planning activities due to budgetary uncertainty and shortfalls," by, for example, canceling field tests and "dress rehearsals that serve as the basis for many final decisions about decennial census methods and operations." *Id.* ¶¶ 42, 44.

Second, the combined effects of a hiring freeze in 2017 and an "order directing agencies to submit plans for personnel cuts" have "prevent[ed] the Census Bureau from hiring staff necessary to ensure an 'actual enumeration' in 2020." *Id.* ¶¶ 55–59.  Also, although the Bureau has a director as of January 2, 2019, the position previously was vacant for eighteen months.  *See* Tara Bahrampour, *Senate confirms new Census Bureau director as 2020 survey approaches*, Wash. Post (Jan. 3, 2019), https://www.washingtonpost.com/local/social-issues/senate-confirms-new-census-bureau-director-as-2020-survey-approaches/2019/01/03/5599b2d2-0fa0-11e9-831f-3aa2c2be4cbd_story.html?utm_term=.0c26387d9e74.

Third, as for the design of the census itself, the 2020 Census will be the first digitized census, "a radical departure from the paper and in-person methods used in all previous censuses." Am. Compl. ¶¶ 68–70.  Consequently, there is a risk that it will face cybersecurity threats that Defendants have not properly guarded against.  *Id.* ¶ 68.  And, in its new digitized form, it may "improper[ly] rel[y] on state administrative databases of varying quality," *id.*, which may "result in inconsistent counting methodologies between states" and "an even higher undercount" for hard-to-count groups.  *Id.* ¶¶ 91–94. The new approach also means "a significant reduction in on-the-ground presence and field workers," *id.* ¶ 68, which Plaintiffs believe "will likely have a devastating impact on communities that have low or little access to reliable broadband internet, many of which are communities of color and low-income households" and "rural residents," *id.* ¶¶ 75, 77; *see also id.* ¶¶ 71–78.  According to Plaintiffs, "Defendants' design flaws, coupled with their insufficient funding, planning and staffing deficiencies, have left them unprepared for the challenges that digitization presents."  *Id.* ¶ 79.

Plaintiffs filed suit to ensure that Defendants reasonably prepare—before it is too late—to enumerate the population accurately.  They claim that "[i]f a court does not act promptly to remedy these constitutional failures, the deficiencies currently present in the 2020 Census will become irremediable, and there will be no amount of funding, hiring, or appropriate planning that can fix the serious existing deficiencies in time for the census."  *Id.* ¶ 117.  In their one-count Amended Complaint, they allege that "Defendants have violated and are at imminent risk of violating the 'actual Enumeration' clause of the United States Constitution, Art. I § 2 cl. 3."  Am. Compl. ¶ 122. Plaintiffs ask the Court to

> [1.] Declare that the Defendants are obligated to ensure an accurate actual enumeration of the people;
>
> [2.] Enjoin Defendants from violating their constitutional duty to conduct an accurate actual enumeration of the people;

[3.] Enter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that hard-to-count populations will be actually enumerated in the decennial census; and

[4.] Grant any other and further relief the Court deems appropriate.

*Id.* at 21–22.   Although not requested in so many words, Plaintiffs' catch-all request for relief necessarily encompasses the possibility of a declaratory judgment targeted at the impact of the Bureau's alleged lack of funding.   *See id.*

## Standard of Review

Defendants contend that this Court lacks subject matter jurisdiction because Plaintiffs lack standing, Defs.' Mem. 7–15, and even if they have standing, their claims still are not justiciable because they are not ripe and, even if ripe, they are barred by the political question doctrine, *id.* at 16–24.[9]   They also move to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.   *Id.* at 25.   When a defendant moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, asserting a facial challenge that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," as Defendants do here,[10] "the facts alleged in the

---

[9] When a plaintiff does not have standing or presents a political question or a claim that is not ripe, its claim is not justiciable.   *Flast v. Cohen*, 392 U.S. 83, 95 (1968); *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013). "Justiciability is an issue of subject-matter jurisdiction."   *Hamilton v. Pallozzi*, 848 F.3d 614, 619 (4th Cir.), *cert. denied,* 138 S. Ct. 500 (2017).

[10] I note that, while Defendants argue that some circumstances have changed, in their view mooting many of Plaintiffs' arguments, they did not contend in their Motion to Dismiss and Memorandum in Support that any of Plaintiffs' jurisdictional allegations were not true.   *See* Defs.' Mem.   In a footnote to their Supplemental Memorandum, Defendants acknowledge that they "primarily assert a 12(b)(1) facial challenge," but state that "the Court may construe Defendants' motion as a 12(b)(1) factual challenge, *see Kerns v. United States*, 585 F.3d 187, 192 (4th Cir 2009), in which case '[t]he Court regards the pleadings' allegations as mere evidence on the issue and its consideration of additional evidence does not convert the proceeding to one for summary judgment.'"   Defs.' Supp. 10–11 n.7 (quoting *Musari v. Countrywide Home Loans*, No. PWG-15-3028, 2016 WL 4124227, at *3 (D. Md. Aug. 3, 2016)).   Defendants assert that "[t]he Court may

complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a 12(b)(6) consideration." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that, on a motion to dismiss, a plaintiff's pleading of the elements of standing are "presum[ed] [to] embrace those specific facts that are necessary to support the claim" (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990))).

Thus, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *see In re KBR, Inc., Burn Pit Litig.*, 925 F. Supp. 2d 752, 758 (D. Md. 2013) (quoting *Kerns*, 585 F.3d at 192). This Court must act "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted). The burden is on the plaintiff to establish jurisdiction. *Sherill v. Mayor of Balt.*, 31 F. Supp. 3d 750, 763 (D. Md. 2014) (citing *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999)).

Even on a facial challenge, the Court's review on a motion to dismiss is not necessarily limited to the pleadings. In addition to the operative complaint, I "may consider . . . documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." *Sposato v. First Mariner Bank*, No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md.

---

then resolve all factual disputes on the basis of outside evidence." *Id.* Given that Defendants only brought a facial challenge, I will not consider outside evidence that is not properly the subject of judicial notice. In any event, as discussed in this Memorandum Opinion, consideration of the documents Defendants identify would not change my analysis.

They also contend, in another footnote to their Supplemental Memorandum, that "the Court may dismiss this case as moot." *Id.* at 11 n.8. I will not do so, given that the case is not moot, as explained below.

Mar. 28, 2013); *see CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir.

2009). Defendants also urge me to take judicial notice of "publicly-available information," *see*

Defs.' Mem. 5 n.6, but this is not the standard. Rather,

> [t]he court may judicially notice a fact that is not subject to reasonable dispute because it:
>
> (1) is generally known within the trial court's territorial jurisdiction; or
>
> (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Fed. R. Evid. 201.

## **Justiciability**

This Court may "adjudicate only actual cases and controversies." *Zaycer v. Sturm Foods,

Inc.*, 896 F. Supp. 2d 399, 407 (D. Md. 2012) (citing U.S. Const. art. III, § 2; *O'Shea v. Littleton*,

414 U.S. 488, 493 (1974); *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009)). This "constraint

of Article III" has two distinct but overlapping facets that must be satisfied for a federal district

court to have subject matter jurisdiction: standing (which addresses who may sue) and ripeness

(which addresses when a party may bring a suit). *See South Carolina v. United States*, --- F.3d ----,

No. 18-1684, 2019 WL 124267, at *7 (4th Cir. Jan. 8, 2019) (quoting *Scoggins v. Lee's Crossing

Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013)). The analysis of both issues is similar.

*See id.* (citing *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (citing Erwin Chemerinsky,

*Federal Jurisdiction* § 2.4 (4th ed. 2003))). The political question doctrine also limits the scope

of federal district courts' subject matter jurisdiction, as courts cannot "review those controversies

which revolve around policy choices and value determinations constitutionally committed for

resolution to the halls of Congress or the confines of the Executive Branch." *Kravitz v. U.S. Dep't

of Commerce*, 336 F. Supp. 3d 545, 561 (D. Md. 2018) (quoting *Japan Whaling Ass'n v. Am.

Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

Among the reasons that Defendants say this case should be dismissed for lack of subject matter jurisdiction is that this Court lacks the authority to review the actions of the Secretary regarding the methods and means chosen to conduct the 2020 Census.  The argument goes like this: Pursuant to Article 1, Section 2, Clause 3 of the Constitution, Congress has the authority to conduct the decennial census "in such Manner as they shall by Law direct."  Congress, in turn, has delegated the same authority to the Secretary, who "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year . . . in such form and content as he may determine . . . ." 13 U.S.C. § 141.  Noting the breadth of this authority, Defendants insist that the Secretary has absolute discretion over the conduct of the decennial census, and the courts are powerless to review it.

It is hardly surprising that the Defendants make this argument, since, as noted, the Supreme Court also has spoken expansively of the discretion the Secretary enjoys when planning the decennial census.  In *Wisconsin v. City of New York*, Chief Justice Rehnquist, writing for the Court explained:

> The text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial "actual Enumeration," and notwithstanding the plethora of lawsuits that inevitably accompany each decennial census, there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides. Through the Census Act, Congress has delegated its broad authority over the census to the Secretary [of Commerce]. Hence, so long as the Secretary's conduct of the census is "consistent with the constitutional language and the constitutional goal of equal representation," it is within the limits of the Constitution. In light of the Constitution's broad grant of authority to Congress, the Secretary's decision not to adjust [the results of the 1990 census to account for a differential undercount] need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census.

517 U.S. 1, 19–20 (1996) (internal citations and footnotes omitted).  Chief Justice Rehnquist observed that the Supreme Court's

deference arises not from the highly technical nature of [the Secretary's] decision, but rather from the wide discretion bestowed by the Constitution upon Congress, and by Congress upon the Secretary. Regardless of the Secretary's statistical expertise, it is he to whom Congress has delegated its constitutional authority over the census. For that same reason, the mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision.

*Id.* at 23.

Moreover, some circuit courts have gone so far as to suggest that there simply is no law that establishes standards by which a court *could* review the Secretary's decision. Take, for example, Judge Posner's observation in *Tucker v. U.S. Department of Commerce*:

The Constitution directs Congress to conduct a decennial census, and the implementing statutes delegate this authority to the Census Bureau. There is a little more to the statutes—they specify a timetable, and a procedure for translating fractional into whole seats—but they say nothing about how to conduct a census or what to do about undercounts. So nondirective are the relevant statutes that it is arguable that there is no law for a court to apply in a case like this—that you might as well turn it over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add to its rationality or fairness.

958 F.2d 1411, 1417–18 (7th Cir. 1992) (internal citations omitted); *accord Senate of Cal. v. Mosbacher*, 968 F.2d 974, 977 (9th Cir. 1992) (quoting *Tucker* and noting that "[o]ther courts have disagreed and have found some law to apply to attacks on census methodology, even though the grant of authority to the Secretary does fairly exude deference"). Indeed, the process of conducting the census is complex and technical, and it usually is the case that there will be competing ideas about how to do it best. In choosing which method among competing suggestions, the Secretary is afforded great deference by the courts. *See Wisconsin*, 517 U.S. at 19–20. And, while accuracy is the constitutional objective, complete accuracy is and always has been impossible to achieve. *See id.* at 6 ("There have been 20 decennial censuses in the history of the United States. Although each was designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been wholly successful in achieving that goal.").

19

That does not mean that the Secretary's decisions are unreviewable, as the Constitution and case law impose a limit on the Secretary's discretion: To the extent possible, the census must be conducted in a way that will not thwart the goal of equal representation, because the accuracy of the census impacts how representation is apportioned. *See Wisconsin*, 517 U.S. at 19–20; *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 317, 331–32 (2002) (recognizing that voter's "expected loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement of Article III standing" because voters have an "'interest in maintaining the effectiveness of their votes,'" and "[w]ith one fewer Representative, [a state's] residents' votes will be diluted" (quoting *Baker v. Carr*, 369 U.S. 186 (1962))).  Since the Constitution caps the total number of Representatives to be apportioned among the states based on population, an inaccurate census that undercounts a state's population and leads to a loss of a Representative will cause vote dilution, which is inconsistent with the constitutional goal of equal representation. Therefore, the discretion of the Secretary and Congress itself cannot be absolute.  Rather, a census so poorly designed and so underfunded as to fail to bear a "reasonable relationship to the accomplishment of an actual enumeration" (one that does not dilute the votes of a state's voters) would be unconstitutional, in violation of the Enumeration Clause.[11]  *See Wisconsin*, 517 U.S. at 19–20.

---

[11] Defendants asserted at oral argument that Judge Furman rejected the "reasonable relationship" standard in *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766 (S.D.N.Y. 2018).  More accurately, Judge Furman stated specifically that "*Wisconsin* cannot be read to suggest, let alone hold, that each and every question on the census must bear a 'reasonable relationship' to the goal of an actual enumeration" because "[d]oing so would contravene the Supreme Court's own acknowledgment that the census 'fulfills many important and valuable functions,' including 'in the allocation of federal grounds to states based on population[.]'"  *Id.* at 804 (quoting *Baldrige v. Shapiro*, 455 U.S. 345, 353 (1982)).

Consistent with this law, a host of district courts have been less cautious than the Circuit Courts that concluded that they could not review the Secretary's decisions.  These trial courts vigorously have rejected arguments that they are powerless to review decisions of the Secretary regarding the conduct of the census. *See, e.g.*, *Dist. of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1179, 1181–82 (D.D.C. 1992) (observing that, "as many courts have noted, the constitutional basis for the jurisdiction of Congress over the conduct of the Census does not provide a reason in every case to shield the Census from judicial review"; concluding that political question doctrine did not bar plaintiff's claim that defendants violated the Enumeration Clause and the Census Act; adopting the "arbitrary and capricious" standard from the APA to review the Census Bureau's decision to count prisoners as residents of the state where they are imprisoned for purposes of the census); *Massachusetts v. Mosbacher*, 785 F. Supp. 230, 265 (D. Mass.) (employing the arbitrary and capricious standard from the APA to review the Census Bureau's decision on how to count overseas personnel for census purposes), *rev'd*, *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) (holding that "the final agency action complained of [the calculation of the number of Representatives per states and the transmittal of the calculation to Congress] is that of the President, and the President is not an agency within the meaning of the Act" and therefore "there [wa]s no final agency action that may be reviewed under the APA standards"); *Texas v. Mosbacher*, 783 F. Supp. 308, 315 (S.D. Tex. 1992) ("The Census Act does not purport to restrict judicial review and furthermore, the impairment of plaintiffs' right to an undiluted vote may not be foreclosed from judicial review by operation of the Administrative Procedure Act."); *City of Willacoochee, Ga. v. Baldrige*, 556 F. Supp. 551, 555 (S.D. Ga. 1983) ("Necessarily implicit in the Census Act is the command that the census be accurate.  Accordingly, the Census Act circumscribes the defendants' discretion in compiling the final census figures and

in disposing of any objections to those figures.  At the very least, the Census Act requires that the defendants' actions not be arbitrary or capricious."); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 675 (E.D. Pa. 1980) (concluding that the "arbitrary and capricious" standard under APA § 706 was the proper test for reviewing challenges by the City of Philadelphia and others to the accuracy of the 1980 census); *City of Camden v. Plotkin*, 466 F. Supp. 44, 46 (D.N.J. 1978) (denying a motion to dismiss for lack of standing a suit against the Secretary claiming that there was an undercount of the population of Camden, New Jersey, that would lead to the loss of federal program funds; adopting the arbitrary and capricious standard of the APA as the proper test to review the decisions of the Census Bureau in connection with a 1979 census "pretest").  In *City of Philadelphia v. Klutznick*, the Eastern District of Pennsylvania observed that "[t]he census is more than a statistic.  It is an essential element in the democratic process." 503 F. Supp. at 675.  In concluding that it could review the Bureau's decisions regarding the decennial census, it reasoned:

> To hold that the agency charged with its tabulation is not subject to judicial review is to hold that the Bureau is free to adopt any numbers, regardless of bias, manipulation, fraud or similarly grave abuse, which is exactly the type of conduct and temptation the Framers wished to avoid by entrusting the census to the federal government.  This cannot be.

*Id.*

But the usefulness of this line of cases in addressing the issues in this case seems limited for two reasons.  First, unlike the present case, the challenges brought by the plaintiffs in those cases were initiated *after* the Census Bureau had acted—not in the midst of the planning process. This distinction is quite important for purposes of applicability of the arbitrary and capricious standard that applies to APA claims, as "[j]udicial review under the APA . . . is limited to 'final agency actions.'"[12]  *See City of New York v. U.S. Dep't of Def.*, No. 18-1699, --- F.3d ----, 2019

---

[12] As noted, in this case, Plaintiffs state a single count for violation of the Enumeration Clause of the U.S. Constitution, Am. Compl. ¶¶ 118–24, and do not assert any violation of the APA.

WL 208080, at *4 (4th Cir. Jan. 16, 2019) (quoting 5 U.S.C. § 704).  Second, all of these cases were decided *before* the Supreme Court issued a string of decisions interpreting the Enumeration Clause of the Constitution and the Census Act, most notably the *Wisconsin* decision, which established the test for an Enumeration Clause challenge: the Secretary's decision how to conduct a decennial census need bear only a "reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the purpose of the census," which is "equal representation."  517 U.S. at 19–20.  Thus, as Chief Justice Rehnquist observed, "notwithstanding the plethora of lawsuits that inevitably accompany each decennial census, there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides."  *See id.* at 19 (footnote omitted).  Rather, in light of the Constitution's broad grant of authority to Congress, the Secretary's decision on how to conduct the census need bear only a "reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census, . . . equal representation."  *Id.* at 19–20.

Moreover, the Supreme Court's failure to incorporate the APA's "arbitrary and capricious" or "abuse of discretion" language into the test for reviewing an Enumeration Clause challenge to the Secretary's decisions regarding how to conduct a decennial census cannot be ignored.  And here, the only claim brought by Plaintiffs is an Enumeration Clause claim—not an APA claim. Additionally, even if they were to seek amendment of the complaint to assert an APA challenge, it is hard to imagine that it would be ripe at the present time, since the Secretary is in the process of making his decisions about how to conduct the 2020 census, and therefore there is no final agency action to examine.  *See* 5 U.S.C. § 704; *City of New York*, 2019 WL 208080, at *4; *cf. New York v. U.S. Dep't of Commerce*, Nos. 18-2921 (JMF) & 18-5025 (JMF), --- F. Supp. 3d ----, 2019 WL 190285, at *89 (S.D.N.Y. Jan. 15, 2019) (finding claim ripe where "[t]here [wa]s no dispute

the Secretary Ross's decision [to include citizenship question] constitute[d] 'final agency action' reviewable under the APA").

Certainly, more recently, this Court and others have exercised their discretion to review the Bureau's *pre*-census decisions regarding the 2020 Census.  *See La Unión del Pueblo Entero v. Ross* ("*LUPE*"), No. GJH-18-1570, --- F. Supp. 3d ----, 2018 WL 5885528, at *5, *7 (D. Md. Nov. 9, 2018); *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 566 (D. Md. 2018); *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 775 (S.D.N.Y. 2018); *California v. Ross & City of San Jose v. Ross*, Nos. 18-1865-RS & 18-2279-RS, slip op. at 9, 15, 17–20, 28 (N.D. Cal. Aug. 17, 2018), ECF No. 47-1.  But, Judge Furman dismissed the plaintiffs' pre-census Enumeration Clause claim for failure to state a claim, only allowing the APA and Due Process Clause claims to go forward.  *New York*, 315 F. Supp. 3d at 775.  And, while the Enumeration Clause claims survived dismissal in the other cases, all of those more recent cases concerned a challenge to a discrete agency action that *already* was finalized—the decision to include a citizenship question on the 2020 Census questionnaire.

Defendants argue that, under the circumstances of this case, in which Plaintiffs challenge their alleged inaction rather than any discrete actions they have taken toward conducting the census, an Enumeration Clause challenge cannot be brought until after the 2020 Census has been taken and the results are announced by the Secretary, because only then will it be possible to determine without speculation whether their alleged failure to prepare has caused a differential undercount.  But by then, Plaintiffs argue, it will be too late to correct the effect of the undercount—the Court must act now to superintend the design of the 2020 Census before it takes place.

It is true that, as noted, Congress itself has found that

> the decennial enumeration of the population is a complex and vast undertaking and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or the laws of the United States, it would be impracticable for the States to obtain, and the Courts to provide, meaningful relief after such enumeration has been conducted.

1998 Appropriations Act § 209(a)(8). And, the Supreme Court rejected a standing challenge to a suit brought prior the conduct of the census to prevent the Secretary's planned use of statistical sampling during the 2000 decennial census, concluding that it was "certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme—possibly irremediable—hardship." *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 332 (1999).

But the circumstances that led to those Congressional findings and that lawsuit were far different from this case, for three reasons. First, the challenge in *U.S. House of Representatives* (like the citizenship question challenges in the 2020 Census cases) was to a discrete decision of the Census Bureau. There, the plaintiffs challenged the Bureau's decision to use two specific types of "statistical sampling to supplement data obtained through traditional census methods," *id.* at 323, as opposed to launching (as Plaintiffs do here) a sweeping challenge to the staffing, leadership, funding, design, and security of the 2020 Census. The Congressional findings also came in response to the Bureau's plan to use statistical sampling in the 2000 census. *See id.* at 326–27. Second, the suit (like the other 2020 Census cases) was brought after the Census Bureau had taken final action,[13] not to interrupt the planning for the census as it was taking place. The Congressional finding also followed the Bureau's "final agency action." *See id.* Third, and

---

[13] The Bureau had determined and announced the type of statistical sampling it planned to use to augment the findings of the traditional census methods. *See U.S. House of Reps.*, 525 U.S. at 326–27 (noting that, in the 1998 Appropriations Act, Congress stated that "the Census 2000 Report and the Bureau's Census 2000 Operational Plan 'shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census'").

perhaps most tellingly, the bringing of a lawsuit to challenge the use of statistical sampling in the 2000 census prior to its completion was *specifically authorized* by Congress—in the 1998 Appropriations Act, which included the Congressional finding. *Id.* at 326–27 (noting that Congress ordered the Census Bureau to provide a report detailing its "proposed methodologies for conducting the 2000 Decennial Census," particularly "including an explanation of any planned use of statistical methodologies that may be used," and that, "[a]fter receiving the Report, Congress passed the 1998 Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, which provide[d] that the Census 2000 Report and the Bureau's Census 2000 Operational Plan 'shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census'" and "[t]he Act also *permit[ted] any person aggrieved by the plan to use statistical sampling in the decennial census to bring a legal action* and require[d] that any action brought under the Act be heard by a three-judge district court" (emphasis added) (citations to 1998 Appropriations Act omitted)).

The Plaintiffs argue that, if they wait until after the planning for the 2020 Census has been completed and the Census has been conducted to bring a lawsuit to challenge any differential undercount affecting them, there will be no effective relief that the Court can order. But this argument flies in the face of decades of litigation that legions of plaintiffs have brought, making nearly identical claims, *after* the challenged census methodology had been finalized and the census had been conducted. *See, e.g.*, *Dist. of Columbia v. Dep't of Commerce*, 789 F. Supp. 1179 (D.D.C. 1992) (suit brought under the Enumeration Clause, the Fifth Amendment, and the Census Act, alleging that the decision of the Census Bureau to apply the "usual residence rule" to count prisoners of Lorton Prison as residents of Virginia instead of the District of Columbia would "cause the District of Columbia to lose $60 million in federal funds over the next ten years");

*Massachusetts v. Mosbacher*, 785 F. Supp. 230, 233–34 (D. Mass. 1992) (suit challenging how the 1990 census had apportioned the 435 seats in the House of Representatives, and seeking a court order "to reallocate the seats apportioned to the several states as a consequence of the 1990 census"); *Texas v. Mosbacher*, 783 F. Supp. 308, 309–10 (S.D. Tex. 1992) (suit by plaintiffs of "hispanic origin" filed after the 1990 census, alleging a differential undercount that deprived them of the right to elect federal, state and local representatives, and the loss of federal funds; seeking "a statistical adjustment to the census numbers"); *City of Willacoochee, Ga. v. Baldrige*, 556 F. Supp. 551 (S.D. Ga. 1983) (suit by city challenging the accuracy of its population count in the 1980 census and the allegedly arbitrary and capricious failure of the Census Bureau to correct the undercount, resulting in the loss of eligibility for federal funds); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663 (E.D. Pa. 1980) (suit brought after the 1980 census, challenging its accuracy and the conduct of the Census Bureau, which allegedly resulted in an undercount in Philadelphia; claiming loss of federal and state representation and eligibility for federal funding); *City of Camden v. Plotkin*, 466 F. Supp. 44, 47 (D.N.J. 1992) (suit filed by City, challenging the manner in which the Census Bureau had conducted the 1976 "pretest census" and alleging that the undercount would result in the loss of federal funding; seeking court order to "rectify the undercounting of minorities").

## *Ripeness*

The foregoing discussion brings us to considerations of ripeness.  Defendants argue that "Plaintiffs' challenge to the Census Bureau's supposedly deficient preparations for the 2020 census is not fit for judicial review some two years before the census because each of the alleged deficiencies in the [Amended Complaint] depends on future uncertainties, as the [Amended Complaint] itself acknowledges."  Defs.' Mem. 17.  Defendants contend that budgetary and

staffing deficiencies could be remedied through "decisions in the next two years." *Id.* Defendants also assert that the lawsuit itself interferes with their ability to prepare for the 2020 Census. *Id.* at 18. In their view, postponing judicial review would create only minimal hardship for Plaintiffs because their alleged injuries would not occur until after the Census. *Id.*

As relevant to this case, the ripeness doctrine protects against premature adjudication of issues by courts before the facts are sufficiently developed to warrant judicial intervention. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998) ("[T]he ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49) (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977))); *see also South Carolina v. United States*, --- F.3d ----, No. 18-1684, 2019 WL 124267, at *8 (4th Cir. Jan. 8, 2019) (same). The ripeness inquiry has three elements: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry*, 523 U.S. at 733.

<u>Delayed Review</u>

Whether delayed review will impose a hardship on Plaintiffs depends on whether the alleged injury that Plaintiffs expect to suffer could be remedied in a later lawsuit, or whether harm to Plaintiffs is imminent, requiring redress now. *See Ohio Forestry*, 523 U.S. at 733–34 (observing, in reaching the conclusion that claim was not ripe: "Nor have we found that the Plan now inflicts significant practical harm upon the interests that the Sierra Club advances—an

important consideration in light of this Court's modern ripeness cases. As we have pointed out, before the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court. The Sierra Club thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." (citing *Abbott Labs*.)).

To be ripe, a claim cannot "rest[] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *U.S. House of Reps. v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 90 (D.D.C. 1998) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)), *appeal dismissed*, 525 U.S. 316 (1999).   For example, in *New York v. U.S. Department of Commerce*, the claim was ripe where plaintiffs were "*already* suffering harm from the addition of the citizenship question due to the diversion of valuable resources" and "time [wa]s of the essence" because "the Census Bureau 'need[s] to begin printing the 2020 census questionnaire' in June 2019."   Nos. 18-2921 (JMF) & 18-5025 (JMF), --- F. Supp. 3d ----, 2019 WL 190285, at *88 (S.D.N.Y. Jan. 15, 2019).   When, as here, a plaintiff alleges an injury that will result "from the *procedure* utilized for conducting the . . . census, . . . 'the courts have applied the imminence requirement to the procedural violation, not to the discrete injury that might someday flow from such.'" *U.S. House of Reps.*, 11 F. Supp. 2d at 91 (quoting *Nat'l Treas. Emps. Union v. United States*, 101 F.3d 1423, 1430–31 (D.C. Cir. 1996)).   In other words, "[t]he matter . . . becomes ripe at the point at which use of th[e] [challenged] procedure is 'certainly impending' – the point at which it is certain that the Bureau will employ [the challenged procedure] in conducting the apportionment enumeration." *Id.*   The possibility that "Congress may yet pass supervening legislation or take other actions that could moot the controversy" does not make "[t]he claimed

injuries . . . fail the immediacy test." *Id.* at 92 ("To ask the court to stay its hand because Congress hypothetically may amend the statutory framework of the Census Act as it now exists, or change the current methodology by attaching a rider to a future appropriations bill, or create a "census crisis" by refusing to fund the decennial enumeration, is asking the court to stay its hand based upon nothing more than mere speculation—the kind of speculation typically offered by a *plaintiff.* . . . [T]he fact that a case is capable of being rendered moot by congressional action does not, without more, make it unripe."). "Where 'delayed resolution of (the) issues would foreclose any relief from the present injury suffered by (plaintiff)' and review would also be beneficial to the defendant, there is no reason to defer consideration of the issues presented." *Carey v. Klutznick*, 508 F. Supp. 404, 412 (S.D.N.Y. 1980) (quoting *Duke Power Co. v. Carolina Envtl. Study*, 438 U.S. 59, 82 (1979)).

Plaintiffs allege that "Defendants' choices in procedures, such as their approach to digitization, and cut-back in field and mailing outreach, *have already been made*," and therefore "Plaintiffs are at imminent risk of harm." Am. Compl. ¶ 116 (emphasis added). This alleged action is not speculative, even if it has not been finalized, *see id.* 88 ("For the 2020 Census, the Census Bureau *proposes to* conduct only one in-person visit to each household." (emphasis added)). *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). Yet, the immediacy of Defendants' actions is not tantamount to a certainty of injury or hardship to Plaintiffs in the absence of Court intervention at this time. And, despite the Plaintiffs' claims that they will be left without an adequate remedy if the Court declines to order the injunctive relief that they request, history has shown otherwise. As Chief Justice Rehnquist ruefully noted in *Wisconsin*, there are a "plethora of lawsuits that inevitably accompany each decennial census." 517 U.S. at 19. As I already have noted, *see supra* at 22, 26–27, the nearly universal characteristic shared by these challenges to

previous censuses is that they were brought after the Census Bureau had made its final determinations regarding how the decennial census should be taken, and after the census already had been taken and preliminary population counts announced.  These cases included those alleging the same types of injuries as the Plaintiffs do here: loss of federal and local representation and the loss of federal funding.  *See, e.g.*, *Dist. of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179 (D.D.C. 1992); *Massachusetts v. Mosbacher*, 785 F. Supp. 230 (D. Mass.), *rev'd*, *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *Texas v. Mosbacher*, 783 F. Supp. 308 (S.D. Tex. 1992); *City of Willacoochee, Ga. v. Baldrige*, 556 F. Supp. 551 (S.D. Ga. 1983); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663 (E.D. Pa. 1980); *City of Camden v. Plotkin*, 466 F. Supp. 44 (D.N.J. 1992).    And, the relief requested included reallocation of congressional seats, *see, e.g.*, *Massachusetts*, 785 F. Supp. at 233–34, and upwards adjustment of alleged differential undercounts of hard-to-count populations, *see, e.g.*, *Texas*, 783 F. Supp. at 309–10; *City of Camden*, 466 F. Supp. at 47.  These cases belie the Plaintiffs' argument that waiting until the Secretary has completed the plans for the 2020 Census, or even later, until after the enumeration has taken place, will deprive them of any effective remedy in the event of a differential undercount.  *See, e.g.*, *Utah v. Evans*, 536 U.S. 452, 463 ("Nor (as we have just explained), if a lawsuit is brought soon enough after completion of the census and heard quickly enough is relief necessarily 'impracticable.'").  Thus, they have not shown that "delayed resolution of (the) issues would foreclose any relief" from their alleged injury."  *See Duke Power Co.*, 438 U.S. at 82; *Carey*, 508 F. Supp. at 412.  Nor have they alleged a specific procedural violation (as opposed to a change in procedure and/or timing) to which I can "appl[y] the imminence requirement" to find that the matter is ripe.  *See Nat'l Treas. Emps. Union*, 101 F.3d at 1430–31; *U.S. House of Reps.*, 11 F. Supp. 2d at 91.

31

Interference with Further Administrative Action

Defendants noted during oral argument and in their Supplement, Defs.' Supp. 7, 10–11 & App'x, that, since the filing of this lawsuit, many of the factual allegations in the Amended Complaint may no longer hold true.  Plaintiffs disputed at oral argument and in their Supplement— with good reason—the admissibility of a number of the "facts" that Defendants insist moot Plaintiffs' allegations.  *See* Pls.' Supp. 14–15.  Federal Rule of Evidence 201(b) only permits the Court to take judicial notice of facts known within its territorial jurisdiction or that are capable of being established readily by reference to sources the reliability of which cannot reasonably be challenged.  Here, Plaintiffs reasonably challenge the reliability of Defendants' "facts."  *See* Pls.' Supp. 14–15.  Thus, neither Defendants' arguments nor evidence that is not properly before the Court can negate Plaintiffs' well-pleaded allegations at this juncture.  *See Lujan*, 504 U.S. at 561; *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

But, even without considering Defendants' disputed "facts," it is undisputed that the President has nominated and the Senate confirmed a permanent Director of the Census Bureau.  Notice, ECF No. 56; *see* Tara Bahrampour, *Senate confirms new Census Bureau director as 2020 survey approaches*, Wash. Post (Jan. 3, 2019), https://www.washingtonpost.com/local/social-issues/senate-confirms-new-census-bureau-director-as-2020-survey-approaches/2019/01/03 /5599b2d2-0fa0-11e9-831f-3aa2c2be4cbd_story.html?utm_term=.bb8d954ee588.  Further, the beginning of the 2020 Census is a year or more away.  Assuming there is sufficient continued funding appropriated by Congress and signed into law by the President (discussed below), then it is inevitable that many of the alleged deficiencies in staffing, census design, and testing will be addressed and, where deficient, corrected. This case is unlike *New York v. U.S. Department of*

*Commerce*, which concerned "final agency action" that the defendants already had taken in deciding to include the citizenship question. Nos. 18-2921 (JMF) & 18-5025 (JMF), --- F. Supp. 3d ----, 2019 WL 190285, at *89 (S.D.N.Y. Jan. 15, 2019).  Here, if the Court were to interject itself into the Bureau's process during the critical final preparations, requiring—as Plaintiffs request—its monitoring and approval of the plans along the way, it is hard to imagine that this oversight would not hinder the process as opposed to facilitate it. Therefore, judicial intervention at this time likely would interfere with further administrative action.

<u>Benefit of Further Factual Development</u>

Finally, the Court clearly would benefit from further factual development before being called to evaluate whether the procedures finally approved for the 2020 Census are sufficient to survive an Enumeration Clause challenge (i.e., whether they bear a reasonable relationship to the accomplishment of an actual enumeration).  For example, completing the testing that the Bureau so far has postponed will provide essential information regarding the accuracy of digital procedures that will be employed in the 2020 Census.[14]  Absent this information, the Court would be forced to decide based on speculative assumptions advanced by the parties.  Assuming adequate funding, the more-than-a-year remaining before the start of the 2020 Census will put to the test the new procedures the Secretary has planned to adopt, and the conduct of the Census itself will result

---

[14] Alternatively, there may come a date when a failure to have conducted the testing may itself be evidence that Defendants' preparations are insufficient. *See Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 332 (1999) ("It is clear that if the Bureau is going to alter its plan to use sampling in the 2000 census, it must begin doing so by March 1999. See Oversight of the 2000 Census: Putting the Dress Rehearsals in Perspective, Hearing before the Subcommittee on the Census of the House Committee on Government Reform and Oversight, 105th Cong., 2d Sess., 84 (1998) (statement of James F. Holmes, Acting Director of the Bureau) ('I must caution that by this time next year [*i.e.,* March 1999] the train for census 2000 has to be on one track. If the uncertainty continues, if our staff continues to have to do two jobs, ... [the census] will truly be imperiled'). *See also* § 209, 111 Stat. 2480 (providing that the Bureau's plan to use statistical sampling in the 2000 census constitutes 'final agency action').").  But that time has not come.

in a preliminary population count that will determine whether the differential undercount that the Plaintiffs fear will adversely affect their federal and local representation and future federal funding. Again, this case stands in stark contrast to *New York*, where "the administrative and trial records" were "plainly sufficient to present the issues in a manner fit for judicial decision making." 2019 WL 190285, at *89. Therefore, the third element of ripeness also militates against hearing these claims at this time. Further, the inability of the Plaintiffs to cite any decision where a lawsuit such as this one has resulted in the sweeping relief that they seek here (an injunction requiring "Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that hard-to-count populations will be actually enumerated in the decennial census," Am. Compl. 21), speaks volumes about the authority (not to mention ability) of courts to second-guess the Secretary's planning of the decennial census as it is taking place, or the standards under which they might attempt to do so. Nonetheless, as Defendants themselves concede, Defs.' Reply 9, the fact that this aspect of Plaintiffs' claim is not ripe at present does not mean that it will not be ripe at some point in the future. For that reason, Plaintiffs' challenges to the methods and means the Bureau plans to employ in the 2020 Census will be dismissed without prejudice to being reinstated later.

<u>The One Ripe Claim for Relief</u>

The fact that Plaintiffs have failed to establish that they are entitled to *all* the relief they seek does not mean that they are not entitled to *any* of it, assuming they can demonstrate evidentiary support for their allegations. This is because they also challenge the adequacy of the Bureau's funding, Am. Compl. ¶¶ 32–37, 79, and they also seek declaratory relief, *see id*. at 21. As noted, the Court could issue a declaratory judgment that Congress has failed to appropriate sufficient funds for the Secretary to perform the Constitutionally required "actual Enumeration"

of the population as of April 1, 2020. Indeed, "Congress [has] committed [itself] to providing the level of funding that is required to perform the entire range of constitutional census activities, with a particular emphasis on accurately enumerating all individuals who have historically been undercounted." 1998 Appropriations Act § 209(a)(9). Moreover, "towards this end, Congress expects— (A) aggressive and innovative promotion and outreach campaigns in hard-to-count communities" and "(B) the hiring of enumerators from within those communities." *Id.* Unlike the challenge to the methods and means of conducting the 2020 Census, the non-funding claim is ripe.

Notably, Defendants argued at oral argument that the Bureau's work is not disrupted at this time. They insist that "Plaintiffs' claims are mooted day by day," as the Bureau's funding has increased, census centers have opened, a number of operations have been deployed successfully, and the Bureau no longer plans to rely on state administrative records. And, along with their Supplement, Defendants filed an affidavit from a Census Bureau official, ostensibly to show that the Bureau has funding. Reist Decl., ECF No. 61-1. But, as discussed, argument of counsel and the Reist Declaration are inappropriate for consideration in ruling on a motion to dismiss, where the facts that the Court may consider are circumscribed. *See Lujan*, 504 U.S. at 561; *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). While Defendants are correct that the Court may take judicial notice of facts (if permitted by Fed. R. Evid. 201) in deciding a motion to dismiss, *see* Defs.' Supp. 10–11, I agree with Plaintiffs that neither the Reist Declaration nor the appendix included with Defendants' Supplemental Memorandum may be judicially noticed. Neither contains facts known within the territorial jurisdiction of the Court, and Plaintiffs' legitimate challenge to their accuracy also means that they are not capable of being established readily by reference to sources of unchallenged reliability. *See* Fed. R. Evid. 201. For this reason, prior census cases, including Judge Furman's

decision in the Southern District of New York, have held that such filings are evidence, appropriate for consideration on summary judgment but not on a motion to dismiss. *See New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 783 (S.D.N.Y. 2018); *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990))).

But, even if I were to consider the assertions at oral argument and in the affidavit, the most they would show is that funding will be exhausted at the end of April 2019, or perhaps sometime in early April. Given what must be done in 2019 to keep on track, this evidence actually demonstrates that there is a justiciable claim as to sufficiency of funding given the government shutdown (the longest in the nation's history, and still looming like a Damoclean sword if the three-week extension of a continuing resolution fails to result in congressional appropriation of lasting funding that is signed into law by the President[15]) and appropriations lapse. While Plaintiffs' other claims could be addressed through post-census litigation, census funding obviously cannot be increased after the fact. Moreover, the federal government shutdown recent ended through a continuing resolution that only allows the Bureau to continue with already-funded operations for three weeks, but adds no additional funding beyond that already appropriated. Thus,

---

[15] *See* Nicholas Fandos, Sheryl Gay Stolberg & Peter Baker, *Trump Signs Bill Reopening Government for 3 Weeks in Surprise Retreat From Wall*, N.Y. Times (Jan. 25, 2019), https://www.nytimes.com/2019/01/25/us/politics/trump-shutdown-deal.html. This fact is appropriate for judicial notice because it meets Fed. R. Evid. 201.

It bears mentioning that, throughout the long government shutdown, during which they were required to work exceptionally long hours on this and the other pending census cases without pay, counsel for the Defendants, just as have counsel for the Plaintiffs, have performed their duties with diligence, skill, and professionalism.

given the prediction that, even by Defendants' estimate, current census funding will run out by

April 2019 (if not earlier)—a full year before the 2020 Census—, "delayed review would cause

hardship to the plaintiffs." *See Ohio Forestry*, 523 U.S. at 733. Additionally, "judicial

intervention" would not "inappropriately interfere with further administrative action"—it will

require no more than elementary school arithmetic to demonstrate (from the Bureau's existing

estimates) what funds are needed to complete the 2020 Census, and the shortfall the funding lapse

has caused. Finally, narrowly targeted discovery that will not unduly interfere with the Bureau's

preparations (while the current funding lasts) will accomplish whatever factual development is

needed of the impact of the lapse of funding. Therefore, Plaintiffs' insufficient funding claim is

ripe.

*Standing*[16]

A plaintiff has standing if

(1) [the plaintiff] has suffered an "injury in fact" that is (a) concrete and
particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the
injury is fairly traceable to the challenged action of the defendant; and (3) it is
likely, as opposed to merely speculative, that the injury will be redressed by a
favorable decision.

*Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399, 408 (D. Md. 2012) (quoting *Bishop v. Bartlett*,

575 F.3d 419, 423 (4th Cir. 2009)); *see also Lujan*, 504 U.S. at 560–61 (same). Notably, while a

plaintiff must plead these elements to allege standing, these elements are more than "mere pleading

requirements"; they are "an indispensable part of the plaintiff's case," and "each element must be

supported in the same way as any other matter on which the plaintiff bears the burden of proof,

*i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."

---

[16] Even though I am dismissing for the present time Plaintiffs' claims regarding the methods and
means of conducting the 2020 Census because they are not yet ripe, I nonetheless will consider
Defendants' other justiciability arguments with respect to these claims (as well as the insufficient
funding claim), as they may be reinstated.

*Lujan*, 504 U.S. at 561.  And, the burden on Plaintiffs to overcome the deference afforded to the Secretary is substantial, and must be met through evidence, not allegations.

But, significantly, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," because "on a motion to dismiss [the Court] 'presume[s] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). If the claim survives dismissal, however, and Plaintiffs must respond to a motion for summary judgment, they will not be able to "rest on such 'mere allegations'" of injury resulting from Defendants' conduct. *Id.*  At that juncture, they will have to "'set forth' by affidavit or other evidence 'specific facts.'" *Id.* (citing Fed. R. Civ. P. 56).  Then, "at the final stage, those facts (if controverted) must be 'supported adequately by evidence adduced at trial.'"  *Id.* (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

<u>Injury in Fact</u>

An "imminent" injury is one that "is not too speculative," i.e., one that "is '*certainly impending*.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Injury cannot be predicted "at some indefinite future time" or expected to result from acts "partly within the plaintiff's own control." *Id.*

As noted in the related arena of ripeness, "delayed review would cause hardship to the plaintiffs" because they could not undo the likely absence of funding. *See Ohio Forestry*, 523 U.S. at 733.  Yet, according to Defendants, "[e]ven crediting Plaintiffs' allegations that preparations for the 2020 Census are deficient, Plaintiffs fail to allege that any supposed deficiencies will remain unremedied by the 2020 Census." Defs.' Mem. 9.  But, I can judicially notice that the Bureau endured a 35-day lapse in appropriations during the recent partial shutdown of the federal

government.  And, the Defendants' own estimates demonstrate that the short-term deal that ended the shutdown does not itself add any funding beyond (at the latest) April 2019.  This ongoing state of uncertainty bolsters Plaintiffs' position that Defendants will be unprepared (in terms of funding, workforce, and testing) for the 2020 Census, while weakening Defendants' argument that their preparedness may change over the coming months, of which fewer than fifteen remain.

While Defendants offer an affidavit to show that the Bureau currently has funding, as discussed above, the affidavit also shows that funding will expire with a year to go before the 2020 Census.  Additionally, it appears that printing of the census questionnaire is imminent, as it "is set to take place this summer," yet "the company contracted to print the forms went bankrupt" and the Bureau has not "announce[d] a new one" (and may not be able to pay one this summer), which strengthens Plaintiffs' argument that Defendants cannot prepare without proper funding.  *See* Tara Bahrampour, *Senate confirms new Census Bureau director as 2020 survey approaches*, Wash. Post  (Jan. 3, 2019),  https://www.washingtonpost.com/local/social-issues/senate-confirms-new-census-bureau-director-as-2020-survey-approaches/2019/01/03/5599b2d2-0fa0-11e9-831f-3aa2c2be4cbd_story.html?utm_term=.c1974a3eb3fc.

Defendants also contend that "Plaintiffs fail to allege facts suggesting that households that would otherwise respond to the 2020 Census will now choose not to do so as a result of deficiencies in funding, staffing, or leadership," Defs.' Mem. 10, or that "their geographic area (Prince George's County) will lose funding and seats *even if potential undercounts in other geographic areas are taken into account*," *id.* at 11 (emphasis in brief).  I disagree that Plaintiffs have not alleged that the 2020 Census plans will not disproportionately impact them.[17]  Rather, Plaintiffs

---

[17] Plaintiffs asserted at oral argument that the NAACP sues on behalf of its members in all states and therefore Plaintiffs need not be bound to facts alleged about Prince George's County alone.  It

allege that Defendants' preparations for the 2020 Census will exacerbate the undercount Prince George's County historically experiences. Am. Compl. ¶¶ 85–104. Specifically, they allege that Prince George's County is a "majority African American county" with regions that "[t]he Census Bureau has characterized . . . as 'hard-to-count,'" and that "the County has faced consistent census undercounts." Am. Compl. ¶¶ 95, 99. They claim that, "[i]n 2010, Prince George's County had the highest net undercount of any county in Maryland, and one of the highest net undercounts in the nation among counties with 100,000 residents or more." *Id.* ¶ 101 (emphasis omitted). The effect of the 1990 undercount, they allege, was a loss of "$200 million in [federal] grants and loans over the course of the decade." *Id.* ¶ 104.

According to Plaintiffs, the underfunded Bureau has "decided to cut its on-the-ground presence and field infrastructure significantly" and "has reduced the number of area offices and workers, and will conduct in-person visits at a fraction of past rates." *Id.* ¶ 85. For example, instead of visiting households in person "up to six times in order to ensure completion of census forms[,] . . . [f]or the 2020 Census, the Census Bureau proposes to conduct only one in-person visit to each household." *Id.* ¶ 88. As for the effects of this approach, Plaintiffs allege:

---

is true that an organization can establish its own standing as a plaintiff by "alleg[ing] that its members, or *any one of them*, are suffering immediate or threatened injury as a result of the challenged action . . . ." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977) (emphasis added). Thus, NAACP clearly can sue on behalf of the Prince George's County residents identified in the Amended Complaint. *See id.* But, if there is a differential undercount in one state, resulting in a loss of a Representative, then another state necessarily gains a Representative, because the total number of Representatives is static. Therefore, logically, NAACP cannot have standing to represent all hard-to-count populations across the United States in a census challenge where the injury to some is to the benefit of others. Standing under these circumstances would mean that *any* national organization with members in all states would have standing to challenge a census resulting in reapportionment, because the reapportionment necessarily would cause some of its members to lose Congressional representation. Moreover, Plaintiffs only plead claims on behalf of Prince George's County, and an opposition to a motion to dismiss is not a vehicle for amending a complaint. *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015).

If the in-person visit is unsuccessful, the Census Bureau plans to use federal and state administrative records to attempt to determine the residents for an undetermined number of the households that have not responded.

State administrative data is often unreliable and of poor quality, and the quality of the information between states varies significantly. Moreover, these databases generally do not include data that the census collects with respect to race, ethnicity, and the relationship of household members to each other.

The Census Bureau has not yet reached agreements with all states to use the states' administrative databases. If the Census Bureau fails to secure agreements with all states, this failure will result in inconsistent counting methodologies between states.

*The Census Bureau plans to use state administrative data as a substitute for in-person enumeration only for those households that are already "hard-to-count," including communities of color. Using unreliable state data as the basis for compiling final census data for households that are disproportionately minority and low-income will lead to an even higher undercount for these groups.*

State administrative databases often lack accurate data on young children and undocumented individuals.

*Because many states do not collect data on race and ethnicity, using state administrative data would create incomplete census records, and would harm communities of color during the post-2020 redistricting process.*

. . .

Moreover, Defendants' failure to conduct a constitutionally sufficient census and the resulting dramatic undercount of Prince George's County residents increases the risk of Maryland losing seats in Congress.  This loss would deprive Prince George's County residents of fair and equal representation.

Am. Compl. ¶¶ 89–94, 108 (paragraph numbers omitted; emphasis added).  Thus, Plaintiffs allege a concrete and particularized injury in the form of underfunding leading to a disproportionate undercount, which in turn would result in reduced funding and representation; it is neither highly attenuated nor merely hypothetical.

According to the Reist Declaration, Defendants will not be relying on state databases.  Reist Decl. 16. But, I cannot judicially notice this fact, *see* Fed. R. Evid. 201(b), and therefore it is not properly before me on Defendants' Motion to Dismiss, as I must accept Plaintiffs' well-pleaded allegations, *see Aziz v. Alcolac*, 658 F.3d 388, 290 (4th Cir. 2011).  In any event, regardless of state

database use, Plaintiffs have alleged sufficiently that, without adequate funding, Defendants will not have the means to conduct an accurate headcount and will disproportionately undercount Prince George's County residents as a result.

Moreover, contrary to Defendants' assertion, Defs.' Mem. 12, Plaintiffs have alleged prudential standing because this injury "falls within the 'zone of interests' sought to be protected by the [Enumeration Clause]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). The Enumeration Clause is intended to ensure equal representation, *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992), and Plaintiffs allege that Defendants' approach to the 2020 Census may leave them with less representation and funding than an accurate tally would provide, Am. Compl. ¶¶ 106, 108. *See La Unión del Pueblo Entero v. Ross* ("*LUPE*"), No. GJH-18-1570, --- F. Supp. 3d ----, 2018 WL 5885528, at *6 (D. Md. Nov. 9, 2018) (finding that plaintiffs satisfied the zone-of-interests requirement "by alleging that the citizenship question will lead to an inaccurate enumeration, causing malapportionment of political power and funding"); *California v. Ross* & *City of San Jose v. Ross*, Nos. 18-1865-RS & 18-2279-RS, slip op. 13–14 (N.D. Cal. Aug. 17, 2018), ECF No. 47-1 (finding that the "allegations easily survive[d] the zone-of-interests test" where plaintiffs "alleged loss of funding and inadequate representation flowing from the Secretary's alleged failure to conduct an 'actual Enumeration' as required by the Constitution").

Further, in *Kravitz v. U.S. Department of Commerce*, this Court agreed with the plaintiffs that "they face a concrete injury in that their states and communities will be disproportionately undercounted as a result of the addition of the citizenship question to the 2020 Census." 336 F. Supp. 3d 545, 557, 558 (D. Md. 2018). Judge Hazel noted that "the Supreme Court has previously held that plaintiffs possess standing in census cases where they face an 'expected loss of a Representative to the United States Congress.'" *Id.* at 557 (quoting *Dep't of Commerce v. U.S.*

*House of Reps.*, 525 U.S. 316, 331–32 (1999)).  He also observed that "a number of courts" have found that plaintiffs satisfied the injury-in-fact requirement in claiming that their votes would be diluted within their states and that they would lose federal funding. *Id.* at 558 (discussing *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (standing based on injury "in the form of dilution of [plaintiffs'] votes and decreased federal funds flowing to their city"); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) (stating that "allegations of decreased federal and state funding is fairly traceable to population counts reported in the decennial census"); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (standing where injury is loss of funds)); *see also LUPE*, 2018 WL 5885528, at *5 ("For the reasons discussed in *Kravitz*, Plaintiffs' alleged vote-dilution injury satisfies the injury-in-fact requirement."); *California & City of San Jose*, slip op. at 12 ("[C]ourts have consistently held that individual plaintiffs have standing where they allege a loss of federal funding to their states and localities resulting from a census undercount." (citing *Carey*, *City of Philadelphia*, and *Glavin*)).  Additionally, "[w]hile it may be, as defendants assert, that undercounts in other states [or counties] will offset the effect on [Prince George's County] in the final apportionment calculation, that is a determination on the merits," and "Defendants cannot defeat plaintiffs' as yet to be proven assertions about [Prince George's County's] projected loss of congressional representation with equally unproven assertions regarding lack of impact." *California & City of San Jose*, slip op. at 12.  Likewise, while Defendants may challenge the likelihood of an undercount, this "argument[] also go[es] to issues of proof," and "there is no requirement, at this juncture, that plaintiffs produce 'definitive, empirical' evidence regarding the effect [of Defendants' preparations, or lack thereof, for the 2020 Census] in order to survive a motion to dismiss."  *Id.* at 11.

Traceable Injury

Defendants argue that the alleged injury is not traceable to their actions because "Plaintiffs' theory of harm relies on a multi-step causal chain" that involves (1) Prince George's County residents failing to respond, (2) state and local governments reducing their "spending on the particular roads and other programs that Plaintiffs use" if and when their federal funding decreases, and (3) Maryland "us[ing] unadjusted census figures for its state-level redistricting." Defs.' Mem. 13–14.

It is true that "a plaintiff may not have standing where the alleged injury is solely 'th[e] result [of] the independent action of some third party not before the court.'" *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 559 (D. Md. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). But, "[f]or an injury to be 'fairly traceable' to the defendant, the defendant's actions need not be 'the very last step in the chain of causation.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). Rather, "the causation element of standing is satisfied . . . where the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendants' conduct 'upon the action of someone else.'" *Id.* (quoting *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett*, 520 U.S. at 169)). Notably, courts have held that "'there is a direct correlation between decennial census population counts and federal and state funding allocations,' and that 'allegations of decreased federal and state funding [are] fairly traceable to population counts reported in the decennial census.'" *Id.* at 558 (quoting *Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) (citing cases)).

In *Kravitz*, Judge Hazel concluded that the plaintiffs "pleaded that their alleged injuries are 'fairly traceable' to the Census Bureau's conduct" by "plausibly plead[ing] that the addition of the

citizenship question to the 2020 Census will determinatively or coercively cause individuals to 'fail or refuse to respond.'" 336 F. Supp. 3d at 560.  He reasoned:

> [W]hile it is true that if an undercount occurs it will occur only because private individuals choose not to respond to the census surveys, Plaintiffs have plausibly alleged that the citizenship question will have a "determinative or coercive effect" on those individuals' decision not to respond. Plaintiffs cite statements by former Census Bureau officials indicating that the citizenship question may cause the Census Bureau to be "perceived as an enforcement agency" which would cause respondents to "misunderstand or mistrust the census and fail or refuse to respond." Plaintiffs allege that the Census Bureau's own internal findings revealed that, in response to citizenship questions, respondents were more likely to fail to respond or falsify responses.

*Id.* (citations to complaint omitted).  And, in *La Unión del Pueblo Entero v. Ross* ("*LUPE*"), he concluded:

> Just as the *Kravitz* plaintiffs plausibly alleged standing's causation element by pleading that the citizenship question would have a coercive effect on individuals' decisions not to respond to the Census, the Plaintiffs here have plausibly alleged that a disproportionate undercount would be "fairly traceable" to the addition of a citizenship question. Although it is true that for an undercount to occur, private individuals would have to choose not to respond to the Census, Plaintiffs allege that government action will directly cause through "coercive effect" those individuals to refuse to answer.

No. GJH-18-1570, --- F. Supp. 3d ----, 2018 WL 5885528, at *5 (D. Md. Nov. 9, 2018) (citing *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013)).

Here, Plaintiffs allege that, as a result of underfunding, Defendants have canceled field tests and have not hired enough "partnership specialists" to "test its novel digitization strategy in rural areas that are most susceptible to undercounting." Am. Compl. ¶¶ 44–46.  They also allege more broadly that Defendants have not "hir[ed] staff necessary to ensure an 'actual enumeration' in 2020."  *Id.* ¶ 59.  And, they allege that the "reduced . . . number of area offices and workers" and reduced number of "in-person visit[s] to each household" will result in reliance on "State

administrative data" that "is often unreliable and of poor quality," as well as "inconsistent" across states, and "will lead to an even higher undercount" of "minority and low-income" individuals, young children, and undocumented individuals. *Id*. ¶¶ 85–93. Moreover, the alleged underfunding leaves the Bureau unable to remedy the purported staffing deficiencies. Thus, as in *LUPE* and *Kravitz*, Plaintiffs have satisfied the causation requirement by alleging that the undercount will be "'produced by [the] determinative or coercive effect' of the defendants' conduct 'upon the action of someone else.'" *Kravitz*, 336 F. Supp. 3d at 558. Therefore, they "have plausibly alleged that a disproportionate undercount would be 'fairly traceable' to" Defendants' plans for conducting the 2020 Census, including understaffing and underfunding. *See LUPE*, 2018 WL 5885528, at *5; *Kravitz*, 336 F. Supp. 3d at 560.

<u>Redressability</u>

A plaintiff's allegations satisfy the redressability prong if it is "likely, and not merely speculative, that a favorable decision will remedy the injury." *Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). When, as here, the decision sought includes a request for a declaratory judgment, there must be "a substantial controversy, between parties having adverse legal interest[s], of sufficient immediacy and reality" that the court's declaration of the parties' rights and/or obligations can remedy the injury. *Icarom, PLC v. Howard Cty., Md.*, 904 F. Supp. 454, 457 (D. Md. 1995) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *see also* 28 U.S.C. § 2201(a) (providing that, "[i]n a case of actual controversy within its jurisdiction," with exceptions not relevant here, this Court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought"). The controversy must be "definite and concrete, touching the legal relations of the parties having adverse legal

interest." *Icarom*, 904 F. Supp. at 457 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)).  For example, in insurance litigation, where declaratory judgments are common, an actual controversy exists when there is a "dispute [that] relates to legal rights and obligations arising from the contracts of insurance."  *Aetna*, 300 U.S. at 242; *see also Hanover Ins. Co. v. Engineered Sys. All., LLC*, No. TDC-15-0112, 2015 WL 8538481, at *2 (D. Md. Dec. 10, 2015) ("[A]n actual controversy exists between an insurer and an insured when the insurer seeks a declaratory judgment on its contractual duty to defend and indemnify the insured in a tort suit," even if the tort suit "has yet to be decided.").  Simply put, Plaintiffs will have standing if there is a declaration that the Court can make regarding Defendants' obligations under the Enumeration Clause that likely will remedy Plaintiffs' injuries.  Notably, the Supreme Court has observed that it is "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination."  *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).

Defendants argue that a declaratory judgment will not redress Plaintiffs' alleged injuries, because the Court cannot appropriate funds, nominate and confirm senior Census Bureau executives, or hire subordinate ones.[18]  Neither would a declaration that Defendants are legally

---

[18] Previously, in cases in which this Court found that the plaintiffs who brought legal challenges to the 2020 Census had standing, the defendants did not dispute redressability.  *See LUPE*, 2018 WL 5885528, at *5 ("[T]he parties do not dispute that the alleged injury—a disproportionate undercount—will be redressed by a decision enjoining the use of the citizenship question on the 2020 Census."); *Kravitz*, 336 F. Supp. 3d at 560 n.10 ("The Government does not dispute that Plaintiffs' alleged injury can be sufficiently redressed by a favorable decision here. Previous census cases have typically found that this prong of the standing requirement is met in such challenges because a 'permanent injunction against the proposed [change in the census] will redress the alleged injury.'" (quoting *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 332 (1999))).  And, in *California* and *City of San Jose*, the defendants argued that the plaintiffs

obligated to conduct an actual enumeration of the population in 2020 redress the injuries that Plaintiffs assert, because the Constitution and the Census Act already require Defendants to do so, and they agree that they must.  All true, of course, and the Plaintiffs do not claim otherwise.  *See* Pls.' Opp'n 22 n.9 (clarifying that they "have not requested that this Court appoint a Census Director or appropriate funds").

But Defendants put too sharp a point on their redressability argument.  No, the Court cannot order Congress to adequately fund the 2020 Census, the President to appoint senior census officials, or the Secretary to hire sufficient qualified persons to plan and execute it.[19]  But the Court

---

"fail[ed] to meet their burden to allege concrete injury-in-fact" and that "plaintiffs' alleged injuries [could] not be fairly traced to government action," but defendants did not raise redressability, such that the issue was not before the California federal court either.  Slip op. at 9.  Likewise, in *New York*, 315 F. Supp. 3d at 781, the defendants "contend[ed] that Plaintiffs fail[ed] to establish that they have been injured in fact and that any injury is traceable to the challenged conduct," without raising redressability, so that the issue also was not before the New York federal court when it considered the defendants' motion to dismiss.  Even though "Defendants ma[d]e no argument whatsoever concerning redressability" in *New York*, the court addressed the issue in its opinion following the bench trial.  *New York v. U.S. Dep't of Commerce*, Nos. 18-2921 (JMF) & 18-5025 (JMF), --- F. Supp. 3d ----, 2019 WL 190285, at *87 (S.D.N.Y. Jan. 15, 2019) ("[G]iven the Court's findings of fact and conclusions of law, it follows that Plaintiffs have proved that their injuries are 'likely' to 'be redressed by a favorable decision.' *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (internal quotation marks omitted). That is, if Secretary Ross's decision to add a citizenship question to the 2020 census is set aside or enjoined, as Plaintiffs request in these cases and as the Court concludes it must be, it is likely that its effects on the net differential undercount will be mitigated to the point of relieving Plaintiffs' injuries. . . . [A]lthough the data generated by the 2020 census may still be less than perfect (no census is perfect, after all), and the resulting political apportionment and funding allocations may not be accurate to the seat or dollar, Plaintiffs have proved that their injuries specifically caused by the citizenship question will be mitigated, if not wholly remedied, by its removal.").

[19] *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."); *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) ("[T]he straightforward and explicit command of the Appropriations Clause[] '[is] simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937))); *see also* 13 U.S.C. § 21(a)(1) ("The Bureau shall be headed by a Director of the Census, *appointed by the President, by and with the advice and consent of the Senate . . . .*" (emphasis added)); 13 U.S.C. § 23(a) ("*The Secretary may establish*, at rates of compensation to be fixed by him . . . , as many

*can* declare that Congress and the President have failed to agree upon and finalize legislation to provide the funding actually needed to conduct the census in 2020—when the Secretary is constitutionally obligated to do so.  Following expedited discovery, Plaintiffs may be able to show by admissible evidence that the currently appropriated funds are insufficient to conduct the 2020 census (after all, the Census Bureau already has gone on record to project the funds that it will need to complete the 2020 Census,[20] and it will not require Napoleonic insight to determine whether the current appropriations meet the Secretary's estimated needs).  If they make that showing, then a declaration by the Court that there are insufficient funds to conduct the 2020 Census within the time mandated by the Constitution can meet the redressability requirement needed to show standing to proceed with the claims of inadequate funding raised in this suit.  *See Franklin*, 505 U.S. at 803 ("For purposes of establishing standing, however, we need not decide whether injunctive relief . . . was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone. The Secretary certainly has an interest in defending her policy determinations concerning the census; even though she cannot herself change the reapportionment, she has an interest in litigating its accuracy.  And, as the Solicitor General has not contended to the contrary, we may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative

---

temporary positions as may be necessary to meet the requirements of the work provided for by law." (emphasis added)); *Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 185 (D.C. Cir. 1992) ("Congress has 'absolute control of the moneys of the United States.' The Appropriations Clause of the Constitution vests Congress with exclusive power over the federal purse . . . ." (quoting *Harrington v. Bush,* 553 F.2d 190, 194 n.7 (D.C. Cir. 1977) (citation and internal quotation marks omitted))).

[20] *See* Pls.' Opp'n 4–5 ("Although, on March 23, 2018, President Trump signed an omnibus spending bill allocating $2.814 billion to the Census Bureau, the bill funds the government only through September 2018. . . .The Commerce Department has acknowledged the severity of underfunding; in October 2017, Defendant Secretary Ross told Congress that the lifecycle cost of the 2020 Census would be $3.3 billion above the Commerce Department's original estimate." (citing Am. Compl.)).

interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." (internal citations omitted)); *accord Utah v. Evans*, 536 U.S. 452, 460, 464 (2002) (citing *Franklin* as authority for rejecting standing challenge; concluding that, under the circumstances of the case before it, "it would seem, as in *Franklin*, 'substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision . . .'"). And, if the Bureau's finalized plans for the 2020 Census prove to be as deficient as Plaintiffs expect, and Plaintiffs' challenges to the methods and means selected by the Secretary to conduct the census are reinstated, the Court will be able to offer further declaratory or injunctive relief.

In Defendants' minds, such a narrow judicial declaration regarding funding still would fall short of meeting the redressability standard (i.e., that it is likely, not speculative, that the injury Plaintiffs allege can be redressed by a favorable court decision, *Lujan v. Defs. of the Wildlife*, 504 U.S. 555, 560–61 (1992)). While it remains to be seen just how the Secretary, Congress and the President would react to a judicial declaration that the 2020 Census cannot be accomplished within the time required by the Constitution and the Census Act because of a lack of funding, thereby necessitating immediate additional funding (assuming the Plaintiffs can prove this), the Supreme Court has expressed its confidence that they are likely to follow such a declaration, even if they are not bound by it. *See Utah*, 536 U.S. at 460; *Franklin*, 505 U.S. at 803. Moreover, given the daily front-page news regarding the recent acrimonious partial government shutdown, which may yet re-emerge, phoenix-like, in the event that the three-week hiatus fails to result in more

permanent funding,[21] it seems that it is at least as speculative, if not more, to believe that sufficient funds will be appropriated in time to allow proper preparations for the 2020 Census than to believe that they will not.  Meanwhile, the April 1, 2020 enumeration date keeps drawing closer, and the allegations in the Amended Complaint make it clear that quite a lot remains to be done before the Census Bureau will be ready to conduct the 2020 decennial census within the time the Constitution and Census Act require.  Thus, to the extent that Plaintiffs have alleged an Enumeration Clause violation because there are insufficient funds to conduct an "actual enumeration" in 2020, they have shown that Defendants' motion to dismiss should be denied, and Plaintiffs permitted expedited, focused discovery, to demonstrate at summary judgment or trial that their allegations have evidentiary support.

As for the exact contours of any declaratory relief this court might grant following an evidentiary hearing or trial, it is enough to say that some form of declaratory relief is likely to redress a proven shortfall in funding for the 2020 census, and it is unnecessary to predict exactly what it would be at this preliminary stage of the case.  *See Texas v. Mosbacher*, 783 F. Supp. 308, 317 (S.D. Tex. 1992) (stating that, on a motion to dismiss, the court did not need to "spell out what

---

[21] *See* Nicholas Fandos, Sheryl Gay Stolberg & Peter Baker, *Trump Signs Bill Reopening Government for 3 Weeks in Surprise Retreat From Wall*, N.Y. Times (Jan. 25, 2019), https://www.nytimes.com/2019/01/25/us/politics/trump-shutdown-deal.html; David Nath, *Furloughed Federal Workers Considering Career Change as Partial Government Shutdown Drags On*, Fox News (Jan. 24, 2019), https://www.foxnews.com/ politics/furloughed-federal-workers-consdiering-career-change-as-partial-government-shutdown-drags-on ("The partial government shutdown has now dragged on for over a month, and there's no end in sight . . . ."); Rachel Martin, *Still No End in Sight for the Longest Government Shutdown*, Nat'l Pub. Radio (Jan. 21, 2019) (interview with White House correspondent Scott Horsley), https://www.npr.org/2019/01/21/687096061/still-no-end-in-sight-for-the-longest-government-shutdown ("President Trump has offered what he calls a compromise plan to end the partial government shutdown now the longest in history.").

shape any relief will take, if any in fact is needed, . . . because there is no record before it which would allow it to venture such speculations").

*Political Question Doctrine*

Defendants also challenge Plaintiffs' claim as a non-justiciable political question. Pursuant to the political question doctrine, courts cannot "review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 561 (D. Md. 2018) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

> This is a "narrow exception" to judicial review. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012). Whether a case presents a non-justiciable political question depends on a number of factors, the most important of which are whether there exists a "textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)

*Kravitz*, 336 F. Supp. 3d at 561.

In the past five months, this Court has ruled twice that "the political question doctrine does not bar courts from considering whether or not the expansive authority granted by [the] Census Clause has been violated." *La Unión del Pueblo Entero v. Ross* ("*LUPE*"), No. GJH-18-1570, --- F. Supp. 3d ----, 2018 WL 5885528, at *5 (D. Md. Nov. 9, 2018) (citing *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 562–63 (D. Md. 2018)). In *Kravitz*, as in this case, *see* Defs.' Mem. 20, "Defendants contend[ed] that because the Clause allows Congress to conduct the census 'in such a Manner' as Congress directs, the method by which the census is conducted . . . is textually committed to Congress and therefore barred from judicial review." 336 F. Supp. 3d at 561. The Court rejected the defendants' "attempt to distinguish [prior cases finding census

52

challenges justiciable] by arguing that the Census Clause has two distinct prongs—an 'actual Enumeration' prong and a 'Manner' prong," ruling that "[w]hether or not Congress or the Census Bureau has violated their expansive breadth of authority is . . . a justiciable question."  *Id.* at 563.

Similarly, in *California v. Ross* & *City of San Jose v. Ross*, the court concluded that the political question doctrine did not preclude it from considering the plaintiffs' claims challenging the defendants' plan to include a citizenship question in the 2020 Census.  Nos. 18-1865-RS & 18-2279-RS, slip. op. 19 (N.D. Cal. Aug. 17, 2018), ECF No. 47-1.  There, also, the court observed that "Courts have routinely held that the Enumeration Clause does not textually commit exclusive, non-reviewable control over the census to Congress."  *Id.* at 18.  On that basis, it rejected the defendants' argument that "the command to conduct an 'actual enumeration' presents a judicially cognizable question that courts have routinely answered, while the latter command regarding the 'manner' of conducting the census presents a nonjusticiable political question reserved for Congress and be delegation, to the Secretary."  *Id.* at 17.  The viability of Defendants' argument is no different before me.  For the same reasons that my colleagues have explained, I conclude that the political question doctrine does not preclude my review of Plaintiffs' Enumeration Clause claim.  *See id.*; *LUPE*, 2018 WL 5885528, at *5; *Kravitz*, 336 F. Supp. 3d at 562–63.[22]

---

[22] Defendants rely on the decision of the U.S. District Court for the Northern District of Illinois in *Tucker v. U.S. Department of Commerce*, 135 F.R.D. 175, 181–82 (N.D. Ill. 1991), where the district court said that the census challenges were non-justiciable political questions.  Defs.' Supp. 5.  But, on appeal, the Seventh Circuit expressed its doubts about the political question doctrine and its applicability, noting that "[t]he scope, rationale, provenance, and legitimacy of the doctrine remain profoundly unclear," and concluding that, regardless, "[t]he accuracy of the decennial census is not [a political] question."  *Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1415 (7th Cir. 1992) (Posner, J.).

**<u>Failure to State a Claim</u>**

"The Constitution requires that the Census be conducted in a manner that bears 'a reasonable relationship to the accomplishment of an actual enumeration of the population,' while keeping in mind the enumeration's other constitutional purposes (i.e. apportionment and equal protection)." *LUPE*, 2018 WL 5885528, at *7 (quoting *Wisconsin v. City of New York,* 517 U.S. 1, 20 (1996)).  And, "[a]lthough the Census Clause does not require the Census Bureau to achieve perfect accuracy, it does require that a preference be given for 'distributive accuracy (even at the expense of some numerical accuracy).'" *Id.* (quoting *Wisconsin*, 517 U.S. at 20).

To state a claim for violation of the Enumeration Clause, Plaintiffs must allege that Defendants' preparations (or lack thereof) for the 2020 Census "unreasonably compromise[] the distributive accuracy of the census." *Id.*; *see also Kravitz*, 336 F. Supp. 3d at 565.  In *LUPE* and *Kravitz*, the plaintiffs alleged that "the citizenship question will reduce participation and depress response rates among the Undercount Groups, resulting in a disproportionate undercount that adversely affects Plaintiffs' congressional apportionment, intra-state representation, and access to federally-funded programs."  *LUPE*, 2018 WL 5885528, at *7; *see Kravitz*, 336 F. Supp. 3d at 565.  This Court concluded in both cases that the plaintiffs sufficiently "alleged that the citizenship question unreasonably compromises the distributive accuracy of the census."  *LUPE*, 2018 WL 5885528, at *7; *see Kravitz*, 336 F. Supp. 3d at 565.  Likewise, here, as discussed in detail above with regard to Plaintiffs' allegations of injury in fact, Plaintiffs allege that Defendants' lack of funding for the 2020 Census will exacerbate the undercount Prince George's County historically experiences, resulting in a "loss of federal funding" and "the risk of Maryland losing seats in Congress," which "would deprive Prince George's County residents of fair and equal representation."  Am. Compl. ¶¶ 85–104, 108, 110, 113.  Thus, they have alleged sufficiently that

proceeding as Defendants are with the 2020 Census will "unreasonably compromise[] the distributive accuracy of the census," thereby stating a claim for violation of the Enumeration Clause. *See LUPE*, 2018 WL 5885528, at \*7; *Kravitz*, 336 F. Supp. 3d at 565.

## <u>ORDER</u>

Accordingly, it is, this <u>29th</u> day of <u>January</u>, <u>2019</u>, hereby ORDERED that

1. Defendants' Motion to Dismiss, ECF No. 43, IS GRANTED IN PART AND DENIED IN PART as follows:

    a. The claims against President Donald J. Trump are DISMISSED by consent;

    b. Defendants' Motion IS DENIED as to Plaintiffs' Enumeration Clause claim for declaratory relief, based on Defendants' lack of funding for the 2020 Census;

    c. Defendants' Motion to Dismiss otherwise IS GRANTED, without prejudice to the reinstatement of the dismissed claims upon a showing that they are ripe; and

    d. The Court will contact counsel to discuss a schedule to conduct focused, targeted discovery on the funding challenge, as well as for further proceedings consistent with this Memorandum Opinion and Order.


_____/S/_____
Paul W. Grimm
United States District Judge


lyb