IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE * 
ADVANCEMENT OF COLORED
PEOPLE, *et al.*, *

    Plaintiffs, *    Civil No. PWG-18-891

v. *

BUREAU OF THE CENSUS, *et al.*, *

    Defendants.
                              *    *    *    *    *    *

**MEMORANDUM OPINION AND ORDER**

This Memorandum Opinion and Order addresses the privilege claims that Defendants have asserted in connection with Plaintiffs' document production requests.[1] The Court has considered the parties' arguments and evidentiary submissions, which are contained in ECF Nos. 87, 88, 127, and 130, and concludes that no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the Court finds that Defendants' privilege assertions are without merit. Defendants will be required to produce the withheld documents to Plaintiffs.

Previously, the Court entered a Memorandum Opinion and Order (ECF No. 64) granting in part and denying in part Defendants' motion to dismiss. Thereafter, the Court permitted the parties to proceed with discovery. (*See* ECF Nos. 85 & 89.) At the Court's invitation, the parties submitted brief letters explaining their respective positions regarding certain documents (the "Spreadsheets") that Defendants had withheld from production to the Plaintiffs based on the deliberative process privilege. (ECF Nos. 87 & 88.) Later, after consulting with the parties, the

---

[1] On May 13, 2019, Judge Grimm referred this case to me for all discovery matters. (ECF No. 107.)

Court directed the parties to submit two-page letters further refining their positions on the privilege issues. The Court also directed the Defendants to file their privilege log and any evidentiary support necessary to sustain their assertion of privilege. (ECF No. 125 at 2-3.) Finally, the Court directed Defendants to transmit to chambers a copy of the Spreadsheets to allow for *in camera* review if necessary. (*Id.*) The parties' two-page letters are filed at ECF Nos. 127 and 130.

The parties largely agree on the scope of the deliberative process privilege. This privilege "is designed to protect the quality of administrative decisionmaking by ensuring that it is not done 'in a fishbowl.'" *City of Virginia Beach, Va. v. U.S. Dept. of Commerce*, 995 F.2d 1247 (4th Cir. 1993) (quoting *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87 (1973)). The privilege "encourages free-ranging discussion of alternatives; prevents public confusion that might result from the premature release of such nonbinding deliberations; and insulates against the chilling effect likely were officials to be judged not on the basis of their final decisions but for matters they considered before making up their minds." *Id.* (internal quotation marks omitted). It is thought that the privilege helps to ensure that a decisionmaker receives "the unimpeded *advice* of his associates." *Florida House of Representatives v. U.S. Dep't of Commerce*, 961 F.2d 941, 947 (11th Cir. 1992) (emphasis in original) (citing *Federal Open Mkt. Comm. v. Merrill*, 443 U.S. 340 (1979)). It does so by providing "assur[ance] that subordinates within an agency will feel free to provide the decisionmakers with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

"To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment*." *Ethyl Corp v. U.S. E.P.A.*, 25 F.3d 1241, 1248 (4th Cir. 1994) (emphasis in original) (quoting *Petroleum Info. Corp. v. United States Dep't of*

*Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)). To qualify for withholding under the deliberative process privilege, a document must be both "predecisional" and "deliberative." *Petroleum Info. Corp.*, 976 F.2d at 1434. A document is predecisional if it was "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Id.* (quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975)). A document is "deliberative" if it "reflects the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes." *Id.* (internal quotation marks omitted). Deliberative material reveals "the manner in which the agency evaluates possible alternative policies or outcomes." *City of Virginia Beach*, 995 F.2d at 1253; *see also Solers, Inc. v. Internal Revenue Serv.*, 827 F.3d 323, 329 (4th Cir. 2016).

In determining whether a document is protected by the deliberative process privilege, courts consider whether the disclosure of that document would be likely to undermine the purposes of the privilege. *Coastal States*, 617 F.2d at 866. Where the contents of a document are "so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency," the document is likely to be privileged. *Id.* "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)). Conversely, "[c]ourts have typically required disclosure of purely factual material, presumably because the prospect of disclosure is less likely to make an advisor omit or fudge raw facts, while it is quite likely to have such an effect on materials reflecting deliberative or policy-making processes." *Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) (internal citations and quotation marks omitted). There are other characteristics that tend to be held by privileged documents. Documents that provide

3

recommendations or alternative suggestions, or which "weigh[] the pros and cons of agency adoption of one viewpoint or another" are likely to be privileged. *Id.* But if the suggestion contained in a document "is adopted, formally or informally, as the agency position on an issue," or if it is "used by the agency in its dealings with the public," the document may lose its privileged status. *Id.*

Given the importance that the context of a document's creation plays in determining whether it is protected by the deliberative process privilege, and the somewhat circular test used for determining whether a document is privileged, prior cases "are of limited help . . . because the deliberative process privilege is so" fact-specific. *Id.* at 867. Nonetheless, an examination of other cases illustrates how courts have analyzed the privilege under similar circumstances.

In *Coastal States*, the D.C. Circuit considered whether memoranda from regional counsel within the Department of Energy were protected from disclosure by the deliberative process privilege.[2] 617 F.2d at 858. The memoranda at issue were sent by regional counsel to auditors working in the agency's field offices. They were transmitted "in response to requests for interpretations of regulations within the context of particular facts encountered while conducting an audit of a firm." *Id*. While recognizing that the memoranda bore certain hallmarks common to documents protected by the deliberative process privilege, the court focused on the lack of anything "subjective or personal about the memoranda." *Id.* at 868. The court succinctly explained its analysis of the memoranda:

> The documents do not contain subjective, personal thoughts on a subject, so public knowledge of the documents will not subject the writer either to ridicule or criticism. Nor do they discuss the wisdom or merits of a particular agency policy,

---

[2] Like most of the cases that discuss the deliberative process privilege, *Coastal States* involved the issue of whether the documents were exempt from disclosure under the Freedom of Information Act ("FOIA") because of the deliberative process privilege.

> or recommend new agency policy, raising the possibility that their disclosure would mislead the public; rather they simply explain and apply established policy.

*Id.* at 869. Responding to the agency's argument that its regional attorneys would be less candid in the future if the memoranda were disclosed, the court stated that it was "unable to find [in any of the memoranda] any statement which could be described as 'candid.'" *Id.* The court saw "no possibility whatsoever that an attorney performing this job would be less 'frank' or 'honest' if he or she knew that the document might be made known to the public." *Id.* This is because "there is little to be frank or honest about when explaining what date a transaction occurs under [the regulations] or whether [the regulations] permit[] a buyer and seller to agree to a price higher than that set by the agency." *Id.* The contents of the memoranda were not purely "factual," but their inclusion of legal opinions and advice did not grant them protection under the deliberative process privilege. To arrive at this conclusion, the court focused on the likely consequence of disclosure. The court concluded that because disclosure of the memoranda would be unlikely to cause any scandal or embarrassment, their protection under the deliberative process privilege would not promote the purpose and policy of that privilege.

In *Quarles*, the D.C. Circuit considered whether certain cost estimates were protected from disclosure by the deliberative process privilege. 893 F.2d at 390. The cost estimates were "prepared by Navy officials in the course of the Navy's selecting homeports for ships in a new battleship group." *Id.* at 391. The court noted that typically "the fact/opinion distinction offers a quick, clear, and predictable rule of decision for most cases" involving the deliberative process privilege. *Id.* at 392 (internal quotation marks omitted). While opinions are protected by the privilege, facts are not. Still, not everything that appears to be a fact can be characterized that way in the context of the deliberative process privilege. For instance, although "[n]umbers have a surface precision that may lead the unsophisticated to think of them as fixed," they are sometimes derived "from a

complex set of judgments" and "partake of just that elasticity that has persuaded courts to provide shelter for opinions generally." *Id.* at 393. The court affirmed the district court's finding that disclosure of the cost estimates "would likely make future researchers highly reluctant to express their candid opinions, particularly where such opinions may later prove controversial." *Id.* (internal quotation marks omitted). The court explained:

> If a study team found significant potential savings in deploying the battleship group at a finalist port otherwise deemed satisfactory, disclosure of the finding surely would tend to undermine the acceptability — among taxpayers — of forsaking that option. Yet the Navy might have reasons for rejecting the seemingly cheaper option, perhaps strategic, perhaps political. Anticipating this scenario, high officials might be inclined either not to call for cost estimates, or to call only for fuzzy ones expressed as wide ranges. The increased tendency to fudge would increase the sloppiness (or decrease the precision) of government decisionmaking. In an ideal world not only officials but also the public would receive such analyses. But the deliberative process exemption rests on the premise that if both (nominally) can get them, neither will: too many analyses will be stillborn or wishy-washy.

*Id.* (internal citations omitted).

In *Petroleum Info. Corp.,* the D.C. Circuit rejected the Bureau of Land Management's withholding under the deliberative process privilege of a computer database comprised of information about public lands drawn exclusively from publicly available documents. 976 F.2d at 1436. The purpose of the database was to consolidate records from a variety of sources so that the information would ultimately be available to the public in one place. *Id.* at 1432. The creation of this database was an "essentially technical and facilitative" task "to organize public records in a more manageable form, and to correct any error [found] in the process." *Id.* at 1437. At the time that the FOIA request for the database was made, the database was still in draft format. The court found that the database was not protected by the deliberative process privilege because the information was largely already publicly available and because the estimates and error corrections it contained (which were not publicly available at the time) were not associated with any

6

"significant *policy* decision." *Id.* at 1437 (emphasis in original). The court distinguished the discretionary tasks associated with creating the database from the "political concerns implicated in locating military bases that figured in *Quarles*, . . ., or the interpretation of 'complex and controversial events' critical to the rewriting of official histories.'" *Id.* (quoting *Russell v. Department of the Air Force*, 682 F.2d 1045 (D.C. Cir. 1982)).[3] Noting that even "mundane" tasks within an agency "could be said to reflect the exercise of agency discretion in some sense," the court explained that for documents to be protected by the deliberative process privilege, "the kind and scope of discretion involved must be of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future." *Id.* at 1436 n.8. The court concluded that the withheld database did not "involve the breadth of discretion, and the wide range of considerations, the many forecasts and 'judgment calls' involved in making the cost projections at issue in *Quarles*." *Id.* at 1438. Because the database did not reveal any "'candid or personal' decisions that, if revealed prematurely, would be likely to 'stifle honest and frank communication within the agency," *id.* at 1439 (quoting *Coastal States*, 617 F.2d at 86), the court concluded its disclosure would not implicate the concerns underlying the deliberative process privilege.

---

[3] In *Russell*, the court concluded that approximately 20 pages of a draft military history document were protected from disclosure by the deliberative process privilege. 682 F.2d at 1046. The court found that the document was the product of "creative debate and candid consideration of the alternatives," that the authors "assigned to draft interpretative histories of complex and controversial evens should be encouraged to provide the best, most honest, and scholarly products they are capable of producing," and that disclosure of the draft document could stifle future authors' willingness to be candid and instead make them "more inclined to draft what they perceive the 'official line' to be." 682 F.2d at 1048. In addition, after conducting an *in camera* review, the court found that disclosure of the withheld draft would "reveal what material supplied by subordinates senior officials judged appropriate for the history and what material they judged inappropriate." *Id.* at 1049.

*Petroleum Info. Corp.* cites two cases that address the deliberative process privilege in connection with documents related to the 1990 census. 976 F.2d at 1429 n.12. In *Assembly of California v. Dep't of Commerce*, 968 F2d 916 (9th Cir. 1992), the Ninth Circuit held that the disclosure of certain computer tapes containing statistically adjusted figures for the 1990 census would "reveal nothing about the [agency's] deliberative process" or expose "the most sensitive decision the Secretary had to make" regarding which set of figures would be adopted as the official United States census. *Id.* at 922. Considering where the statistically adjusted figures fell "along the continuum of deliberation and fact," the court concluded that the figures "fell closer to fact and would not reveal the agency's protectable thought processes." *Id.* The Eleventh Circuit reached the opposite conclusion in *Florida House of Representatives v. Department of Commerce*, 961 F.2d 941, 950 (11th Cir. 1992). The court stated that in reviewing a claim of deliberative process privilege, "[t]he only inquiry that should be made . . . is: Does the information reflect the give-and-take of the consultive [sic] process?" If the answer to the question is yes, the information reflects an agency's opinion (as opposed to a fact) and is "*per se* deliberative." *Id.* at 949. The court went on to state that it is improper to consider whether disclosure of the information would implicate the policies underlying the deliberative process privilege. Applying a strict "fact/opinion distinction," the court concluded that the statistically adjusted data at issue should be characterized as opinion. *Id.* at 950. This is because the information was created "as a proposal or a recommendation that eventually was rejected by the person in charge." *Id.* at 949.

Here, the Spreadsheets are not protected from disclosure by the deliberative process privilege. Although the Spreadsheets are predecisional, they are not deliberative because they do not "reflect the give-and-take of the consultative process." *Petroleum Info. Corp.*, 976 F.2d at 1434. Without express guidance from the Fourth Circuit, the Court is not persuaded to adopt the

strict "fact/opinion distinction" employed by *Florida House of Representatives*, 961 F.2d at 950. *See Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537-38 (D.C. Cir. 1993) (noting that "the fact/opinion test, while offering 'a quick, clear, and predictable rule of decision,' is not infallible and must not be applied mechanically"). Applying this approach would permit the Executive Branch to assert the deliberative process privilege for "[e]ven the most mundane material" that reflected the exercise of agency discretion, including information about "the typeface an official favors." *Petroleum Info. Corp.*, 976 F.2d at 1436 n.8. The purpose of the deliberative process privilege is not to protect the mundane, but rather to protect the disclosure of information related to the exercise of discretion that is "of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future." *Id.* "[T]he privilege serves to protect the deliberative process itself, not merely documents containing deliberative material." *Mapother*, 3 F.3d at 1537.

Indeed, the Spreadsheets contain calculations and formulas created by the Census Bureau for the Executive Branch to use in documenting the lifecycle cost estimate for the decennial census, which assists the Executive Branch in making its budget request for the census to the Legislative Branch. (ECF No. 127 at 1.) The calculations and formulas contained in the Spreadsheets result in the "detailed cost outputs in the [Basis of Estimate ("BOE")]." (*Id.*) The Spreadsheets "reflect a simplified representation of the model that is used to turn the detailed input assumptions already in the BOE to the detailed cost outputs reflected in the BOE." (*Id.* at 7.) They contain information that is both factual and information that is the result of estimation and the exercise of agency discretion.[4] But none of the information contained within the Spreadsheets is of a nature that its

---

[4] To the extent that the Spreadsheets contain "factual" information, it cannot reasonably be separated from the information that might be deemed to be "opinion."

9

disclosure would implicate the policies underlying the deliberative process privilege. Because disclosure of the Spreadsheets is not likely to chill future Census Bureau cost estimators from doing their jobs, the Spreadsheets are not protected from disclosure by the deliberative process privilege.

The Spreadsheets do not contain any information that is "candid or personal." They do not contain any proposed alternatives or any suggestions about which choice among alternatives should be adopted. The Spreadsheets do not "weigh the pros and cons" of adopting various estimates. *See Quarles*, 893 F.2d at 392. Instead, they contain complex calculations and numerical estimates. No authors are identified within the Spreadsheets. The Court cannot fathom how disclosure of the Spreadsheets might ever embarrass someone, cause someone in the future to be less than candid in their professional cost estimations, or result in an Executive Branch official purposefully calling only for "fuzzy" estimates expressed in wide ranges. *See Quarles*, 893 F.2d at 393.

In support of their assertion of the privilege, Defendants have submitted the Declaration of Benjamin K. Taylor ("Mr. Taylor"), the Chief of the Decennial Budget Office of the Census Bureau. (ECF No. 127 at 5-9.) Mr. Taylor states that "[t]o allow the [Spreadsheets] to leave the Executive Branch would severely chill the cost estimation and budgetary decision-making processes." (*Id.* at 7.) Mr. Taylor suggests that if the individuals making the judgments and calculations involved in the budget estimation knew that their decisions would be disclosed outside the Executive Branch, their activities would be chilled in two ways. (*Id.* at 7-8.) First, the number of estimates requested might be reduced or eliminated. (*Id.*) Second, if estimates were still requested, they might be requested as only "simplified and broad concepts," which would "significantly hurt the maturity and accuracy of the final product." (*Id.*) Mr. Taylor suggests that

this chilling effect of disclosure is likely because if senior decision-makers must learn and "be[] held to every detailed equation employed by cost estimators," it would be imprudent for them to continue to seek such detailed estimates. (*Id.*)

Mr. Taylor goes on to speculate that disclosure of the Spreadsheets would "allow for widespread second-guessing on each and every technical decision leading to finalized cost estimates." (*Id.* at 8.) Unlike the finalized cost estimates, which Mr. Taylor agrees should be subject to public debate, "[e]xposing the internal agency cost estimation minutia would only chill agency deliberations." (*Id.*) In addition, disclosure of the intermediate budgetary estimates "would not yield fertile ground" for criticizing the estimates because the calculations are "so complex and interwoven that no outsider and few insiders could properly utilize them to glean any useful information not already included in the BOE." (*Id.* at 8.)

The Court has carefully reviewed the Spreadsheets *in camera* and is unable to find any statement contained in them that could be described as "candid." As Mr. Taylor states, the Spreadsheets contain numerous calculations that appear to be highly technical. Many of the calculations, if not all of them, relate to purely mundane budget-related matters: how the cost of health insurance for certain employees is estimated; how the cost of postage is estimated; and how the cost of office space is estimated. Presumably, these estimates are already included in the BOE (which Plaintiffs already have) but the Spreadsheets provide additional information about how the estimates were calculated.[5] Mr. Taylor acknowledges that the calculations contained in the Spreadsheets are so complex that it would be difficult to "glean any useful information" from them that is not already included in the BOE. If this is indeed the case, it is not clear why disclosure of the Spreadsheets would cause such a chilling effect within the Executive Branch.

---

[5] The Court has not examined a copy of the 2019 BOE.

11

The cost estimates in this case are different from those in *Quarles*. There, the court had no difficulty zeroing in on a potential chilling effect of disclosure. If a cost estimate indicated that one port was the least expensive, but that port was not chosen, someone outside the agency might protest that tax dollars were being wasted. All the while, there might have been perfectly good reasons (perhaps political or strategic) to choose a more expensive port, and a good reason to keep the rationale for the decision confidential. But here, the cost estimates contained in the Spreadsheet are not presented as competing alternatives. The Spreadsheets do not reveal the cost of one approach compared to another approach. They simply indicate what certain parts of the 2020 Census are estimated to cost. To the extent that these cost estimates may prove to be controversial, they are certainly no more controversial than the final cost estimates contained in the BOE. And because the Spreadsheets are so technical and lacking in the sort of "frank" and "candid" comments that might be embarrassing if revealed to the public, the Court is not persuaded that any future career cost estimator or other official in the Executive Branch would be chilled from seeking or providing detailed cost estimates. The cost estimates and calculations contained in the Spreadsheets may be deliberative in the most technical sense, but they do not involve "the kind and scope of discretion . . . of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future." *See Petroleum Info. Corp.*, 976 F.2d at 1436 n.8. Defendants have not met their burden in demonstrating that the Spreadsheets are protected by the deliberative process privilege. Defendants will be required to produce the Spreadsheets to Plaintiffs.

In the alternative, even assuming that the Spreadsheets are protected by the deliberative process privilege (either because they are per se deliberative, *see Florida House of Representatives*, 961 F.2d at 949, or because disclosure might stifle agency deliberations in the

future, *see Mapother*, 3 F.3d at 1537), Plaintiffs have demonstrated a compelling need for disclosure that overcomes the privilege. "When a party . . . seeks agency materials, the validity of the [deliberative process] privilege 'depends . . . upon a balancing of the public interest in nondisclosure with the need for the information as evidence.'" *Cipollone v. Liggett Grp. Inc.*, Nos. 86-1198, 86-1223, 1987 WL 36515, at *2 (4th Cir. Feb. 13, 1987) (per curiam) (quoting *Dowd v. Calabrese*, 101 F.R.D. 427, 431 (D.D.C. 1984)). "In striking this balance," courts consider a number of factors, "including: (1) the relevance of the evidence to the lawsuit; (2) the availability of alternative evidence on the same matters; (3) the government's role (if any) in the litigation, and (4) "the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.* (quoting *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)). *Id.* On balance, these factors weigh in favor of disclosure of the Spreadsheets to the Plaintiffs and against the Defendants' privilege assertion.

First, the calculations contained in the Spreadsheets are relevant to this lawsuit. The scope of discovery under Rule 26 is broad. "[T]he question whether a given document should be produced in discovery is quite different from the question whether that document would be admissible at trial." *Harrison v. Shanahan*, No. LMB-18-641, 2019 WL 2216474, at *7 n.17 (E.D. Va. May 22, 2019) (discussing relevance in the context of the discovery of purportedly privileged documents). Information about the estimated cost of the 2020 Census is relevant to Plaintiffs' funding claim under Rule 26. This factor weighs in favor of disclosure.

Second, there are no viable alternative sources of evidence on the same matters. As Mr. Taylor states, the Spreadsheets contain complex and technical calculations, but they are themselves "a simplified representation of the model that is used to turn the detailed input assumptions already in the BOE to the detailed cost outputs reflected in the BOE." (ECF No. 127 at 7.) Presumably,

any alternative source of evidence regarding the calculations contained in the Spreadsheets would be less "simplified" and perhaps more burdensome for Defendants to produce. The Court recognizes that Plaintiffs are in possession of the 2019 BOE, which takes into account the cost estimates set forth in the Spreadsheets. But the Court can reasonably assume that the 2019 BOE does not contain the same level of detail as the Spreadsheets. This factor weighs in favor of disclosure.

Frankly, the Court is not certain how the third factor, the government's role in the case, is to be considered. Defendants suggest that this factor weighs against disclosure because there is no evidence of the government's bad faith or misconduct. (ECF No. 127 at 2.) Defendants cite *Coal. For a Sustainable Delta v. Koch*, 2009 WL 3378974, at *9 (E.D. Cal. Oct. 15, 2009) in support of their argument. Other courts, however, have considered this factor to refer to whether the government is a party to a case. *See Murray Energy Corp. v. McCarthy*, 2016 WL 6902359 (N.D.W.V. July 20, 2016). Here, because Defendants are parties to this case, they have a more central role in the litigation than they would have had if they had received a subpoena as a non-party. This would weigh in favor of disclosure. The Court will give the Defendants the benefit of the doubt and assume that this factor weighs against disclosure because there is no evidence of their bad faith, and because Plaintiffs have presented only limited argument on this factor.

Regarding the fourth factor, it is difficult for the Court to imagine how disclosure of the Spreadsheets "would hinder frank and independent discussion regarding contemplated policies and decisions." *Cipollone*, 1987 WL 36515, at *2. The contents of the Spreadsheets and the implications of the calculations and estimates contained therein are not so sensitive that their disclosure might diminish the candor of agency deliberations in the future. For the sake of

argument, however, the Court will give this factor neutral weight and assume that disclosure could result in some diminishment in agency candor.

After carefully weighing the factors, the Court concludes that disclosure is warranted. Even if disclosure of the Spreadsheets will have a chilling effect, the information contained in the Spreadsheets is relevant to Plaintiffs claims. Production of the Spreadsheets is necessary because the same information is not readily available by any alternative source. The burden on Defendants to produce the Spreadsheets is minimal. Plaintiffs' need for the Spreadsheets in this case outweighs the public interest in nondisclosure.

## ORDER

For these reasons, Defendants' claims of privilege regarding the Spreadsheets are **OVERRULED**. Defendants shall produce the Spreadsheets to Plaintiffs (subject to any confidentiality designation under the confidentiality order (ECF No. 122) that is appropriate) by **July 23, 2019**.

<u>July 16, 2019</u>  
Date

/s/  
Timothy J. Sullivan  
United States Magistrate Judge