**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, | * * * |
| Plaintiffs, | * |
| v. | * Case No.: PWG-18-891 |
| BUREAU OF THE CENSUS, *et al.*, | * |
| Defendants. | * * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

On February 1, 2019, the Bureau of the Census ("Bureau") released Version 4.0 of its 2020 Census Operational Plan ("Final Operational Plan"). *2020 Census Operational Plan: A New Design for the 21st Century* (Version 4.0), U.S. Census Bureau (December 2018), https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management /planning-docs/operational-plan.html. Two weeks later, on February 15, 2019, Congress appropriated to the Bureau of the Census ("Bureau") $3,551,388,000 for the 2020 Census, ending the longest shutdown of the U.S. government in history. *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (Feb. 15, 2019) ("2019 Appropriations Act").

During the government shutdown and shortly before the Bureau released its Final Operational Plan, I had denied Defendants' motion to dismiss Plaintiffs' Enumeration Clause

claim for declaratory relief with regard to the funding of the 2020 Census.[1] *NAACP v. Bureau of Census*, 382 F. Supp. 3d 349, 356 (D. Md. 2019).  I concluded that sole claim was justiciable while granting the motion as to Plaintiffs' other Enumeration Clause claims challenging the Bureau's preparedness for the 2020 Census. *Id.*  Against the backdrop of an imminent lapse in funds to continue preparation for the 2020 Census (and a prolonged government shutdown, during which no further funds were forthcoming), I noted that it was "plausible that this Court could fashion declaratory relief that would make it likely that sufficient funds will be appropriated to enable the final planning and execution of the 2020 Census to take place," and I allowed for targeted discovery to determine whether an evidentiary basis existed for Plaintiffs' remaining claim.  *Id.*

Plaintiffs sought leave to amend the Amended Complaint to add Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, claims and allegations about recent factual developments, and I granted their request, while denying their request to reintroduce their dismissed Enumeration Clause claims. Feb. 28, 2019 Ltr. Order, ECF No. 76.  I also granted Defendants' request to file a motion to dismiss the funding claim as moot and the APA claims "for lack of agency action." *Id.* at 4.

Plaintiffs filed their Second Amended Complaint, ECF No. 91, and Defendants' Motion to Dismiss that pleading, ECF No. 95, now is fully briefed and ripe for resolution, ECF Nos. 95-1, 98, 108, 131, 132.  A hearing is not necessary.  *See* Loc. R. 105.6.  Because the 2019

---

[1] U.S. Const. art. I, § 2, cl. 3 ("Enumeration Clause" or "Census Clause").

Plaintiffs are the National Association for the Advancement of Colored People ("NAACP"); Prince George's County (the "County"); Prince George's County Maryland NAACP Branch (the "County NAACP"); Robert E. Ross, President of the County NAACP; and H. Elizabeth Johnson, County NAACP Executive Committee member.  Defendants are the Bureau of the Census (the "Bureau"); Steven Dillingham, Director of the Bureau; Wilbur Ross, Secretary of Commerce; and the United States of America.

Appropriations Act moots the funding claim, which no longer is justiciable, the Motion to Dismiss is granted as to that claim. And, because the Final Operational Plan is not final agency action reviewable under the APA, the Motion to Dismiss is granted as to the APA claims as well.

## **Standard of Review**

Defendants challenge this Court's subject matter jurisdiction based on their belief that the 2019 Appropriations Act moots Plaintiffs' remaining Enumerations Clause claim. They also argue the Court lacks authority to redress the injury that Plaintiffs allege the underfunding of the census will cause and, further, that the Final Operational Plan is not subject to judicial review because it was not a final agency action.[2] When a defendant moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, asserting a facial challenge that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," as Defendants do here, "the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a 12(b)(6) consideration." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that, on a motion to dismiss, a plaintiff's pleading of the elements of standing is "presum[ed] [to] embrace those specific facts that are necessary to support the claim" (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990))).

---

[2] Whether an agency's action "constituted final agency action under the APA so as to be reviewable in court" is "a question of subject matter jurisdiction." *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 458 (4th Cir. 2004). And, "[f]ederal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases and controversies." *Khan v. Citibank*, No. PX 16-3121, 2017 WL 2311185, at *2 (D. Md. May 26, 2017) (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)). While Defendants assert in their Motion that they also move to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, their Memorandum focuses solely on jurisdictional arguments.

Pursuant to Rule 12(b)(6), a plaintiff's claims are subject to dismissal if they "fail[ ] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Rule 12(b)(6)'s purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012) (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)).

Whether considering a Rule 12(b)(1) factual challenge or a Rule 12(b)(6) motion, the Court may take judicial notice of "fact[s] that [are] not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Additionally, the Court may "consider documents that are explicitly incorporated into the complaint by reference." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). The Final Operational Plan, which is available on the Bureau's website and which Plaintiffs cite to and quote from extensively in their Second Amended Complaint, *e.g.*, Sec. Am. Compl. 3, ¶¶ 32–33, 66–67, 70–71, 74, 76, 90–92, 107–09, 116, 132–33, 137, 147, 153, 157–60, falls into both of these categories. Likewise, I may consider the President's 2020 Census budget request for $3,551,388,000 for Fiscal Year ("FY") 2019, *see* App'x, Proposed Budget of the U.S. Gov't, FY 2019 at 184, https://www.whitehouse.gov/wp-content/uploads/2018/02/appendix-fy2019.pdf (cited at Defs.' Mem. 5 n.4), as well as the Bureau's 2020 Census budget request for $6.4 billion for FY 2020, presented to Congress in March

2019, *see* U.S. Census Bureau's Budget FY 2020, at 59, https://www.commerce.gov/sites/default/files/2019-03/fy2020_census_congressional_budget_justification_0.pdf (cited in Sec. Am. Compl. ¶ 57). *See* Fed. R. Evid. 201(b)(2).

Moreover, when a defendant attaches documents to its motion to dismiss that are "integral to the complaint and their authenticity is not disputed," the Court may consider those documents. *Sposato v. First Mariner Bank*, No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013); *see CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009). Defendants provide a link to the online version of the Final Operational Plan, Defs.' Mem. 4 n.1, and Plaintiffs provide the web address for it as well, Pls.' Opp'n 4 n.1; it is integral to Plaintiffs' pleading, and they do not challenge its authenticity. Accordingly, I may consider it on this basis also. *See Sposato*, 2013 WL 1308582, at *2.

## Enumerations Clause Claim for Underfunding

### *Mootness*

Article III of the Constitution limits the judicial power to "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted). The "case-or-controversy" requirement subsists through all stages of federal judicial proceedings. *Id.* Thus, an actual controversy must exist "at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks and citations omitted). A case becomes moot when the issues presented are "no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). To show that the case is moot, Defendants must meet a "heavy" burden by demonstrating that "'there is no reasonable expectation . . .' that the alleged violation will recur," and that "interim relief or

events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles*, 440 U.S. at 631 (citations omitted).

Defendants contend that Plaintiffs' underfunding claim is moot now that Congress has appropriated more than $3.5 billion to the Bureau, and they insist that my earlier Memorandum Opinion made clear that the underfunding claim only was viable in light of the government shutdown, which since has ended. Defs.' Mem. 4–5, 8.[3] Indeed, I previously observed the significance of the government shutdown's detrimental effects on the Bureau's funding, stating, *inter alia*:

> I can judicially notice that the Bureau endured a 35-day lapse in appropriations during the recent partial shutdown of the federal government. And, the Defendants' own estimates demonstrate that the short-term deal that ended the shutdown does not itself add any funding beyond (at the latest) April 2019. This ongoing state of uncertainty bolsters Plaintiffs' position that Defendants will be unprepared (in terms of funding, workforce, and testing) for the 2020 Census, while weakening Defendants' argument that their preparedness may change over the coming months, of which fewer than fifteen remain.

_____

[3] Plaintiffs filed a Notice of Supplemental Authority, ECF No. 131, drawing the Court's attention to the Supreme Court's recent decision in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), which they view as supporting their claims. In their response, Defendants rely on *Department of Commerce* to argue that the Enumeration Clause claim should be dismissed because "the Supreme Court definitively rejected the notion that each and every census-related decision must bear 'a reasonable relationship to the accomplishment of an actual enumeration' under the Enumeration Clause" and "squarely held that this standard applies only to 'decisions about the population count itself,'" which Defendants believe "ends this case." Defs.' Resp. 1, ECF No. 132. More accurately, the Supreme Court observed that its "cases applying [the reasonable relationship] standard concerned decisions about the population count itself," and "declined . . . to measure the constitutionality of the citizenship question by a standard that would seem to render every census since 1790 unconstitutional." 139 S. Ct. at 2566–67. It did not hold the standard *only* applied under the circumstances in which the Court had previously applied it. Further, the Supreme Court did not address the standard that would apply to the funding decision at issue in Plaintiffs' Enumeration Clause claim, a decision more closely related to "the population count itself" and how to achieve it than to ancillary decisions about what else to ask when counting the population.

*NAACP*, 382 F. Supp. 3d at 376. On that narrow ground, with the government shutdown and no appropriations bill in place, I concluded that Plaintiffs' underfunding claim was justiciable. *Id.* at 384. Plaintiffs insist that receipt of the current level of funding is not the same thing as having received sufficient funding to conduct an accurate enumeration of the population. Pls.' Opp'n 22.

Plainly, there has been a significant change in the facts relevant to Plaintiffs' underfunding claim, in that the Bureau now has funding in the amount of $3,551,388,000 through 2021. 2019 Appropriations Act. Given that the Bureau not only received funding, but received the exact amount requested for it in the President's budget request to Congress, *compare* 2019 Appropriations Act, *with* App'x, Proposed Budget of the U.S. Gov't, FY 2019, at 184, Defendants have established that "'there is no reasonable expectation . . .' that the [likely underfunding] will recur." *See County of Los Angeles*, 440 U.S. at 631. Further, the 2019 Appropriations Act and its grant of the entire funding request submitted by the Administration on behalf of the Bureau is "interim relief or events" that "completely and irrevocably eradicated the effects of the alleged violation." *See id.* Simply put, the Bureau now has the funding it previously lacked, and there is no likelihood that the funding will be revoked.

Moreover, given the change in circumstances, I must reassess the justiciability of Plaintiffs' underfunding claim to confirm that this Court still has jurisdiction, *see* Fed. R. Civ. P. 12(h)(3), focusing specifically on their standing to bring this claim and the political question doctrine, to determine whether an issue remains that the Court may decide. Each consideration raises overlapping issues of redressability.

### *Standing*

For standing, a plaintiff must have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," and it must be "likely,

as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399, 408 (D. Md. 2012) (quoting *Bishop v. Bartlett,* 575 F.3d 419, 423 (4th Cir. 2009)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (same).[4] An "imminent" injury is one that "is not too speculative," i.e., one that "is '*certainly impending.*'" *Lujan*, 504 U.S. at 564 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Imminent Injury

Previously, I concluded that Plaintiffs' injury was "not too speculative" to be "imminent" because no funding was projected beyond April 2019 at the time I issued the January 29, 2019 Memorandum Opinion and Order, and Plaintiffs could not later "undo the *likely* absence of funding." *See NAACP*, 382 F. Supp. 3d 349 at 376 (emphasis added) (citing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)). But now the shutdown has ended and the 2019 Appropriations Act passed, including $3,551,388,000 dedicated to the 2020 Census through 2021. Further, the amount appropriated for the 2020 Census for FY 2019 matched the President's request for the Bureau. *Compare* 2019 Appropriations Act, *with* App'x, Proposed Budget of the U.S. Gov't, FY 2019, at 184. Thus, this is not a situation where Congress appropriated less than requested, creating doubt about whether the agency could fulfill its responsibilities or making it possible or even likely that funding still was insufficient after the appropriation. Consequently, the absence of funding no longer is likely. Simply put, there is no absence of funding.

But, even if the current appropriation should prove to be less than required to complete the 2020 Census, Congress has the power to appropriate supplemental funds. *See* U.S. Const. art. I, § 9, cl. 7; *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 601 (2014) (noting Congress's ability to make

---

[4] The injury also must be "fairly traceable to the challenged action of the defendant." *Zaycer*, 896 F. Supp. 2d at 408 (quoting *Bishop,* 575 F.3d at 423).

a supplemental appropriation). Now that the Bureau has received all the funding requested on its behalf for FY 2019, there is nothing in the pleadings or the documents I have judicially noticed to suggest that it will not receive additional funding upon further request. Indeed, the Bureau in March 2019 presented its FY 2020 budget to Congress, including a proposed $6.4 billion for the 2020 Census. *See* U.S. Census Bureau's Budget FY 2020, at 59. Congress previously listened to the President's request for funding, and nothing in the Second Amended Complaint or the materials I am permitted to consider in resolving this motion suggests that it is unlikely to do so again. Consequently, it would be speculative to conclude that Congress will fail to appropriate those funds, and speculative harm is insufficient for justiciability. *See Lujan*, 504 U.S. at 564; *Whitmore*, 495 U.S. at 158; *see also Bishop,* 575 F.3d at 423; *Zaycer*, 896 F. Supp. 2d at 408.

<u>Redressability</u>

As for the redressability prong, it must be "likely, and not merely speculative, that a favorable decision will remedy the injury." *Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). I already have noted (and Plaintiffs agree) that the Court cannot order the appropriation of funds. *NAACP*, 382 F. Supp. 3d at 382. Yet I also noted that this Court can make a declaration regarding Defendants' obligations under the Enumeration Clause, and that circumstances may exist in which Congress is likely to follow a judicial declaration, even though not required to do so. *See id.* (citing *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992)). If Congress's adherence to such a declaration were likely to remedy Plaintiffs' injuries—and the harm were not merely speculative—, then Plaintiffs would have standing. *Id.* at 381. But the willingness of Congress to adhere to a non-binding judicial declaration is not a given, and necessarily depends on what that declaration says, and the underlying authority of the Court to declare it.

Previously, I concluded that Plaintiffs' underfunding claim satisfied the redressability prong because the Court could declare specifically that "Congress and the President ha[d] failed to agree upon and finalize legislation to provide the funding actually needed to conduct the census in 2020—when the Secretary is constitutionally obligated to do so." *Id.* at 382. But now, Congress and the President *have* agreed upon and finalized the 2019 Appropriations Act, which provides what they have determined to be the funding necessary for conducting the 2020 Census. And, as discussed below, the Constitution vests broad authority in Congress (and in its designee, the Secretary of Commerce, as part of the President's Administration) to design and execute the census, and in Congress alone to determine the proper level at which to fund it. In the face of such explicit authority, it is far from clear that, once it has been executed by those assigned to do so by the Constitution, Congress would be willing to follow a contrary, non-binding judicial funding declaration. Consequently, the proposed remedy has been rendered moot by Congress's action, and Plaintiffs no longer have standing. *See Friends of the Earth*, 204 F.3d at 154.

Significantly, despite their previous concession that the Court cannot order the appropriation of funds, Plaintiffs now seek just that. In their request to file a motion for emergency relief, ECF No. 146, they seek a Court order directing the Bureau to spend the money it is holding in reserve. Apparently, it no longer is sufficient for the Court to declare that Congress should appropriate funds, or even that they should appropriate a certain amount of funds; Plaintiffs want the Court to tell the Bureau when and how to spend the funds and, in effect, take supervisory control over the execution of the 2020 Census.

That is not a remedy that a court has the authority, expertise, or time to provide. Rather, Congress determined that it was the Bureau that was best equipped to complete this task. 13 U.S.C. § 141(a). This is its function, to enumerate our nation's population. *See id.*

Moreover, if the Court entertained challenges by private citizens or interested parties to the amount of funding an agency requests and receives from Congress and then provided any portion of the relief Plaintiffs now seek—declaring that the funding was insufficient, ordering the agency to spend money, or otherwise supervising the agency as it carried out its duties—the lawsuits would, in effect, transform the federal courts into a venue for every person or entity with an axe to grind or an agenda to advance.  As Defendants assert:

> Allowing Plaintiffs to challenge Congress's duly enacted funding for the Census Bureau would mean that private citizens essentially have a freestanding constitutional right to some hypothetical level of funding for their favorite agency. This concept finds no support in the law. *See Farbstein v. Hanks*, 2006 WL 6628293, at *4 (E.D.N.Y. June 30, 2006) ("The Plaintiff does not cite any case law nor is this Court aware of any Constitutional right to [agency] funding or Congressional assistance in gaining [agency] funding."), *aff'd*, 331 F. App'x 890 (2d Cir. 2009). And Plaintiffs' position becomes no more viable simply because they are proceeding under the Enumeration Clause, which provides for a decennial census. The Constitution also provides for the Post Office, U.S. Cons. art. I, § 8, cl. 7, the Army, U.S. Cons. art. I, § 8, cl. 12, and the Navy, U.S. Cons. art. I, § 8, cl. 13. Can anyone inject federal courts into the appropriations process by simply suing the Post Office or the Department of Defense under the theory that these agencies are unconstitutionally underfunded? For that matter, can someone file suit and proceed to discovery, as here, by alleging that the *Supreme Court* is unconstitutionally underfunded? *See* U.S. Cons. art. III, § 1 (mandating a Supreme Court). Surely not. [This is] a usurpation of Congress's appropriations power. *See Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1481–82 (4th Cir. 1992) ("[A]ny exercise of a power granted by the Constitution to the judicial branch is limited by a valid reservation of congressional control over funds in the Treasury.").

Defs.' Mem. 9.

In *Farbstein v. Hanks*, the plaintiff, who sought but was repeatedly denied funding from NASA for his scientific inventions, sued Congressional aides for violating his "rights to NASA funding, use of NASA facilities, and Congressional assistance." No. 05-14 (JS)(MLO), 2006 WL 6628293, at *1, *4 (E.D.N.Y. June 30, 2006), *aff'd*, 331 F. App'x 890 (2d Cir. 2009).  The court observed that it was not "aware of any Constitutional right to NASA funding or Congressional

assistance in gaining NASA funding." *Id.* at *4. Neither I am aware of any Constitutional right to agency funding or to Congressional assistance in gaining funding. Likely such a right does not exist because it would cause unending interference with agency actions by private parties and the court. Defendants identify problematic examples of legal challenges that parties could bring to enhance Congressional appropriations to their favored agencies. *See* Defs.' Mem. 9. But this parade of horribles marches in two directions. If such a right existed, it would not be limited to suits seeking additional funding. Rather, it would apply with equal force to suits to limit or block Congressional funding to agencies unfavored or disliked by the challenger. There would be no end to the mischief such a "right" would create. Therefore, it is not "likely . . . that a favorable decision will remedy the injury," when the Court cannot grant the relief Plaintiffs seek. *See Friends of the Earth*, 204 F.3d at 154.

Moreover, the distinction between the proper role of this Court and that of the Bureau leads to the second redressability issue: the political question doctrine. As I will explain, this doctrine counsels that Plaintiffs' request for judicial supervision of the 2020 Census is not merely impracticable and unwise, but also impermissible.

<u>*Political Question Doctrine*</u>

Pursuant to the political question doctrine, courts cannot address controversies that "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 561 (D. Md. 2018) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). Notably, Congress has full authority to plan and execute the Census, U.S. Const. art. 1, § 2, cl. 3, and it delegated this broad authority to the Bureau, an agency of the Executive Branch, 13 U.S.C. § 141. *See also Wisconsin v. City of New York*, 517

U.S. 1, 19–20 (1996) (noting Congress's "virtually unlimited discretion in conducting the decennial 'actual Enumeration'" and its delegation of its "broad authority" to the Bureau). Nonetheless, as I observed in January (in the context of a funding lapse and uncertainty whether and when any additional funding would be available), a census "so underfunded as to fail to bear a 'reasonable relationship to the accomplishment of an actual enumeration' (one that does not dilute the votes of a state's voters) would be unconstitutional, in violation of the Enumeration Clause." *NAACP*, 382 F. Supp. 3d at 365 (quoting *Wisconsin*, 517 U.S. at 19–20). And, this Court has held that "[w]hether or not Congress or the Census Bureau has violated their expansive breadth of authority is . . . a justiciable question." *Kravitz*, 336 F. Supp. 3d at 563.

When I issued *NAACP* in January, Plaintiffs' challenge was not a political question because the Bureau was on the brink of being unfunded, and a likely lack of additional money would create a situation that would prevent it from conducting the 2020 Census. 382 F. Supp. 3d at 385. Yet the Bureau's ability to conduct a census with funds likely to expire is vastly different from what Plaintiffs now challenge: the Bureau's ability to carry out the 2020 Census with all the funding that it requested. Plaintiffs question whether the appropriated funding is sufficient, and Defendants respond that the funding is sufficient because Congress gave the Bureau the amount requested by the President on its behalf.

To determine whether the issue before it is a political question, the Court considers whether there is

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).

Essentially, Plaintiffs ask whether the Bureau can prepare to actually enumerate the population in 2020 with a FY 2019 budget of $3,551,388,000.  The question is doubly problematic, as it asks the Court to interfere with both the decisions of those Constitutionally charged with determining how the census is to be conducted (originally Congress and derivatively the Bureau) *and* the determinations of the branch empowered to appropriate the budget (Congress).   That is, the text of Article I of the Constitution itself provides two unambiguous grants of authority to Congress: the first addresses how the census is to be conducted, U.S. Const. art I, § 2, cl. 3 ("The actual Enumeration shall be made . . . every . . . ten Years, *in such manner as they [Congress] shall by Law direct.*" (emphasis added)), and the second states that it is Congress that has the power of the purse to appropriate funds, U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.").  Thus, the Founders clearly intended Congress to have paramount authority in both the design and execution of the census, as well as its funding.  Therefore, this is a determination "constitutional[ly] commit[ted] . . . to a coordinate political department." *See Baker*, 369 U.S. at 217.

Further, to answer this question, the Court would need to determine what exactly the Bureau needs to do to conduct the Census and the cost of each action – for example, how many enumerators it needs to hire and at what wages, how many field offices and field tests are necessary and what it costs to run a field office or a field test.  But, there is "a lack of judicially discoverable and manageable standards" for determining whether funding is sufficient. *See id.*

And, the Court cannot "undertak[e] independent resolution without expressing lack of the respect due coordinate branches of government." *Id.*  After consulting with the Bureau, the President included a request for funding for the census in his FY 2019 budget request, and

Congress appropriated the exact amount requested, as the only branch of government that the Constitution empowered to appropriate funds. A district court cannot intervene to substitute its views of what the proper amount is against this clear and broad authority. Thus, addressing Plaintiffs' underfunding claim as it now stands would take the Court into the area reserved for Congress and the Executive Branch. *Id.* Accordingly, for all the reasons stated above, Defendants' Motion to Dismiss IS GRANTED as to Plaintiffs' Enumeration Clause claim for underfunding.

## APA Claims

The actions of an agency such as the Bureau "are presumptively subject to judicial review." *Elecs. of N.C., Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1266 (4th Cir. 1985) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41 (1967)). Yet, for purposes of the APA, "agency action" is "'a term of art that does not include all conduct' on the part of the government." *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 430 (4th Cir. 2019) (quoting *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013)). And, to be subject to review, the governmental act at issue must be a "*final* agency action[]." *Id.* (quoting 5 U.S.C. § 704) (emphasis added).

The APA itself defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* at 431 (quoting 5 U.S.C. § 551(13)). Two significant limitations arise from this definition of "agency action." *See id.*

> First, each of the terms that comprise the definition of "agency action" is limited to those acts that are "circumscribed" and "discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004). When challenging agency action—whether it be a particular action or a failure to act altogether—the plaintiff must therefore identify specific and discrete governmental conduct, rather than

launch a "broad programmatic attack" on the government's operations. *Id*. at 64. This distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers. Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials. We are woefully ill-suited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored "obey the law" injunction, *see Int'l Longshoremen's Ass'n, Local 1291 v. Phil. Mar. Trade Ass'n*, 389 U.S. 64, 76 (1967), or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so. The Supreme Court's guidance on this point is worth considering in full:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved-which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 542 U.S. at 66-67. The requirement that the challenger identify a discrete act keeps us from entering such a quagmire.

*City of New York*, 913 F.3d at 431.

The second limitation is that the "agency action" must "determin[e] rights and obligations."

*Id.* (quoting *Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438, 445 (4th Cir. 2014));

*see also Vill. of Bald Head Island*, 714 F.3d at 193 (noting that the APA definition "focuses on an

agency's *determination* of rights and obligations, *see Bennett v. Spear*, 520 U.S. 154, 177–78

(1997), whether by rule, order, license, relief, or similar action").

This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties. To meet this requirement, a party must demonstrate that the challenged act had "an immediate and practical impact," *see Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010), or "alter[ed] the legal regime" in which it operates. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). It is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the "independent responses and choices of third parties," or mere "coercive pressures." *Flue-Cured Tobacco*, 313 F.3d at 859, 861. This requirement applies fully to claims that an agency has failed to act, which is "properly understood as a failure to take an *agency action*." *See Norton*, 542 U.S.

at 62. Since "agency actions" must determine rights and obligations, claims to compel an agency to take an action must seek such a determination as well.

*City of New York*, 913 F.3d at 431–32.

Additionally, it is well established law that, to be final, "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Vill. of Bald Head Island*, 714 F.3d at 194 (quoting *Bennett*, 520 U.S. at 177–78 (citation and quotation marks omitted)). The Supreme Court has said that "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts,* 505 U.S. 788, 797 (1992).

In Defendants' view, Plaintiffs' APA claims fail for four reasons: (1) "they do not challenge a cognizable 'agency action'"; (2) "any supposed agency action is not 'final'"; (3) "review of any 'final agency action' is . . . barred because such operational details are 'committed to agency discretion by law'"; and (4) "Plaintiffs' APA claims are unripe." Defs.' Mem. 11. I agree that Plaintiffs do not direct their challenges to acts that meet the definition of "agency action," and therefore I need not reach the other grounds that Defendants raise.[5]

### *The Challenged Actions*

Plaintiffs claim that "[t]he decisions set forth in the Final Operational Plan and described in paragraphs 66 through 175 of th[e] [Second Amended] complaint, individually and cumulatively, constitute agency action that is arbitrary, capricious, an abuse of discretion, and

---

[5] Accordingly, I need not consider Plaintiffs' argument in their Notice of Supplemental Authority that the Supreme Court held in *Department of Commerce*, 139 S. Ct. 2551, that the Bureau's challenged actions in conducting the census are not committed to agency discretion by law. *See* Pls.' Notice 1–2.

otherwise not in accordance with law," as well as "'contrary to constitutional right' because it deprives Plaintiffs of their constitutional right to a fair and accurate census in 2020." Sec. Am. Compl. ¶¶ 206, 212. They identify six "design choices" that they view as "arbitrary and irrational":

> (a) a plan to hire an unreasonably small number of enumerators; (b) a drastic reduction in the number of Census Bureau field offices; (c) cancellation of crucial field tests; (d) a decision to replace most in-field address canvassing with in-office address canvassing; (e) a decision to make only extremely limited efforts to count inhabitants of housing units that appear vacant or nonexistent based on unreliable administrative records; and (f) a significant reduction in the staffing of the Bureau's partnership program.

*Id.* ¶ 67. As they see it, they "are not mounting 'a generalized attack' or requesting that the Court 'inject itself into the day-to-day agency management[.]'" Pls.' Opp'n 16 (quoting *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 21 (D.D.C. 2018)). Plaintiffs argue: "That the Bureau's failings are multiple does not make them any less discrete." *Id.* at 17.

Despite Plaintiffs' identification of six specific Bureau decisions, Defendants insist that Plaintiffs are making an "improper, programmatic attack on the design of the 2020 Census" because "the only way the Court could attempt to determine whether census design features are 'contrary to constitutional right,' 5 U.S.C. § 706(2)(B), is to examine the Operational Plan 'cumulatively.' *See* SAC ¶ 212." Defs.' Mem. 12. They contend that Plaintiffs fail to "explain how the Court could examine these design choices 'collectively' or 'cumulatively' *without* passing judgment on the entire Operational Plan." Defs.' Reply 9.

A closer examination of Plaintiffs' challenges shows that some are, indeed, interrelated with other aspects of the Final Operational Plan and cannot be analyzed in a vacuum. For example, according to Plaintiffs, the Bureau stated that it decreased its number of field offices compared to

the 2010 Census "based on the number of enumerators needed for field operations."[6] Sec. Am. Compl. ¶ 123. Plaintiffs are skeptical about Defendants' rationale, because, during its planning for the 2020 Census the Bureau increased the number of enumerators (although not to the level of 2010) without increasing the number of field offices. *Id.* ¶ 124. Regardless of what Defendants' actual reasoning was in determining the final number of field officers, the challenges to the number of enumerators and the number of field officers are interrelated and must be considered together. *See id.* ¶¶ 124–29 (challenging number of field offices based on number of enumerators).

And, relying on the fact that the Bureau hired more enumerators in the past, Plaintiffs also allege that the Bureau simply does not plan to hire enough enumerators for the 2020 Census. *See id.* ¶¶ 69–73. But, the Bureau's decision to reduce the number of enumerators is inextricably intertwined with its decision to "use new technology and new protocols" and the anticipated effects of the new technology and protocols. *See id.* ¶¶ 74, 76. Indeed, Plaintiffs acknowledge that "[t]he introduction of Internet Self-Response (ISR) is a radical departure from the paper and in-person methods used in all previous censuses." *Id.* ¶ 86. Therefore, the number of enumerators cannot be considered without addressing the efficacy of the new technology.

Defendants have not identified any relationship between any of Plaintiffs' four other challenges (to the cancellation of field tests, how address canvassing is conducted, the efforts made to count inhabitants when a dwelling appears vacant, and the number of partnership program staff) and other aspects of the Final Operational Plan. Significantly, Plaintiffs claim not only that these decisions are "cumulatively" arbitrary and capricious or otherwise contrary to law, but also that

---

[6] Enumerators are "field workers . . . who physically visit housing units from which no self-response was received." Sec. Am. Compl. ¶ 69.

each "individually" is an improper action. *See* Sec. Am. Compl. ¶¶ 206, 212 (challenging actions "*individually and* cumulatively" (emphasis added)).

Yet the relief Plaintiffs seek provides insight into the collective nature of their claims. Plaintiffs do not ask the Court to compel the Bureau to hire more enumerators or open more field offices or conduct more field tests. Nor do they ask the Court to compel the Bureau to take a different approach to address canvassing, counting inhabitants of dwellings that appear vacant, or staffing partnership programs. Rather, Plaintiffs ask the Court to

> 6. Enter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that hard-to-count populations will be actually enumerated in the decennial census;
>
> 7. Hold unlawful and set aside the agency actions described in paragraphs 66 through 175 of this complaint;
>
> 8. Enter an injunction that prohibits Defendants Bureau of the Census and U.S. Department of Commerce from re-enacting the unlawful agency actions described in paragraphs 66 through 175 of this complaint . . . .

Sec. Am. Compl. 39–40. The relief Plaintiffs request in Paragraph 6 cannot be read as anything less than court-ordered modification to the Bureau's overall plan for the 2020 Census. *See id.* Additionally, in Paragraph 6, they unabashedly ask the Court to compel (and superintend) broad agency action, instead of compelling action in discretely identified areas, inviting the Court to "reach into the internal workings" of the Bureau in ways that the Fourth Circuit has made clear that courts are ill suited to accomplish, and should decline to undertake. *City of New York*, 913 F.3d at 431. And in Paragraph 8, by asking the Court to prohibit the Bureau from implementing its current plan, Plaintiffs indirectly ask the Court to compel Defendants to go back to the drawing board in conducting the 2020 Census. *See id.* Even in Paragraph 7, where Plaintiffs ask the Court to "[h]old unlawful and set aside" the Bureau's actions, the necessary effect of their request is that, if the Court held that the Bureau could not carry out the 2020 Census as described in the Final

Operational Plan, it would be compelled (albeit not by Court order that sets out specific actions that must be taken) to enact another plan in accordance with the Court's order.

These requests provide insight in two respects. First, their broad nature shows that what Plaintiffs seek is not changes to six discrete "agency actions," but rather a sweeping overhaul to the Final Operational Plan, which exceeds the scope of reviewable "agency action." *See City of New York*, 913 F.3d at 432. Second, Plaintiffs are asking the Court, both directly and indirectly, to compel agency action. *See* Sec. Am. Compl. 39–40. Notably, the APA only authorizes the court to compel actions "that have been 'unlawfully withheld or unreasonably delayed.'" *City of New York*, 913 F.3d at 432 (quoting 5 U.S.C. § 706(1)). In other words, the action that a plaintiff wants a court to compel must be "legally required," because the courts only can enforce "'a specific, unequivocal command,' over which an official has no discretion." *Id.* (quoting *SUWA*, 542 U.S. at 63). The Fourth Circuit recently observed:

> Taken together, the limitations imposed on claims to compel agency action under the APA strike a balance between meaningful judicial review and the needs of effective administration. Review is available only when acts are discrete in character, required by law, and bear on a party's rights and obligations. The result is a scheme allowing courts to review only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management.
>
> These principles guide our consideration of all claims to compel agency action, regardless of the context.

*Id.* (citing *SUWA*, 542 U.S. at 64–65).

Relying on this case law, Defendants argue that, "[t]o the extent Plaintiffs' APA claims are targeted at the Census Bureau's *failure* to act, *see, e.g.*, SAC ¶ 138 (arguing against the Census Bureau's decisions to 'cancel some field tests and eliminate major elements of other field tests for the 2020 Census'), these claims are also unavailing." Defs.' Mem. 14 n.6. They insist that "Plaintiffs can point to no legal requirement that the Census Bureau conduct certain field tests,

hire a specific number of enumerators, open a specific number of Census Bureau field offices, or take any other action Plaintiffs would prefer." *Id.* (citing Sec. Am. Compl. ¶¶ 66–175). There is merit to Defendants' position, as perhaps Plaintiffs recognize, given that they do not address it. *See* Pls. Opp'n.

Certainly, the Census Act imposes some parameters on the conduct of the Census; it "constrains the Secretary's authority to determine the form and content of the census" by limiting the "use [of] statistical sampling" and "circumscrib[ing] his power in certain circumstances to collect information through direct inquiries when administrative records are available," and it requires the Bureau "to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Franklin*, 505 U.S. at 819–20 (Stevens, J., concurring)). But, Plaintiffs do not challenge the use of statistical sampling, and their challenge regarding the use of administrative records alleges an overreliance, rather than a failure to use available records. And, while they could allege that the Bureau is failing to fulfill its duty to conduct an accurate census, they only could do so by attacking the Final Operational Plan as a whole, not by challenging specific actions as "discrete" actions. Thus, not only is it questionable at best, on the pleadings before me, whether the Bureau's challenged actions are "discrete in character," the actions also are not "required by law," and therefore they are not the proper subjects for the relief Plaintiffs seek. *See City of New York*, 913 F.3d at 432; 5 U.S.C. § 706(1).

It is true, as Plaintiffs assert in their Notice of Supplemental Authority, that in *Department of Commerce*, the Supreme Court observed that it "and other courts have entertained both constitutional and statutory challenges to census-related decisionmaking." 139 S. Ct. at 2568 (citing *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316 (1999); *Wisconsin v. City of New*

*York*, 517 U.S. 1 (1996); *Carey v. Klutznick*, 637 F.2d 834 (2d Cir. 1980)); *see* Pls.' Notice 2. But the Supreme Court did not consider APA claims or the requirements that the challenged agency action be discrete, required by law, and determinative of a private party's rights and obligations, *see City of New York*, 913 F.3d at 432, in either *Department of Commerce*, 525 U.S. 316, or *Wisconsin*, 517 U.S. 1. And, while the Second Circuit considered an APA claim in *Carey*, its analysis focused on whether the conduct of the census was committed to agency discretion by law, not whether the claims before it pertained to "agency action." *See Carey*, 637 F.2d at 838 (concluding that, where the census had taken place but not yet been reported and appellees had shown that "Census Bureau actions in New York State have caused a disproportionate undercount which will result in loss of representation in Congress," the exception under which the court had "no power to review agency action that is 'committed to agency discretion by law'" did not apply because the "impairment of [appellees'] right to a vote free of arbitrary impairment" was "a matter which cannot, of course, be foreclosed from judicial review by operation of the Administrative Procedure Act").

### *Determining Rights and Obligations*

Moreover, the Bureau's acts do not qualify as "agency action" because they do not "determin[e] rights and obligations." *City of New York*, 913 F.3d at 431 (quoting *Clear Sky Car Wash*, 743 F.3d at 445); *see also Bennett*, 520 U.S. at 177–78; *Vill. of Bald Head Island*, 714 F.3d at 193. As noted, an agency's act meets this criterion if it has "'an immediate and practical impact'" on "private parties." *City of New York*, 913 F.3d at 431 (quoting *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010). Alternatively, it could "'alter[] the legal regime' in which it operates." *Id.* (quoting *Bennett*, 520 U.S. at 178).

In *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010), the Fourth Circuit distinguished between actions with an "immediate and practical impact" and those without. As an example of an action with an "immediate and practical impact," the court described the Interstate Commerce Commission's order discussed in *Frozen Food Express v. United States,* 351 U.S. 40 (1956). *Golden & Zimmerman*, 599 F.3d at 433. That agency's order "list[ed] commodities that [the agency] found to be 'agricultural commodities,' the carriers of which were exempt from a permit requirement, and commodities it found not to be agricultural commodities." *Id.* (quoting *Frozen Food Express,* 351 U.S. at 44). The Supreme Court had concluded that it "had 'an immediate and practical impact on carriers who [were] transporting the commodities' by 'warn[ing] every carrier, who [did] not have authority from the Commission to transport those commodities, that it [did] so at the risk of incurring criminal penalties.'" *Id.* (quoting *Frozen Food Express,* 351 U.S. at 44). The Fourth Circuit observed that, "in *Frozen Food Express,* the order itself was the source of the obligation, modifying the applicable legal landscape by interpreting the scope of the agricultural commodities exception and becoming 'the basis for carriers in ordering and arranging their affairs.'" *Id.* (quoting *Frozen Food Express,* 351 U.S. at 44). In contrast, the answer to a frequently asked question that the Bureau of Alcohol, Tobacco, Firearms and Explosives included in its Reference Guide, which firearms dealers challenged in *Golden & Zimmerman*, was "not the source of an obligation that g[ave] rise to penalties or other consequences," even though it "warn[ed] members of the regulated community that they could be subject to prosecution for engaging in certain transactions." *Id.* On that basis, the Fourth Circuit held that the Reference Guide and the answer to the frequently asked question "did not constitute final agency action reviewable in court." *Id.*

Plaintiffs argue:

> The decisions Plaintiffs are challenging—Defendants' final decisions that they will drastically understaff the 2020 Census and gut their own field operations that reach Hard-to-Count communities—have an undeniable impact on how Defendants will carry out their constitutional obligations to conduct the census, thus determining Plaintiffs' right to fair political representation, and the allocation of resources Plaintiffs receive.

Pls.' Opp'n 14. Notably, what Plaintiffs challenge is how the Bureau's plans for the 2020 Census "impact on how *Defendants* [themselves] will carry out their constitutional obligations." *Id.* (emphasis added). But, challenges are "properly directed at the effect that agency conduct has *on private parties*," not the agencies themselves. *City of New York*, 913 F.3d at 431 (emphasis added). Indeed, the requirement that the challenged action "determin[es] rights and obligations" is imposed to "ensure[] that judicial review does not reach into the internal workings of the government." *Id*. Therefore, the actions are not subject to judicial review for the effects they have on the Defendants. *Id.*

As for the effects of the Bureau's 2020 Census plans on Plaintiffs themselves, Plaintiffs contend that the decisions impair their rights because the decisions will guide how Defendants conduct the 2020 Census, which *in turn* will affect how many representatives and how much funding Plaintiffs receive. *See* Pls.' Opp'n 14. This indirect impact, with one action leading to another, is attenuated, not "immediate." *See Golden & Zimmerman*, 599 F.3d at 433. In sum, because the challenged acts are not "discrete in character" when considered in the context of the challenges Plaintiffs raise, are not "required by law," and do not "determin[e] [Plaintiffs'] rights and obligations," judicial review is not available. *See City of New York*, 913 F.3d at 431–32. Plaintiffs' APA claims are dismissed. *See id.*

## **ORDER**

For the reasons stated in this Memorandum Opinion and Order, it is, this 1st day of August, 2019, hereby ORDERED that

1. Defendants' Motion to Dismiss Second Amended Complaint, ECF No. 95, IS GRANTED;

2. Plaintiffs' claims ARE DISMISSED; and

3. The Clerk SHALL CLOSE this case.

_____/S/_____

Paul W. Grimm
United States District Judge

lyb