IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
4805 Mt. Hope Drive, Baltimore, Maryland
21215, Baltimore County; PRINCE GEORGE'S
COUNTY MARYLAND, 14741 Gov. Oden Bowie
Drive, Suite 5121, Upper Marlboro, Maryland 20772,
PRINCE GEORGE'S COUNTY
MARYLAND, 14741 Gov. Oden Bowie Drive,
Suite 5121, Upper Marlboro, Maryland 20772,
Prince George's County;
PRINCE GEORGE'S COUNTY
MARYLAND NAACP BRANCH,
9201 Basil Court, Suite 115, Largo, Maryland 20774,
Prince George's County;
ROBERT E. ROSS, 10900 Wharton Drive Upper Marlboro, Maryland 20774,
Upper Marlboro, Maryland 20774, Prince
George's County; and
H. ELIZABETH
JOHNSON,
5406 Stratford Lane, Temple Hills,
Maryland 20748, Prince George's County,

Case No. 8:18-cv-00891-PWG

~~Case No. 8:18-cv-00891-PWG~~

SECOND AMENDED COMPLAINT

     *Plaintiffs,*

     v.

BUREAU OF THE CENSUS, *service at*
4600 Silver Hill Road, Suitland, MD 20746;
STEVEN DILLINGHAM, Director, Bureau of the
Census, 4600 Silver Hill Road, Suitland, MD
20746, Prince George's County; WILBUR ROSS,
WILBUR ROSS, Secretary of Commerce, 1401
Constitution Ave NW,
Washington, DC 20230, and
THE UNITED STATES, *service at* 6406 Ivy Lane,
Suite 800, Greenbelt, MD 20770

     *Defendants.*



Article I, Section 2 of the United States Constitution imposes one of the few affirmative obligations on the federal government: to conduct an "actual Enumeration" of all residents every ten years. Despite this duty, the United States has consistently undercounted people of color since the nation's founding, starting with the decision to treat African American slaves as only three-fifths of a person. The Three-Fifths Clause appeared in the same constitutional provision that mandates a decennial census.

The failure to fully to count African Americans has persisted to the present. In the 2010 Census, for example, there was a 2.1% percent net undercount of African Americans. Accordingly, in the past, federal officials have made considerable efforts to enumerate what the Census Bureau calls "hard-to-count" individuals, including African Americans, non-English speakers, and young people. These efforts reflect the recognition that an inaccurate census hurts some communities more than others, depriving them of their constitutional right to representation and their fair share of resources.

The government's plans and preparations for the 2020 Census, however, are so conspicuously deficient as to extend far beyond the failures of past censuses, such that they and violate Defendants' constitutional duty to conduct an "actual Enumeration." U.S. Const. Art. I, § 2, as well as the statutory prohibition on arbitrary and capricious agency action, 5 U.S.C. § 706(2)(A). [a]

---

[a] Plaintiffs recognize that the Court has dismissed their Enumeration Clause claims without prejudice, except for the claim for declaratory relief as to the underfunding of the 2020

**Formatted:** Font: 12 pt

In contrast with previous censuses, the Census Bureau has chosen to severely scale back field operations and outreach as set forth in the Bureau's final version of the 2020 Census Operational Plan ("Final Operational Plan") published on February 1, 2019. ~~Pursuant to the Final Operational Plan, the~~The Bureau will hire an unreasonably small ~~numbers~~number of employees to staff its field operations and ~~develop~~support its community partnerships.~~In updating its nationwide list of residential addresses, the Bureau will abandon previous policies of reviewing most blocks in person and instead will physically canvas only 38 percent of the nation's residential blocks. According to the Final Operational Plan, the Bureau is also~~, drastically ~~scaling~~scale back its ~~longstanding~~network of field offices, ~~reducing its ability to address problems in its field operations. And the Bureau will rely on demonstrably~~and utilize unreliable administrative records to determine which housing units should receive only one visit before ~~the Bureau gives~~giving up on counting the people who live there.

Sufficient staffing, funding, and preparation in advance of the census are essential to such a monumental undertaking. Yet~~, less than a year~~ just months from ~~the 2020~~ "Census~~, Day"—April 1, 2020—~~the Census Bureau has failed to ~~fill routine staff vacancies. The Bureau canceled essential~~undertake necessary investments in hiring, field ~~tests in 2017 and two of three "dress rehearsal" tests in 2018, and then confirmed in 2019~~

---

~~Census, ECF No. 64, and denied leave to reinstate their dismissed claims at this time. ECF No. 76. Solely to preserve the dismissed claims for appeal, Plaintiffs replead the full Enumeration Clause claim here and reallege facts to support all claims.~~

**Formatted:** Font: 12 pt

that these tests would not be rescheduled. The operations, and community partnerships. And the limited testing the Bureau did conduct, in Rhode Island, demonstrated grave challenges to its predictions for how smoothly operations in 2020 will occur.

Moreover, the Bureau's intention to adopt substantial new technologies for the 2020 Census makes these cancellations especially dangerous. Defendants are unprepared to conduct has conducted in advance of the first-ever digital census, which will exacerbate differential undercounts and leave the census vulnerable to cyber-attack. demonstrates grave challenges to its operating assumptions, underscoring the importance of field operations and outreach to address issues as they arise on the ground in 2020. Despite these imminent threats, the Bureau has refused to expend more than $1 billion in appropriated funds, money *it already has* and that Congress has explicitly directed it to use to the accuracy and integrity of the 2020 Census, the Bureau has been operating on the cheap, without sufficient funding to address its many address these challenges in the House and Senate Reports accompanying the Bureau's 2020 appropriation.

These deficiencies will result in a massive and differential undercount of communities of color. The effects of an inaccurate census will be felt across the country, and especially in places like Prince George's County, Maryland that are home to many "hard-to-count" people. Such a dramatic undercount will especially dilute the votes of racial and ethnic minorities, deprive their communities of critical federal funds, and undervalue their voices and interests in the political arena.

Plaintiffs the National Association for the Advancement of Colored People (NAACP), the Prince George's County Maryland Branch NAACP, Prince George's County, Robert Ross, and Elizabeth Johnson, ask this Court to address this grave and

**Formatted:** Font: 12 pt

imminent threat to the accuracy of the census. In particular, Plaintiffs ask this Court to declare that the Census Bureau's actions jeopardize Plaintiffs' constitutional rights; ~~set aside~~enter an injunction directing the ~~arbitrary, capricious,~~Bureau to expend monies appropriated but unspent for the purposes specified by Congress, including ensuring that communications and ~~unconstitutional decisions~~outreach activities be conducted at a level of ~~the~~ effort no less than that used for the 2010 Census ~~Bureau,~~ adjusted for inflation; and compel Defendants to uphold their constitutional obligation to conduct an actual enumeration of *all* people ~~residing~~ in the United States.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Article III of the U.S. Constitution.

*[Formatted: Indent: Left: 0", First line: 0.5", No widow/orphan control]*

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e) because Plaintiff Prince George's County Maryland NAACP Branch maintains its principal place of business in, Plaintiffs Robert Ross and Elizabeth Johnson reside in, and Plaintiff Prince George's County is located in, the District of Maryland, Southern Division; the events or omissions giving rise to the claim occurred in this district and division; and no real property is involved in the action.

3.      Venue is also proper pursuant to 28 U.S.C. § 1391(e) because Defendants Bureau of the Census and its Director, Steven Dillingham, are located in Suitland, Maryland, also in the District of Maryland, Southern Division.

## PARTIES

4.      Plaintiff National Association for the Advancement of Colored People (NAACP), a § 501(c)(3) non-profit, is the nation's oldest and largest grassroots-based civil

*[Formatted: Font: 12 pt]*

rights organization. Its mission is to ensure the political, educational, social, and economic equality of rights ~~of~~for all persons and to eliminate race-based discrimination. The NAACP is headquartered in Baltimore, Maryland, and has over two thousand local units nationwide. These units have helped and will continue to help promote the accuracy of the census by conducting outreach to community members.

5.      Plaintiff Prince George's County Maryland NAACP Branch is the local affiliate of the NAACP in Prince George's County. It was founded in 1935. Hester V. King served as the first branch President and continued in that role for nearly thirty years, during which time she worked to desegregate the Upper Marlboro courthouse, schools, and other public accommodations in the county. Mrs. King also helped conduct a statewide drive for passage of an equal accommodations bill by the State Legislature. The branch is headquartered in Upper Marlboro, Maryland, and devotes resources to ensuring the voting rights of its members.

6.      Plaintiff Prince George's County is a majority African American county in southeastern Maryland. Prince George's County has been repeatedly undercounted in past censuses. In the 2000 Census, the undercount in the county was 1.91~~%, and~~ percent; in 2010, the net undercount was 2.3~~%.~~ percent. In 2010, the County suffered the largest net census undercount of any large county in Maryland, and one of the largest undercounts in the entire United States for any county of 100,000 or more residents. The County is allocated federal funds and political representation depending on its population as determined by the census.

7.      Plaintiff Robert Ross has resided in Prince George's County, Maryland since 2001 and has served as the President of the Prince George's County Maryland

**Formatted:** Font: 12 pt

NAACP Branch since 2010. Mr. Ross drives on roads in Prince George's County that depend on federal funding for upkeep and repair and in other ways is affected by the level of federal funding allocated to the County based on the census.

8.     Plaintiff Elizabeth Johnson has resided in Prince George's County, Maryland since 1974. Ms. Johnson serves on the Executive Committee of the Prince George's County Maryland NAACP Branch and chairs the Branch's Housing Committee. Ms. Johnson drives on roads in Prince George's County that depend on federal funding for upkeep and repair and in other ways is affected by the level of federal funding allocated to the County based on the census.

9.     Defendant the Bureau of the Census is the agency within the United States Department of Commerce that oversees and implements the decennial census. The Census Bureau is headquartered and maintains its principal offices in Suitland, Maryland.

**Formatted:** Indent: Left: 0", First line: 0.5", No widow/orphan control

10.     Defendant Steven Dillingham is the Director of the Bureau of the Census, which is charged with completing the decennial census. He is sued in his official capacity.

11.     Defendant Secretary Wilbur Ross, as Secretary of the U.S. Department of Commerce, oversees all operations of the Department of Commerce, including the operations of the Census Bureau. He is sued in his official capacity.

12.     Defendant United States has a constitutional obligation to conduct an actual enumeration every ten years.

## FACTUAL ALLEGATIONS

12.     Article I, Section 2 of the Constitution requires the federal government to conduct an "actual Enumeration," or count" of every resident of the United States, every ten years.

**Formatted:** Font: 12 pt

7

13. In carrying out that obligation, Congress has traditionally played an active role in supervising the Bureau's conduct of the census by, among other things, issuing directives pursuant to the Census Act and enacting related appropriations legislation. Most recently, Congress instructed the Bureau to conduct partnership and communications activities at "no less than the level of effort and staffing that was utilized in preparation for the 2010 Decennial Census when accounting for inflation." S. REP. No. 116-127, at 19 (2019).

14. The federal government uses census data to allocate hundreds of billions of dollars in public funding. These funds considerably impact the state and local governments' and other public sector's entities' ability to provide for high quality education, health care, housing, transportation, and other vital services.

15. Census data is also used for seat apportionment in the U.S. House of Representatives, drawing boundaries for congressional districts and many state legislative districts, and voting rights enforcement.

16. Maryland is among the states that use census data for purposes of state legislative districting.

**History and Background of the Census**

17. The Founders were deeply concerned with ensuring an accurate census. The founding generation knew that counts of residents have been Since 1790, the government has conducted since ancient times, and a decennial census as recently as the 1750s there had been significant public controversy over how to count the British population.

18. 17. the Constitution directs. The drafters of the Constitution also "knew "that the calculation of populations could be and often were skewed for political or financial

8

purposes," *Utah v. Evans*, 536 U.S. 452, 500 (2002) (Thomas, J., concurring in part and dissenting in part), and ~~therefore~~ sought to ~~draft a constitutional provision~~ensure that ~~would avoid these problems.~~ the process remained removed from politics.

~~19.     John Randolph, for example, in discussing the accuracy of the census, remarked that "if a fair representation of the people be not secured, the injustice of the government will shake it to its foundations."~~

~~20.     At the time of the first census, in 1790, the authorizing legislation required enumerators to visit each household, post completed census schedules in public places in every jurisdiction, and submit the final tally to the president.~~

18.     The constitutional duty to conduct an actual enumeration was the Founders' solution to this concern. As Alexander Hamilton explained, "[a]n actual census or enumeration of the people must furnish the rule; a circumstance which effectually shuts the door to partiality or oppression." The Federalist No. 36, at 226 (J. Cooke ed., 1961).

19.     Congress has delegated responsibilities to the Bureau to manage the day-to-day operations of the census, but it has never ceded its oversight authority and has taken steps to limit the Bureau's discretion. Courts have historically adjudicated lawsuits challenging census operations, including those brought under the Enumeration Clause.

20.     Congress has supervised census operations through its appropriations statutes and accompanying committee and conference reports, which often contain directives to the agency.

21.     For example, for at least the last three decades, Congress has tasked the Bureau with reducing the differential undercount for "individuals who have historically been undercounted." Dep'ts of Commerce, Justice, & State, the Judiciary, & Related

9

Agencies Appropriations Act, Pub. L. No. 105-119, § 209(a)(9), 111 Stat. 2440, 2481 (1997); S. Rep. No. 116-127, at 19 (2019). The Bureau has thus historically spent congressionally allocated funds to reach hard-to-count communities.

**Recent Efforts to Promote an Accurate Census**

21.    The census has historically undercounted racial and ethnic minorities.

22.    The Census The Bureau has identified what it terms "hard-to-count" populations. These include racial and ethnic minorities, non-English speakers, lower income people, the homeless, undocumented immigrants, young and mobile people, children, LGBTQ individuals, and "persons who are angry at and/or distrust the government."

23.    In 2010, the Bureau's substantial effort and expenditures led to the most accurate census in decades in terms of the overall population, with a net overcount of 0.01 percent, as compared to an overcount of 0.49 percent in 2000 and undercount of 1.61 percent in 1990, according to an official government post-census survey.

23. 24.  However, for hard-to-count communities, the 2010 Census had a net undercount of 2.1% percent of African Americans and 1.5% percent of Hispanic Americans, according to an official government post-census study.

24. 25.  The 2010 Census did not account for failed to count an estimated 1.5 million black and Hispanic residents, which would be enough people to fill two Congressional districts.

25. 26.  The census has also undercounted other populations. In 2010, for example, home renters were undercounted by 1.1% percent and children under the age of five were undercounted by 4.6% percent.

10

26.27.  By contrast, ~~the census has overcounted homeowners and non-Hispanic whites. In~~in 2010, ~~the~~there was a net *over*count ~~was~~of 0.6% percent for homeowners and 0.8% percent for non-Hispanic whites.

27.28.  The inequality in net undercounts across different subpopulations of the United States, known as the "differential undercount," inevitably has enormous consequences for the distribution of political power and economic resources.

29.    In order to ameliorate differential undercounts, in the 2010 Census and earlier the Bureau spent time and resources on programs designed to reach hard-to-count communities. These programs include advertising, communications, and partnership campaigns directed at traditionally undercounted populations; questionnaire assistance operations; and large staffs of enumerators who knock on doors to conduct Nonresponse Follow-up operations. These efforts have not eliminated differential undercounts entirely, but they have reduced them, preventing even more dramatic losses of political representation and funding to hard-to-count communities.

**Imminent Risk of a Constitutionally Deficient 2020 Census**

28.30.  ~~While past censuses have resulted in troubling undercounts of African Americans and other racial and ethnic minorities,~~ Defendants' preparations for the 2020 Census are so deficient as to raise imminent concerns of ~~a~~an undercount that is both substantially greater ~~undercount~~ than in past years and entirely foreseeable, particularly ~~affecting such "~~regarding hard-to-count~~"~~ populations.

29.    The deficiencies in the 2020 Census preparations are not simply the result of a choice of methodology.  Rather, they are a result of conspicuous neglect of a

constitutional duty, through underfunding, understaffing, and under-planning inadequacies that are all the more dangerous because of the roll-out of untested new technology.

30.31. Throughout the lead-up to 2020, Defendants are well behindfailed to establish the typical pace of funding, staffing, and preparation at this stage of a census cycle, even before considering the ambitious technological approach that. Moreover, Defendants have decided to undertake.make a number of dramatic technological changes for the 2020 Census, including relying on a largely untested online response system. These sweeping changes have not been accompanied by sufficient analysis and in-field assessment.

32. The Census Bureau recentlyIn 2017, Defendants cancelled field tests in Puerto Rico, North Dakota, South Dakota, and Washington State. Defendants also cancelled two of three sites for the 2018 End-to-End Census Test, dress rehearsals that serve as the basis for many final decisions about census methods and operations. Additionally, Defendants truncated the one remaining 2018 End-to-End testing site, removing advertising and partnerships, as well as the coverage measurement operation that helps measure how many residents are missed.

31. Earlier this year, the Bureau moved from the planning stage of the 2020 Census to the operational stage. This transition was marked by the Bureau's publication of the final version of the 2020 Census Operational Plan on February 1, 2019.

32.33. The Final Operational Plan, which by its own description, "documents the design for conducting the 2020 Census" and "describ[es] design concepts and their rationale."

12

33.    The Census Bureau has stated publicly that the Final Operational Plan "reflects [the] final design" for the 2020 Census.

34.    There is a~~n~~at imminent risk that the 2020 Census will of severely and differentially ~~undercount~~undercounting people of color. This risk is caused by Congress's persistent underfunding of the Census Bureau, by the Census because of the Bureau's own understaffing,refusal to expend appropriated funds and by unlawful agency decisionsconstitutionally deficient design choices set forth in the Final Operational Plan.

35.    Given the size and scope of the decennial census, immediate relief is necessary to ensure that Defendants have ample opportunity to implement the changes required to ensure a constitutionally sufficient census.

*Underfunding*

36.    The cost of the decennial census has roughly doubled each decade from 1970 to the present.

37.    However, Congress directed that the budget for the 2020 Census not exceed the cost of the 2010 enumeration, which was $12.3 billion.

38.    Typically around the seventh year of the decade, funding for the Census Bureau escalates to prepare for the decennial census. Between 2007 and 2008, for example, the Bureau's budget increased by 61 percent.

39.    However, Congress approved only $1.47 billion for the Census Bureau in the 2017 fiscal year, which was approximately 10 percent below what the Obama Administration had requested and only 7.3 percent higher than the Census Bureau's appropriation for the 2016 fiscal year.

40.    The Trump Administration's 2018 budget request for the Census Bureau asked for an increase of only two percent from 2017 levels.

41.    The Department of Commerce has acknowledged the severity of underfunding. In October 2017, Defendant Ross told Congress that the lifecycle cost of the 2020 Census would be $3.3 billion above the original estimate and that the administration would request an additional $187 million for Fiscal Year 2018.

42.    Former Bureau officials, outside experts, members of Congress, and Government Accountability Office (GAO) staff have all expressed alarm about the Bureau's funding shortage.

43.    A senior GAO official testified that the cost estimate for the 2020 Census "was not reliable and did not adequately account for risk."

44.    Former Bureau Directors Kenneth Prewitt and Vincent Barabba described the 2020 Census as "under threat by uncertain funding."

45.    The two former directors explained, "This is a critical period in which to begin operations, including well-researched advertising messages, staffing and training an army of temporary workers, opening field offices and testing new technology. The Census Bureau cannot do any of this at the last minute, just as the Defense Department cannot prepare for military action when a threat is imminent."

46.    The Census Bureau has already had to scale back critical planning activities due to budgetary uncertainty and shortfalls.

47.    Then-Census Bureau Director John Thompson testified on May 3, 2017, at an oversight hearing of the House Committee on Appropriations that, "[i]n order to

**Formatted:** Font: 12 pt

14

concentrate our resources on systems readiness in this fiscal year, we had to make difficult decisions to descope some aspects of the program and pause others."

48.    Due to underfunding, Defendants:

*canceled 2017 field tests in Puerto Rico, North Dakota, South Dakota, and Washington State;

*canceled two of three sites for the 2018 End to End Census Test, dress rehearsals that serve as the basis for many final decisions about decennial census methods and operations;

*delayed opening six Regional Census Centers.

49.    Moreover, by dropping the West Virginia test site from the 2018 End to End Census Test, Defendants eliminated testing in nine West Virginia counties in which 31 percent of the population lacks access to high-quality residential broadband. As a result, the Bureau will not be able to test its novel digitization strategy in rural areas that are most susceptible to undercounting before the 2020 Census.

50.    On March 23, 2018, the President signed an omnibus spending bill (the "FY 2018 Bill") that allocated $2.814 billion to the Census Bureau, $2.544 billion of which is set aside for Periodic Censuses and Programs, including the 2020 Census.

51.    The report from the appropriations committee that accompanies the FY 2018 Bill states that the FY 2018 Bill "provides half of the amount needed for the 2020 Census for" fiscal years 2019 and 2020.

52.    The FY 2018 bill funded the government only through September 2018 and was inadequate to redress the long term and cumulative underfunding problems set forth above.

**Formatted:** Font: 12 pt

53.     On January 25, 2019, President Trump signed a continuing resolution that authorized only three weeks of spending and froze funding at FY 2018 levels, following the longest government shutdown in U.S. history.

54.     The Consolidated Appropriations Act of 2019 provides $3.82 billion to the Census Bureau, of which $3.55 billion is set aside for Periodic Censuses and Programs, including the 2020 Census.

55.     Even this $3.82 billion for fiscal year 2019 is short of the funding necessary to conduct a fair and accurate census. By contrast, the Census Bureau received $4.2 billion in fiscal year 2009 to fund the 2010 Census.

56.     This lower level of funding for FY2019 is particularly problematic given the deficiencies that have set in from the prior years' funding shortfalls.

57.     The Trump Administration's 2020 budget request for the Census Bureau— its final in advance of the 2020 Census—was $6.15 billion. However, this request is even lower than the Department of Commerce's own FY 2020 cost estimate (prepared in October 2017) of $6.694 billion. Moreover, the request does not include sufficient funding for priorities set forth in House and Senate Appropriations Committee reports, such as a 10% contingency fund as recommended by Secretary Ross in the Bureau's most recent lifecycle cost estimate.

58.     Even if the Bureau receives an appropriation for FY 2020 equal to the FY 2020 cost estimate Defendants prepared in October 2017, that amount of money will be insufficient to conduct a constitutionally adequate census.

59.     Given Congress's repeated failures to pass new spending bills and modify existing funding levels, there is no guarantee, and strong reason to doubt, that the Census

**Formatted:** Font: 12 pt

16

~~Bureau will receive further increases in the current funding level for the 2020 Census, as~~
~~Congress consistently has failed to pass new spending bills for the subsequent fiscal year~~
~~in a timely way.~~

*~~Understaffing~~*

~~60.~~ ~~On January 23, 2017, President Trump issued a Presidential Memorandum~~
~~instituting a hiring freeze throughout much of the executive branch. Hiring Freeze, 82 Fed.~~
~~Reg. 8493 (Jan. 23, 2017).~~

~~61.~~ ~~As of April 10, 2017, the hiring freeze had prevented filling at least 157 jobs~~
~~at the Census Bureau.~~

~~62.~~ ~~The Office of Management and Budget lifted the hiring freeze on April 12,~~
~~2017, but immediately imposed a new order directing agencies to submit plans for~~
~~personnel cuts and other restructuring moves to fit the budget blueprint.~~

~~63.~~ ~~The Department of Commerce has not publicly disclosed these plans, or~~
~~how they will affect the Bureau's plans to hire up to half a million temporary workers to~~
~~conduct the enumeration.~~

~~64.~~ ~~The effect of the Presidential Memorandum and the subsequent personnel~~
~~directive has been to prevent the Census Bureau from hiring staff necessary to ensure an~~
~~"actual enumeration" in 2020.~~

~~65.~~ ~~As of February 1, 2019, the Census Bureau had hired only 397 partnership~~
~~specialists for the 2020 Census, despite having planned to hire 473 partnership specialists~~
~~by that date.~~

*~~Irrational~~*<u>Unreasonable</u> **Design Choices in Final Operational Plan**

~~66.~~36.   The ~~Census~~ Bureau's Final Operational Plan includes serious design defects

17

that will produce ~~an even~~a more ~~dramatic~~severe differential undercount of hard-to-count populations than in previous censuses.

~~67.~~37.  These ~~arbitrary and irrational~~design choices include ~~(a) a plan to~~decisions to: (a) significantly reduce the Bureau's communications and partnership program, even though Congress has expressly directed the Bureau to ensure that its communications and outreach activities for the 2020 Census be conducted at a level of effort "no less than" that used for the 2010 Census, adjusted for inflation; (b) hire an unreasonably small number of enumerators; ~~(b) a drastic reduction in~~c) drastically reduce the number of ~~Census~~Bureau field offices;~~(c) cancellation of crucial field tests;~~ (d) ~~a decision to~~replace most ~~in field address canvassing~~In-*Field* Address Canvassing with ~~in-office address canvassing;~~ In-*Office* Address Canvassing; and (e) ~~a decision to~~make only ~~extremely~~limited efforts to count inhabitants of ~~housing~~units that appear vacant or nonexistent based on unreliable administrative records;~~ and (f) a significant reduction in the staffing of the Bureau's partnership program.~~

~~68.~~38.  Individually and collectively, these five decisions ~~amount to~~demonstrate an abandonment of the ~~Census~~Bureau's congressionally designated goal of reaching ~~Hard~~hard-to-~~Count~~count communities in the 2020 Census and bear no reasonable relationship to the Bureau's constitutional mandate to accurately enumerate the population.

   A. **Insufficient** *~~Planned Hiring of Enumerators~~Communications and Partnership Program Staffing*

   39.  Hiring partnership staff is a crucial component of the modern decennial census. Partnership staff work with local organizations and conduct targeted community outreach to encourage hard-to-count populations to complete the census.

18

40.     Despite the importance of the partnership program for reaching hard-to-count populations, the growth in population since 2010, heightened distrust of government, and other increased challenges for reaching these populations for the 2020 Census, the Bureau has decided to decrease its partnership program from 2010 to 2020.

41.     According to Bureau planning documents, the Bureau will hire twice as many partnership specialists for the 2020 Census (1,501) as it did for the 2010 Census (849). But this figure is misleading because it omits other key outreach staff. For the 2010 Census, for example, the Bureau hired 2,000 partnership assistants to assist the specialists; for the 2020 Census, the Bureau will hire none (0).

42.     The Bureau has failed to reach even its unreasonably low target figures for hiring and retaining partnership staff.

43.     On January 24, 2019, the Bureau published the 2020 Census Barriers, Attitudes and Motivators Study Survey Report ("2020 CBAMS Survey Report") and the 2020 Census Barriers, Attitudes and Motivators Study Focus Group Final Report ("2020 CBAMS Focus Group Final Report"). The two documents together record the results of the 2020 Census Barriers, Attitudes and Motivators Study ("2020 CBAMS").

44.     As elaborated below, the 2020 CBAMS Report found dangerously low self-response rates. That Report also found that many people were unfamiliar with the census, that there was persistent lack of knowledge about the census's purpose and process, and that knowledge about the census was spread unevenly across demographic groups.

45.     The decreased prioritization of partnership staff is especially unreasonable given the alarming findings of the 2020 CBAMS Report regarding self-response rates.

46.     The communications program will be less effective than in 2010, for three

19

reasons. First, given the significant cut to the partnership program, more spending is required to inform hard-to-count communities about the Census just to match 2010 levels of awareness. Second, given the current climate of distrust of government, hard-to-count communities will be even more skeptical and hesitant to respond than in previous censuses and will require increased communications to assuage their concerns. Third, given that 2020 is a presidential election year, advertising will cost more as campaigns compete with the Bureau and for-profit advertisers for advertising space.

47.     In every modern decennial census, one of the most important operations is Nonresponse Followup (Non-Response Follow-Up ("NRFU")"), the Census Bureau's process of attemptingprogram to enumerate households that didcount those who do not self-respond to the census.

48.     The Bureau's 2020 Census Detailed Operational Plan for NRFU identifies "Factors that Could Increase the NRFU Workload in the 2020 Census" and explains that "[w]hile concerted efforts are being taken to reduce the cost of NRFU and overall workload, several factors cannot be controlled."

49.     The first uncontrollable factor the Bureau lists is "[l]ow self-response rates." This is inaccurate. The Bureau can influence and control the likelihood of low self-response rates by increasing communications and partnership activities.

50.     Given the enormous barriers to census participation among hard-to-count communities this cycle, the Bureau's decision to reduce its partnership staffing is unreasonable and will contribute to a severe and differential undercount.

51.     In deciding to reduce overall staffing of the partnership program, Defendants unreasonably failed to consider the consequences for a differential undercount

20

and to analyze evidence about how this decision would affect the absolute undercount.

52.     The decision to reduce overall staffing of the partnership program will worsen both the absolute undercount and the differential undercount of Plaintiffs, their members and residents, and communities geographically close to Plaintiffs.

53.     The decision also contravenes explicit direction from Congress for the Bureau to expend sufficient resources on outreach. As the Explanatory Statement accompanying the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2020 stated, communications and outreach activities for the 2020 Census must occur at "no less than the level of effort for outreach and communications that was utilized in preparation for the 2010 Decennial Census, adjusted for inflation." Explanatory Statement of the Consolidated Appropriations Act, 2020, H.R. 1158, 116th Cong., Division B, at 7 (2019).

### B.  Insufficient Hiring of Enumerators

69.54.  Non-Response Follow-Up (NRFU) is conducted principally by field workers called enumerators, who physically visit housing units from which no self-response was received.

55.     Because hard-to-count populations historically self-respond at much lower rates than the general population, an adequate number of enumerators is essential for reducing the differential undercount.

70.56.  The Final Operational Plan announcesannounced a decision to hire drastically fewer enumerators than the Bureau hired for the 2010 Census.

71.57.  In fact, the Census Bureau has made a final decision to hire more than *two hundred thousand* (200,000) *fewer* enumerators for the 2020 Census than it hired for the

2010 Census. This will reduce the number of enumerators by one-third compared to 2010, even though the total U.S. population has grown by nearly 6 percent since 2010.

58.    Of this drastically reduced number of enumerators, the Bureau plans to actually deploy in the field an even smaller number, relying only on approximately 250,000 "core enumerators."

72.59.  In deciding to hire a drastically reduced number of enumerators for the 2020 Census, Defendants failed to consider how this decision would affectimpact the differential undercount, and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

73.60.  The decision to hire a drastically reduced number of enumerators will exacerbate both the absolute undercount and the differential undercount of Plaintiffs, Plaintiffs'their members and residents, and communities geographically close to Plaintiffs and their members.

74.61.  The Bureau states in the Final Operational Plan that it needs fewer enumerators for the 2020 Census than it did for the 2010 Census because (a) each enumerator will be, on average, more productive than in 2010, and (b) the NRFU workload will be reduced to a level that the Bureau's reduced staff of enumerators can handle.

75.62.  Neither of these premises is rationallysufficiently justified in the Final Operational Plan, and both are unreasonable.

76.63.  The Bureau claims that the average productivity per enumerator will be unprecedentedly high in 2020 because the Bureau will use new technology and new protocols. The Bureau's prediction about enumerator productivity in the 2020 Census cannot be verified because its new technology and protocols have been only partially tested

22

in a single dress- rehearsal, ~~which was~~ conducted at a single and unrepresentative site ~~that does not provide a reliable proxy for the nation as a whole.~~.

64. Furthermore, the results of the dress rehearsal had a self-response rate of just 52.3 percent, much lower than the 60.5 percent currently assumed by the Bureau.

~~77.~~65. Even if enumerators in the 2020 Census complete as many cases per hour as the Bureau reports that enumerators did in the 2018 End-to-End Test, there will be far too few enumerators to conduct an actual enumeration in the 2020 Census.

~~78.~~66. The Bureau's ~~stated beliefs~~assumptions about ~~the size of the~~ NRFU workload ~~are irrationally optimistic and~~ fail to account for factors that will increase the ~~size of the NRFU~~ workload and contradict the results of the Bureau's own tests, and thus bear no reasonable relationship to the goal of promoting the accuracy of the census.

~~79.~~67. Specifically, the Bureau (a) fails to account for the Bureau's own recent research findings that show there will be a low self-response rate; (b) ~~irrationally~~unjustifiably assumes that soliciting online census responses will increase, rather than decrease, the self-response rate; and (c) assumes without evidence that the Bureau will be able reduce the NRFU workload significantly by enumerating households based on administrative records.

*The Bureau's ~~Own~~ Research Contradicts Its Assumptions About NRFU Workload*

~~80.~~ ~~1.   On January 24, 2019, the Bureau published the 2020 Census Barriers, Attitudes and Motivators Study Survey Report ("2020 CBAMS Survey Report") and the 2020 Census Barriers, Attitudes and Motivators Study Focus Group Final Report ("2020 CBAMS Focus Group Final Report"). The two documents together record the results of~~

23

~~the 2020 Census Barriers, Attitudes and Motivators Study ("2020 CBAMS").~~

~~81.~~68.  According to the 2020 CBAMS Survey Report, only 67 percent of householders who participated in the 2020 CBAMS Survey reported that they were "extremely likely" or "very likely" to fill out a census form. This is an exceptionally low percentage~~:~~; it is twenty percentage points *lower* than in 2010.

~~82.~~69.  The actual self-response rate in the 2020 Census will be lower than 67 percent because, as the 2020 CBAMS Survey Report ~~points out~~observed, "past research suggests that even individuals who report a commitment to participate may not follow through on their intention."

~~83.~~70.  In the 2010 Census, 86 percent of 2010 CBAMS participants said they would "definitely" or "probably" respond to the 2010 Census, and the actual self-response rate was 76 percent.

~~84.~~71.  The 2020 CBAMS Survey Report also shows that ~~people of color are on average less likely to respond to the census than their white peers. This finding indicates that self-response rates in communities of color will be even lower than the overall self-response rate~~the self-response rate will be significantly lower for households of color than for white households.

~~85.~~72.  In making a final decision to hire significantly fewer enumerators for the 2020 Census, the Bureau has unreasonably failed to account for and draw ~~rational~~fair conclusions from the results of the 2020 CBAMS.

*Reliance on Internet Self-Response Cannot Justify Reduced Enumerator Hiring*

~~86.~~73.  The 2020 Census will be the first to attempt to collect a large proportion of census responses online. The introduction of Internet Self-Response (ISR) is a radical

departure from the paper and in-person methods used in all previous censuses.

87.74.  The 2010 Census delivered approximately 360 million paper questionnaires to 133 million housing units.

88.75.  This cycle, Defendants instead intend to encourage self-response primarily by internet and to reduce the number of in-person visits to households that do not self-respond.

89.76.  In 2020, Defendants will divide the United States population into cohorts.

90.77.  Defendants will mail census questionnaires initially to only 20% percent of those cohorts.

91.78.  Defendants will mail the remaining 80 percent of cohorts, comprising the majority of all housing units, a notification inviting them to complete the census questionnaire online. ShouldIf these cohorts do not complete the questionnaire online or by telephone, Defendants plan to mail a paper version.

92.79.  The Census Bureau concluded in the Final Operational Plan that the introduction of ISR will cause an increase in the overall self-response rate, including a "[p]otential increase in self-response from traditionallytraditional hard-to-count populations."

93.80.  The Bureau aims to achieve this increase in self-response by persuading 45 percent of households to self-respond through ISR in the 2020 Census.

94.81.  The Bureau's aspirational 45 percent ISR rate is not realisticunreasonable and not supported by available evidence.

95.82.  In the End-to-End Census Test in 2018, only 32.6 percent of households self-responded through ISR.

25

~~96.~~83.  The response rate will be even lower among hard-to-count populations, who are by definition the populations least likely to self-respond in the first place and may have reduced access to or trust in internet-based systems.

~~97.~~  The "digital divide" in the United States is stark. Only half of households earning incomes less than $30,000 per year have access to broadband internet.

~~98.~~84.  ~~In addition,~~ and many rural residents have significantly reduced access to the internet.

~~99.~~85.  Communities of color, including African Americans and ~~Hispanics~~Hispanic Americans, are ~~more~~less likely to have ~~reduced~~ access to internet than their white counterparts.

~~100.~~86.    The introduction of ISR will cause a significant number of households not to self-respond to the 2020 Census because of public concern about the Bureau's ability to protect census responses from data breaches.

~~101.~~87.    The ~~Census~~ Bureau has not explained in detail how it will protect the personal information of hundreds of millions of Americans and respond to the cybersecurity concerns ISR presents.

~~102.~~88.    Even if the Bureau is actually able to protect data about responding households, perceived data insecurity will dissuade responses, especially in light of recent high-profile and large-scale data breaches including of the Office of Personnel Management in 2015 and for clients of Equifax, Yahoo!, and Uber, among others.

~~103.~~89.    Moreover, the Bureau's cancellation of planned tests deprives it of comprehensive opportunities to test critical cybersecurity infrastructure. The absence of adequate testing of the Bureau's cybersecurity infrastructure will contribute to the public's

26

fear of responding to the census online.

~~104.~~90.     Contrary to the Bureau's conclusion that ISR will cause a net increase in the overall self-response rate, ISR creates an imminent risk of a net decrease in the overall self-response rate, which will likely be more pronounced among communities of color. This will lead to a larger NRFU workload and a corresponding need for more enumerators.

~~105.~~91.     In formulating its final decision to hire ~~a~~ significantly ~~reduced staff of~~fewer enumerators for the 2020 Census, the Bureau unreasonably failed to account for and draw ~~rational~~fair conclusions from evidence that ISR will deter self-response ~~evidence that ISR will~~ and fail to elicit responses from hard-to-count populations, and data showing that ISR rates in tests have fallen far short of the Bureau's aspirational ISR rate.

*Administrative Record Use Cannot Justify Reduced Enumerator Hiring*

~~106.~~92.     Another premise underlying the Bureau's decision to hire ~~a significantly reduced staff of~~far fewer enumerators is the Bureau's prediction that it will be able to ~~enumerate~~count a significant number of households based on federal administrative records.

~~107.~~93.     Under the Final Operational Plan, the Bureau will attempt to use federal administrative records to enumerate any nonresponding household that has not been enumerated after ~~a~~ Defendants mail a postcard and make a single NRFU visit~~, although nonresponding households will also receive a postcard asking them to self-respond~~.

~~108.~~94.     The Final Operational Plan states that a nonresponding household will be enumerated through administrative records if and only if "the Census Bureau has

high-quality administrative records from trusted sources" on that household.

109.95.     The Final Operational Plan lists three "[e]xamples" of "trusted sources of administrative records:": Internal Revenue Service ("IRS") Individual Tax Returns, IRS Information Returns, and the Center for Medicare and Medicaid Statistics Medicare Enrollment Database.

110.96.     The Census Bureau has not sufficiently tested its current plan to enumerate households based on federal administrative records and therefore lacks evidence that this method will substantially reduce the NRFU workload.

111.97.     Administrative-record-based enumerations will not, in fact, substantially reduce the NRFU workload.

112.98.     Hard-to-count populations, who will make up a disproportionately large part of the NRFU workload in the 2020 Census, are underrepresented in sources of federal administrative data like IRS Individual Tax Returns, IRS Information Returns, and the Center for Medicare and Medicaid Statistics Medicare Enrollment Database.

113.99.     In finally determining to hire a significantly reduced staff of enumerators for the 2020 Census, the Bureau unreasonably relied on its untested and implausible theory that administrative-record-based enumerations will substantially reduce the NRFU workload.

### C.   Insufficient Network of Area CensusBureau Field Offices

114.     For each decennial census, the Census Bureau opens temporary field offices around the country.

115.100.     The Bureau opened 494 local census offices and one area office for the 2010 Census.

116.101.   Under the Final Operational Plan, the Bureau plans to replace those 495 offices with just 248 area census offices (("ACOs")) for the 2020 Census.

117.102.   In deciding to drastically reducehalve the number of field offices for the 2020 Census, Defendants failed to consider how this decision would affect the differential undercount and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

118.103.   The final decision to open a drastically reducedhalve the number of field offices will worsen both the absolute undercount and the differential undercount of Plaintiffs, Plaintiffs'their members and residents, and communities geographically close to Plaintiffs and their members.

119.104.   Opening a sufficient number of ACOs is essential for an accurate 2020 Census because the ACOs will play critical roles in recruiting, hiring, training, and supervising field staff for address canvassing and NRFU.

120.105.   If the Census Bureau has too few ACOs, it will not be able to hire and train a staff ofenough enumerators capable of conductingto conduct an actual enumeration of households that do not self-respond to the 2020 Census, nor will it be able to hire and train a staff of listers capable of performing address canvassing accurately. As a result, households—disproportionately from the hard-to-count populations that are overrepresented in the NRFU workload—will go uncounted.

121.106.   Having too few ACOs will also constrain the Census Bureau's ability to identify and address any problems that arise during address canvassing and NRFU. It is especially important for the Bureau to have this ability during the 2020 Census because the Bureau is implementing many new methods and technologies that have not

been ~~thoroughly~~adequately tested.

Formatted: Font: Times New Roman

~~122.~~107.     The number of ACOs that the Bureau has decided to open for the

Formatted: Font: Times New Roman

2020 Census is insufficient and not ~~rationally~~reasonably explained by the Bureau's stated

Formatted: Font: Times New Roman

rationale.

~~123.~~108.     The Bureau has stated that its final decision on the number of ACOs

to open for the 2020 Census is based on the number of enumerators needed for field

operations.

~~124.~~109.     However, the anticipated number of enumerators cannot be the basis

for the number of ACOs the Bureau has decided to open, because the Bureau has

Formatted: Font: Times New Roman

substantially revised its projected number of enumerators without making a corresponding

change to the planned number of ACOs.

~~125.~~110.     The Bureau initially ~~formulated its plan~~planned to open 248 ACOs

Formatted: Font: Times New Roman

based on a then-current estimate that the 2020 Census would need 173,021 "core

enumerators." The Bureau assumed that each ACO would have 49 field supervisors, each

overseeing 15 enumerators, for a total of 735 enumerators per ACO.

~~126.~~111.     In 2017, the Bureau ~~revised~~increased the projected number of core

Formatted: Font: Times New Roman

enumerators ~~upward~~ to 256,336. To ~~keep~~maintain its ~~originally planned~~ enumerator-to-

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

ACO ratio ~~while employing 256,336 enumerators~~, the Bureau would need 349 ACOs.

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

~~127.~~112.     Instead of ~~increasing the planned number of~~adding  ACOs,

however, the Bureau has made a final decision to open 248 ACOs, resulting in a much

higher enumerator-to-ACO ratio than ~~initially~~ planned.

Formatted: Font: Times New Roman

~~128.~~113.     In a report released in April 2018, the U.S. Department of

Commerce Office of ~~the~~ Inspector General stated that it "found no evidence that the Bureau

Formatted: Font: Times New Roman
Formatted: Font: 12 pt

30

reconciled the increased NRFU workload and associated increase in the number of enumerators with" the assumptions underlying the original plan to open 248 ACOs.

129.114.      To the extent that the Bureau now claims to have a reasoned basis for its new enumerator-to-ACO ratio, that rationale has been reverse-engineered and does not represent the Bureau's real reasons for failing to open more than 248 ACOs.

*Cancellation of Field Tests*

130.    On October 18, 2016, the Census Bureau decided to cancel two of its planned 2017 field tests.

131.    According to a February 2017 report from the GAO, the Bureau canceled the tests "in order to mitigate risks from funding uncertainty. Specifically, the Bureau said it would stop all planned field activity, including local outreach and hiring, at its test sites in Puerto Rico, North and South Dakota, and Washington State. The Bureau will not carry out planned field tests of its mail-out strategy and follow up for non-response in Puerto Rico or its door-to-door enumeration. The Bureau also cancelled plans to update its address list in the Indian lands and surrounding areas in the three states."

132.    The Final Operational Plan states that the Coverage Measurement Field Operation (CMFO), which collects information used in the Post Enumeration Survey (PES) to measure the undercount, "was descoped from the 2018 End-to-End Census Test, and there are no plans in place to test collection and processing of real-world data before CMFO goes live."

133.    The Final Operational Plan acknowledges that "IF CMFO does not participate in a field test prior to the start of the operation, THEN the operation may

encounter unforeseen operational issues, potentially increasing cost and reducing data quality." (emphasis omitted).

134.   The removal of the Census Coverage Measurement from the 2018 End-to-End Census Test severely undermines the Bureau's ability to use the 2018 End-to-End Census Test results to evaluate how its new methods will affect the accuracy of the 2020 Census.

135.   The Bureau's failure to test the Census Coverage Measurement will also leave the Bureau less prepared to evaluate the accuracy of the 2020 Census after the census itself. If the undercount itself cannot be accurately determined, its effects will be irremediable.

136.   The Final Operational Plan also does not provide for testing of the Enumeration at Transitory Locations (ETL) Operation, which enumerates individuals in transitory locations including recreational vehicles, campgrounds, motels, marinas, and others who do not have a "usual home elsewhere."

137.   The Final Operational Plan acknowledges that "IF field testing of the ETL Operation is not conducted before the 2020 Census, THEN the operation may encounter unforeseen operational issues, potentially increasing cost and reducing data quality." (emphasis omitted).

138.   In deciding to cancel some field tests and eliminate major elements of other field tests for the 2020 Census, Defendants irrationally and arbitrarily chose to disregard the effect of this decision on the differential undercount, and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

**Formatted:** Font: 12 pt

139.   The decision to cancel some field tests and eliminate major elements of other field tests will worsen both the absolute undercount and the differential undercount of Plaintiffs, Plaintiffs' members, and communities geographically close to Plaintiffs and their members.

115.   During the 2010 Census, the Bureau addressed the problem of individuals who did not receive or complete a questionnaire in the mail or receive an in-person interview by establishing 29,157 staffed Questionnaire Assistance Centers ("QACs") and 9,670 unstaffed Be Counted ("BC") sites.

116.   760,748 people were counted in 2010 through the QACs and BCs. Of those who visited a stateside QAC, over 38 percent said they had not received a questionnaire in the mail, suggesting that their housing units were not included in the Bureau's Master Address File (MAF).

117.   The Bureau has nevertheless eliminated these nearly 40,000 sites and plans to replace them with mobile response units. In 2010, 65 percent of people who used a QAC reported that they learned of the QAC by seeing it in person. It is unreasonable to expect that people left out of the MAF will find and use a mobile-based system with no fixed presence.

118.   These decisions will further exacerbate the differential undercount. They will particularly harm residents, such as those in atypical housing units, that are likely to be left out of the MAF. Indeed, the U.S. House of Representatives Committee on Oversight and Reform questioned whether it was reasonable for the Bureau to cut QACs despite having over a billion dollars in unspent funds.

### D.  Elimination of Most In-Field Address Canvassing

~~140.~~119.    Address canvassing operations allow the ~~Census~~ Bureau to establish the universe of housing units to be counted. A comprehensive and correct address list is necessary to ensure the inclusion of all housing units for mailings and enumerator visits.

~~141.~~120.    The ~~Census~~ Bureau keeps a database of housing units in the Master Address File/Topologically Integrated Geographic Encoding and Referencing (~~"MAF/TIGER"~~) System.

~~142.~~121.    In past censuses, ~~listers —~~ temporary ~~Census~~ Bureau employees —called "listers" walked nearly every block and identified each living ~~quarter's~~quarters' status before making address changes in the MAF.

~~143.~~122.    ~~In~~For the ~~lead-up to~~ 2020 Census, the ~~Census~~ Bureau has departed from this past practice to save costs. Instead, it ~~plans~~decided to conduct a majority of address ~~canvasing~~canvassing solely in-office. This process began in September 2015 and will be completed in ~~2019~~2020.

~~144.~~123.    The In-Office Address Canvassing process includes multiple components. First, the Bureau updates and validates its existing address list using external information sources. ~~Census~~Bureau employees also review satellite imagery of blocks to see whether the number of living quarters is likely to deviate from its address lists. Blocks where deviations are likely are marked for In-Field Address Canvassing operations.

~~145.~~124.    The ~~Census~~ Bureau planned to conduct an in-office follow-up process called Active Block Resolution (~~"ABR"~~) to review and update blocks previously identified as having a changed number of addresses based on imagery review and comparison with the MAF.

~~146.~~125.    The ~~Census~~ Bureau suspended this program in 2017. The MAF

Coverage Study, which was intended to assess In-Office Address Canvassing and provide continuous updates, was also paused in 2017 ~~because of~~ purportedly due to funding considerations.

~~147.~~126.    The ~~Census~~ Bureau initially claimed that In-Office Address Canvassing would reduce the share of In-Field Address Canvassing to 25 percent. However, the Final Operational Plan ~~now~~ states that the ~~Census~~ Bureau will use In-Field Address Canvassing for 38 percent of ~~living quarters~~ addresses.

~~148.~~127.    In deciding to conduct the majority of canvassing with In-Office Address Canvassing, rather than In-Field Address Canvassing, ~~for the 2020 Census,~~ Defendants failed to consider how this decision would affect the differential undercount, and failed to ~~rationally~~ reasonably analyze evidence about how this decision would affect the absolute undercount.

~~149.~~128.    The decision to conduct the majority of canvassing with In-Office Address Canvassing, rather than In-Field Address Canvassing, will worsen both the absolute undercount and the differential undercount of Plaintiffs, ~~Plaintiffs'~~ their members and residents, and communities geographically close to Plaintiffs ~~and their members~~.

~~150.~~129.    The Bureau knew or should have known that heavy reliance on In-Office Address Canvassing would undermine the accuracy of the address list for the 2020 Census and increase burdens for In-Field Address Canvassers.

~~151.~~130.    The Office of Inspector General's audit of the 2018 End-to-End Test in Providence, Rhode Island found that "[i]n-office address canvassing did not correctly identify blocks for in-field address canvassing." The audit found that in 61~~%~~ percent of the 433 passive blocks in the 2018 End-to-End Test, in-field and in-office results differed.

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: Times New Roman
Formatted: Font: 12 pt

Within those blocks, 1,287 housing units were deleted in-field and 1,087 were added.

~~152.~~131.      Two previous tests of In-Office Address Canvassing results also demonstrated higher error rates than anticipated. ~~However, the Census Bureau has not determined why such errors occurred.~~

~~153.~~132.      ~~Further,~~Even the Operational Plan ~~notes~~acknowledges "that some higher levels of government" may "believe an In-Field ADC may yield a greater 'quality' canvassing than In-Office ADC."

~~154.~~133.      The ~~Census~~ Bureau has not sufficiently analyzed or sought to correct the source of in-office categorization errors, and no additional analysis is planned. Further, the suspension of ABR and the MAF Coverage Study ~~have~~has limited opportunities to assess and improve the quality of In-Office Address Canvassing.

~~155.~~134.      The ~~Census~~ Bureau's disregard for the risk that In-Office Address Canvassing ~~could~~will harm address list quality means that households ~~may~~will be improperly excluded from the address universe of the 2020 Census and go uncounted. The ~~Census~~ Bureau has also not adequately analyzed or addressed the impact of miscategorization at the in-office level on different demographic groups.

### E.   *Use of Unreliable Data to Deprive Households of Full NRFU Efforts*

~~156.~~135.      To scale back its ~~NFRU~~NRFU workload, the Bureau has decided to supplant in-person contacts to certain housing units with the use of administrative records.

~~157.~~136.      Based primarily on United States Postal Service Undeliverable-As-Addressed ~~(~~("UAA~~)~~") information, the Bureau will identify vacant and nonexistent housing units among those which do not initially self-respond to the census questionnaire.  Those

36

households will be exempt from the full ~~NFRU~~NRFU protocol in favor of a single field visit to determine whether the address is actually occupied.

~~158.~~137.    Addresses deemed unoccupied on the basis of that single ~~NFRU~~NRFU contact will not be contacted subsequently.

~~159.~~138.    Addresses will be deemed unoccupied where the contact attempt is unsuccessful and both UAA information and other federal administrative records ~~– such as IRS Individual Tax Returns, IRS Information Returns, and the Center for Medicare and Medicaid Statistics Medicare Enrollment Database –~~ indicate that the address is vacant or nonexistent.

~~160.~~139.    The Final Operational Plan provides no reasonable rationale as to the sufficiency of this method.

~~161.~~140.    Moreover, ~~even~~ those addresses believed to be occupied upon the first unsuccessful contact will nonetheless be counted via ~~the same~~ such federal administrative records, if available, and no further contacts will be attempted.

~~162.~~141.    The Bureau knew or should have known that the UAA information is a highly inaccurate predictor of vacant and nonexistent housing units.

~~163.~~142.    The Bureau's own field testing indicated that 18 percent of housing units identified as vacant by administrative records and 30 percent of those identified as nonexistent were in fact occupied. The Bureau has failed to consider other, more effective options for addressing the problems identified through testing.

~~164.~~143.    The Bureau cannot show a ~~rational~~reasonable connection between the introduction of administrative-record-based enumeration and the purported reduced need for enumerators and ~~NFRU~~NRFU contacts.

37

165.144.      In deciding to use administrative records to reduce the maximum number of NRFU contacts for certain housing units, Defendants failed to consider how this decision would affect the differential undercount, and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

166.145.      The final decision to use administrative records to reduce the maximum number of NRFU contacts for certain housing units will worsen both the absolute undercount and the differential undercount of Plaintiffs, Plaintiffs'their members and residents, and communities geographically close to Plaintiffs and their members.

167.146.      Given thatBecause removing a housing unit from the NRFU universe is tantamount to giving up on counting the people who live there, the Bureau's insistence on excluding housing units from NRFU based on administrative data that it has discovered are largely inaccurate is arbitrary and an abuse of discretionunreasonable.

*Insufficient Partnership Program Staffing*

***Current Unspent Funds That Would Help Mitigate Undercount***

147.      The Consolidated Appropriations Act of 2019 appropriated $3.55 billion to the Bureau for Fiscal Year 2019.

148.      The Conference Report accompanying the Consolidated Appropriations Act of 2019 states: "The agreement reiterates House and Senate language regarding the Bureau's partnership and communications efforts aimed at maximizing self-response to the 2020 Decennial Census. Additionally, the Bureau shall devote funding to expand targeted communications activities as well as to open local questionnaire assistance centers in hard-to-count communities."

149.      The Conference Report also explains that the cost estimate for the "2020

38

Decennial Census . . . assumes the need for additional in-person follow-up visits due to fewer households expected to initially respond to the Census."

150.    The House Report accompanying the Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2019 states: "The Census Bureau is directed to ensure that its fiscal year 2019 partnership and communications activities in support of the 2020 Census are conducted at a level of effort no less than that conducted during fiscal year 2009 in preparation for the 2010 Decennial Census."

151.    The Senate Report accompanying the Departments of Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2019 reads, in relevant part: "The Committee is concerned about the proposed levels for partnership staff and communications efforts for the 2020 Decennial Census . . . . Additionally, the Committee understands that the 2020 Decennial Census plan includes only about half the number of local field offices and Regional Census Centers compared to the 2010 Decennial Census. Therefore, the Committee expects the Bureau to provide a plan that increases the number of partnership program staff, communication efforts, and field operations; an assessment of increasing external partnerships; and the associated costs, within 45 days of enactment. The plan should include an assessment of doubling the number of partnership staff and increasing the number of area census offices to 300."

152.    Fiscal Year 2019 ended on September 30, 2019. The Bureau currently has over $1 billion unspent from its FY 2018 and FY 2019 appropriations.

153.    The Bureau received an additional $7.284 billion in appropriations in November 2019 for the periodic censuses and programs, of which at least $90 million must be spent on improving outreach through questionnaire assistance.

**Formatted:** Font: 12 pt

154. The Explanatory Statement accompanying the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2020 specified that the Bureau should expend no less than 2010 levels on outreach and communications. Explanatory Statement of the Consolidated Appropriations Act, 2020, H.R. 1158, 116th Cong., Division B, at 7 (2019).

168.1. The Bureau's unspent reserve funds would, if used as directed, ameliorate the effects of its drastic cuts in resources for the 2020 Census, especially for the field operations and communications and partnership programs that Congress has specified must be conducted at "no less than" 2010 levels, adjusted for inflation. Hiring partnership staff is a crucial component of the modern decennial census. Partnership staff work with local organizations and conduct targeted community outreach to encourage hard to count populations to complete the census.

169. In the lead up to 2020, the Census Bureau has struggled to hire and retain partnership staff due to underfunding and a tighter labor market than existed prior to the 2010 Census.

170. For the 2010 Census, the Census Bureau spent $334 million on partnership staff in local and regional offices. According to the Census Bureau's 2020 Life Cycle Cost Estimate, the equivalent figure for the 2020 Census will be reduced to $248 million.

171. According to Census Bureau planning documents, the Bureau plans to hire twice as many partnership specialists for the 2020 Census as it did for the 2010 Census. But this figure is misleading because it omits other key outreach staff. For the 2010 Census, for example, the Bureau hired 1,750 partnership assistants to assist the specialists; for the 2020 Census, the Bureau will hire none (0). Taking into account the elimination of all

40

partnership assistants, the overall staff of the partnership program will be smaller for 2020 than it was for 2010.

172.   The decreased prioritization of partnership staff is especially irrational given the low self response rates found in the 2020 CBAMS Survey Report. The Report also found that many people were unfamiliar with the census, that there were persistent misconceptions about the census's purpose and process, and that knowledge about the census was spread unevenly across demographic groups.

173.1.  Given the enormous barriers to census participation among hard to count communities this cycle, the Bureau's decision to reduce its partnership staffing is unreasonable and will contribute to a severe and differential undercount.

174.   In deciding to reduce the overall staffing of the partnership program, Defendants failed to consider how this decision would affect the differential undercount, and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

175.155.   The decision to reduce the overall staffing of the partnership program will worsen both the absolute undercount and the differential undercount of Plaintiffs, Plaintiffs' members, and communities geographically close to Plaintiffs and their members.

**The Impact of Defendants' Failings on Plaintiffs**

176.156.   Plaintiff Prince George's County is the only majority African American county in the state of Maryland. It was the nation's first majority African American suburban county.

177.157.   Prince George's County is well-known for its status as an African

41

American middle-class community. For example, described by the Brookings Institution has described Prince George's County as "a pathway to the middle class for large numbers of lower-income, working minorities."

178.158.     Prince George's County has been hailed by residents and civil rights advocates alike as representing a model of racial and economic integration, interracial communal relations, and African American political, academic, and economic leadership.

179.159.     However, census undercounts have threatened this model, causing political and economic harm to Prince George's County.

180.160.     The Census Bureau has characterized parts of Prince George's County as "hard-to-count," and the County has faced consistent census undercounts.

181.161.     In the 1990, 2000, and 2010 Censuses, the County's net undercounts were 3.0%, percent, 1.91%, percent, and 2.3% percent respectively.

182.162.     In 2010, Prince George's County had the highest net undercount of any county in Maryland, and one of the highest net undercounts *in the nation* among counties with 100,000 residents or more.

183.163.     This undercount data is all the more significant given that the net undercount is the rate of omissions offset by the number of erroneous enumerations (people counted twice or included by mistake).

184.164.     Accordingly, in the 2010 Census, the total rate of omissions amounted to 8.3% percent of Prince George's County residents—or over 70,000 individuals.

185.165.     After the 1990 Census, the Chairman of the County Planning Board concluded that had the census count been accurate, the County would have received $20

Formatted: Font: 12 pt

million more in federal funds per year, or a total of $200 million in grants and loans over the course of the decade.

186.166.   Based on the 2000 Census undercount, the County lost almost $27 million in federal funding for eight prominent federal programs between 2002 and 2012.

187.167.   Defendants' current failings threaten to result in a significantly higher undercount for Prince George's County, leading to an even greater loss of funding.

188.168.   A census undercount carries with it significant political consequences as well. The Maryland legislature uses census data for state and congressional redistricting purposes. An undercount in Prince George's County therefore deprives county residents of fair and equitable representation in the state legislature and in Congress.

189.169.   Moreover, Defendants' failure to conduct a constitutionally sufficient census and the resulting dramatic undercount of Prince George's County residents increases the risk of Maryland losing seats in Congress. This loss would deprive Prince George's County residents of fair and equitable representation.

190.170.   Members of the NAACP reside across the country, but the residences of its members are not equally distributed geographically.

191.171.   For example, the Census Bureau's own reports have shownshow that over half of the total African American population in the United States lives in the South, with 60 percent of that population residing in just ten states, including Maryland. The loss of a congressional seat in one of those states due to undercounting of "hard-to-count" populations, then, will translate not to the equalizing effect of increased representation of the same populations elsewhere, but to a net underrepresentation

Formatted: Font: 12 pt

43

nationwide.

192.   Similarly, theThe uneven distribution of African Americans is also observable at the county level.

193.172.      2010 Census data indicated, for example, that African American populations tend to be concentrated in counties within metropolitan areas. Over 60 percent of counties nationwide have an African American population of less than 5 percent, while counties outside Southern states with African American populations between 25 percent and 49.9 percent were overwhelmingly located in metropolitan areas.

194.173.      The differential undercount of African American residents will injure NAACP members in states, congressional districts, and state legislative districts across the country. by depriving them of federal funding and political power.

195.174.      The injuries to these NAACP members are not remedied by the windfall of federal funding or political power that will accrue to other residents of the United States who unfairly benefit from the differential undercount of African Americans, even if some NAACP members happen to reside in some of the states, congressional districts, or state legislative districts that unfairly benefit from the differential undercount.

196.175.      NAACP members, including Prince George's County residents Robert Ross and Elizabeth Johnson, and the organization itself face actual and imminent injuries based on Defendants' constitutional violations.

197.176.      The NAACP has had to divert resources from other pressing concerns in order to address Defendants' inadequate preparations for the 2020 Census. The NAACP has devoted additional staff time to its efforts to encourage participation in the 2020 Census, has begun providing Census-related trainings to its membership units across

the country, and has established new Census-related partnerships with outside organizations. In light of the NAACP's concerns that Defendants are less prepared today than in previous cycles to conduct a fair and accurate Census, the NAACP has instituted a more thorough effort to promote awareness of and participation in the 2020 Census. The NAACP is also developing plans to address unprecedented challenges associated with the 2020 Census, including those stemming from Defendants' reliance on internet self-response.

198.177.    Similarly, Prince George's County Maryland Branch NAACP members also face actual and imminent injury.

199.178.    Branch members face impending political underrepresentation. Branch members also face imminent injury due to the loss of federal funding that would result from an undercount of the Prince George's County population.

200.179.    The Branch faces an impending need to expend substantial resources to educate community members about the importance of the census and to encourage them to respond to the census questionnaire.

201.180.    The harm faced by all Plaintiffs is impending as of the date of the filing of this lawsuit. Defendants' unconstitutional failures to fund, staff, and plan for the 2020 Census are compounding with each day that the 2020 Census draws nearer.

202.181.    Defendants' final choices in procedures, such as their approach to digitization,regarding the "methods and cut back in field and mailing outreach, have already been made.  As Defendants have already decided on these approaches formeans" of conducting the 2020 Census, Plaintiffs are at have been made and create an imminent risk of harm to Plaintiffs.

Formatted: Font: 12 pt

203.182.    If a court does not act promptly to remedy these constitutional failures, the deficiencies currently present in the 2020 Census will become irremediable, and there will be no amount of funding, hiring, or appropriate planning that can fix the serious existing deficiencies in time for the census.

CAUSES

CAUSE OF ACTION

COUNT 1: ARBITRARY AND CAPRICIOUS AGENCY ACTION

*Against Defendants Bureau of the Census and U.S. Department of Commerce*

204.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 203 of this complaint.

205.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), prohibits agency action that is "arbitrary, capricious, an abuse of discretion, [or] otherwise not in accordance with law."

206.    The decisions set forth in the Final Operational Plan and described in paragraphs 66 through 175 of this complaint, individually and cumulatively, constitute agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

207.    Defendants Bureau of the Census and U.S. Department of Commerce have violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

208.    Plaintiffs are aggrieved by this violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

COUNT 2: UNCONSTITUTIONAL AGENCY ACTION

*Against Defendants Bureau of the Census and U.S. Department of Commerce*

209.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 203 of this complaint.

210.    The Constitution requires a fair and accurate count of all persons in the United States in 2020. U.S. Const. art. I § 2 cl. 3.

211.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), prohibits agency action that is "contrary to constitutional right, power, privilege, or immunity."

212.    The decisions set forth in the Final Operational Plan and described in paragraphs 66 through 175 of this complaint, individually and cumulatively, constitute agency action that is "contrary to constitutional right" because it deprives Plaintiffs of their constitutional right to a fair and accurate census in 2020.

213.    Defendants Bureau of the Census and U.S. Department of Commerce have violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

214.    Plaintiffs are aggrieved by this violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

**COUNT 3: VIOLATION OF ENUMERATION CLAUSE**[1]

*Against All Defendants*

215. 183.    The Constitution obligates Defendants to conduct a fair and accurate count of all persons in the United States in 2020.

---

[1] Plaintiffs recognize that the Court dismissed their Enumeration Clause claims without prejudice, except for their claim for declaratory relief as to underfunding, ECF No. 64, and denied leave to reinstate the dismissed constitutional claims at this time. ECF No. 76. Plaintiffs replead their dismissed claims here solely so as to preserve them for appeal, if any.

216.    Defendants have already cancelled numerous important field tests and dress rehearsals in 2017 and 2018. Defendants have thus squandered priceless opportunities to ensure that adequate systems and plans are in place for the 2020 Census.

184.    "Nothing is more existential to the preservation of the 'Republic' than requiring an 'actual Enumeration' without 'partiality or oppression.'" *NAACP v. Bureau of the Census*, 945 F.3d 183, 194 (4th Cir. 2019) (Gregory, C.J., concurring).

217.185.    Defendants have adopted a program for the 2020 Census that is understaffed and underfunded,unreasonably refuses to expend over $1 billion in appropriated funds now sitting in Bureau reserves and that inadequately addresses the challenge of reaching hard-to-count populations, and that fails to safeguard the census from cyber attack through communications and partnership programs, enumerators, and other methods and means.

218.186.    Defendants have violated and are at imminent risk of violating the "actual Enumeration" clause of the United States Constitution, Art. I, § 2, cl. 3.

219.187.    Defendants' violation will lead to an undercount of racial and ethnic minorities and harm the Plaintiffs. —This violation will deprive Plaintiffs of their constitutional right to representation and their fair share of resources.

220.188.    Defendants' violation has caused and will continue to cause ongoing, irreparable harm to Plaintiffs.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Assume jurisdiction over this matter;

2.      Declare that the Defendants are obligated to ensure an accurate actual

enumeration of the people;

3.     Declare that the Defendants are in violation of their constitutional duty to conduct an accurate actual enumeration of the people by reason of ~~underfunding of the Census Bureau;~~

4.3.    ~~Declare that the Defendants are in violation of their constitutional duty to conduct an accurate actual enumeration of the people by reason of~~ the totality of the circumstances;

5.4.    Enjoin Defendants from violating their constitutional duty to conduct an accurate actual enumeration of the people;

~~6.     Enter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that hard-to-count populations will be actually enumerated in the decennial census;~~

~~7.     Hold unlawful and set aside the agency actions described in paragraphs 66 through 175 of this complaint;~~

~~8.     Enter an injunction that prohibits Defendants Bureau of the Census and U.S. Department of Commerce from re-enacting the unlawful agency actions described in paragraphs 66 through 175 of this complaint; and~~

5.     Enter an injunction directing the Bureau to expend monies appropriated but unspent for purposes specified by Congress, including but not limited to requiring that (a) the Bureau's efforts to conduct outreach and communications activities in support of the 2020 Census be no less than the level expended in preparation for the 2010 Census, adjusted for inflation; (b) the Bureau deploy "core enumerators" in the field at levels no less than those of 2010; (c) increase the number of field offices to an amount that bears a

**Formatted:** Font: 12 pt

49

reasonable relationship to a fair and accurate count; and

**Formatted:** Font: 12 pt

~~9.~~6. Grant any other and further relief the Court deems appropriate.

Respectfully submitted,

/s/ Michael J. Wishnie

Rachel Brown, Law Student ~~InternCasey Gilfoil,[a] Law Student~~ Intern
Lisa Chen, Law Student Intern
Daniel Ki[a], Law Student Intern
Nikita Lalwani, Law Student Intern
~~Abigail Olson~~Wishcha (Geng) Ngarmboonanant, Law Student Intern
~~Joseph Schottenfeld~~Laura Pietrantoni, Law Student Intern
~~Charlotte Schwartz, Law Student Intern~~
~~Jeffrey Zalesin, Law Student Intern~~
Joshua Zoffer, Law Student Intern
Renee Burbank (Bar No. 20839)
Michael J. Wishnie (Bar No. 20350)
Peter Gruber Rule of Law Clinic
Yale Law School[‡]
127 Wall Street
New Haven, CT 06511
Tel: (203) 436-4780
michael.wishnie@ylsclinics.org
*Counsel for all Plaintiffs*

Jeremy M. Creelan, *pro hac vice*
Susan J. Kohlmann, *pro hac vice*
Jacob D. Alderdice, *pro hac vice*
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3908
Tel: (212) 891-1600
jcreelan@jenner.com
skohlmann@jenner.com
*Counsel for all Plaintiffs*

~~Khyla D. Craine (Bar No. 14117)~~
Anson Asaka (Bar No. 20456)
National Association for the Advancement of Colored People, Inc.
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5797
Fax: (410) 358-9350
*Counsel for Plaintiffs NAACP and Prince George's County NAACP Branch*

~~Benjamin D. Alter, *pro hac vice*~~
~~National Association for the~~
~~Advancement of Colored People, Inc.~~
~~50 Broadway, 31st Floor, New York,~~
~~NY 10004~~

---

[a] Law student interns. Petition to practice forthcoming.

[‡] This complaint does not purport to state the views of Yale Law School, if any.

**Formatted:** Default Paragraph Font
**Formatted:** Default Paragraph Font
**Formatted:** Footnote Reference
**Formatted:** Font: Not Italic
**Formatted:** Font: Italic
**Formatted:** Indent: Left: 0", Hanging: 3", Widow/Orphan control
**Formatted:** Font color: Auto
**Formatted:** Indent: Left: 0", Hanging: 3", Pattern: Clear
**Formatted:** Small caps
**Formatted:** Widow/Orphan control
**Formatted:** Font: Italic, Font color: Auto
**Formatted:** No widow/orphan control, Pattern: Clear
**Formatted:** Font: 12 pt

Tel: (212) 626-6412
Fax: (212) 248-5250

*Counsel for Plaintiffs NAACP and*
*Prince George's County NAACP Branch*

Formatted: Body Text, Line spacing: Multiple 0.06 li

Formatted: Body Text, Line spacing: Multiple 0.06 li

## CERTIFICATE OF SERVICE

I, Michael J. Wishnie, certify that copies of the foregoing *Third Amended Complaint* were served this 10th day of January, 2020 upon all counsel of record by ECF.

/s/ Michael J. Wishnie

Michael J. Wishnie
*Counsel for all Plaintiffs*